# 23-370

### In the
# United States Court of Appeals
## For the Second Circuit



WOLFE MARGOLIES,

*Petitioner-Appellant,*

v.

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

## APPELLANT'S APPENDIX
### Volume I of II (Pages A-1 – A-174)

BENJAMIN WHITE, ESQ.
BLOCH & WHITE LLP
*Attorney for Petitioner-Appellant*
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 901-3825

i

# Table of Contents

**Page**

Docket Entries for Case #: 1:19-cr-00178-KMW ........................ A-1

Docket Entries for Case #: 1:22-cr-03489-KMW ........................ A-9

Criminal Complaint, Sworn to February 13, 2019
(Case #: 1:19-cr-00178-KMW) .................................................. A-11

Indictment, Filed on March 13, 2019
(Case #1:19-cr-00178-KMW) .................................................. A-22

Transcript of Bail Hearing, Dated March 19, 2019
(Case #1:19-cr-00178-KMW) .................................................. A-27

Decision of Honorable Kimba M. Wood,
Dated March 20, 2019 (Case #1:19-cr-00178-KMW) .............. A-32

Agreement Letter from Geoffrey S. Berman to
Maurice H. Sercarz, Dated June 4, 2019
(Case #1:19-cr-00178-KMW) .................................................. A-54

Transcript of Agreement, Dated June 24, 2019
(Case #1:19-cr-00178-KMW) .................................................. A-61

Memorandum in Aid of Sentencing on Behalf of
Wolfe Margolies, Dated November 1, 2019
(Case #1:19-cr-00178-KMW)
(Reproduced in Sealed Appendix at pp. SA-1–SA-37) ............. A-86

Letter from Mollie Bracewell to Honorable Kimba M. Wood,
Dated November 11, 2019
(Case #1:19-cr-00178-KMW) .................................................. A-87

Transcript of Proceeding, Dated December 2, 2019
(Case #1:19-cr-00178-KMW) .................................................. A-94

Ex Parte Motion to Authorize Toxicology Report and
E-Mail from Mollie Bracewell to Alessandra DeBlasio,
Dated August 17, 2020, with Attachments
(Case #1:19-cr-00178-KMW) .................................................. A-126

Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside or
Correct Sentence by a Person in Federal Custody,
Executed on April 19, 2022, with Memorandum of
Law in Support of Motion, Filed on April 27, 2022
(Case #1:19-cr-00178-KMW) .................................................. A-132

ii

**Page**

Letter from Mollie Bracewell to Honorable Kimba M. Wood,
Dated July 1, 2022
(Case #1:19-cr-00178-KMW) ...................................................A-160

Exhibit A to Letter -
Agreement Letter from Geoffrey S. Berman to
Maurice H. Sercarz, Dated June 4, 2019
(Case #1:19-cr-00178-KMW) ...................................................A-168

Exhibit B to Letter -
Transcript of Agreement, Dated June 24, 2019
(Case #1:19-cr-00178-KMW) ...................................................A-175

Exhibit C to Letter -
Sentencing Transcript, Dated December 2, 2019
(Case #1:19-cr-00178-KMW) ...................................................A-200

Reply to Government's Response to Motion,
Filed on August 9, 2022
(Case #1:19-cr-00178-KMW) ...................................................A-232

Letter from Mollie Bracewell to Honorable Kimba M. Wood,
Dated September 21, 2022
(Case #1:19-cr-00178-KMW) ...................................................A-241

Presentence Investigation Report, Prepared by Ashley E. Geiser,
Dated November 18, 2019
(Case #1:19-cr-00178-KMW)
(Reproduced in Sealed Appendix at pp. SA-38–SA-73)...........A-245

Motion for Appointment of Counsel Pursuant to
18 U.S.C. § 3006A(g), Filed on April 27, 2022, with
Financial Affidavit of Wolfe Margolies,
Sworn to April 18, 2022
(Case #1:22-cv-03489-KMW) ..................................................A-246

Reply to Government's Response to *Ex Parte* Motion Related
to Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside,
or Correct a Sentence, Filed October 4, 2022
(Case #1:22-cv-03489-KMW) ..................................................A-251

Transcript of Bail Hearing, Dated March 20, 2019
(Case #1:19-cr-00178-KMW) ..................................................A-254

Judgment of Honorable Kimba M. Wood,
Dated January 7, 2020
(Case #1:19-cr-00178-KMW) ..................................................A-296

iii

**Page**

Notice of Appeal, Dated January 8, 2020
    (Case #1:19-cr-00178-KMW) ....................................................A-304

Opinion and Order of Honorable Kimba M. Wood,
Dated January 17, 2023
    (Case #1:22-cv-03489-KMW) ..................................................A-306

Notice of Appeal, Filed on March 16, 2023
    (Case #1:22-cv-03489-KMW) ..................................................A-316

## A-1

**Query**   **Reports**   **Utilities**   **Help**   **Log Out**

CLOSED,APPEAL,ECF,PRIOR

### U.S. District Court
### Southern District of New York (Foley Square)
### CRIMINAL DOCKET FOR CASE #: 1:19-cr-00178-KMW All Defendants

| | |
|---|---|
| Case title: USA v. Margolies | Date Filed: 03/13/2019 |
| Related Case: 1:22-cv-03489-KMW | Date Terminated: 01/07/2020 |
| Magistrate judge case number: 1:19-mj-01520-UA | |

Assigned to: Judge Kimba M. Wood

**Defendant (1)**

**Wolfe Margolies**
*TERMINATED: 01/07/2020*
*also known as*
HOPE
*TERMINATED: 01/07/2020*
*also known as*
Wolfie Margolies

represented by **Maurice H. Sercarz**
Sercarz & Riopelle, L.L.P.
810 Seventh Avenue, Suite 620
New York, NY 10019
(212) 586-4900
Fax: (212) 586-1234
Email: msercarz@sercarzandriopelle.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: Retained

**Roland Gustaf Riopelle**
Sercarz & Riopelle, L.L.P.
810 Seventh Avenue, Suite 620
New York, NY 10019
(212) 586-4900
Fax: (212) 586-1234
Email: rriopelle@juno.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: Retained

| **Pending Counts** | **Disposition** |
|---|---|
| 21:846=ND.F CONSPIRACY TO DISTRIBUTE NARCOTICS (1) | IMPRISONMENT: 168 Months. SUPERVISED RELEASE: 5 Years. |
| 18:2252A.F ACTIVITIES RE MATERIAL CONSTITUTING/CONTAINING CHILD PORNO (2) | IMPRISONMENT: 168 Months. SUPERVISED RELEASE: 5 Years. |

| **Highest Offense Level (Opening)** | |
|---|---|
| Felony | |

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

| **Highest Offense Level (Terminated)** | |
|---|---|
| None | |

| **Complaints** | **Disposition** |
|---|---|

A-2

SDNY CM/ECF NextGen Version 1.7

18:2252A.F ACTIVITIES RE MATERIAL
CONSTITUTING/CONTAINING CHILD
PORNOGRAPHY , 21:846=CD.F CONSPIRACY TO
DISTRIBUTE CONTROLLED SUBSTANCE

---

**Plaintiff**

**USA**                                    represented by **Mary Elizabeth Bracewell**
                                            U.S. Attorney's Office, SDNY (St Andw's)
                                            One St. Andrew's Plaza
                                            New York, NY 10007
                                            (212) 637-2218
                                            Fax: (212) 637-2443
                                            Email: Mary.bracewell@usdoj.gov
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*
                                            *Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/13/2019 | 1 | COMPLAINT as to Ekin Erkan (1), Wolfe Margolies (2). In Violation of 18 U.S.C. 2252A and 21 U.S.C. 846 (Signed by Magistrate Judge Kevin Nathaniel Fox) (dif)[1:19-mj-01520-UA] Modified on 1/9/2020 (jm). (Entered: 02/14/2019) |
| 02/14/2019 | | Arrest of Wolfie Margolies in the United States District Court - District of Louisiana. (vb) [1:19-mj-01520-UA] (Entered: 03/07/2019) |
| 02/20/2019 | 8 | Rule 5(c)(3) Documents Received as to Wolfie Margolies from the United States District Court - Eastern District of Louisiana. (dif) [1:19-mj-01520-UA] (Entered: 02/20/2019) |
| 03/06/2019 | 9 | NOTICE OF ATTORNEY APPEARANCE: Roland Gustaf Riopelle appearing for Wolfie Margolies. (vb) [1:19-mj-01520-UA] (Entered: 03/07/2019) |
| 03/06/2019 | 10 | Minute Entry for proceedings held before Magistrate Judge Debra C. Freeman:Initial Appearance as to Wolfie Margolies held on 3/6/2019. Defendant Wolfie Margolies present with attorney Roland Riopelle. AUSA Mary Bracewell present for the Government. Defendant is ordered detained on consent without prejudice. Preliminary hearing set for 3/27/19. (vb) [1:19-mj-01520-UA] (Entered: 03/07/2019) |
| 03/06/2019 | 11 | MEDICAL ATTENTION ORDER as to Wolfie Margolies. (Signed by Magistrate Judge Debra C. Freeman on 3/6/19)(vb) [1:19-mj-01520-UA] (Entered: 03/07/2019) |
| 03/06/2019 | | Set/Reset Hearings as to Wolfie Margolies: Preliminary Hearing set for 3/27/2019 at 10:00 AM in Courtroom 5A, 500 Pearl Street, New York, NY 10007 before Judge Unassigned.. (vb) [1:19-mj-01520-UA] (Entered: 03/07/2019) |
| 03/13/2019 | 12 | INDICTMENT FILED as to Wolfe Margolies (1) count(s) 1, 2. (jm) Modified on 1/9/2020 (jm). (Entered: 03/14/2019) |
| 03/13/2019 | | Case Designated ECF as to Wolfie Margolies. (jm) (Entered: 03/14/2019) |
| 03/19/2019 | 13 | Minute Entry for proceedings held before Magistrate Judge James L. Cott:Initial Appearance on disposition sheet as to Wolfie Margolies held on 3/19/2019. Deft present with atty Maurice Sercarz. (jw) (Entered: 03/19/2019) |
| 03/19/2019 | | Minute Entry for proceedings held before Magistrate Judge James L. Cott:Arraignment on disposition sheet as to Wolfie Margolies (1) Count 1,2 held on 3/19/2019 ( Pretrial Conference set for 3/20/2019 at 02:00 PM before Judge Kimba M. Wood.), Plea entered by Wolfie Margolies (1) Count 1,2 Not Guilty. (jw) (Entered: 03/19/2019) |
| 03/19/2019 | | ***DELETED DOCUMENT. Deleted docket entry, no document number. "Minute Entry for proceedings held before Magistrate Judge James L. Cott: Change of Plea Hearing as to Wolfie Margolies held on 3/19/2019." The document was incorrectly filed in this case. (bw) (Entered: 03/20/2019)** |
| 03/20/2019 | 14 | Minute Entry for proceedings held before Judge Kimba M. Wood:Pretrial Conference as to Wolfie Margolies held on 3/20/2019. Appearances entered by AUSA Mollie Bracewell for the Government, Attorney Maurice Sercarz on behalf of the defendant. Review of bail decision set by Magistrate. BAIL DISPOSITION: DETENTION: Risk of flight/Danger. Defendant is detained until his passport is surrendered. When his passport is surrendered, the conditions set by Magistrate Judge Cott will apply, plus the conditions listed in the pretrial services report on page 5, plus whenever Ms. Margolies is absent for one hour or more from her home, a friend or family member must be present in the home and she must keep track of who that person is. (Court Reporter Courtflow) (ap) Modified on 3/25/2019 (ap). (Entered: 03/20/2019) |

| 03/20/2019 | 15 | Minute Entry for proceedings held before Magistrate Judge James L. Cott:Bail Hearing on disposition sheet as to Wolfie Margolies held on 3/20/2019. $200,000 PRB, 3 FRP, Secured by $10,000 Cash/Property, Travel restricted to SDNY/EDNY, Surrender travel documents (& No new applications), Drug testing/treatment as directed by PTS, Mental health evaluation/treatment as directed by PTS, Home incarceration, Electronic monitoring, GPS, Deft not to possess firearm/destructive device/other weapon, Defendant's mother to serve as a third-party custodian. Defendant to maintain residence at mother's apartment and not relocate without PTS approval. Defendant may not possess, subscribe to, or view, any media depicting children in the nude and/or in sexually explicit positions. Defendant to have no contact with alleged victims and potential witnesses, and no contact with co-defendant except in presence of counsel. Defendant to have no unsupervised contact with minors. Deft to have no computer/internet capable device use unless approved by PTS; defendant may use landline residence phone solely to contact PTS, medical professionals, or his counsel. (jw) (Entered: 03/25/2019) |
| 03/20/2019 | | Minute Entry for proceedings held before Judge Kimba M. Wood:Bail Review Hearing as to Wolfie Margolies held on 3/20/2019. Defendant Wolfie Margolies is present with his attorney Maurice Sercarz. AUSA Mollie Bracewell is present. Pretrial Officer Joshua Rothman is present. Court reporter Rebecca Foreman is present. Bail review hearing is held (see transcript). The defendant will remain detained until his passport is surrendered. When the defendant's passport is surrendered, the conditions set by Magistrate Judge Cott will apply, plus the conditions listed in the pretrial services report on Page 5, plus whenever Ms. Margolies is absent for one hour or more from her home, a friend or family member must be present in the home with the defendant, and Ms. Margolies must keep track of who that person is. Pretrial motions are due by May 17, 2019. Trial is scheduled for June 10, 2019, at 9:00 a.m. Joint voir dire and requests to charge are due by June 4, 2019. Time is excluded through June 10, 2019. (jw) (Entered: 03/25/2019) |
| 03/29/2019 | 16 | LETTER by Wolfie Margolies addressed to Judge Kimba M. Wood from Maurice H. Sercarz dated March 29, 2019 re: report of the defendant's prerequisites for release on bail (Sercarz, Maurice) (Entered: 03/29/2019) |
| 03/29/2019 | 17 | MEMO ENDORSEMENT as to Wolfie Margolies on re: 16 Letter filed by Wolfie Margolies...ENDORSEMENT...Upon consent of the Government and the defendant, the condition stating that defendant "may use the landline phone solely to contact PTS, medical professionals, or his counsel," (ECF No. 15), is modified to state that the Government must monitor the landline using a pen register. (Signed by Judge Kimba M. Wood on 3/29/19)(jw) (Main Document 17 replaced on 3/29/2019) (jw) (Entered: 03/29/2019) |
| 03/29/2019 | 18 | Appearance Bond Entered as to (19-Cr-178-1) Wolfie Margolies in amount of $200,000.00, Receipt # 465401232119. $200,000 PRB; 3 FRP; Secured by $10,000 Cash/Property; Travel restricted to SDNY/EDNY; Surrender travel documents (& no new applications); Drug testing/treatment as directed by PTS; Mental health evaluation/treatment as directed by PTS; Home incarceration; Electronic monitoring; GPS; Defendant not to possess firearm/destructive device/other weapon; Defendant's mother to serve as a third-party custodian; Defendant to maintain residence at mother's apartment and not relocate without PTS approval. Defendant may not possess, subscribe to, or view, any media depicting children in the nude and/or in sexually explicit positions. Defendant to have no contact with alleged victims and potential witnesses, and no contact with co-defendant except in presence of counsel. Defendant to have no unsupervised contact with minors. Defendant to have no computer/internet capable device use unless approved by PTS. Defendant may use landline residence phone solely to contact PTS, medical professionals, or his counsel. MODIFIED BY USDJ WOOD ON 03-29-2019: Upon consent of the Government and the defendant, the condition stating that defendant "may use the landline phone solely to contact PTS, medical professionals, of his counsel." (ECF No. 15), is modified to state that the Government must monitor the landline using a pen register. Under these circumstances, I consent to defendant's release. (bw); Modified on 5/15/2019 (bw). (Entered: 04/02/2019) |
| 04/17/2019 | 19 | TRANSCRIPT of Proceedings as to Wolfie Margolies re: Conference held on 3/20/19 before Judge Kimba M. Wood. Court Reporter/Transcriber: Rebecca Forman, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/8/2019. Redacted Transcript Deadline set for 5/20/2019. Release of Transcript Restriction set for 7/16/2019. (McGuirk, Kelly) (Entered: 04/17/2019) |
| 04/17/2019 | 20 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Wolfie Margolies. Notice is hereby given that an official transcript of a Conference proceeding held on 3/20/19 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/17/2019) |
| 04/30/2019 | 21 | LETTER MOTION addressed to Judge Kimba M. Wood from Maurice H. Sercarz dated April 30, 2019 re: postponment of defense motion schedule and trial date . Document filed by Wolfie Margolies. (Sercarz, Maurice) (Entered: 04/30/2019) |
| 05/01/2019 | 22 | AMENDED LETTER MOTION addressed to Judge Kimba M. Wood from Maurice H. Sercarz dated May 1, 2019 re: request to postpone defense motion schedule and trial date . Document filed by Wolfie Margolies. (Sercarz, Maurice) (Entered: 05/01/2019) |

| 05/06/2019 | 23 | MEMO ENDORSEMENT as to Wolfie Margolies (1) granting in part and denying in part 21 LETTER MOTION addressed to Judge Kimba M. Wood from Maurice H. Sercarz dated May 1, 2019 re: request to postpone defense motion schedule and trial date; granting in part and denying in part 22 AMENDED LETTER MOTION addressed to Judge Kimba M. Wood from Maurice H. Sercarz dated May 1, 2019 re: request to postpone defense motion schedule and trial date. ENDORSEMENT: The Court extends the motion deadline to June 14, 2019. Trial shall begin on July 15, 2019. (Signed by Judge Kimba M. Wood on 5/6/2019) (ap) (Entered: 05/06/2019) |
| 05/06/2019 |  | Set/Reset Deadlines/Hearings as to Wolfie Margolies: Motions due by 6/14/2019. Jury Trial set for 7/15/2019 at 10:00 AM before Judge Kimba M. Wood. (ap) (Entered: 05/06/2019) |
| 05/06/2019 | 24 | ENDORSED LETTER as to Wolfie Margolies addressed to Judge Kimba M. Wood, from Mollie Bracewell dated 5/2/2019 re: The Government writes to request adjournment of trial. ENDORSEMENT: Trial is adjourned to July 15, 2019. (Signed by Judge Kimba M. Wood on 5/6/2019) (ap) (Main Document 24 replaced on 5/6/2019) (bw). (Entered: 05/06/2019) |
| 05/08/2019 | 25 | ORDER as to Wolfie Margolies. Time excluded from 5/8/19 until 7/15/19. On May 1, 2019, defense counsel submitted a letter requesting that the trial in the above-captioned matter, then scheduled for June 10, 2019, be adjourned to July 29, 2019. On May 6, 2019, the Court granted defense counsel's request in part, adjourning trial to July 15, 2019. The Government has requested that time be excluded through July 15, 2019 pursuant to the provisions of the Speedy Trial Act, 18 U.S.C. § 3161(h)(7), to allow the parties to continue discussions regarding a possible pretrial disposition and to allow the defense additional time to review discovery. Defense counsel consents to this request. The Court finds that the proposed exclusion would be in the interest of justice. The Court therefore excludes the time from today until July 15, 2019, from the running of the Speedy Trial Act clock (Signed by Judge Kimba M. Wood on 5/8/19)(jw) (Entered: 05/08/2019) |
| 05/13/2019 | 26 | LETTER MOTION addressed to Judge Kimba M. Wood from Maurice H. Sercarz dated May 13, 2018 re: Bail Modification . Document filed by Wolfie Margolies. (Sercarz, Maurice) (Entered: 05/13/2019) |
| 05/14/2019 | 27 | AMENDED LETTER MOTION addressed to Judge Kimba M. Wood from Maurice H. Sercarz dated May 14, 2019 re: Bail Modification . Document filed by Wolfie Margolies. (Sercarz, Maurice) (Entered: 05/14/2019) |
| 05/15/2019 | 28 | SUPPLEMENTAL LETTER MOTION addressed to Judge Kimba M. Wood from Maurice H. Sercarz dated May 15, 2019 re: 27 AMENDED LETTER MOTION addressed to Judge Kimba M. Wood from Maurice H. Sercarz dated May 14, 2019 re: Bail Modification . re: Bail Modification . Document filed by Wolfie Margolies. (Sercarz, Maurice) (Entered: 05/15/2019) |
| 05/15/2019 | 29 | MEMO ENDORSEMENT granting 27 AMENDED LETTER MOTION filed by Wolfie Margolies (1), addressed to Judge Kimba M. Wood from Attorney Maurice H. Sercarz dated May 14, 2019 re: Bail Modification. I write to request that the defendant's bail conditions be modified in two respects: First, I would request that the defendant's mother, Liz Margolies, be permitted to leave, the home for 3 hours per day without the requirement of having a substitute adult in the home to monitor the defendant's compliance with his bail conditions. [GRANTED]; Second, I would request that Liz Margolies be permitted to host Father's Day at the apartment she shares with the defendant; and that she be permitted to invite the defendant's female cousins who are 16 and 12 years of age, respectively. [GRANTED]. ENDORSEMENT: SO ORDERED. (Signed by Judge Kimba M. Wood on 5/15/2019) (bw) (Entered: 05/15/2019) |
| 06/24/2019 |  | Minute Entry for proceedings held before Magistrate Judge Robert W. Lehrburger: Change of Plea Hearing as to Wolfie Margolies held on 6/24/2019. Defendant appears with attorney Maurice Sercarz for a Felony Plea. A.U.S.A Mollie Bracewell present for the government. Defendant plead guilty to charges on the Indictment to 21 U.S.C. 846, and 18 U.S.C. 2252 A(a)(5)(B), (b)(2) and 2. Magistrate Judge Robert W. Lehrburger recommends Judge Wood accept the plea. Defendant detained Sentencing scheduled for September 24, 2019, at 11:00 a.m. (Sentencing set for 9/24/2019 at 11:00 AM before Judge Kimba M. Wood) (Court Reporter Eve Giniger) (ap) Modified on 6/25/2019 (ap). (Entered: 06/24/2019) |
| 06/24/2019 |  | Minute Entry for proceedings held before Magistrate Judge Robert W. Lehrburger: **Plea entered by Wolfie Margolies (1) Guilty as to Count 1,2.** (ap) (Entered: 06/24/2019) |
| 06/24/2019 | 30 | CONSENT TO PROCEED BEFORE US MAGISTRATE JUDGE ON A FELONY PLEA ALLOCUTION by Wolfie Margolies. (jw) (Entered: 06/24/2019) |
| 06/26/2019 | 31 | SENTENCINGSCHEDULING ORDER as to Wolfie Margolies: The Defendant is scheduled to be sentenced on October 7, 2019 at 11:00 a.m. The Presentence Investigation Report is due to the Court on September 23, 2019. Any sentencing submissions by Defendant must be made by September 26, 2109, and must state specifically whether Defendant contests any fact in the Presentence Report, and whether Defendant contests the appropriateness of the Probation Officer's Sentencing Recommendation. Defense counsel must arrange for the presentence interview to occur within 14 days of the defendant's guilty plea. The Government must submit a statement of facts to Probation within 14 days of the defendant's guilty plea. The Government must submit its SK 1.1 letter, if applicable, 14 days before sentencing. All counsel must review the Court's Individual Rules before submitting sentencing memoranda. Probation should contact Chambers if they experience difficulty scheduling the presentence interview or if the PSR will not be completed in a timely fashion. Any response or other submission from the Government is due October 1, |

**A-5**

| | | |
|---|---|---|
| | | 2019. SO ORDERED. (Responses due by 10/1/2019. Sentencing set for 10/7/2019 at 11:00 AM before Judge Kimba M. Wood.) (Signed by Judge Kimba M. Wood on 6/26/2019) (lnl) (Entered: 06/26/2019) |
| 06/27/2019 | 32 | ORDER as to Wolfie Margolies. WHEREAS, with the defendant's consent, his guilty plea allocution was taken before a Magistrate Judge on June 24, 2019; WHEREAS, a transcript of the allocution was made and thereafter transmitted to the District Court; and WHEREAS, upon review of the transcript, this Court has determined that the defendant entered the guilty plea knowingly and voluntarily and that there is a factual basis for the guilty plea, IT IS HEREBY ORDERED that the defendant's guilty plea is accepted. SO ORDERED. (Signed by Judge Kimba M. Wood on 6/27/19) (jbo) (Entered: 06/27/2019) |
| 07/08/2019 | 33 | TRANSCRIPT of Proceedings as to Wolfie Margolies re: Plea held on 6/24/19 before Magistrate Judge Robert W. Lehrburger. Court Reporter/Transcriber: Eve Giniger, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/29/2019. Redacted Transcript Deadline set for 8/8/2019. Release of Transcript Restriction set for 10/7/2019. (McGuirk, Kelly) (Entered: 07/08/2019) |
| 07/08/2019 | 34 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Wolfie Margolies. Notice is hereby given that an official transcript of a Plea proceeding held on 6/24/19 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 07/08/2019) |
| 07/12/2019 | 35 | LETTER MOTION addressed to Judge Kimba M. Wood from Maurice H. Sercarz dated July 12, 2019 re: Exoneration of Bail . Document filed by Wolfie Margolies. (Attachments: # 1 Text of Proposed Order)(Sercarz, Maurice) (Entered: 07/12/2019) |
| 07/17/2019 | 36 | ORDER EXONERATING BAIL as to Wolfie Margolies (1): IT IS HEREBY ORDERED, upon the application of counsel for defendant Wolfe Margolies, that Mr. Margolies' personal recognizance bond in this matter is hereby exonerated and released, and that all suretors on Mr. Margolies' personal recognizance bond and all property posted as security for Mr. Margolies' personal recognizance bond are also released from any liability in connection with said bond. IT IS FURTHER ORDERED, that the cash posted by Ms. Lisbeth Margolies to secure the defendant's bail be returned to Ms. Margolies by the Clerk of Court in the form of a check payable to "Lisbeth Margolies" and delivered to her Margolies attorney, Maurice H. Sercarz, Esq., Sercarz & Riopelle, 810 Seventh Avenue, Ste. 620, New York, NY 10019. SO ORDERED. (Signed by Judge Kimba M. Wood on 7/17/2019) (lnl) (Entered: 07/17/2019) |
| 08/13/2019 | 37 | SEALED DOCUMENT placed in vault. (rz) (Entered: 08/13/2019) |
| 09/16/2019 | | CASH BAIL RETURNED as to Wolfie Margolies as per 36 Order on Letter Motion,,, dated 9/6/2019, from Judge Kimba M. Wood, in the amount of $10,000.00, Check No. 01905574, Check Dated 9/6/2019, payable to Lisbeth Margolies. (cla) (Entered: 09/16/2019) |
| 10/10/2019 | 38 | ORDER as to Wolfie Margolies. It is hereby ORDERED that the Clerk of the Court pay the attached invoice submitted by Jennifer McCarthy, Ph.D, in the amount of $4,500.00, for professional services rendered in connection with the above captioned case. (Signed by Judge Kimba M. Wood on 10/9/2019)(jw) (Entered: 10/10/2019) |
| 11/07/2019 | 40 | SEALED DOCUMENT placed in vault. (rz) (Entered: 11/07/2019) |
| 11/11/2019 | 41 | SENTENCING SUBMISSION by USA as to Wolfie Margolies. (Bracewell, Mary) (Entered: 11/11/2019) |
| 11/13/2019 | 42 | SEALED DOCUMENT placed in vault. (mhe) (Entered: 11/13/2019) |
| 11/14/2019 | 43 | SENTENCING SUBMISSION by Wolfie Margolies. (Attachments: # 1 Supplement Sickler Ltr, # 2 Supplement Expert CV)(Sercarz, Maurice) (Entered: 11/14/2019) |
| 11/15/2019 | 44 | ORDER as to Wolfie Margolies: Due to a conflict in the Court's schedule, sentencing in this matter is adjourned until Monday, December 2, 2019, at 4:00 p.m. (Sentencing set for 12/2/2019 at 04:00 PM before Judge Kimba M. Wood) (Signed by Judge Kimba M. Wood on 11/15/2019) (ap) (Entered: 11/15/2019) |
| 12/02/2019 | | Minute Entry for proceedings held before Judge Kimba M. Wood: Sentencing held on 12/2/2019 for Wolfie Margolies (1) Count 1,2. Defendant Wolfe Margolies is present with his attorney Maurice Sercarz. AUSA Mollie Bracewell is present. Court reporter Jennifer Thun is present. The defendant is sentenced to 168 months in custody on each count, to run concurrently. The Court imposes 3 years of supervised release on Count 1, and 5 years of supervised release on Count 2, to run concurrently. No fine is imposed. The special assessment of $200 is due immediately. The standard and mandatory conditions of supervised release apply, along with the following special conditions: You shall submit your person, and any property, residence, vehicle, papers, computer, other electronic communication, data storage devices, cloud storage or media, and effects to a search by any United States Probation Officer, and if needed, with the assistance of any law enforcement. The search is to be conducted when there is reasonable suspicion concerning violation of a condition of supervision or unlawful conduct by the person being supervised. Failure to submit to a search may be grounds for revocation of release. You shall warn any other |

occupants that the premises may be subject to searches pursuant to this condition. Any search shall be conducted at a reasonable time and in a reasonable manner. You will participate in an outpatient treatment program approved by the United States Probation Office, which program may include testing to determine whether you have reverted to using drugs or alcohol. You must contribute to the cost of services rendered based on your ability to pay and the availability of third-party payments. The Court authorizes the release of available drug treatment evaluations and reports, including the presentence investigation report, to the substance abuse treatment provider. You must participate in an outpatient mental health treatment program approved by the United States Probation Office. You must continue to take any prescribed medications unless otherwise instructed by the health care provider. You must contribute to the cost of services rendered based on your ability to pay and the availability of third-party payments. The Court authorizes the release of available psychological and psychiatric evaluations and reports, including the presentence investigation report, to the health care provider. You shall undergo a sex-offense-specific evaluation and participate in an outpatient sex offender treatment and/or outpatient mental health treatment program approved by the U.S. Probation Office. You shall abide by all rules, requirements, and conditions of the sex offender treatment program(s), including submission to polygraph testing and refraining from accessing websites, chatrooms, instant messaging, or social networking sites to the extent that the sex offender treatment and/or mental health treatment program determines that such access would be detrimental to your ongoing treatment. You will not view, access, possess, and/or download any pornography involving adults unless approved by the sex-offender specific treatment provider. You must waive your right of confidentiality in any records for mental health assessment and treatment imposed as a consequence of this judgment to allow the U.S. Probation Office to review the course of treatment and progress with the treatment provider. You must contribute to the cost of services rendered based on your ability to pay and the availability of third-party payments. The Court authorizes the release of available psychological and psychiatric evaluations and reports, including the presentence investigation report, to the sex offender treatment provider and/or mental health treatment provider. You shall permit the U.S. Probation Office to install any application or software that allows it to survey and/or monitor all activity on any computer(s), automated service(s), or connected devices that you will use during the term of supervision and that can access the internet (collectively, the "Devices"), and the U.S. Probation Office is authorized to install such applications or software. Tampering with or circumventing the U.S. Probation Office's monitoring capabilities is prohibited. To ensure compliance with the computer monitoring condition, you must allow the probation officer to conduct initial and periodic unannounced examinations of any Device(s) that are subject to monitoring. You must notify any other people who use the Device(s) that it is subject to examination pursuant to this condition. You must provide the U.S. Probation Office advance notification of planned use of any Device(s), and will not use any Device(s) without approval until compatibility (i.e., software, operating system, email, web-browser) is determined and installation is completed. Applications for your Device(s) shall be approved by the U.S. Probation Office once the Probation Office ensures compatibility with the surveillance/monitoring application or software. Websites, chatrooms, messaging, and social networking sites shall be accessed via the Device(s) web browser unless otherwise authorized. You will not create or access any internet service provider account or other online service using someone else's account, name, designation or alias. You will not utilize any peer-to-peer and/or file sharing applications without the prior approval of your probation officer. The use of any Device(s) in the course of employment will be subject to monitoring or restriction as permitted by the employer. You must not have deliberate contact with any child under 18 years of age, unless approved by the U.S. Probation Office. You must not loiter within 100 feet of places regularly frequented by children under the age of 18, such as schoolyards, playgrounds, and arcades. You must not view and/or access any web profile of users under the age of 18. This includes, but is not limited to, social networking websites, community portals, chat rooms or other online environment(audio/visual/messaging), etc. which allows for real time interaction with other users, without prior approval from your probation officer. You are restricted from viewing, accessing, possessing, and/or downloading any sexually explicit material involving minors, including those created via the method of morphing or other image creation format. You will not view or possess any "visual depiction" (as defined in 18 USC 2256), including any photograph, film, video, picture, or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of "sexually explicit conduct" by a minor under the age of 18. The defendant will not access any websites, chatrooms, instant messaging, or social networking sites where the defendant's criminal history-including this conviction-would render such access in violation of the terms of service of that website, chatroom, instant messaging, or social networking site. The defendant shall be supervised by the district of residence. The Court recommends to the Bureau of Prisons that the defendant be incarcerated at FCI Danbury, and be allowed to participate in the Resolve and RDAP programs. The defendant's appeal rights are read. The defendant is remanded. (Court Reporter Jennifer Thun) (ap) (Entered: 12/11/2019)

| 01/02/2020 | 45 | TRANSCRIPT of Proceedings as to Wolfie Margolies re: Sentence held on 12/2/19 before Judge Kimba M. Wood. Court Reporter/Transcriber: Jennifer Thun, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/23/2020. Redacted Transcript Deadline set for 2/3/2020. Release of Transcript Restriction set for 4/1/2020. (McGuirk, Kelly) (Entered: 01/02/2020) |
| 01/02/2020 | 46 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Wolfie Margolies. Notice is hereby given that an official transcript of a Sentence proceeding held on 12/2/19 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request |

| | | Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 01/02/2020) |
|---|---|---|
| 01/07/2020 | 47 | JUDGMENT IN A CRIMINAL CASE as to Wolfe Margolies (1). THE DEFENDANT: pleaded guilty to counts 1 (one) and 2 (two). IMPRISONMENT: 168 months on each of Counts 1 and 2, to run concurrently. The court makes the following recommendations to the Bureau of Prisons: The Court recommends to the Bureau of Prisons that the defendant be incarcerated at FCI Danbury, and be allowed to participate in the Resolve and RDAP programs. Ill The defendant is remanded to the custody of the United States Marshal. SUPERVISED RELEASE: 3 years on Count 1, and 5 years on Count 2, to run concurrently. See ADDITIONAL SUPERVISED RELEASE TERMS. See SPECIAL CONDITIONS OF SUPERVISION. ASSESSMENT: $200.00 due immediately. (Signed by Judge Kimba M. Wood on 1/7/2020)(ap) (Entered: 01/07/2020) |
| 01/09/2020 | 48 | NOTICE OF APPEAL by Wolfie Margolies from 47 Judgment. Filing fee $ 505.00, receipt number 465401252023. (tp) (Entered: 01/09/2020) |
| 01/09/2020 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Wolfe Margolies to US Court of Appeals re: 48 Notice of Appeal - Final Judgment. (tp) (Entered: 01/09/2020) |
| 01/09/2020 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Wolfe Margolies re: 48 Notice of Appeal - Final Judgment were transmitted to the U.S. Court of Appeals. (tp) (Entered: 01/09/2020) |
| 06/28/2021 | 49 | MANDATE of USCA (Certified Copy) as to Wolfe Margolies re: 48 Notice of Appeal. USCA Case Number 20-60. The Government moves to dismiss this appeal as barred by the waiver of appellate rights contained in Appellants plea agreement. Upon due consideration, it is hereby ORDERED that the motion is GRANTED and the appeal is DISMISSED.. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Issued As Mandate: 06/28/2021. (nd) (Entered: 06/28/2021) |
| 04/27/2022 | 50 | MOTION to Vacate under 28 U.S.C. 2255. Document filed by Wolfe Margolies. (sac) Civil case 1:22-cv-03489 opened. (Entered: 04/29/2022) |
| 04/27/2022 | 51 | MOTION FOR APPOINTMENT OF COUNSEL PURSUANT TO 18 U.S.C. § 3006A(g). Document filed by Wolfe Margolies. (sac) (Entered: 04/29/2022) |
| 05/06/2022 | 52 | ORDER TO ANSWER, 28 U.S.C. § 2255 as to Wolfe Margolies... The Court, having concluded that the motion brought under 28 U.S.C. 2255 should not be summarily dismissed as being without merit, hereby ORDERS that: The Clerk of Court shall electronically notify the Criminal Division of the U.S. Attorney's Office for the Southern District of New York that this Order has been issued. Within sixty days of the date of this order, the U.S. Attorney's Office shall file an answer or other pleadings in response to the motion. Movant shall have thirty days from the date on which Movant is served with Respondent's answer to file a response. Absent further order, the motion will be considered fully submitted as of that date. All further papers filed or submitted for filing must include the criminal docket number and will be docketed in the criminal case. (Signed by Judge Kimba M. Wood on 5/6/22)(jw) (Entered: 05/06/2022) |
| 07/01/2022 | 53 | LETTER RESPONSE in Opposition by USA as to Wolfe Margolies addressed to Judge Kimba M. Wood from AUSA Mollie Bracewell dated 7/1/2022 re: 50 MOTION to Vacate under 28 U.S.C. 2255, 51 MOTION to Appoint Counsel.. (Attachments: # 1 Exhibit Plea Agreement, # 2 Exhibit Plea Transcript, # 3 Exhibit Sentencing Transcript) (Bracewell, Mary) (Entered: 07/01/2022) |
| 08/03/2022 | 54 | EX PARTE MOTION re: United States v. Wolfe Margolies 19Cr178(KMW). Document filed by Wolfe Margolies. [NOTE: Refer to 22-Cv-3489(KMW) also. ***] (bw) (Entered: 08/03/2022) |
| 08/09/2022 | 55 | REPLY TO GOVERNMENT'S RESPONSE to Motion UNDER USC 2255 TO VACATE, SET ASIDE, OR CORRECT A SENTENCE. Refer to 22 cv 3489 (KMW) (jw) (Entered: 08/10/2022) |
| 08/22/2022 | 56 | ORDER as to Wolfe Margolies. Defendant Wolfe Margolies moves the Court in connection with his April 27, 2022 motion pursuant to 28 U.S.C. § 2255. (ECF No. 54.) The Government shall respond to Defendant's August 3, 2022 motion no later than September 21, 2022 (Government Responses due by 9/21/2022) (Signed by Judge Kimba M. Wood on 8/22/22)(jw) (Entered: 08/22/2022) |
| 09/21/2022 | 57 | LETTER by USA as to Wolfe Margolies addressed to Judge Kimba M. Wood from AUSA Mollie Bracewell dated 9/21/2022 re: Defendant's Supplemental Ex Parte Motion Document filed by USA. (Bracewell, Mary) (Entered: 09/21/2022) |
| 10/04/2022 | 58 | REPLY TO GOVERNMENT'S RESPONSE TO EX PARTE MOTION RELATED TO MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT A SENTENCE. Document filed by Wolfe Margolies. [*** Refer to civil case 22-cv-3489 (KMW) also. ***] (bw) (Entered: 10/05/2022) |
| 01/17/2023 | 59 | OPINION & ORDER as to Wolfe Margolies: Margolies's motions are DENIED. Because Margolies has not made a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253. Furthermore, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that an appeal from this Order would not be taken in good faith and thus Margolies may not proceed in forma pauperis for any such appeal. |

**A-8**

|  |  | See Coppedge v. United States, 369 U.S. 438, 444-45 (1962). The Clerk is respectfully directed to close the motions at ECF Nos. 50, 51, and 54. SO ORDERED. (Signed by Judge Kimba M. Wood on 1/17/2023) (See OPINION & ORDER as set forth) (22-CV-3489 (KMW)) (lnl) (Entered: 01/17/2023) |
|---|---|---|
| 03/16/2023 | 60 | NOTICE OF APPEAL by Wolfe Margolies from 59 Opinion & Order. **This document also entered in case: 22-cv-3489, DE # 10].** (nd) (Entered: 03/16/2023) |
| 03/16/2023 |  | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Wolfe Margolies to US Court of Appeals re: 60 Notice of Appeal. (nd) (Entered: 03/16/2023) |
| 03/16/2023 |  | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Wolfe Margolies re: 60 Notice of Appeal were transmitted to the U.S. Court of Appeals. (nd) (Entered: 03/16/2023) |
| 03/16/2023 |  | Appeal Remark as to Wolfe Margolies re: 60 Notice of Appeal. USCA Appeal Filing fee of $ 505.00 paid, receipt number ANYSDC-27475696. (nd) (Entered: 03/16/2023) |
| 04/05/2023 | 61 | TRANSCRIPT of Proceedings as to Wolfe Margolies re: Conference held on 03/06/2019 before Magistrate Judge Debra C. Freeman. Court Reporter/Transcriber: Adrienne Mignano (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/26/2023. Redacted Transcript Deadline set for 5/8/2023. Release of Transcript Restriction set for 7/5/2023. (nmo) (Entered: 04/05/2023) |
| 04/05/2023 | 62 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Wolfe Margolies. Notice is hereby given that an official transcript of a Conference proceeding held on 03/06/2019 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (nmo) (Entered: 04/05/2023) |
| 04/10/2023 | 63 | TRANSCRIPT of Proceedings as to Wolfe Margolies re: Conference held on 03/19/2019 before Magistrate Judge James L. Cott. Court Reporter/Transcriber: Marissa Mignano (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/1/2023. Redacted Transcript Deadline set for 5/11/2023. Release of Transcript Restriction set for 7/10/2023. (nmo) (Entered: 04/10/2023) |
| 04/10/2023 | 64 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Wolfe Margolies. Notice is hereby given that an official transcript of a Conference proceeding held on 03/19/2019 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (nmo) (Entered: 04/10/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 11/07/2023 17:21:31 | | |
| PACER Login: | appealteam | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:19-cr-00178-KMW |
| Billable Pages: | 12 | Cost: | 1.20 |

A-9

**Query**    **Reports**    **Utilities**    **Help**    **Log Out**

APPEAL,2255,ECF,PRO-SE

## U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:22-cv-03489-KMW

Margolies v. United States of America                     Date Filed: 04/27/2022
Assigned to: Judge Kimba M. Wood                          Jury Demand: None
Related Case: 1:19-cr-00178-KMW-1                         Nature of Suit: 510 Prisoner: Vacate Sentence
Cause: 28:2255 Motion to Vacate / Correct Illegal Sentenc Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Wolfe Margolies**                          represented by **Wolfe Margolies**
                                                            Reg. 37756-034
                                                            FCI Danbury
                                                            Federal Correctional Institute
                                                            Route 37
                                                            Danbury, CT 06811
                                                            PRO SE

V.

**Defendant**

**United States of America**

| Date Filed | # | Docket Text |
|---|---|---|
| 04/27/2022 | 1 | MOTION to Vacate, Set Aside or Correct Sentence (28 U.S.C. 2255). NO FURTHER ENTRIES. PLEASE SEE CRIMINAL CASE: 1:19-cr-00178-KMW-1. Document filed by Wolfe Margolies. (sac) (Entered: 04/29/2022) |
| 04/27/2022 | | Case Designated ECF. (sac) (Entered: 04/29/2022) |
| 04/27/2022 | | Magistrate Judge Barbara C. Moses is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (sac) (Entered: 04/29/2022) |
| 04/27/2022 | 2 | MOTION FOR APPOINTMENT OF COUNSEL PURSUANT TO 18 U.S.C. § 3006A(g). Document filed by Wolfe Margolies. (sac) (Entered: 04/29/2022) |
| 05/06/2022 | 4 | ORDER TO ANSWER, 28 U.S.C. § 2255: The Clerk of Court shall electronically notify the Criminal Division of the U.S. Attorney's Office for the Southern District of New York that this Order has been issued. By July 5, 2022, the U.S. Attorney's Office shall file an answer or other pleadings in response to the motion. Movant shall have thirty days from the date on which Movant is served with Respondent's answer to file a response. Absent further order, the motion will be considered fully submitted as of that date. All further papers filed or submitted for filing must include the criminal docket number and will be docketed in the criminal case. SO ORDERED. (Signed by Judge Kimba M. Wood on 5/06/2022) (ama) (Entered: 05/06/2022) |
| 05/06/2022 | 5 | INFORMATION PACKAGE MAILED to Wolfe Margolies, Reg. 37756-034, at FCI Danbury, Federal Correctional Institute, Route 37, Danbury, CT 06811, on 5/6/2022 Re: 4 Order to Answer. The following document(s) were enclosed in the Service Package: a copy of the order of service or order to answer and other orders entered to date, the individual practices of the district judge and magistrate judge assigned to your case, Instructions for Litigants Who Do Not Have Attorneys, Notice Regarding Privacy and Public Access to Electronic Case Files, a Motions guide, a notice that the Pro Se Manual has been discontinued, a Notice of Change of Address form to use if your contact information changes, a handout explaining matters handled by magistrate judges and consent form to complete if all parties agree to proceed for all purposes before the magistrate judge. (sha) (Entered: 05/06/2022) |
| 08/10/2022 | 6 | REPLY TO GOVERNMENT'S RESPONSE TO MOTION UNDER 28:2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE. Document filed by Wolfe Margolies. (sc) Modified on 8/10/2022 (sc). (Entered: 08/10/2022) |
| 08/22/2022 | 7 | ORDER: Defendant Wolfe Margolies moves the Court in connection with his April 27, 2022 motion pursuant to 28 U.S.C. § 2255. (ECF No. 54.) The Government shall respond to Defendant's August 3, 2022 motion no later than |

A-10

| | | |
|---|---|---|
| | | September 21, 2022. SO ORDERED. (Responses due by 9/21/2022.) (Signed by Judge Kimba M. Wood on 8/22/2022) (mml) (Entered: 08/22/2022) |
| 08/23/2022 | | MAILING RECEIPT: Document No: 7. Mailed to: Wolfe Margolies Reg.37756-034 FCI Danbury Route 37 Danbury, CT 06811. (kh) (Entered: 08/23/2022) |
| 10/04/2022 | 8 | REPLY TO GOVERNMENT'S RESPONSE TO EX PARTE MOTION RELATED TO MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT A SENTENCE Document filed by Wolfe Margolies.. (rro) (Entered: 10/04/2022) |
| 01/17/2023 | 9 | OPINION AND ORDER: For the foregoing reasons, Margolies's motions are DENIED. Because Margolies has not made a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253. Furthermore, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that an appeal from this Order would not be taken in good faith and thus Margolies may not proceed in forma pauperis for any such appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962). The Clerk is respectfully directed to close the motions at ECF Nos. 50, 51, and 54. SO ORDERED. (Signed by Judge Kimba M. Wood on 1/17/2023) (ama) (Entered: 01/17/2023) |
| 01/18/2023 | | MAILING RECEIPT: Document No: 9. Mailed to: Wolfe Margolies Reg.37756-034 FCI Danbury Route 37 Danbury, CT 06811. (dsh) (Entered: 01/18/2023) |
| 03/16/2023 | 10 | NOTICE OF APPEAL from 9 Memorandum & Opinion,,. Document filed by Wolfe Margolies. Filing fee $ 505.00, receipt number ANYSDC-27475696. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(White, Benjamin) (Entered: 03/16/2023) |
| 03/16/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 10 Notice of Appeal..(nd) (Entered: 03/16/2023) |
| 03/16/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 10 Notice of Appeal filed by Wolfe Margolies were transmitted to the U.S. Court of Appeals..(nd) (Entered: 03/16/2023) |
| 03/16/2023 | | Appeal Remark as to 10 Notice of Appeal filed by Wolfe Margolies. This appeal also entered in the related criminal case: 19-cr-0178, DE # 60..(nd) (Entered: 03/16/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 11/07/2023 17:54:28 | | |
| PACER Login: | appealteam | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:22-cv-03489-KMW |
| Billable Pages: | 2 | Cost: | 0.20 |

A-11

19 MAG 1520

Approved: _____
          MOLLIE BRACEWELL
          Assistant United States Attorney

Before:   HONORABLE KEVIN NATHANIEL FOX
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - X
                              :
UNITED STATES OF AMERICA      :    **SEALED COMPLAINT**
                              :
        - v. -                :    Violations of
                              :    18 U.S.C. §§ 2252A and
                              :    2, 21 U.S.C. § 846
EKIN ERKAN, and               :
WOLFE MARGOLIES,              :    COUNTY OF OFFENSE:
        a/k/a "HOPE,"         :    NEW YORK
                              :
                Defendants.   :
                              :
- - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        PATRICK MAGNER, being duly sworn, deposes and says
that he is a Special Agent with the Department of Homeland
Security, Homeland Security Investigation ("DHS-HSI"), and
charges as follows:

COUNT ONE
(Narcotics Conspiracy)

        1.   From at least in or about June 2017, up to an
including at least in or about January 2019, in the Southern
District of New York and elsewhere, EKIN ERKAN and WOLFE
MARGOLIES, a/k/a "Hope," the defendants, and others known and
unknown, intentionally and knowingly did combine, conspire,
confederate, and agree together and with each other to violate
the narcotics laws of the United States.

        2.   It was a part and an object of the conspiracy
that EKIN ERKAN and WOLFE MARGOLIES, a/k/a "Hope," the
defendants, and others known and unknown, would and did
distribute and possess with intent to distribute a controlled
substance, in violation of Title 21, United States Code, Section
841(a)(1).

**A-12**

3.   The controlled substance that EKIN ERKAN and WOLFE MARGOLIES, the defendants, conspired to distribute and possess with intent to distribute was a quantity of mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 841(b)(1)(C).

(Title 21, United States Code, Section 846.)

<u>COUNT TWO</u>
(Possession of Child Pornography)

4.   From at least in or about October 2018 up to and including at least in or about January 2019, in the Southern District of New York and elsewhere, WOLFE MARGOLIES, a/k/a "Hope," the defendant, knowingly did possess and access with intent to view, and attempt to possess and access with intent to view, a book, magazine, periodical, film, videotape, computer disk, and other material containing an image of child pornography that had been mailed, shipped and transported using a means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce by any means, including by computer, and that was produced using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by computer, to wit, MARGOLIES possessed images of child pornography in his residence in New York, New York.

(Title 18, United States Code, Sections 2252A(a)(5)(B), (b)(2), and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5.   I am a Special Agent with DHS-HSI, and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law enforcement agents, witnesses, and others, as well as my examination of report and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.  Where figures,

calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

6.   Based on my involvement in the investigation, I have learned, among other things, that EKIN ERKAN, the defendant, operated a drug dealer referral scheme (the "Referral Scheme"), through which ERKAN referred customers to drug dealers in exchange for an online payment in the form of a "tip."

7.   Based on my conversations with others, including other law enforcement officers and a particular undercover officer ("UC-1") with the New York City Police Department ("NYPD"), my review of reports prepared by law enforcement officers, and my review of telephone communications between EKIN ERKAN, the defendant, and UC-1, I have learned, among other things, the following:

a.   Law enforcement officers identified ERKAN's telephone number (the "ERKAN Phone") in the cellphone of a particular overdose victim ("Victim-1"). Based on my review of the medical examiner's report relating to Victim-1's death, I have learned that Victim-1 was found dead in his apartment in Queens, New York, on or around January 15, 2017, of a heroin and fentanyl overdose. In or around June 2017, UC-1 initiated contact with ERKAN, posing as a customer looking for narcotics. On or about June 20, 2017, ERKAN and UC-1 had the following exchange of text messages:

| ERKAN: | Why u call? |
| UC-1: | Needed some stuff. [Victim-1] used to get it from u and give me some |
| ERKAN: | Idk that number [Victim-1's cellphone] tho, but i dont deal. I give u plug's number who delivers to u. But u send me tip first so i know ur straight. |
| UC-1: | Ok |
| ERKAN: | They deliver to u. 80/bun. |
| ERKAN: | U need to [send payment through online payment platforms to] me tho |
| UC-1: | Ok |
| ERKAN: | U got any of those? |

3

A-14

| | |
|---|---|
| UC-1: | Nah |
| ERKAN: | U got smart phone? |
| UC-1: | Yea . . . |
| ERKAN: | Download the app [for a particular payment platform ("Platform-1")] |
| UC-1: | K got it |
| ERKAN: | [. . .] You send me tip via Platform-1 and then i vouch for u, and ["CC-1"] or ["CC-2"] will deliver. |
| UC-1: | K |
| ERKAN: | Lmk when sent.  Tip of 20-35 dollars |

b.   Based on my training and experience, and as explained below, I understand this to be a discussion regarding the purchase of heroin and an explanation of the Referral Scheme:

i.   ERKAN explained that he does not "deal," but instead would provide a phone number for a dealer who would deliver narcotics to UC-1 ("I give u plug's number who delivers to u").

ii.   ERKAN also informed UC-1 of the price of the narcotics, $80 per "bundle," referring to ten glassines of heroin.

iii.   ERKAN required a money payment – a "tip" – before he would provide UC-1 with his dealer's phone number so that he knew UC-1 was a legitimate buyer ("so i know ur straight").

iv.   ERKAN accepted such a tip through various online payment methods.

v.   After receiving the tip, ERKAN, in addition to providing contact information, would "vouch" for the customer with the drug dealer.

c.   Also on or about June 20, 2017, UC-1 successfully transferred $25 to ERKAN via a mobile application. After the tip was paid, ERKAN wrote to UC-1, "I got it.  Okay ill vouch for u rn" and subsequently provided the telephone

4

**A-15**

number of CC-2 ("CC-2 Phone").  ERKAN stated, in part: "My name is ekin. . . . If anyone asks ur my friend from nyc techno parties, as i am a dj."

        d.    UC-1 subsequently contacted the CC-2 Phone, and agreed upon a location and time to meet for the sale of two bundles – *i.e.*, 20 glassines – of heroin.  At the agreed upon time and place, on or about June 20, 2017, UC-1 purchased from CC-2 approximately 20 glassines of a substance that later tested positive as heroin, in exchange for $160.

        8.    Based on my conversations with others, including other NYPD officers and UC-1, my review of reports prepared by law enforcement officers, and my review of telephone communications between UC-1 and EKIN ERKAN, the defendant, and between UC-1 and WOLFE MARGOLIES, a/k/a "Hope," the defendant, I have learned, among other things, the following:

        a.    On or about December 17, 2017, UC-1 sent a text message to ERKAN indicating that a previous narcotics supplier was "hard to get up with" and "never answered the phone."  ERKAN responded by providing the contact telephone number for "a new plug w fire," which, based on my training and experience, I believe references a new dealer with highly potent narcotics.  ERKAN stated that "Their name is hope," and provided two contact telephone numbers, a number ending in 1420 ("Hope 1420 Phone") and an "alternate" phone number ending in 8884 ("Hope 8884 Phone").

        b.    On or about February 22, 2018, UC-1 sent a text message to ERKAN, in which UC-1 asked if "u got anybody in queens."  ERKAN replied, "Hope," and UC-1 asked for a telephone number.  ERKAN responded: "need tip first unfortunately."  After UC-1 paid a tip of $30 via PayPal,, ERKAN provided a phone number for Hope ending in -2549 (the "Hope 2549 Phone"), a number associated with MARGOLIES in certain state databases.

        c.    On or about February 22, 2018, UC-1 received a text messages from the Hope 2549 Phone, which stated: "Hey its hope Lmk if u need anything."  On or about February 27, 2018, UC-1 wrote back to the Hope 2549 Phone, "Jus saw ur text . . . Will be back Friday, u around."  The Hope 2549 Phone responded that he was available "whenever."  UC-1 replied, "Ok am gonna b in queens."

        d.    On or about March 2, 2018, UC-1 again contacted the Hope 2549 Phone and arranged to purchase five bundles of heroin at a certain time and place in Queens, New York.  UC-1

then met an individual who identified himself as "Hope" at the agreed upon time and location and purchased five bundles of a substance that later tested positive for heroin, in exchange for $420.  After the transaction, UC-1 identified MARGOLIES in a photo array as the individual who provided UC-1 with the five bundles of heroin, *i.e.* Hope.

e.   On at least five subsequent occasions, and as set forth below, UC-1 met MARGOLIES and purchased narcotics in controlled transactions:

i.   On or around March 9, 2018, UC-1 purchased from MARGOLIES five bundles of narcotics in exchange for $420 at a location in Queens, New York.  The narcotics subsequently tested positive for the presence of heroin and fentanyl.

ii.   On or around March 21, 2018, UC-1 purchased from MARGOLIES one sleeve of a substance that later tested positive for the presence of heroin in exchange for $750 at a location in Queens, New York.

iii.   On or around April 3, 2018, UC-1 purchased from MARGOLIES one sleeve of a substance that later tested positive for the presence of heroin in exchange for $740 at a location in Queens, New York.

iv.   On or around May 1, 2018, UC-1 purchased from MARGOLIES 30 bundles of a substance that later tested positive for the presence of heroin in exchange for $1800 at a location in Queens, New York.

v.   On or around May 11, 2018, UC-1 purchased from MARGOLIES 101 glassines of a substance that later tested positive for the presence of heroin in exchange for $700 at a location in Queens, New York.

9.   Based on my review of location information for the Hope 2549 Phone obtained pursuant to a judicially authorized warrant, I have learned that on or around March 21, 2018, the Hope 2549 Phone traveled from New York, New York to the location of the controlled buy on March 21, 2018 with UC-1 discussed above, *see supra* ¶ 8(e)(ii).

10.   Based on my involvement in this investigation, my discussions with other law enforcement officers and review of NYPD reports, and my review of the contents of a cellphone belonging to

**A-17**

a particular male overdose victim ("Victim-2"), I have learned, among other things the following:

     a.   On or about February 2, 2018, Victim-2 texted the ERKAN Phone and the following conversation, in sum and substance, occurred via text message:

| | |
|---|---|
| Victim-2: | Hey man in Albert from long islands friend. Lookin for 300 of H |
| ERKAN: | No problem man. I'll hook you up. I do ask for a finder's fee first though. . . . Via [various online payment platforms]. This helps prove you are legit first |
| Victim-2: | I don't have to wait for full confirm right? Lol |
| ERKAN: | No but i do need to see a screenshot or proof uve sent. If you would rather use square cash its a bit faster. . . . I offer a range of services, not sure if albert elucidated |
| Victim-2: | Give me a few min plz. I can do square how does that work . . . |
| ERKAN: | Delivery; the first is via a service denoted as Hope. 80/bun. Very high quality. Fent free. . . . |
| Victim-2: | Cool I want 3 bun |
| ERKAN: | Certainly, not a problem. But first I do need the "finder's fee" confirmation amount sent via [Platform-1] first, before anyone delivers to you. . . . |
| Victim-2: | It says complete on my end |
| ERKAN: | [. . .] hope's # is [the Hope 2549 Phone] . . . |
| Victim-2: | Thanks. Contacting hope now. |

     b.   Based on my training and experience, I believe that Victim-2 was requesting a quantity of heroin ("300 of H") and EKIN ERKAN, the defendant, in exchange for a tip, subsequently

7

**A-18**

provided Victim-2 with the information for WOLFE MARGOLIES, a/k/a "Hope," the defendant, described as having high quality heroin, for 80$ per bundle, without fentanyl ("fent free"). A short period of time later, ERKAN contacted Victim-2 to ask if Victim-2 could send ERKAN's payment in another manner because the payment had not gone through.

      c.   Based on my review of communications between Victim-2 and MARGOLIES, using the Hope 2549 Phone, I have learned that, later on or about February 2, 2018, Victim-2 sent a message to MARGOLIES requesting three bundles of heroin ("3 bun?"). MARGOLIES replied, "I can do that tn. WheRe u at?" Victim-2 and MARGOLIES agreed to meet at a location in Brooklyn that evening.

      d.   Several hours later, also on or about February 2, 2018, Victim-2 texted MARGOLIES on the Hope 2549 Phone with the message "Sooner for a tip?" Based on my training and experience, I believe Victim-2 was offering MARGOLIES a tip if MARGOLIES could deliver the narcotics sooner. MARGOLIES replied, "Gotta reup. Going to u soon as i can," indicating that he first had to obtain more narcotics.

      e.   Several hours later, Victim-2 texted MARGOLIES at the Hope 2549 Phone the message, "Eta?" referring to MARGOLIES' estimated time of arrival. MARGOLIES responded and directed Victim-2 to a particular location in Brooklyn, New York. MARGOLIES later sent a message indicating that he was "walking from train," to which Victim-2 replied, "Aight." Based on my review of Victim-2's cellphone, I have learned that this was the last outgoing message sent by Victim-2's phone. Approximately five minutes later, MARGOLIES texted Victim-2 the message "here."

      f.   Several hours later, on February 3, 2018, ERKAN texted Victim-2 the messages, "Hey it went through," and "Did u meet w hope?"

      g.   On or about February 6, 2018, at approximately 5:54 p.m., ERKAN texted Victim-2 the message, "Yo u alivr?"

      h.   Based on my review of the medical examiner's report relating to Victim-2's death, I have learned that Victim-2 was found dead in his apartment in Brooklyn, New York, on or about February 3, 2018, and the cause of death was determined to be a heroin overdose.

Case 23-370, Document 49, 11/13/2023, 3589727, Page23 of 178

11.    Based on my involvement in the investigation, my review of databases maintained by DHS, and my discussions with other law enforcement officers, I have learned the following:

a.    On or about January 13, 2018, WOLFE MARGOLIES, a/k/a "Hope," the defendant, traveled on a commercial flight from Tel Aviv, Israel to John F. Kennedy Airport ("JFK Airport") in Queens, New York.  Upon arriving at JFK Airport, personnel with DHS conducted a border search of MARGOLIES including a cellular phone in his possession (the "MARGOLIES Phone").  During the search, a DHS computer forensic analyst copied the data from the MARGOLIES Phone and returned the MARGOLIES Phone to MARGOLIES.

b.    Based on my review of a surveillance report prepared by DHS agents, I have learned that MARGOLIES was surveilled as he left JFK Airport, that he traveled from JFK Airport to New York City, and that he entered a particular residential building located on West 16th Street in New York, New York ("Residence-1").

c.    Based on my review of publicly available records, and surveillance of Residence-1, including review of the identified residents listed on Residence-1's intercom system, I believe that MARGOLIES' mother resides in a particular apartment in Residence-1.  Based on my review of communications on the MARGOLIES Phone between MARGOLIES and an individual identifying herself as MARGOLIES' mother, I believe that MARGOLIES resides with his mother.

d.    Based upon my review of the data from the MARGOLIES Phone, I have learned the MARGOLIES Phone had an account with username "drrtypharms" ("MARGOLIES Online Account") on a particular online messaging application ("Application-1")[1].  The MARGOLIES Phone included records of certain message exchanges conducted through Application-1.[2]

12.    Based on my review of the contents of the MARGOLIES Phone, including records of communications on and through the

_____

[1] Based on my training and experience, I have learned that Application-1 is a smartphone messenger application that lets users connect with other users and exchange text, pictures, and videos.

[2] Based on my review of the contents of the MARGOLIES Phone, it appears that WOLFE MARGOLIES, a/k/a "Hope," the defendant used a different phone for narcotics-related communications, including those communications that MARGOLIES had with UC-1.

A-20

MARGOLIES Online Account between WOLFE MARGOLIES, a/k/a "Hope," the defendant, and another Application-1 user ("Online User-1"), I have learned, in substance and in part, the following:

     a.   On or around October 25, 2018, the MARGOLIES Online Account exchanged messages with Online User-1, who asked if MARGOLIES was alone: "U alone bitch?"  MARGOLIES responded that he was: "ya [. . .] wassup."

     b.   At or around 9:32 p.m., Online User-1 then transmitted to MARGOLIES a video file, approximately 31 seconds in length, which, based on my training and experience, I believe constitutes child pornography.  The video depicts a toddler being raped, with vaginal penetration, by an unidentified adult male.

     c.   After receiving the video, MARGOLIES responded "lolll" and "me."  Based on my experience and training, I believe "lolll" refers to "laughing out loud," an abbreviation commonly used in message exchanges to describe something humorous.

     d.   The video remained on the MARGOLIES Phone until at least on or around January 13, 2019.

     e.   On or around October 25, 2018, MARGOLIES was added by Online User-1 to a group chat forum on Application-1. Among the other participants in the forum were Application-1 users with the following display names: "young lovers," "TabooPervDaddy," and "Cecil B. Demented."  During the group exchange, one user ("Kit Kat") sent a photo constituting child erotica, in which a young prepubescent female is depicted with a suggestive photograph.  During the chat, TabooPervDaddy wrote that: "I have zero limits."  Online User-1 posted a message, "Pm to trade."  Based on my training and experience, and familiarity with the lingo commonly used in these kinds of internet forums, I understand that "Pm" refers to a "private message," and thus, I believe that Online User-1 was inviting other Application-1 chat participants to trade child pornography.

     f.   Based on my review of the contents of the MARGOLIES Phone, I have learned that it contains approximately 35,000 images, among which are images that, based on my training and experience, I believe  constitute "child erotica," including the following:

     i.   A photograph, saved into the phone's camera roll on November 10, 2018, showing what appears to be a prepubescent female who appears to be pregnant with the caption: "Breed Them Young."

Case 23-370, Document 49, 11/13/2023, 3589727, Page25 of 178

**A-21**

       ii.    A photograph, saved into the phone's camera roll on November 11, 2018, of an adult female hugging what appears to be a prepubescent female and looking at the camera, with the caption: "I don't care if she dies . . . I want to see you force all 8″ of your cock inside her."

       iii.    A photograph, saved into the phone's camera roll on September 17, 2018, of what appears to be a prepubescent female's face, showing an expression of surprise, with the caption: "When he says he's 7 inch but in fact it's more like 8."

       iv.    A photograph, saved into the phone's camera roll on October 18, 2018, showing an adult female looking at what appears to be a prepubescent female, with the caption: "We watched Daddy drive off for his business trip.  Then Mommy gave me the 'You're gonna eat my pussy for days look."

       v.    A cartoon image, saved into the phone's camera roll on September 3, 2018, depicting what appears to be a prepubescent boy ejaculating after vaginal intercourse with an adult female, with the caption: "It's ok baby.  That happens to little boys.  Just put in back in and we'll try for another."

    WHEREFORE, the deponent respectfully requests that warrants be issued for the arrest of EKIN ERKAN and WOLFE MARGOLIES, a/k/a "Hope," the defendants, and that they be imprisoned or bailed as the case may be.

PATRICK MAGNER
Special Agent, DHS-HSI

Sworn to before me this
13th day of February, 2019

THE HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

A-22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                     :

       - v. -                                            :

WOLFE MARGOLIES,                             :
       a/k/a "Hope,"                              :

       Defendant.                                   :

- - - - - - - - - - - - - - - - - - - X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: MAR 1 3 2019

INDICTMENT

**19 CRIM 178**

### COUNT ONE
**(Narcotics Conspiracy)**

The Grand Jury charges:

1.   From in or around December 2017, up to and including at least in or about January 2019, in the Southern District of New York and elsewhere, WOLFE MARGOLIES, a/k/a "Hope," the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

2.   It was a part and an object of the conspiracy that WOLFE MARGOLIES, a/k/a "Hope," the defendant, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

3.   The controlled substance that WOLFE MARGOLIES, a/k/a "Hope," the defendant, conspired to distribute and possess with intent to distribute was a quantity of mixtures and substances



containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 841(b)(1)(C).

(Title 21, United States Code, Section 846.)

## COUNT TWO
### (Possession of Child Pornography)

The Grand Jury further charges:

4.    From at least in or about October 2018 up to and including at least in or about January 2019, in the Southern District of New York and elsewhere, WOLFE MARGOLIES, a/k/a "Hope," the defendant, knowingly did possess and access with intent to view, and attempt to possess and access with intent to view, a book, magazine, periodical, film, videotape, computer disk, and other material containing an image of child pornography that had been mailed, shipped and transported using a means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce by any means, including by computer, and that was produced using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by computer, to wit, MARGOLIES possessed images of child pornography in his residence in New York, New York.

(Title 18, United States Code, Sections 2252A(a)(5)(B), (b)(2), and 2.)

## FORFEITURE ALLEGATIONS

5.    As a result of committing the offense alleged in Count One of this Indictment, WOLFE MARGOLIES, a/k/a "Hope," the

2

defendant, shall forfeit to the United States, pursuant to Title
21, United States Code, Section 853, any and all property
constituting, or derived from, any proceeds obtained, directly or
indirectly, as a result of said offense and any and all property
used, or intended to be used, in any manner or part, to commit, or
to facilitate the commission of, said offense, including but not
limited to a sum of money in United States currency representing
the amount of proceeds traceable to the commission of said offense.

6.    As a result of committing the offense alleged in Count
Two of this Indictment, WOLFE MARGOLIES, a/k/a "Hope," the
defendant, shall forfeit to the United States, pursuant to Title
21, United States Code, Section 2253(a): (1) any visual depiction
described in Tile 18, United States Code, Section 2252A, or any
book, magazine, periodical, film, videotape, or other matter which
contains any such visual depiction, which was produced,
transported, mailed, shipped or received in violation of Title 18,
United States Code, Chapter 110; (2) any property, real or
personal, constituting or traceable to gross profits or other
proceeds obtained from such offense; and (3) any property, real or
personal, used or intended to be used to commit or to promote the
commission of such offense, or any property traceable to such
property.

(Title 18, United States Code, Section 2253(a).)

3

### Substitute Assets Provision

7.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third person;

      c.    has been placed beyond the jurisdiction of the Court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 2253(b);
Title 21, United States Code, Section 853.)


_____
FOREPERSON

_____
GEOFFREY S. BERMAN
United States Attorney

4

A-26

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

**v.**

**WOLFE MARGOLIES,**
**a/k/a "Hope,"**

**Defendant.**

---

**INDICTMENT**

19 Cr.

(18 U.S.C. §§ 2252A and 2;
21 U.S.C. § 846.)

GEOFFREY S. BERMAN
United States Attorney

_Foreperson_

---

3/13/19   Filed Indictment
Case assigned to Judge Wood

USMJ Gorenstein

MQ

**A-27**

```
                   UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK


UNITED STATES OF AMERICA,          : Docket #19-cr-00178
                                        19-mj-01520-UA
                      Plaintiff,   :

     -against-                     :

WOLFE MARGOLIES,                   : New York, New York
                                     March 19, 2019
                   Defendant.

-------------------------------:

                      PROCEEDINGS BEFORE
                 THE HONORABLE JAMES L. COTT
                 UNITED STATES MAGISTRATE JUDGE



APPEARANCES:

For Plaintiff:       UNITED STATES ATTORNEY'S OFFICE
                     SOUTHERN DISTRICT OF NEW YORK
                     BY:  ATTORNEY'S NAME
                     1 St. Andrew's Plaza
                     New York, New York 10007

For Defendant:       NAME OF LAW FIRM
                     BY:  ATTORNEY'S NAME
                     ADDRESS
                     CITY, STATE  ZIP




Transcription Service: Marissa Mignano Transcription
                       Phone:  (631) 813-9335
                       E-mail:marissamignano@gmail.com



Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

Case 23-370, Document 49, 11/13/2023, 3589727, Page32 of 178

A-28

INDEX

E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None |  |  |  |  |

E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None |  |  |  |  |

```
 1              THE DEPUTY CLERK:  This is United States of
 2    America vs. Wolfe Margolies.  Will counsel please
 3    state your name for the record.
 4              MS. BRACEWELL:  Good morning, Your Honor.
 5    Molly Bracewell for the Government.
 6              THE COURT:  Good morning, Ms. Bracewell.
 7              MR. SERCARZ:  For the defendant, Margolies
 8    Maurice Sercarz, S-E-R-C-A-R-Z.
 9              THE COURT:  Good morning, Mr. Sercarz.
10    Good morning, Mr. Margolies.
11              We're here for an arraignment.  Is that
12    correct?
13              MS. BRACEWELL:  That's correct.
14              THE COURT:  All right, Mr. Tam.
15              THE DEPUTY CLERK:  Will the defendant
16    please rise.  You are the Defendant Wolfe Margolies?
17              THE DEFENDANT:  Yes.
18              THE DEPUTY CLERK:  Have you seen a copy of
19    the indictment?
20              THE DEFENDANT:  Yes.
21              THE DEPUTY CLERK:  Have you discussed it
22    with your attorney?
23              THE DEFENDANT:  Yes.
24              THE DEPUTY CLERK:  Do you waive the reading
25    of the indictment?
```

1               THE DEFENDANT:  Yes.

2               THE DEPUTY CLERK:  How do you plea?

3               THE DEFENDANT:  Not guilty.

4               THE COURT:  Okay.  A not guilty plea will

5     be entered.

6               Is there anything else we need to do today,

7     Ms. Bracewell?

8               MS. BRACEWELL:  No.  I just note for the

9     record that there's a pretrial conference scheduled

10    before Judge Wood tomorrow at 2:00 p.m.

11              THE COURT:  2:00 p.m.?

12              MS. BRACEWELL:  Yes.

13              THE COURT:  Okay.  Very good.  Thank you.

14    Anything else?

15              MS. BRACEWELL:  Nothing further.

16              THE COURT:  Okay.  Thank you.  Have a good

17    day.

18

19

20

21

22

23

24

25

Case 23-370, Document 49, 11/13/2023, 3589727, Page35 of 178

1              C E R T I F I C A T E

2

3        I, Marissa Mignano, certify that the foregoing

4   transcript of proceedings in the case of

5   UNITED STATES OF AMERICA v. WOLFE MARGOLIES, Docket

6   #19-CR-00178, was prepared using digital

7   transcription software and is

8   a true and accurate record of the proceedings.

9

10

11  Signature   _____Marissa Mignano_____

12                  Marissa Mignano

13

14  Date:       April 10, 2023

15

16

17

18

19

20

21

22

23

24

25

J3K3MARC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          19 CR 178 (KMW)

5    WOLFIE MARGOLIES,

6                   Defendant.

7    ------------------------------x

8                                         New York, N.Y.
                                          March 20, 2019
9                                         2:00 p.m.

10
     Before:
11
                         HON. KIMBA M. WOOD,
12
                                          District Judge
13

14                        APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     MARY E. BRACEWELL
17        Assistant United States Attorney

18   SERCARZ & RIOPELLE, LLP
          Attorneys for Defendant
19   MAURICE SERCARZ

20   ALSO PRESENT:  Pretrial Services Officer Joshua Rothman

21

22

23

24

25

Case 23-370, Document 49, 11/13/2023, 3589727, Page37 of 178

J3K3MARC

```
 1              THE DEPUTY CLERK:  The Court calls the United States
 2    of America v. Wolf Margolies.  Will counsel please state their
 3    appearances.
 4              MS. BRACEWELL:  Good afternoon, your Honor.  Mollie
 5    Bracewell for the government.  Also at counsel's table is
 6    Joshua Rothman from pretrial services.
 7              THE COURT:  Very good.
 8              MR. SERCARZ:  For the defendant Margolies, Maurice
 9    Sercarz.
10              THE COURT:  Good afternoon, Mr. Margolies.  I think we
11    are here on the government's appeal of bail.
12              MS. BRACEWELL:  Yes, your Honor.  We were originally
13    scheduled to appear for a pretrial conference, but we had the
14    bail hearing in front of the magistrate judge at noon, and so,
15    we suggested doing the appeal at the same time.
16              THE COURT:  Okay.  Could you speak into the mic.
17    Thank you.  Go ahead.
18              MS. BRACEWELL:  Sure.  Hopefully that's better.  So I
19    was just saying that we are here scheduled for a pretrial
20    conference, and that we are now appealing the bail
21    determination made by the magistrate judge earlier today at
22    noon.  So, if your Honor would like the government to begin?
23              THE COURT:  I would, thank you.
24              MS. BRACEWELL:  The government is seeking detention in
25    this case based on both dangerousness and risk of flight.  So,
```

1    the indictment charges the defendant with both conspiracy to

2    commit narcotics trafficking as well as possession of child

3    pornography.

4              The complaint by which he was originally charged sets

5    forth a bit greater detail.  But, to summarize briefly, the

6    defendant was arrested for his involvement in a sustained

7    period of time in which he was dealing drugs, specifically

8    heroin, and on one occasion heroin with fentanyl, to an

9    undercover officer.  The defendant was also connected to an

10   overdose death that occurred in Brooklyn, New York, on

11   February 3, 2018.  The defendant's phone number was found in

12   the overdose victim's phone.  The series of text messages

13   between the victim and the defendant show an arrangement to

14   meet at a particular time and location, then update on status

15   of arriving to the location.  I think the last sort of message

16   exchanged is something like "five minutes away," and then the

17   communications ceases, which supports very strongly an

18   inference that the meet occurred, and that drugs were then

19   purchased.

20             The defendant is connected to the phone number that

21   was being used to communicate with that overdose victim.  It is

22   the same phone number that was being used to communicate with

23   the undercover officer, in sales that began several weeks

24   later.  And Wolf Margolies was identified as Hope, the dealer

25   that the undercover officer was interacting with.  It is the

1    same that was used in the overdose victim's phone.

2          That's all to say that the defendant's linked to the

3    trafficking of narcotics and possibly lethal narcotics, so the

4    danger presented by the narcotics trafficking is substantial,

5    and it, we submit, presents a real danger to the community.

6          In addition, the defendant has been linked as well to

7    child pornography.  This is essentially a separate

8    investigation.  The defendant traveled overseas at the end of

9    December.  He returned in early January.  His phone was

10   searched at the border pursuant to a border search.  During the

11   course of reviewing the contents of the phone, material that

12   constituted child pornography was found in the phone.  There

13   was one short video of approximately 30 seconds that

14   indisputably constituted child pornography.  It was a toddler

15   and an adult engaged in a sexual interaction.

16         In addition to that video, there are various materials

17   within the phone that constitute child erotica.  They show

18   various references to lewd sexual activity with children.

19         The phone itself that the government was reviewing had

20   been deleted, much of its history had been deleted through

21   something like October.  The reason that the child pornography

22   video was recovered is because my understanding is it had been

23   automatically saved through the application that was being used

24   to receive it.  It was coming through the Kik application,

25   which is routinely used among individuals who traffic in child

A-36

1    pornography through various forums.

2        The defendant's phone showed that he was both the

3    recipient of this video, through one direct communication, but

4    also a member of another broader chat group where the various

5    names of the other participants suggested that they, too, were

6    trafficking in child pornography.  They had very illustrative

7    names that, for example, something like Taboo Perv Daddy,

8    something that allows the inference that child pornography is

9    what they were seeking.

10        So, the content of the child pornography that we found

11   on defendant's phone is alarming, but our investigation is

12   ongoing, including into devices that were seized from the

13   defendant at the time of his arrest.  What the phone also

14   showed, and this presents perhaps the most substantial concern,

15   is that the defendant had crossed the line into action.

16        At the time of his arrest in New Orleans, the

17   defendant was with a 17-year-old girl.  Our understanding from

18   both that minor's comments to law enforcement at the time of

19   the arrest, but in addition a review of publicly available

20   content from the defendant's social media accounts, show that

21   the two had been engaged in a relationship.  The minor stated

22   to law enforcement that she had known the defendant since she

23   was 16, that she had originally been approached through online

24   means, and that he had elicited nude photographs before they

25   met.

J3K3MARC

1           This investigation is ongoing with respect to that

2    conduct, and with respect to what other materials the defendant

3    might have.  But, it strongly suggests that the defendant is

4    not merely a collector of child pornography, but is in fact an

5    actor who has and will continue to reach out to vulnerable

6    victims like minor 16-year-old girls.

7           There was an addition another chat in the defendant's

8    phone in which a minor communicated with the defendant to say

9    something along lines of -- I'm paraphrasing -- stay away from

10   my friends, we're underage.  The agents reviewing that text

11   message, their understanding was that the defendant had had

12   some sort of outreach, some sort of romantic overture to

13   friends of this minor, who had then used a telephone or an

14   application on a telephone to ask the defendant to stay away.

15   So this shows a course of conduct that presents substantial

16   concern to the government.

17          So, these factors combined, both the conduct with

18   respect to the narcotics trafficking, and the conduct

19   underlying the possession of child pornography, are both

20   serious, and they also present the possibility of substantial

21   mandatory minimums.

22          The overdose is set out because there is the strong

23   possibility that the defendant can be connected to that and

24   could face a death resulting charge.  That obviously requires

25   approval of our office, and it's not approval that we have at

Case 23-370, Document 49, 11/13/2023, 3589727, Page42 of 178

1    this point.  But the defendant is facing serious charges, which

2    in and of itself suggests that there is a risk of flight here.

3          He was arrested in New Orleans.  He was recently in

4    Israel.  He seems to have the means and the mobility to travel

5    around the country, travel around the world.

6          Acknowledging that there is substantial family

7    support, we would just submit that the family support has been

8    present as this conduct was occurring, going back through early

9    2018, at least.  So, we just respectfully submit that this

10   danger cannot be adequately accounted for through conditions of

11   bail.

12          THE COURT:  Thank you.  In Louisiana, is a 17-year-old

13   girl viewed as a minor?

14          MS. BRACEWELL:  I believe defense counsel said today

15   that the age of consent in Louisiana is 17.  I have no reason

16   to doubt that.  My understanding from the girl's comments is,

17   however, that their sexual relationship began when she was 16.

18          THE COURT:  Okay.  Thank you.

19          Mr. Sercarz.

20          MR. SERCARZ:  Thank you, your Honor.  Your Honor,

21   pretrial services --

22          THE COURT:  I'm sorry.  May I interrupt you for a

23   moment.

24          MR. SERCARZ:  Sure.

25          THE COURT:  I do have pretrial services' report.  I

Case 23-370, Document 49, 11/13/2023, 3589727, Page43 of 178

J3K3MARC

1    did want to ask the government, what was the rationale of the

2    magistrate judge?

3            MS. BRACEWELL:  Judge Cott found that there was not a

4    risk of flight.  He found that it was a close call, I think is

5    what he said with respect to dangerousness.  But he felt that

6    conditions, a series of strenuous conditions could account for

7    the danger here.  The conditions included home incarceration,

8    and monitored by electronic monitoring and limited internet and

9    phone access.

10           THE COURT:  Thank you.  Do we know where his passport

11   is now?

12           MS. BRACEWELL:  So, that remained unclear.  I was

13   unaware that it was seized in New Orleans, but I have reached

14   out to the agents.  If it was seized, then we will keep it.

15   But I'm not aware it is among our seized evidence yet.

16           MR. SERCARZ:  Your Honor, I respectfully submit that

17   the Court should uphold the decision that was made by Judge

18   Cott.

19           With regard to the suggestion of risk of flight, the

20   onerous conditions here, including home confinement, the

21   prohibition of access to the internet, and even to a smartphone

22   while the defendant remains in a condition of incarceration, in

23   his mother's home, is sufficient to safeguard against any

24   danger or risk.

25           Indeed, the judge, after reviewing the complaint

Case 23-370, Document 49, 11/13/2023, 3589727, Page44 of 178

J3K3MARC

1    carefully, and hearing the arguments of the assistant, found

2    that the government had failed to meet its burden regarding

3    risk.

4          On the subject of dangerousness, and the Court focused

5    on the drug sales.  I'd like to speak to that part of the issue

6    in greater detail.

7          The defendant was arrested in New Orleans a month ago.

8    The government has had a month in which to continue its

9    investigation.  The defendant has now been indicted, but the

10   charge is a (b)(1)(C) narcotics offense, which carries no

11   mandatory minimum, and does not contain the language alleging a

12   causal link between a drug sale by my client and the death of

13   an individual.  What you have is an instance in which the

14   defendant is alleged to have participated in a series of direct

15   sales of personal use quantities to an undercover officer, and

16   to at least one other individual.  Apparently, within 24 hours

17   after allegedly having received a packet of drugs from the

18   defendant, the individual other than the undercover, was

19   pronounced dead.  But there is nothing in this lengthy

20   complaint to suggest anything beyond that linking the drugs

21   sold by the defendant to the fatality.

22         THE COURT:  Tell me again, what is the link between

23   the defendant and the fatality, if any?

24         MR. SERCARZ:  Well, there's evidence, and I think the

25   government just outlined it, indicating that there was contact

J3K3MARC

1   between the defendant and the deceased in connection with the

2   purchase of drugs by the deceased.  But there was a 24-hour

3   interval, an interval, I should say up to, to be more precise,

4   of 24 hours between the purchase of those drugs by the deceased

5   and the time when the deceased was found dead in his apartment.

6   And as of now, and it's a month after the defendant's arrest,

7   he's been incarcerated for a month.  We've waived any bail

8   application for a month, and that's what they have at the

9   present time.

10          This is not a case that carries a presumption, it is

11   not a case as of now that carries a mandatory prison sentence.

12   And I respectfully submit that the conditions, and they're

13   onerous conditions, imposed by Judge Cott, they go beyond the

14   recommendation of pretrial services, are more than sufficient

15   to guarantee that this defendant cannot sell drugs or have

16   contact for purpose of enabling the sale of drugs on an ongoing

17   basis.

18          THE COURT:  I don't yet have a copy of that

19   transcript.  What are the more onerous conditions?

20          MR. SERCARZ:  I'm sorry.  I couldn't hear you.  The

21   conditions?

22          THE COURT:  What are the conditions that are more

23   onerous than those on the last page of pretrial services'

24   report?

25          MR. SERCARZ:  Pretrial services recommended home

**A-42**

J3K3MARC

1    confinement, and Judge Cott recommended something which he

2    described as home incarceration.

3           The conditions of bail are as follows.  I tried to

4    write them down:  A $200,000 personal recognizance bond

5    cosigned by three responsible persons.  The defendant's mother

6    who is present in court, she is a psychotherapist as indicated,

7    would be required to post $10,000 in cash, and act as -- I'm

8    sorry.  I forget the precise language.  A third-party

9    custodian.  She would be obligated to report any violation of

10   the bail conditions immediately to the authorities.  There

11   would be strict pretrial supervision, the defendant would be

12   permitted to depart from home incarceration, as it is

13   described, only to meet either with his attorney or with a

14   medical provider, within the Southern or Eastern Districts of

15   New York.  Surrender the passport and all documents.  He would

16   be subject to drug testing and mental health testing and

17   treatment according to the wishes of pretrial services.

18          On the subject of internet access, there is a note in

19   the pretrial services report that the mother's computer can be

20   accessed only by her and only through the use of her

21   fingerprint.  There is to be no other internet device or

22   smartphone device, no other device with access to the internet

23   within the confines of the mother's home.

24          And I should hasten to add that she is a therapist and

25   practices out of her own home.  So she is there for the great

J3K3MARC

1      bulk of the time.  There is a landline phone in the home which

2      would be the way that pretrial services would access the

3      defendant.  The defendant is not permitted to make any outgoing

4      calls over that landline, with the exception of calls to

5      pretrial services, to a medical professional, or to me.  And

6      the defendant is expressly prohibited from having any contact

7      with the co-defendant or with minors.

8              With regard to those drug sales that are the subject

9      of the complaint and the indictment, I thought it useful to

10     note not only that these were personal use quantities, but that

11     the defendant was allegedly part of a ring in which an

12     individual named Ekin Erkan, who is named as a co-defendant in

13     the complaint, took phone calls from potential customers, and

14     referred the customers to others, including allegedly the

15     defendant.  In other words, the defendant did not have his own

16     list of customers.  And I submitted that the defendant did not

17     have the wherewithal to have direct access to customers for the

18     purpose of selling them the heroin, and indeed, that a careful

19     reading of the complaint would suggest that either Mr. Erkan or

20     others involved in the conspiracy were in fact the sources of

21     the heroin as well.

22             And I would call the Court's attention to the fact

23     that Mr. Erkan appeared on the radar of the government because

24     an individual with whom he had had contact was found dead of an

25     overdose of fentanyl laced heroin, having nothing to do with my

1 | client.  That the fatal overdose that is described in the
2 | complaint, and which the government seeks to attribute to
3 | heroin sold by my client, was touted by Mr. Erkan as being
4 | fentanyl-free heroin, so Mr. Erkan was more than simply a
5 | referral service.  And I call the Court's attention to page
6 | seven, paragraph 10, of the complaint.  Which --
7 |          THE COURT:  I don't have the complaint.
8 |          MR. SERCARZ:  You don't have the complaint with you?
9 | It -- may I hand my copy up to the Court?
10 |          THE COURT:  Yes.  Thank you.  And give me a moment to
11 | look it over.
12 |          MR. SERCARZ:  Of course.
13 |          (Pause)
14 |          THE COURT:  Please go ahead.
15 |          MR. SERCARZ:  Thank you, your Honor.  At page seven,
16 | paragraph 10, there is a dialogue between Mr. Erkan, who is in
17 | the process of referring a potential customer to Hope, and the
18 | customer.  In the middle, it is about the middle of the page,
19 | Mr. Erkan says that delivery person will be a source of
20 | high-quality fentanyl free.  F-E-N-T free heroin.
21 |          Mr. Erkan was more than simply someone who had a
22 | collection of numbers, phone numbers of people who would
23 | deliver heroin.  He touted the product.  And in determining the
24 | alleged role, even assuming that the allegations in the
25 | complaint were true, I thought that was an important fact.

Case 23-370, Document 49, 11/13/2023, 3589727, Page49 of 178

J3K3MARC

1          The other thing I will tell you about the proceedings

2    that took place earlier today is that there was some dialogue

3    between Judge Cott and the defense about whether or not the

4    defendant had ever been involved in the sale of drugs while he

5    was actually living in his mother's home.  And the answer, the

6    short answer is no.

7          Elizabeth Margolies, who is present in the courtroom,

8    indicated to me that between August of 2018 and January of

9    2019, the defendant lived intermittently in his mother's home.

10   She was making an assiduous effort to change his life, and it

11   was Ms. Margolies who sent my client to Israel pursuant to the

12   Birthright program for Jewish kids.  My client made contacts

13   with people in New Orleans while he was away.  It was

14   Ms. Margolies that put my client into a coding school while he

15   was down in New Orleans, all as part of the effort to change

16   the fabric of his life and give him a more productive

17   environment and a more productive life.

18         It is Ms. Margolies who is going to stand as the

19   third-party guarantor.  It is her home that is going to be my

20   client's prison, effectively, at least if that's not too strong

21   a term during this period when the case is being litigated.

22   And I respectfully submit, your Honor, that the conditions

23   carefully determined and put in place by Judge Cott are more

24   than adequate to overcome any danger that my client would

25   reoffend, either by attempting to obtain or sell drugs or by

**A-46**

J3K3MARC

1    having inappropriate contact with minors, including the receipt

2    of child pornography.

3            So, I ask you to uphold the findings that were made

4    just earlier today, your Honor.

5            THE COURT:  Would the government like to be heard

6    further?

7            MS. BRACEWELL:  Just one brief point of clarification,

8    and not to stray too far from the relevant issues here.  But,

9    all the evidence that we have suggests that Mr. Erkan, the

10   co-defendant, functioned as a middleman.  That he received a

11   tip and provided a dealer, dealer's contact information to

12   various customers.  And the phone records, both with the

13   undercover and with the overdose victim that we've referenced,

14   bear that out.

15           What happened after receiving a dealer's phone number

16   from Erkan, is that these individuals commenced and carried out

17   plans to buy and purchase drugs from the actual drug dealers,

18   including Margolies.

19           So, I don't think Erkan's role is particularly

20   relevant to bail determination here, but to the extent that

21   there's any kind of insinuation that he was the source of the

22   drugs or actually actively engaged in facilitating those deals,

23   that's not borne out by the evidence.

24           And second, I would just note, respectfully, that the

25   home environment, even with the most diligent caregiver, is

Case 23-370, Document 49, 11/13/2023, 3589727, Page51 of 178

J3K3MARC

 1      inadequate for a few very salient reasons in this case.  The

 2      defendant has, as he's reported, a demonstrated history with

 3      drug use of his own.  He has a sustained history of dealing

 4      drugs, including, as we've discussed, drugs that pose a real

 5      danger to the community.  And he's shown a tendency to collect

 6      child pornography and to cross the line to conduct with minors,

 7      which can take place if there's access to a computer, there's

 8      access to a phone, which can, even with the most diligent

 9      restrictions, they're easily accessed in this world where

10      they're so ubiquitous.

11             For all these reasons, we submit that home

12      incarceration, even as set forth by Judge Cott, is simply

13      inadequate.

14             THE COURT:  Mr. Sercarz, how many hours a day is the

15      defendant's mother in her home?

16             MR. SERCARZ:  She is in the home virtually all day

17      because she works out of the house.  And I spoke to

18      Ms. Margolies about whether or not some provision could be made

19      on those occasions when she may have to travel, or be away from

20      the home for a substantial period of time, as to whether or not

21      someone else could also be present.  And I believe those

22      arrangements could be made in the event that the Court insists

23      upon this as an additional condition.

24             Ms. Margolies is in court, your Honor, and would

25      respond directly to questions by the Court, if you see fit to

J3K3MARC

 1   address.

 2          THE COURT:  All right.  Ms. Margolies, could you come

 3   forward to the podium, please.  Good afternoon.

 4          MS. MARGOLIES:  Hi.

 5          MR. SERCARZ:  I apologize, your Honor.  It's my fault.

 6          MS. MARGOLIES:  Yes, this mic is working.

 7          THE COURT:  On an average day, about how many hours

 8   are you absent from your home?

 9          MS. MARGOLIES:  Other than four minutes to walk my dog

10   several times, I'm home all day.  I have a private practice as

11   a psychotherapist and I also run a nonprofit, and I run that

12   out of a home office as well.

13          THE COURT:  All right.  And if you were to be absent

14   from your home for an hour or more, who could be in your home?

15          MS. MARGOLIES:  I have a very strong network of

16   support.  They were even more people here to support Wolf this

17   morning.  I would have no problem, my friends and family have

18   volunteered.  Because I sometimes have to travel to give

19   presentations for my nonprofit, they have offered to stay in

20   the apartment.

21          THE COURT:  All right.  Thank you.

22          In my view, the conditions set forth in the pretrial

23   services report on page five, along with the conditions Judge

24   Cott ordered, along with the condition that whenever

25   Ms. Margolies is absent from her home for an hour or more, she

J3K3MARC

 1    must have present in her home someone who is friends or family

 2    of hers and keep track of who that person is and how long that

 3    person's there.  I believe that that would suffice to protect

 4    the community, and to negate risk of flight.

 5          However, the passport has not yet been surrendered and

 6    his travel documents along with the passport would have to be

 7    surrendered.

 8          MR. SERCARZ:  Your Honor, I have reason to believe

 9    that the passport was seized when the defendant was arrested in

10    New Orleans.  The only reason why there is some question about

11    it is because, at some point, the authorities in New Orleans

12    released a package of personal belongings that belonged to the

13    defendant, and that package has not as yet reached

14    Ms. Margolies at the 16th Street address.  But it would be

15    contrary to protocol for the authorities in New Orleans to

16    release a passport of an arrested and detained individual and

17    simply put it in the mail and send it somewhere.  So I'm pretty

18    confident that the passport is still with the authorities at

19    the location of arrest.

20          If the Court wants to add some kind of a condition

21    that bail cannot be posted until that passport is accounted

22    for, I'll be in touch with the government, and we'll try and

23    ensure it's still in New Orleans.

24          THE COURT:  Condition number three on page five of the

25    pretrial services report is that the defendant must surrender

Case 23-370, Document 49, 11/13/2023, 3589727, Page54 of 178

J3K3MARC

1   travel documents.

2           MR. SERCARZ:  Yes, your Honor.

3           THE COURT:  Until that happens, he cannot make bail.

4           MR. SERCARZ:  Yes, your Honor.

5           THE COURT:  And we need to know where that passport

6   is, and have it brought here.

7           MR. SERCARZ:  Yes, your Honor.  In the event it's with

8   the authorities in New Orleans, would a letter to that effect

9   suffice or indeed that the government --

10          THE COURT:  I don't know why they would need to keep

11  it.  Can't they send it to their people here?

12          MR. SERCARZ:  Your Honor, I'll track it down and I'll

13  be in touch with the Court.

14          THE COURT:  Okay.  Thank you.  Is there anything

15  further?  Okay.  We are adjourned.

16          MS. BRACEWELL:  Oh, your Honor.  Just if we could

17  proceed as well with the pretrial conference that was already

18  scheduled?

19          THE COURT:  Yes, certainly.

20          MS. BRACEWELL:  Okay.  Since we're here.

21          THE COURT:  That's good.  Where are we on discovery?

22          MS. BRACEWELL:  The government will be making a

23  initial production within two weeks.  It consists of recordings

24  of the undercover buys, various cell phone communications,

25  warrants, so it will be rather voluminous.  We expect to make

J3K3MARC

1    it within two weeks.  There might be subsequent productions,

2    but we can complete the majority within four weeks I think.

3            THE COURT:  All right.  When would it be reasonable

4    for a defense lawyer to be able to make motions with respect to

5    that?

6            MS. BRACEWELL:  I believe we could produce the

7    warrants very quickly.  So however long the defense needs with

8    those warrants.  I should note there's two warrants at issue

9    for his review.

10           THE COURT:  All right.

11           MR. SERCARZ:  I'm sorry, I didn't get that.  There are

12   two warrants?

13           MS. BRACEWELL:  Yes.  There was a premises search

14   warrant and then there was a warrant for certain electronic

15   devices.

16           THE COURT:  All right.  Could any motions be made

17   within a month, Mr. Sercarz?

18           MR. SERCARZ:  One month from today or one month after

19   the receipt of all the discovery, your Honor?

20           THE COURT:  After receipt of all the discovery.

21           MR. SERCARZ:  Yes, your Honor.

22           THE COURT:  All right.  Now, I'd like to set dates

23   certain.  So let me have the government tell me, with as much

24   specificity as you can, when will discovery be complete.

25           MS. BRACEWELL:  So we could have discovery produced by

```
 1    April 19.  I think that's approximately one month by my very
 2    rough count.
 3              THE COURT:  All right.  So the motions are due by
 4    May 17.  And you should indicate whether or not a hearing is
 5    sought.
 6              MR. SERCARZ:  Yes, your Honor.
 7              THE COURT:  Once I receive the government's response,
 8    I'll review the situation.  If there is any reply from defense
 9    counsel, I'll review that.  And then if we need a hearing, my
10    deputy will get on the phone to set it with you.  If you don't,
11    I'll simply decide the motions.
12              Now how soon can the case be tried?  I'd like to find
13    a date when both counsel are available.
14              MS. BRACEWELL:  We are presently awaiting the results
15    of certain electronic devices, but we anticipate having those
16    within a matter of weeks, so I don't think that should
17    substantially hold up the trial.
18              THE COURT:  All right.  How about July 1 for trial?
19              MR. SERCARZ:  Your Honor, the first two weeks in July
20    I'm scheduled to be away with my wife.  If we can put it over
21    until after mid-July, I would be grateful.
22              THE COURT:  How is July 15?
23              MR. SERCARZ:  Can we do it in August so I'm not
24    confronted with a trial the day I get back from vacation?
25              THE COURT:  No.  Let's put it before your vacation.
```

J3K3MARC

1     Let's say June 10 at 9 a.m.

2              Trial is set for June 10, 2019, at 9 a.m.  Voir dire

3     and proposed request to charge all on one disc are due June 4.

4     That will require defense counsel and the government to get

5     together and see what you can agree to and what you disagree

6     about.

7              MR. SERCARZ:  Yes, your Honor.  I'm sorry.  You said

8     June 4 for submission, joint submission of voir dire?

9              THE COURT:  Yes.

10             MR. SERCARZ:  And request.  Okay.

11             THE COURT:  I will exclude time from today through the

12    day trial starts, which is June 10, unless there is any

13    objection.

14             MR. SERCARZ:  No, your Honor.

15             THE COURT:  In light of the fact that counsel needs

16    time to prepare for trial, I find that an exclusion of time

17    from today through July 10, 2019, is in the interest of

18    justice, and that those interests outweigh the interests of the

19    defendant and public in a speedy trial.  I thus exclude that

20    time.

21             Is there anything further?

22             MS. BRACEWELL:  Nothing from the government, thank

23    you.

24             MR. SERCARZ:  Not by the defense, your Honor.

25             THE COURT:  Thank you.  We are adjourned.

ORIGINAL

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 4, 2019

**BY EMAIL**

Maurice H. Sercarz, Esq.
Sercarz & Riopelle, LLP
810 Seventh Avenue, Suite 620
New York, NY 10019
(212) 586-4900
msercarz@sercarzandriopelle.com

　　Re:　**United States v. Wolfe Margolies, 18 Cr. 178 (KMW)**

Dear Mr. Sercarz:

　　On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will accept a guilty plea from Wolfe Margolies ("the defendant") to Counts One and Two of the above-referenced Indictment (the "Indictment").

　　Count One charges the defendant with conspiring to distribute and possess with intent to distribute mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(C). Count One carries a maximum sentence of twenty years' imprisonment; a maximum term of supervised release of life; a mandatory minimum term of three years' supervised release; a maximum fine, pursuant to Title 18, United States Code, Section 3571 and Title 21, United States Code, Section 841(b)(1)(C), of the greatest of $1,000,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a mandatory $100 special assessment. In addition to the foregoing, the Court must order restitution as specified below.

　　Count Two charges the defendant with possession of child pornography, in violation of Title 18, United States Code, Sections 2252A(a)(5)(B), (b)(2), and 2. Count Two carries a maximum sentence of twenty years' imprisonment; a mandatory minimum term of supervised release of five years; a maximum term of supervised release of life; a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a $100 special assessment. In addition to the foregoing, the Court must order restitution as specified below.

　　In consideration of the defendant's plea to the above offenses, the defendant will not be further prosecuted criminally by this Office (except for criminal tax violations, if any, as to which

this Office cannot, and does not, make any agreement) for conspiring to distribute and possess with intent to distribute mixtures and substances containing a detectable amount of heroin, from in or about December 2017 through in or about January 2019, as charged in Count One of the Indictment, and for possession of child pornography from in or about October 2018 up to in or about January 2019, as charged in Count Two of the Indictment, it being understood that this Agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 *et seq.* In addition, at the time of sentencing, the Government will move to dismiss any open Counts against the defendant. The defendant agrees that with respect to any and all dismissed charges he is not a "prevailing party" within the meaning of the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), and will not file any claim under that law.

It is further understood that the defendant shall make restitution in an amount to be ordered by the Court in accordance with 18 U.S.C. §§ 3663, 3663A, and 3664.

The defendant furthermore admits the forfeiture allegations with respect to Counts One and Two of the Indictment. The defendant agrees to forfeit to the United States, pursuant to Title 21, United States Code, Section 853, any and all property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense in Count One, and any and all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense. The defendant furthermore agrees to forfeit to the United States, pursuant to Title 21, United States Code, Section 2253(a): (1) any visual depiction described in Title 18, United States Code, Section 2252A, or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction, which was produced, transported, mailed, shipped or received in violation of Title 18, United States Code, Chapter 110; (2) any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from the offense in Count Two; and (3) any property, real or personal, used or intended to be used to commit or to promote the commission of such offense, or any property traceable to such property. It is further understood that any forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon him in addition to forfeiture.

In consideration of the foregoing and pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") Section 6B1.4, the parties hereby stipulate to the following:

**A. Offense Level**

      1.    The November 2018 edition of the Guidelines Manual applies to this case.

**Count One**

      2.    The Sentencing Guideline applicable to Count One is U.S.S.G. § 2D1.1.

3.    Pursuant to U.S.S.G. § 2D1.1(a)(2), the base offense level is 38 because the offense of conviction establishes that death or serious bodily injury resulted from the use of the substance.

### Count Two

4.    The Sentencing Guideline applicable to Count Two is U.S.S.G. § 2G2.2.

5.    Pursuant to U.S.S.G. § 2G2.2(a)(1), the base offense level is 18.

6.    Pursuant to U.S.S.G. § 2G2.2(b)(2), because the material involved a prepubescent minor or a minor who had not attained the age of 12 years, the offense level is increased by two levels.

7.    Pursuant to U.S.S.G. § 2G2.2(b)(4)(B), because the offense involved sexual abuse or exploitation of an infant or toddler, the offense level is increased by four levels.

8.    Pursuant to U.S.S.G. § 2G2.2(b)(6), two levels are added because the offense involved the use of a computer or an interactive computer service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material.

9.    Accordingly, the adjusted offense level for Count Two is 26.

### Grouping Analysis

10.    Pursuant to U.S.S.G. § 3D1.2, Count One constitutes a group ("Group One"), and Count Two constitutes a separate group ("Group Two").

11.    Pursuant to U.S.S.G. § 3D1.4(a), Group One counts as one Unit because it is the Group with the highest offense level. Pursuant to § 3D1.4(c), Group Two is disregarded because it is nine or more levels less serious than Group One. Accordingly, the combined offense level is 38.

12.    Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

In accordance with the above, the applicable Guidelines offense level is 35.

**B. Criminal History Category**

Based upon the information now available to this Office (including representations by the defense), the defendant has zero criminal history points. Accordingly, the defendant's Criminal History Category is I.

**C. Sentencing Range**

Based upon the calculations set forth above, the defendant's Guidelines range is 168 to 210 months' imprisonment (hereinafter "the Stipulated Guidelines Range"). In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines level 35, pursuant to U.S.S.G. §§ 5E1.2(c)(3) and (4), the applicable fine range is $40,000 to $1,000,000.

The parties agree that neither a downward nor an upward departure from the Stipulated Guidelines Range set forth above is warranted. Accordingly, neither party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein. Nor will either party in any way suggest that the Probation Office or the Court consider such a departure or adjustment under the Guidelines.

The parties agree that either party may seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).

Except as provided in any written Proffer Agreement(s) that may have been entered into between this Office and the defendant, nothing in this Agreement limits the right of the parties (i) to present to the Probation Office or the Court any facts relevant to sentencing; (ii) to make any arguments regarding where within the Stipulated Guidelines Range (or such other range as the Court may determine) the defendant should be sentenced and regarding the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a); (iii) to seek an appropriately adjusted Guidelines range if it is determined based upon new information that the defendant's criminal history category is different from that set forth above; and (iv) to seek an appropriately adjusted Guidelines range or mandatory minimum term of imprisonment if it is subsequently determined that the defendant qualifies as a career offender under U.S.S.G. § 4B1.1. Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, regardless of any stipulation set forth above, if the defendant fails clearly to demonstrate acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence. Similarly, nothing in this Agreement limits the right of the Government to seek an enhancement for obstruction of justice, *see* U.S.S.G. § 3C1.1, regardless of any stipulation set forth above, should it be determined that the defendant has either (i) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice or (ii) committed another crime after signing this Agreement.

It is understood that pursuant to U.S.S.G. § 6B1.4(d), neither the Probation Office nor the Court is bound by the above Guidelines stipulation, either as to questions of fact or as to the

Case 23-370, Document 49, 11/13/2023, 3589727, Page62 of 178

determination of the proper Guidelines to apply to the facts. In the event that the Probation Office or the Court contemplates any Guidelines adjustments, departures, or calculations different from those stipulated to above, or contemplates any sentence outside of the stipulated Guidelines range, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

It is understood that the sentence to be imposed upon the defendant is determined solely by the Court. It is further understood that the Guidelines are not binding on the Court. The defendant acknowledges that his entry of a guilty plea to the charged offense authorizes the sentencing Court to impose any sentence, up to and including the statutory maximum sentence. This Office cannot, and does not, make any promise or representation as to what sentence the defendant will receive. Moreover, it is understood that the defendant will have no right to withdraw his plea of guilty should the sentence imposed by the Court be outside the Guidelines range set forth above.

It is agreed (i) that the defendant will not file a direct appeal; nor bring a collateral challenge, including but not limited to an application under Title 28, United States Code, Section 2255 and/or Section 2241; nor seek a sentence modification pursuant to Title 18, United States Code, Section 3582(c), of any sentence within or below the Stipulated Guidelines Range of 168 to 210 months' imprisonment, and (ii) that the Government will not appeal any sentence within or above the Stipulated Guidelines Range. This provision is binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, it is agreed that any appeal as to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) the above stipulation. The parties agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with the undischarged portion of any other sentence of imprisonment that has been imposed on the defendant at the time of sentencing in this case. The defendant further agrees not to appeal any term of supervised release that is less than or equal to the statutory maximum. The defendant also agrees not to appeal any fine that is less than or equal to $1,000,000, and the Government agrees not to appeal any fine that is greater than or equal to $40,000. Notwithstanding the foregoing, nothing in this paragraph shall be construed to be a waiver of whatever rights the defendant may have to assert claims of ineffective assistance of counsel, whether on direct appeal, collateral review, or otherwise. Rather, it is expressly agreed that the defendant reserves those rights.

The defendant hereby acknowledges that he has accepted this Agreement and decided to plead guilty because he is in fact guilty. By entering this plea of guilty, the defendant waives any and all right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, *Jencks* Act material, exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, or impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

The defendant recognizes that, if he is not a citizen of the United States, his guilty plea and conviction make it very likely that his deportation from the United States is presumptively

mandatory and that, at a minimum, he is at risk of being deported or suffering other adverse immigration consequences. If the defendant is a naturalized citizen of the United States, he recognizes that pleading guilty may have consequences with respect to the defendant's immigration status. For example, under federal law, an individual may be subject to denaturalization and removal if his naturalization was procured by concealment of a material fact or by willful misrepresentation, or otherwise illegally procured. The defendant acknowledges that he has discussed the possible immigration consequences (including removal or denaturalization) of his guilty plea and conviction with defense counsel. The defendant affirms that he wants to plead guilty regardless of any immigration or denaturalization consequences that may result from the guilty plea and conviction, even if those consequences include denaturalization and/or removal from the United States. The defendant understands that denaturalization and other immigration consequences are typically the subject of a separate proceeding, and the defendant understands that no one, including his attorney or the District Court, can predict with certainty the effect of the defendant's conviction on the defendant's immigration or naturalization status. It is agreed that the defendant will have no right to withdraw his guilty plea based on any actual or perceived adverse immigration consequences (including removal or denaturalization) resulting from the guilty plea and conviction. It is further agreed that the defendant will not challenge his conviction or sentence on direct appeal, or through litigation under Title 28, United States Code, Section 2255 and/or Section 2241, on the basis of any actual or perceived adverse immigration consequences (including removal or denaturalization) resulting from his guilty plea and conviction.

The defendant understands and acknowledges that, under the Sex Offender Registration and Notification Act, a federal law, he must register and keep the registration current in each of the following jurisdictions: where he resides, where he is employed, and where he is a student. The defendant understands that the requirements for registration include providing his true name, residence address, and the names and addresses of any places where he is or will be an employee or student. The defendant further understands that the requirement to keep the registration current includes informing at least one of the aforementioned jurisdictions not later than three days after any change of name, residence, employment, or student status. The defendant understands that failure to comply with these obligations subjects him to prosecution for failure to register under federal law, Title 18, United States Code, Section 2250, which is punishable by a fine, imprisonment, or both.

It is further agreed that should the conviction following the defendant's plea of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement (including any counts that the Government has agreed to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

It is further understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office.

A-60

Page 7

Apart from any written Proffer Agreement(s) that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and the defendant.  No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

By:

Mollie Bracewell
Assistant United States Attorney
(212) 637-2218

APPROVED:

Shawn Crowley
Co-Chief, Narcotics Unit

AGREED AND CONSENTED TO:

Wolfe Margolies

6/24/19
DATE

APPROVED:

Maurice Sercarz, Esq.
Attorney for Wolfe Margolies

6/24/19
DATE

J6O8MARP

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        19 Cr. 178 (KMW)

5    WOLFE MARGOLIES,

6                   Defendant.

7    ------------------------------x

                                         New York, N.Y.
8                                        June 24, 2019
                                         10:50 a.m.

9
     Before:
10
                         HON. ROBERT W. LEHRBURGER,
11
                                         Magistrate Judge
12
                              APPEARANCES
13
     GEOFFREY S. BERMAN
14        United States Attorney for the
          Southern District of New York
15   MOLLIE BRACEWELL
          Assistant United States Attorney
16
     MAURICE SERCARZ
17        Attorney for Defendant

18

19

20

21

22

23

24

25

J6O8MARP

```
1              (Case called)

2              THE DEPUTY CLERK:  Counsel, please state your name for

3    the record, starting with the government.

4              MS. BRACEWELL:  Good morning, your Honor.  Mollie

5    Bracewell for the government.

6              THE COURT:  Good morning.

7              MR. SERCARZ:  For the defendant Margolies, Maurice

8    Sercarz.  Good morning, your Honor.

9              THE COURT:  Good morning.

10             All right.  So I understand we are here for a plea,

11   and let me ask the defendant, how do you intend to plead today?

12             MR. SERCARZ:  The defendant intends to plead guilty to

13   the charges.  Do you want to hear it from the defendant?

14             THE COURT:  No.  That's OK.

15             So I am going to need to ask you a number of questions

16   under oath.  So I am going to ask my courtroom deputy to swear

17   you in.

18             (Defendant sworn)

19             THE COURT:  So Mr. Margolies, let me just remind you,

20   because you will be giving answers under oath, if any of your

21   statements are false, they could be used in a prosecution for

22   perjury which would carry its own additional penalty.  So let's

23   proceed.

24             So I have before me a document that's entitled,

25   Consent to Proceed before a United States Magistrate Judge on a
```

J6O8MARP

1     Felony Plea Allocution that you have signed.  This form says

2     that you know you have the right to have your plea taken by a

3     United States district judge, but you are agreeing to have your

4     plea taken by a United States magistrate judge.  As a

5     magistrate judge, I have the authority to take your plea, with

6     your consent, and you will still be entitled to all the same

7     rights and protections as if you were before a district judge.

8     Among other things, you will be sentenced by a district judge.

9             Did you indeed sign a consent to proceed before a

10    United States magistrate judge?

11            THE DEFENDANT:  Yes, your Honor.

12            THE COURT:  Did you do so voluntarily?

13            THE DEFENDANT:  Yes, your Honor.

14            THE COURT:  Before you signed the form, did your

15    lawyer explain it to you?

16            THE DEFENDANT:  Yes, your Honor.

17            THE COURT:  Do you in fact wish to proceed with your

18    plea before a United States magistrate judge?

19            THE DEFENDANT:  Yes, your Honor.

20            THE COURT:  I am accepting your consent.

21            So the purpose of this proceeding is to make sure that

22    you understand your rights, to decide whether you are pleading

23    guilty of your own free will, and to make sure you are pleading

24    because you are guilty and not for some other reason.

25            So I am going to start by asking you a number of

J6O8MARP

1    questions that go to your competency to give a plea.  And

2    again, listen very carefully and answer honestly, and if you

3    don't understand anything, just let me know.

4              What is your full name?

5              THE DEFENDANT:  Wolfe Barrett Margolies.

6              THE COURT:  How old are you?

7              THE DEFENDANT:  26.

8              THE COURT:  Can you read and write in English?

9              THE DEFENDANT:  Yes.

10             THE COURT:  How far did you go in school, Mr.

11   Margolies?

12             THE DEFENDANT:  Some college.

13             THE COURT:  Are you currently or have you recently

14   been under the care of a doctor, psychiatrist, psychologist or

15   other mental health care provider for any reason?

16             THE DEFENDANT:  Yes, your Honor.

17             THE COURT:  You are currently under care of a doctor

18   or psychiatrist?

19             THE DEFENDANT:  Yes.

20             THE COURT:  What type of doctor?

21             THE DEFENDANT:  Psychologist.

22             THE COURT:  Has the psychologist prescribed any

23   medication for you or asked you to get any medication?

24             THE DEFENDANT:  No, your Honor.

25             THE COURT:  Do you have any condition that affects

A-65

J6O8MARP

1    your ability to see or to hear?

2              THE DEFENDANT:  No, your Honor.

3              THE COURT:  Do you have any condition that affects

4    your ability to think or to understand or to make judgments or

5    decisions on your own behalf?

6              THE DEFENDANT:  No, your Honor.

7              THE COURT:  Have you ever been hospitalized for mental

8    illness, alcoholism or narcotics addiction?

9              THE DEFENDANT:  Yes, your Honor.

10             THE COURT:  When were you hospitalized?

11             THE DEFENDANT:  2011.

12             THE COURT:  Have you been hospitalized since then?

13             THE DEFENDANT:  No.

14             THE COURT:  As you sit here today, are you under the

15   influence of any mind-altering drugs or alcohol?

16             THE DEFENDANT:  No, your Honor.

17             THE COURT:  How do you feel today?

18             THE DEFENDANT:  Fine.

19             THE COURT:  Is your mind clear?

20             THE DEFENDANT:  Yes, your Honor.

21             THE COURT:  Do you understand what is happening in

22   this proceeding?

23             THE DEFENDANT:  Yes, your Honor.

24             THE COURT:  All right.  So you were charged pursuant

25   to an indictment.  Have you seen the indictment that has the

J6O8MARP

| | |
|---|---|
| 1 | charges against you? |
| 2 | THE DEFENDANT:  Yes, your Honor. |
| 3 | THE COURT:  Did you read it? |
| 4 | THE DEFENDANT:  Yes, your Honor. |
| 5 | THE COURT:  You understand what it says you did? |
| 6 | THE DEFENDANT:  Yes, your Honor. |
| 7 | THE COURT:  Have you had enough time to talk about the |
| 8 | case with your attorney and how you wish to plead? |
| 9 | THE DEFENDANT:  Yes, your Honor. |
| 10 | THE COURT:  Has your attorney told you the |
| 11 | consequences of pleading guilty? |
| 12 | THE DEFENDANT:  Yes, your Honor. |
| 13 | THE COURT:  Are you satisfied with your attorney's |
| 14 | representation of you? |
| 15 | THE DEFENDANT:  Yes, your Honor. |
| 16 | THE COURT:  Does either counsel have any objections or |
| 17 | concerns about the defendant's competence to plead at this |
| 18 | time? |
| 19 | Government. |
| 20 | MS. BRACEWELL:  No, your Honor. |
| 21 | THE COURT:  Defense. |
| 22 | MR. SERCARZ:  No, your Honor. |
| 23 | THE COURT:  All right. |
| 24 | Now, Mr. Margolies, I want to explain to you certain |
| 25 | rights you have and are waiving, or giving up, by entering into |

J6O8MARP

 1   this plea.

 2            First, under the Constitution and the laws of the

 3   United States, you have a right to plead not guilty to the

 4   charges contained in the indictment.

 5            Do you understand that?

 6            THE DEFENDANT:  Yes, your Honor.

 7            THE COURT:  If you plead not guilty, you would be

 8   entitled under the Constitution to a speedy and public trial by

 9   a jury of those charges.

10            At that trial, you would be presumed innocent, and the

11   government would be required to prove your guilt beyond a

12   reasonable doubt before you could be found guilty.  And you

13   could not be convicted unless a jury of 12 people agreed

14   unanimously that you are guilty beyond a reasonable doubt.

15            Do you understand that?

16            THE DEFENDANT:  Yes, your Honor.

17            THE COURT:  If you decided to go to trial, at that

18   trial, and at every stage of your case, you would have the

19   right to be represented by an attorney, and if you could not

20   afford one, an attorney would be appointed to represent you at

21   the government's expense.  And even if you retained a private

22   attorney, but ran out of money and could no longer afford one,

23   again, the government would appoint an attorney for you.  So

24   you would be entitled to an attorney all the way through trial

25   and not just for a guilty plea.  And your decision to plead

J6O8MARP

```
 1      guilty should not depend on whether you could afford to hire an

 2      attorney.

 3              Do you understand that?

 4              THE DEFENDANT:  Yes, your Honor.

 5              THE COURT:  During a trial, the witnesses for the

 6      prosecution would have to come to court and testify in your

 7      presence, where you could see and hear them, and your lawyer

 8      could cross-examine witnesses.  If you wanted, your lawyer

 9      could offer evidence on your behalf, and you would be able to

10      use the court's power to compel witnesses to come to court to

11      testify in your defense even if they did not want to come.

12              Do you understand that?

13              THE DEFENDANT:  Yes, your Honor.

14              THE COURT:  Now, at the trial, you would have the

15      right to testify in your own defense, if you wanted to.  But

16      you would also have the right not to testify, and if you chose

17      not to testify, that could not be used against you in any way.

18      No inference or suggestion of guilt would be permitted from the

19      fact that you chose not to testify.

20              Do you understand that?

21              THE DEFENDANT:  Yes, your Honor.

22              THE COURT:  If you were convicted at trial, you would

23      have the right to appeal that verdict to a higher court.

24              Do you understand that?

25              THE DEFENDANT:  Yes, your Honor.
```

J6O8MARP

```
 1              THE COURT:  As I said before, you have the right to
 2     plead not guilty.  Even now, you have the right to plead or
 3     continue to plead not guilty and go to trial.  But if you do
 4     plead guilty, and if I accept your plea, you will give up the
 5     rights I have just described.  If you plead guilty, there will
 6     be no trial.  All that will remain to be done will be to impose
 7     a sentence.  You and the government will have a chance to make
 8     arguments about what sentence you should get, but there will
 9     not be any further trial to determine whether you are guilty or
10     not guilty of the charges against you.
11              Do you understand that?
12              THE DEFENDANT:  Yes, your Honor.
13              THE COURT:  Finally, if you do plead guilty, you are
14     also giving up the right not to incriminate yourself, and I
15     will ask you questions about what you did in order to satisfy
16     myself that you are actually guilty.  And by pleading guilty,
17     you will be admitting your factual as well as legal guilt.
18              Do you understand?
19              THE DEFENDANT:  Yes, your Honor.
20              THE COURT:  So I now want to review with you the
21     charges against you and the consequences of pleading guilty to
22     them.  I understand that you intend to plead to Count One and
23     Two of the indictment.
24              Count One charges you with conspiring to distribute
25     and possess with intent to distribute mixtures and substances
```

J6O8MARP

1    containing a detectable amount of heroin, in violation of Title

2    21 U.S.C., Sections 846 and 841(b)(1)(C).

3            So I am now going to ask the Assistant U.S. Attorney

4    to state the elements of this charge.  The elements are what

5    the government would have to prove in order to establish your

6    guilt.

7            Please proceed.

8            MS. BRACEWELL:  Count One has two elements:

9            First, that there was an unlawful agreement to

10   distribute controlled substances or to possess controlled

11   substances with the intent to distribute them; and

12           Second, the defendant knowingly became a member of the

13   conspiracy; that is, knowingly associated with the conspiracy

14   and participated in the conspiracy to distribute or possess

15   with the intent to distribute controlled substances.

16           THE COURT:  How do you intend to plead to Count One?

17           THE DEFENDANT:  Guilty.

18           THE COURT:  I now want to explain to you what the

19   potential penalties are in connection with Count One.  I am

20   going to explain what the maximum penalty is that the court can

21   impose.  The maximum means the most that could possibly be

22   imposed.  It does not mean that is what necessarily you would

23   receive.  But by pleading guilty, you are exposing yourself to

24   the possibility of receiving any combination of punishments up

25   to the maximum that I am about to describe.

Case 23-370, Document 49, 11/13/2023, 3589727, Page75 of 178

J6O8MARP

1          Do you understand that?

2          THE DEFENDANT:  Yes, your Honor.

3          THE COURT:  So Count One carries a maximum sentence of

4    20 years' imprisonment.  It also includes a maximum term of

5    supervised release of life.

6          Supervised release means that after you are released

7    from prison, you may be subject to the supervision of the

8    probation department, and if you are placed on supervised

9    release, but thereafter commit a violation of any condition of

10   your supervised release, the district judge can revoke the term

11   of your supervised release previously imposed and return you to

12   prison without giving you any credit for time previously served

13   on post-release supervision.

14         In addition to the restrictions on your liberty that I

15   have just described, Count One also carries a maximum fine of

16   the greatest of $1 million or twice the gross pecuniary gain

17   derived from the offense or twice the gross pecuniary loss to

18   persons other than you resulting from the offense, whichever of

19   these three is greater.  It also carries a mandatory special

20   assessment of $100.  And in addition, the court is required to

21   order restitution if applicable.

22         Count Two charges you with possession of child

23   pornography, in violation of Title 18 U.S.C., Sections

24   2252A(a)(5)(B), (b)(2) and 2.

25         Ms. Bracewell, can you recite the elements of Count

J6O8MARP

1    Two, please.

2           MS. BRACEWELL:  Yes.  Count Two has three elements:

3           First, the defendant knowingly possessed any matter

4    that contained an image of child pornography, as defined in

5    Title 18, United States Code, Section 2256(8);

6           Second, that such child pornography had been

7    transported in interstate or foreign commerce by any means

8    including by computer, or that such child pornography had been

9    produced using materials that had been mailed or shipped or

10   transported in interstate or foreign commerce by any means

11   including a computer; and

12          Third, the defendant knew that such items constituted

13   child pornography.

14          THE COURT:  So Count Two -- by the way, what is your

15   intent to plead with respect to Count Two?

16          THE DEFENDANT:  Guilty.

17          THE COURT:  Count Two carries a maximum sentence of 20

18   years' imprisonment, a mandatory minimum term of supervised

19   release of five years -- a minimum meaning that at least that

20   number has to be imposed -- a maximum term of supervised

21   release of life, and a maximum fine of the greatest of

22   $250,000, twice the gross pecuniary gain derived from the

23   offense or twice the gross pecuniary loss to persons other than

24   you resulting from the offense, and again, a $100 special

25   assessment and any restitution that is applicable.

J6O8MARP

```
 1                Additionally, if -- and I have to apprise all
 2    defendants of this -- if you are not a citizen of the United
 3    States, then your guilty plea may also have adverse
 4    consequences for your ability to remain in or return to the
 5    United States, including removal, deportation, denial of
 6    citizenship and denial of admission to the United States in the
 7    future.  If that does happen, you will still be bound by your
 8    guilty plea, that is, you will not be able to withdraw it,
 9    regardless of any advice you have received from your counsel or
10    others regarding the immigration consequences of your plea.
11                Do you understand that?
12                THE DEFENDANT:  Yes, your Honor.
13                THE COURT:  Do you understand the charges against you
14    and the consequences of pleading guilty?
15                THE DEFENDANT:  Yes, your Honor.
16                THE COURT:  So as I referred to earlier, there is a
17    plea agreement between you and the government.
18                Did you sign this plea agreement?
19                THE DEFENDANT:  Yes, your Honor.
20                THE COURT:  Did you read the agreement before you
21    signed it?
22                THE DEFENDANT:  Yes, your Honor.
23                THE COURT:  Did you discuss it with your attorney
24    before you signed it?
25                THE DEFENDANT:  Yes, your Honor.
```

Case 23-370, Document 49, 11/13/2023, 3589727, Page78 of 178

J6O8MARP

```
 1              THE COURT:  Did your attorney explain to you all of
 2   its terms and conditions?
 3              THE DEFENDANT:  Yes, your Honor.
 4              THE COURT:  Do you understand those terms and
 5   conditions?
 6              THE DEFENDANT:  Yes, your Honor.
 7              THE COURT:  The letter says that you and the
 8   government have reached an agreement as to the appropriate
 9   calculation of your sentence under a part of our law known as
10   the sentencing guidelines, and that the appropriate guideline
11   sentencing range is 168 months to 210 months' imprisonment and
12   a fine in the range of $40,000 to $1 million.
13              Do you understand that?
14              THE DEFENDANT:  Yes, your Honor.
15              THE COURT:  So under this agreement, neither you nor
16   the government is allowed to argue to the sentencing judge for
17   a calculation that is different than the one in this agreement.
18   However, the sentencing judge is not bound by the calculation
19   in this letter, and he or she will be free to do his or her own
20   calculation, which may result in a sentencing range that
21   differs from the one in this letter.
22              Do you understand that?
23              THE DEFENDANT:  Yes, your Honor.
24              THE COURT:  Do you understand that the sentencing
25   range is just one of many factors the judge will consider in
```

Case 23-370, Document 49, 11/13/2023, 3589727, Page79 of 178

J6O8MARP

```
1    determining your sentence and the judge has discretion to give
2    a prison sentence below or above the range, anywhere up to the
3    maximum I told you about earlier?
4              THE DEFENDANT:  Yes, your Honor.
5              THE COURT:  Do you understand as long as the
6    sentencing judge sentences you to a prison term of no longer
7    than 210 months, you are giving up your right to challenge your
8    sentence, whether by direct appeal, writ of habeas corpus, or
9    otherwise?
10             THE DEFENDANT:  Yes, your Honor.
11             THE COURT:  Do you understand that by pleading guilty,
12   you also will not be able to appeal any fine up to $1 million,
13   any lawful sentence of supervised release, or any restitution
14   which the court orders?
15             THE DEFENDANT:  Yes, your Honor.
16             THE COURT:  Do you understand that under the terms of
17   this plea agreement, even if you later learn that the
18   government withheld from your counsel certain information that
19   would have been helpful to you in defending yourself at trial,
20   you will not be able to complain about that or withdraw your
21   guilty plea on that basis?
22             THE DEFENDANT:  Yes, your Honor.
23             THE COURT:  Let me ask counsel, starting with the
24   government, is there any other provision of the plea agreement
25   you would like me to review with the defendant?
```

**A-76**

J6O8MARP

1            MS. BRACEWELL:  Yes, your Honor.  If he could be

2    allocuted on the Sex Offender Registration and Notification

3    Act.

4            THE COURT:  That does apply to this offense?

5            MS. BRACEWELL:  On page 6, yes.

6            THE COURT:  Mr. Margolies, do you understand as a

7    result of your guilty plea, you will be required to register as

8    a sex offender under the Sex Offender Registration and

9    Notification Act?

10            THE DEFENDANT:  Yes, your Honor.

11            THE COURT:  Do you understand -- let me ask the

12    government.  Would you like me to read further?

13            MS. BRACEWELL:  No, that's sufficient.

14            THE COURT:  OK.

15            Is there anything else the defense would like me to

16    bring to the attention of the defendant?

17            MR. SERCARZ:  No, your Honor.

18            THE COURT:  Apart from what is contained in the plea

19    agreement, have any promises been made to you in order to get

20    you to plead guilty?

21            THE DEFENDANT:  No, your Honor.

22            THE COURT:  Has anyone threatened, forced, or coerced

23    you in any way, either directly or indirectly, to get you to

24    plead guilty?

25            THE DEFENDANT:  No, your Honor.

J6O8MARP

1           THE COURT:  So now that you have been advised of the

2      charges against you, the possible penalties you face, and the

3      rights you are giving up, is it still your intention to plead

4      guilty to Counts One and Two of the indictment?

5           THE DEFENDANT:  Yes, your Honor.

6           THE COURT:  Is your plea voluntary and made of your

7      own free will?

8           THE DEFENDANT:  Yes, your Honor.

9           THE COURT:  So Mr. Margolies, with respect to Count

10     One of the indictment, how do you plead, guilty or not guilty?

11          THE DEFENDANT:  Guilty.

12          THE COURT:  With respect to Count Two of the

13     indictment, how do you plead, guilty or not guilty?

14          THE DEFENDANT:  Guilty.

15          THE COURT:  Mr. Margolies, can you please tell me in

16     your own words what you did that makes you guilty of the crimes

17     charged in the indictment?

18          THE DEFENDANT:  During the period described in the

19     indictment, I agreed with others to distribute controlled

20     substances, including those containing heroin, to retail

21     customers of Ekin Erkan.

22          I have reviewed those portions of the complaint which

23     alleges that on February 2, 2018, I delivered a controlled

24     substance containing heroin to an individual identified as

25     Victim-2, and that this individual subsequently died after

J6O8MARP

1    having ingested some of the heroin included in that delivery.

2         I do not have a specific recollection of this

3    delivery.  However, I have reviewed with my attorney the

4    relevant portions of the complaint, an affidavit in support

5    electronic eavesdropping authority on certain cell phones, and

6    the death certificate prepared by the office of the chief

7    medical examiner.  Based upon my review of these materials and

8    my conversations with my attorney, I am prepared to admit the

9    following:

10        I recall that on February 2, 2018, I was the

11   individual who possessed the cell phone described in the

12   complaint as the "Hope 2549 phone";

13        I recall that during the period, I engaged in

14   deliveries of controlled substances to retail customers of Ekin

15   Erkan;

16        That on February 2, 2018, Victim-2 placed an order for

17   three bundles of heroin to me on my cell phone;

18        That shortly after this delivery, the deceased stopped

19   making outgoing calls or sending text messages from his cell

20   phone;

21        That on February 3, 2018, Victim-2's roommate

22   discovered the body of the deceased.  In close proximity to the

23   deceased were two open glassines and 19 unopened glassines.

24        That according to the death certificate prepared by

25   the office of the chief medical examiner, on February 3, 2018

1    at 6:12 p.m., Victim-2 was pronounced dead of acute heroin

2    intoxication.

3            During the period alleged in the indictment, I

4    possessed an image of child pornography.

5            Specifically, on or about October 25, 2018, I

6    communicated by text message with an individual known to me.

7    This individual sent to me a text message and a link to a chat

8    room.  When I entered the chat room, I received a video

9    containing child pornography.  Upon receiving the video, I

10   viewed it and sent a responsive text message.

11           Although I subsequently deleted the video, both the

12   video and accompanying text were extracted from my phone during

13   a border search that took place on January 13, 2019 when I

14   returned to the United States from a trip to Israel.

15           MR. SERCARZ:  For the sake of completing the

16   allocution, may I ask the defendant one or two additional

17   questions?

18           THE COURT:  Sure.

19           MR. SERCARZ:  Wolfe, during the period on or about

20   February 2, 2018, do you have any reason to believe that anyone

21   else was in possession of or made text messages or received

22   text messages on the Hope 2549 phone?

23           THE DEFENDANT:  No.

24           MR. SERCARZ:  Do you have any reason to believe that

25   anyone else used that phone to engage in the distribution of

J6O8MARP

```
 1          drugs to any individual?

 2                    THE DEFENDANT:  No.

 3                    THE COURT:  OK.  Where did your activity take place?

 4          Was it in New York?

 5                    THE DEFENDANT:  Yes.

 6                    THE COURT:  You mentioned distribution of drug

 7          substances.  What were those drugs that you distributed and

 8          delivered?

 9                    THE DEFENDANT:  Heroin.

10                    THE COURT:  All right.  Ms. Bracewell, are there any

11          additional questions you would like me to ask the defendant?

12                    MS. BRACEWELL:  Your Honor had mentioned venue, but I

13          would just ask for specification as to the possession of the

14          child pornography, that it continued into the Southern District

15          of New York and that some portion of the drug trafficking

16          occurred in Manhattan or New York City.

17                    THE COURT:  Did any of your distribution or delivery

18          of drugs take place in New York, in Manhattan?

19                    THE DEFENDANT:  Yes, your Honor.

20                    THE COURT:  Did you possess the child pornography

21          while you were in Manhattan?

22                    THE DEFENDANT:  Yes, your Honor.

23                    THE COURT:  Satisfied, Ms. Bracewell?

24                    MS. BRACEWELL:  Yes.

25                    The government would just stipulate that Victim-2, who
```

J6O8MARP

```
 1   was referenced in the allocution, is a particular individual
 2   who died in Brooklyn, New York on or around February 3, 2018
 3   and the number that was referred to in communication with the
 4   victim referencing a delivery of narcotics immediately prior to
 5   the death.
 6           THE COURT:  I do want to ask another question before I
 7   get to the defense, which is, Mr. Margolies, did you know at
 8   the time that you committed these acts that what you were doing
 9   was wrong and against the law?
10           THE DEFENDANT:  Yes.
11           THE COURT:  All right.  Ms. Bracewell, does the
12   government represent that it has sufficient evidence to
13   establish guilt beyond a reasonable doubt at trial?
14           MS. BRACEWELL:  Yes, your Honor.
15           THE COURT:  Do you believe there is a sufficient
16   factual predicate for a guilty plea?
17           MS. BRACEWELL:  Yes, your Honor.
18           THE COURT:  Would you like to make a proffer?
19           MS. BRACEWELL:  Yes.  At trial, the government would
20   offer evidence including, but not limited to, recordings of
21   buys made by the defendant to an undercover officer of heroin,
22   lab reports confirming that the substance sold was heroin, cell
23   phone communications between the defendant and the undercover
24   officer prior to those sales.  We would also offer, with
25   respect to Count Two, records of the border search of the
```

Case 23-370, Document 49, 11/13/2023, 3589727, Page86 of 178

**A-82**

J6O8MARP

 1    defendant's cell phone, including the video that constitutes

 2    child pornography.

 3            Finally, with respect to the victim that was

 4    referenced in the allocution, the government would offer phone

 5    records showing communications between the defendant and the

 6    victim, as well as the medical records showing that the cause

 7    of the victim's death was acute heroin intoxication.

 8            THE COURT:  Thank you.

 9            Let me ask defense counsel, are there any additional

10    questions you would like me to ask the defendant?

11            MR. SERCARZ:  No, your Honor.

12            THE COURT:  Do you believe there is a sufficient

13    factual predicate for a guilty plea?

14            MR. SERCARZ:  Yes, your Honor.

15            THE COURT:  Do you know of any defense that would

16    prevail at trial or other reason why your client should not be

17    permitted to plead guilty?

18            MR. SERCARZ:  No, your Honor.

19            THE COURT:  Mr. Margolies, on the basis of your

20    responses to my questions and my observations of your demeanor,

21    I find that you are competent to enter an informed guilty plea

22    and that there is a factual basis for it.  I am satisfied that

23    you understand your rights, that you are aware of the

24    consequences of your plea, including the sentence that may be

25    imposed, and that you are voluntarily pleading guilty and that

J6O8MARP

1    you have admitted that you are guilty as charged in Counts One

2    and Two of the indictment.  For these reasons, I recommend that

3    the district judge accept your plea.

4              All right.  I assume the government will order a copy

5    of the transcript and submit it together with any additional

6    paperwork.

7              MS. BRACEWELL:  Yes, we will.

8              I neglected to ask earlier if the defendant could be

9    allocuted on the forfeiture allegation.

10             THE COURT:  OK.

11             The indictment against you also includes provisions

12   for forfeiture of any fruits and instrumentalities of the

13   crimes that you committed.  Do you understand that that is also

14   an additional penalty of punishment that will be imposed or

15   could be imposed with respect to any sentence that you receive

16   for both Count One and Count Two?

17             THE DEFENDANT:  Yes, your Honor.

18             THE COURT:  Knowing that, is your plea still voluntary

19   and made of your own free will?

20             THE DEFENDANT:  Yes, your Honor.

21             THE COURT:  You still in fact plead guilty to Counts

22   One and Two having heard that additional information?

23             THE DEFENDANT:  Yes, your Honor.

24             THE COURT:  Has the district judge set a sentencing

25   date?

A-84

J6O8MARP

 1          MS. BRACEWELL:  No, your Honor.  We would just seek a

 2   control date and be in touch with chambers following the plea

 3   today.

 4          THE COURT:  OK.  We will set September 24 at 11 for

 5   the control date.

 6          I direct that the presentence report be prepared.

 7          Will you, Ms. Bracewell, be able to deliver the case

 8   summary for purposes of the presentence report within 14 days?

 9          MS. BRACEWELL:  Yes, we will.

10          THE COURT:  Defense, will you be available to be

11   interviewed with your client by the probation department within

12   14 days?

13          MR. SERCARZ:  Your Honor, I am scheduled to leave on a

14   vacation on Thursday.  I will be back on July 11.  If the

15   interview could be scheduled shortly after my return, that will

16   be helpful.

17          THE COURT:  Do you see any problem with that, Ms.

18   Bracewell?

19          MS. BRACEWELL:  No, we do not.

20          THE COURT:  That is fine.

21          So you return on the 11th.  Could you present yourself

22   for an interview with the defendant within a week of your

23   return?

24          MR. SERCARZ:  Yes, your Honor.

25          THE COURT:  We will do that.

Case 23-370, Document 49, 11/13/2023, 3589727, Page89 of 178

J6O8MARP

1              What are we doing with respect to detention or

2       release, Ms. Bracewell?

3              MS. BRACEWELL:  The government believes that following

4       a plea detention is mandatory under the statute.

5              THE COURT:  Does the defense have a position?

6              MR. SERCARZ:  No, your Honor.

7              THE COURT:  All right.  The defendant will be remanded

8       and detained in light of his plea.

9              That takes care of everything for today.

10             Ms. Bracewell, anything else?

11             MS. BRACEWELL:  Nothing further.  Thank you.

12             THE COURT:  Anything else from the defense?

13             MR. SERCARZ:  No, your Honor.

14             THE COURT:  Mr. Margolies, I wish you well and good

15      luck, and I hope that you are able to do better in the future

16      and learn from your mistakes.  Thank you.

17             We are adjourned.

18             (Adjourned)

19

20

21

22

23

24

25

**A-86**

**MEMORANDUM IN AID OF SENTENCING ON BEHALF OF
WOLFE MARGOLIES, DATED NOVEMBER 1, 2019
(CASE #1:19-CR-00178-KMW)
(REPRODUCED IN SEALED APPENDIX AT PP. SA-1-SA-37)**



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

_____

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 11, 2019

**BY ECF**

The Honorable Kimba M. Wood
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> Re:   *United States* v. *Wolfe Margolies*, 19 Cr. 178 (KMW)

Dear Judge Wood:

   The Government respectfully submits this letter in advance of the sentencing of defendant Wolfe Margolies (the "defendant") scheduled for November 18, 2019 at 2:30 p.m.  The defendant has pled guilty to two different offenses: conspiring to distribute heroin, including a fatal dose to a particular victim, and possession of child pornography.  The defendant's conduct has caused immeasurable harm, and the nature of his conduct demonstrates that he presents an ongoing risk to the community.  Accordingly, the Government respectfully submits that a sentence within the Stipulated Guidelines Range of 168 to 210 months' imprisonment is appropriate and just.

**I.     Background and Offense Conduct**

   **A.   Narcotics Conspiracy**

   As described in the PSR, the case arose from the investigation of a drug referral business operated by Ekin Erkan, in which Erkan received an online payment, or "tip," from customers in exchange for a referral to drug dealers.  Among the dealers to whom Erkan directed customers was Margolies, the defendant.  (United States Probation Office ("Probation"), Final Presentence Report dated October 28, 2019 ("PSR"), ¶11).  The investigation began after Erkan's phone number was recovered in the cellphone of an overdose victim in January 2017 ("Victim-1").

   In about December 2017, an undercover officer (the "UC") with the New York City Police Department ("NYPD") received a referral from Erkan for a "new plug w fire," referring to a new drug dealer with potent narcotics.  Erkan identified this new dealer as "Hope."  (PSR ¶12).  Again in February 2018, in response to the UC's question about a dealer in Queens, New York, Erkan again provided the telephone number for "Hope."  (PSR ¶13).  On March 2, 2018, the UC contacted the telephone number for Hope provided by Erkan, and arranged to purchase five bundles of heroin in exchange for $420.  (PSR ¶15).  After the transaction, the UC identified Margolies as the

Hon. Kimba M. Wood                                                                    Page 2
November 11, 2019

individual "Hope" who had sold the heroin to the UC.  On at least five subsequent occasions between March and May of 2018, the UC purchased quantities of heroin from Margolies.

Additionally, in February 2018, law enforcement officers responded to the overdose death of a particular individual in Brooklyn, New York ("Victim-2").  Officers recovered a phone belonging to Victim-2, which showed a number of communications with Erkan and Margolies prior to Victim-2's death.  On February 2, 2018, Erkan referred Victim-2 received to "Hope," *i.e.* Margolies.  Later the same day, Victim-2 communicated with Margolies and arranged to purchase three bundles of heroin.  Victim-2 tried to move forward the meeting time and Margolies indicated that he had to restock before he could meet Victim-2 ("Gotta reup. Going to u soon as I can.").  Later the same day, Margolies indicated that he was on his way to Victim-2 ("walking from train"), and Victim-2 responded "Alright," in what was the last message sent from Victim-2's phone.  Victim-2 was found dead in his Brooklyn, New York apartment on February 3, 2018, and the cause of death was found to be a heroin overdose.  (PSR ¶¶17-19).

## B.  Possession of Child Pornography

On January 13, 2019, the defendant arrived on a flight from Israel into John F. Kennedy Airport in Queens, New York.  Law enforcement officers conducted a border search of a cellphone in the defendant's possession.  During a review of the cellphone's content, law enforcement officers discovered a video file constituting child pornography that the defendant had received in an online chat exchange on October 25, 2018.  (PSR ¶¶23-26).

The defendant had received the video during an exchange with another interest user on or around October 25, 2018.  Also on October 25, 2018, the defendant had been added to a group chat where other participants had such names as "young lovers," "TabooPervaddy," and "Cecil B. Demented."  (PSR ¶28).

In addition to the video described above, law enforcement officers discovered that the phone also contained images constituting child erotica.  These images showed children in a sexualized context, for example, prepubescent children posed with captions that allude to sexual activity with adults.  (PSR ¶30).

At the time of his arrest in February 2019, law enforcement officers seized devices from Margolies.  These devices were subsequently searched pursuant to a judicially authorized warrant and found to contain certain child erotica, as well as screenshots of chat exchanges between Margolies and minor individuals.  (PSR ¶¶31-33).

## II.   The Defendant's Plea and Applicable Guidelines Range

The defendant was initially charged by sealed complaint dated February 13, 2019.  He was arrested in the Eastern District of Louisiana on February 14, 2019, and first appeared in the Southern District of New York on March 6, 2019.  The defendant was released on bail on March 29, 2019, with conditions including home incarceration with electronic monitoring, the defendant's mother to serve as a third-party custodian, and a personal recognizance bond in the amount of $200,000 to be co-signed by three financially responsible persons.

Hon. Kimba M. Wood                                                                                    Page 3
November 11, 2019

Indictment 19 Cr. 178 (KMW) was filed on March 13, 2019, and charged the defendant in
Count One with conspiracy to distribute and possess with intent to distribute heroin, in violation
of Title 21, United States Code, Sections 846 and 841(b)(1)(C), and in Count Two with possession
of images of child pornography, in violation of Title 18, United States Code, Section
2252A(a)(5)(B), (b)(2), and 2.

On June 24, 2019, the defendant entered a guilty plea before the Honorable Robert
Lehrburger, United States Magistrate Judge, to Counts One and Two, pursuant to a plea agreement
dated June 4, 2019 (the "Plea Agreement"). After the plea allocution, the defendant was remanded.
On June 27, 2019, the District Court accepted the defendant's guilty plea. (Dkt. No. 32).

The Plea Agreement calculated the applicable Guidelines range of 168 to 210 months'
imprisonment (the "Stipulated Guidelines Range"). On October 28, 2019, Probation issued the
final PSR, which calculated a combined adjusted offense level of 35, a Criminal History Category
of I, and, consistent with the Plea Agreement, a resulting Guidelines range of 168 to 210 months'
imprisonment.[1] Probation recommends a sentence of 84 months' imprisonment on each count to
run concurrently.

### III.    Applicable Law

The Guidelines still provide important guidance to the Court following *United States* v.
*Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although
*Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and
that district courts must "consult" the Guidelines and "take them into account" when sentencing.
*Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing
proceedings by correctly calculating the applicable Guidelines range," which "should be the
starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007). As the
Second Circuit has noted, although the Guidelines do not dictate a presumptively reasonable
sentence, they are not merely a "body of casual advice." *United States* v. *Cavera*, 550 F.3d 180,
189 (2d Cir. 2008) (en banc) (internal quotation marks omitted). The Guidelines' relevance
throughout the sentencing process stems in part from the fact that, while they are advisory, "the
sentencing statutes envision both the sentencing judge and the Commission as carrying out the
same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the
Guidelines are "the product of careful study based on extensive empirical evidence derived from
the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*,
551 U.S. at 349.

After making the initial Guidelines calculation, however, a sentencing judge must consider
seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and
circumstances of the offense and the history and characteristics of the defendant"; (2) the four
legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the
Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the

---

[1] With respect to Count One, the PSR calculates an adjusted offense level of 38, consistent with the Plea Agreement.
With respect to Count Two, the PSR calculates an adjusted offense level of 28 – two levels more than what is set
forth in the Plea Agreement. Because Count Two is nine or more levels less serious than Count One for purposes of
the calculation set forth in both the PSR and the Plea Agreement, it is disregarded for grouping purposes.
Nevertheless, the Government stands by the calculation set forth in the Plea Agreement.

Hon. Kimba M. Wood                                                                 Page 4
November 11, 2019

need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7).  *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)     to afford adequate deterrence to criminal conduct;
(C)     to protect the public from further crimes of the defendant; and
(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent the Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera,* 550 F.3d at 189 (quoting *Gall,* 552 U.S. at 50).

### IV.     A Sentence Within the Guidelines Range Is Appropriate In This Case

The Government respectfully submits that the application of the statutory sentencing factors set forth in Title 18, United States Code, Section 3553(a) weighs heavily in favor of a sentence within the Stipulated Guidelines Range of 168 to 210 months' imprisonment.

#### A.     The Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

The nature and circumstances of the offenses, both the narcotics conspiracy and the child pornography, necessitate a sentence within the Stipulated Guidelines Range.

##### 1. Narcotics Conspiracy

With respect to the drug trafficking offense, the defense submission's description of the offense minimizes the seriousness, and the ramifications, of the defendant's conduct.  The defendant acted as a drug dealer, delivering heroin, on command, to customers all over the city. He did so for his own profit.  Some of those narcotics customers were referred to him by another individual, Erkan, but the deals, the drugs, and the profits originated with and accrued to this defendant.  The customers separately paid a "tip" – or fee – to Erkan for the initial referral, but, in exchange for the tip, Erkan provided those customers with the dealers' contact information so the customers could coordinate directly with the dealers to whom they were referred, including dealers like Margolies.  While Erkan was involved in making initial referrals, the defendant operated his own narcotics business, including by obtaining the narcotics, by coordinating the transactions with the customers, by making sales of narcotics, and by collecting the proceeds.  To describe them as "Erkan's customers," *see* Def. Mem. at 19, overlooks entirely Margolies' independent and sustained activity as a dealer.  Margolies was not a "delivery boy for his

Hon. Kimba M. Wood                                                              Page 5
November 11, 2019

partner's operation," *see* Def. Ex. O at 1, or a mule, *see* Def. Mem. at 25, he was instead a dealer who maximized his business by receiving and accepting referred customers.[2]

Furthermore, the defendant's narcotics dealing undoubtedly posed a grave risk to the public, which ultimately culminated in the most serious of harms, the death of a particular customer, Victim-2.  The defense submission speculates on the causal relationship between the drugs delivered by the defendant and the overdose death, while ignoring that harm to particular users and risk to the general public is the entirely predictable consequence of trafficking in heroin.  The defendant's sale to Victim-2 is all the more troubling because Victim-2, in a text exchange with the defendant prior to the sale, showed his own eagerness to receive the drugs as soon as possible, going so far as to promise an additional tip for an earlier delivery.  (PSR ¶18).  Victim-2's statements to the defendant, trying to arrange an immediate fix, plainly suggested that Victim-2 was struggling with addiction.  Nonetheless, the defendant proceeded to make the delivery to Victim-2 on the same day and despite these warning signs.

While acknowledging that the defendant suffered from drug addiction himself, the defendant did not just use drugs, he instead chose to engage in the sale of drugs which endangered others like Victim-2.  The very substantial harm that resulted from the defendant's choice to sell drugs to others must be considered.

2. Possession of Child Pornography

With respect to the defendant's possession of child pornography, the defense submission describes that the particular child pornography discovered on the defendant's device was "designed to shock, rather than appeal to the sexual interest of the observer."  Def. Mem. at 21.  The defense submission's characterization of the video focuses on the defendant's experience of the video, without acknowledging the tremendous harm that such material causes to its victims and without acknowledging the particular trauma suffered by the child featured in this video.  The harm and trauma caused by such material does not depend upon the observer's purported purpose or the "design" of the creator.  Even if the defendant obtained these materials because of their "shock" value, it suggests a callous disregard for the exhibition of harm to the child that is itself deeply troubling.

The defense submission goes on to suggest that the possession of child pornography was a method "to alleviate the emotional pain" that the defendant was suffering as a result of prior trauma, and "to try to resolve his confusion around his gender and sexual identity."  Def. Mem. at 21.  Additionally, the defense submission attempts to liken the defendant's consumption of child pornography with his prior experience of victimization.  The submission describes that the

---

[2] Ekin Erkan, *see United States v. Ekin Erkan*, 19 Cr. 179 (RA), has not yet been sentenced.  Erkan is participating in the Young Adult Offender Program ("YAOP"), which describes that "[p]rogram participants, if they are successful, may receive a shorter sentence, a reduction or deferral of the charges filed against them, or possibly a dismissal of the charges entirely."  *See* United States District Court, Southern District of New York, "Young Adult Offender Program," https://www.nysd.uscourts.gov/programs/young-adult-offender-program.  In light of the very serious conduct with which Erkan is charged, the Government cannot predict how his case will be resolved or what sentence he might receive.  Additionally, Erkan was charged with conspiring to distribute narcotics and, as far as the Government is aware, had no involvement with the child pornography offense to which Margolies pled guilty.  Accordingly, there are substantial differences between these defendants, and no present sentencing disparity to address.

Hon. Kimba M. Wood                                                                          Page 6
November 11, 2019

defendant receives the child pornography after a brief conversation, in which the defendant received a message from the sender: "You alone, bitch?"  And then, the defendant, after receiving the child pornography, responded: "Loll. Me."  The defense submission concludes that the meaning of this exchange is "unmistakable" – *i.e.*, that by using the pejorative "bitch," "the sender made it clear that the defendant was being likened to the female child rather than the male assailant," and that "Wolfe's response . . . confirms that he identified himself with the completely powerless participant in the sexual assault."  Def. Mem. at 22.

The defense's interpretation of this short exchange is strained and speculative, and overlooks a much more salient part of the exchange.  The defendant reacted to the video with "Loll," meaning "laughing out loud," over the horrific content that he had just received.  In other words, after receiving a horrific video showing forcible sexual intercourse perpetrated upon a female toddler, the defendant responded by treating the content as humorous.  Even accepting that the defendant's emotional troubles and gender confusion were a cause of his conduct, the defense submission does not explain why child pornography was his chosen palliative, rather than the therapy or medical intervention made available to this defendant throughout his childhood and young adulthood.

Moreover, and most critically, the defense interpretation of this exchange ignores how the defendant's other actions contributed to his receipt of the video.  The defendant did not accidentally receive this video.  To the contrary, the defendant participated in online forums with other internet users who, through their screen names, trumpeted their interest in child pornography (*i.e.*, with online user names like "young lovers," "TabooPervaddy," and "Cecil B. Demented").  (PSR ¶28).  The defendant assembled an extensive collection of child erotica, which showed children in sexualized contexts or with superimposed text that graphically described sexual contact with the children.  The PSR reports that some of the defendant's music lyrics similarly reflect an interest in sexual contact with minors.  The PSR quotes from one song that explicitly references such sexual contact ("Making babies do gay shit for pay B, all my kids pros, just pick one out the van, you could be inside every child's mouth like Toucan Sam . . .").  (PSR ¶75).  The defendant's possession of the child pornography was not a result of happenstance, but instead, reflects a deliberate immersion of himself amongst individuals who trumpeted their interest in such material.  His reaction to this particular video, as described above, suggests that he was pleased to receive the child pornography described above and that he was desensitized to the harm represented by the video.  His other conduct belies any suggestion that the defendant's receipt of this video was an unlucky turn of event.

A sentence within the Stipulated Guidelines Range is necessary to reflect the seriousness of the defendant's conduct and to provide just punishment for both offenses.

**B.  The Need for Specific Deterrence and to Protect the Public**

Additionally, a sentence within the Stipulated Guidelines Range is necessary to provide adequate deterrence to this defendant.

The need for specific deterrence and to protect the public is apparent from the description of the defendant's personal and family history. Unlike so many individuals that engage in criminal conduct, the defendant has had significant family support.  The defendant has had numerous

Case 23-370, Document 49, 11/13/2023, 3589727, Page97 of 178

Hon. Kimba M. Wood                                                                                Page 7
November 11, 2019

opportunities to receive treatment, and the defense submission includes evaluations by doctors and psychiatrists going back to the defendant's childhood. The defense submission also describes that the defendant has received sustained and extensive family support through the years, which is also apparent from the numerous letters submitted by family members and family friends.

Despite this support, and repeated efforts to provide him with help for his emotional issues through the years, the defendant has resorted to crime, both in the form of trafficking in drugs and in possessing child pornography. The defense submission describes the defendant's history of treatment without explaining why interventions will now be successful in addressing the underlying issues. The defendant's history suggests the contrary – that the defendant has not responded to medical and familial interventions and his conduct has only escalated over the years and become more harmful to the community.

Most troubling, the defendant has not been limited to the consumption of child pornography, but instead, the defendant appears to have become involved with minors in real life. As noted in the PSR, the defendant at the time of his arrest was in a relationship with a 17-year-old minor and had been for approximately eight months. (PSR ¶77). Devices recovered from the defendant contained screenshots of exchanges with other minor females, which suggest that this was not a single incident but a pattern of conduct. (PSR ¶33). Based on these exchanges, it appears that the defendant's conduct has escalated to the point where he is pursuing relationships or sexual contact with minor females, thereby presenting an actual threat to some of the most vulnerable members of the community.

Here, the particular needs of deterrence and protection of the public are important factors weighing in favor of a sentence within the Guidelines Range.

**V.    Conclusion**

For the reasons set forth above, the Government respectfully submits that a sentence within the Guidelines Range would be just and appropriate in this case.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By: _____
Mollie Bracewell
Assistant United States Attorney
(212) 637-2218

cc:      Maurice Sercarz, Esq. (via ECF)

JC26WOLS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                          19 CR 178(KMW)

5   WOLF MARGOLIES,

6            Defendant.                  Sentencing

7   ------------------------------x
                                         New York, N.Y.
8                                        December 2, 2019
                                         4:00 p.m.
9

10  Before:

11
                     HON. KIMBA M. WOOD,
12
                                         District Judge
13
                         APPEARANCES
14
    GEOFFREY S. BERMAN
15       United States Attorney for the
         Southern District of New York
16  BY:  MOLLIE BRACEWELL
         Assistant United States Attorney
17
    SERCARZ & RIOPELLE, LLP
18       Attorney for Defendant
    BY:  MAURICE H. SERCARZ
19

20  Also present:

21  Special Agent Patrick Magner, DHS
    Special Agent David Cheng, DHS
22  Detective Patrick Theodore, NYPD

23

24

25

JC26WOLS

1              (Case called)

2              THE COURT:  Good afternoon.  Please have a seat.

3              THE LAW CLERK:  United States v. Wolf Margolies.

4              Will counsel please state their names for the record.

5              MS. BRACEWELL:  Good afternoon, your Honor.  Mollie

6    Bracewell for the government.  I am joined at counsel's table

7    by Special Agent Patrick Magner and David Cheng from Homeland

8    Security Investigations and NYPD Detective Patrick Theodore.

9              THE COURT:  Good afternoon, your Honor.

10             Mr. Sercarz.

11             MR. SERCARZ:  For the defendant Margolies, Maurice

12   Sercarz.  The defendant is present in court.

13             THE COURT:  Good afternoon, Mr. Margolies.

14             I have the submissions, which I have read, along with

15   of course the many letters from relatives and supporters of

16   Mr. Margolies.

17             At this point, I will ask Mr. Sercarz, have you and

18   Mr. Margolies had an adequate opportunity to review the

19   presentence report?

20             MR. SERCARZ:  We have, your Honor.  I have reviewed it

21   with my client.

22             THE COURT:  Do you wish any changes to it?

23             MR. SERCARZ:  None beyond those that are already

24   described in the final version of the presentence report

25   itself.

JC26WOLS

1              THE COURT:  Very good.

2              I would be glad to hear anything that you and your

3       client wish to say.

4              MR. SERCARZ:  You want us to go first, your Honor?

5              THE COURT:  If you would rather have the government go

6       first, I will do that.

7              MR. SERCARZ:  How is this:  If I may speak and then if

8       my client can wait until the end to address the Court and have

9       a little more time to think about what he has to say?

10             THE COURT:  That's fine.  Thank you.

11             MR. SERCARZ:  Your Honor, I want to begin by giving

12      credit where credit is due.  The government, in particular

13      Ms. Bracewell, could have insisted that my client plead guilty

14      to a substantive count involving the sale of a controlled

15      substance in which death resulted and my client would have been

16      faced with the horrible alternative of either proceeding to

17      trial in this case or pleading guilty to a count carrying a

18      minimum mandatory sentence of 20 years and a potential life

19      sentence in the case.  By providing the defendant with the

20      opportunity to plead guilty to a conspiracy, the government

21      permitted me to seek a variance based on the defendant's

22      personal history and circumstances.  I commend the government

23      for that decision and I commend Ms. Bracewell for that

24      decision.

25             That said, there are two areas in which I feel that

JC26WOLS

1    the government and I have a difference of opinion after reading

2    the government's submission.  First, I will say that I've been

3    aggressive in my arguments seeking a substantial variance from

4    the guidelines calculation and in responding to what I felt was

5    missing in the psychosexual evaluation of my client.  To the

6    extent that the government in their submission reviews my

7    arguments regarding the counts of conviction and suggests that

8    somehow they indicate that my client lacks an appreciation of

9    the terrible harm that befell the individual known as Victim-2,

10   or the toddler in that pornographic image, I respectfully

11   submit that they have it wrong.  My client understands the

12   damage that has been done.  My client -- and you will hear it

13   at the end of this proceeding -- is filled with remorse.  These

14   are my arguments and they should be attributed to my zealous

15   advocacy on behalf of my client.  When the government offered

16   me the invitation to seek a variance on behalf of my client and

17   a sentence that I would regard as more just and more

18   proportionate to all of the factors that the Court will

19   consider, I accepted their invitation.

20          The second quarrel I have with the government is this:

21   The Court will and must examine the 3553(a) factors.  In

22   speaking to those factors in its submission, I respectfully

23   submit the government ignores the impact of my client's prior

24   history, his history of abuse, his difficulties in life, his

25   psychosexual evaluation on everything but for the last of the

1    3553(a) factors, namely, the need for a sentence to provide

2    appropriate medical care, training and the like in the most

3    just and efficacious way.  Having ignored the impact of all of

4    these factors on the other 3553(a) factors, including

5    deterrence, just punishment and the need to protect the public

6    from the crimes of the defendant, it becomes easy having

7    cabined my arguments to give them the back of the hand by

8    suggesting that the defendant has been in therapy throughout

9    his life and yet he chose to offend and therefore we have

10   little confidence that he won't offend again.

11        It's as a result of this analysis that the government

12   with their outsized emphasized on the link between the delivery

13   of the drugs and the resulting death -- I am using quotes for

14   the word "resulting" -- calls for a sentence of 14 and a half

15   to 17 years of incarceration notwithstanding that the Probation

16   Department, which ordered and had the benefit of its own

17   psychosexual evaluation of my client and a better appreciation

18   both of his personal history and the risk, if any, that he

19   might reoffend, recommends 84 months concurrently on each count

20   of conviction, a seven-year sentence.  Yet, the government

21   finds a sentence in the range of 14 and a half to 17 years to

22   be appropriate and just.

23        For the rest of my statement, and I won't go on at

24   great length, I want to review the government's arguments in

25   support of a guidelines sentence to show why they are

 1    misguided.  With regard to the narcotics conspiracy, the

 2    government begins by stating that the defendant's conduct has

 3    caused, and I quote, "immeasurable harm."  So stipulated.  But

 4    that is a very revealing choice of words -- immeasurable harm,

 5    immeasurable.  The sentencing guidelines in this case and the

 6    base offense level in this case for the narcotics offense are

 7    an effort to quantify the immeasurable.  They give outsized

 8    weight to the fact that the buyer took a fatal overdose which

 9    resulted from the distribution and there is no countervailing

10    consideration in that base offense level for the fact that this

11    was a single retail delivery of a personal use quantity that

12    the defendant had no knowledge of the contents or potency of

13    this particular delivery of heroin, no intent to do more than

14    supply the drugs and that leaves out all of the information

15    regarding the factors that led my client to such a state of

16    despair that he participated in this distribution conspiracy in

17    the first place.

18            In describing my client's conduct, Ms. Bracewell and I

19    were -- I submit to a large extent -- talking past each other.

20    My focus was on the single fatal delivery of the narcotics and

21    comparing my client's role to that of Mr. Erkan while the

22    government focused as is perfectly appropriate on Wolf's role

23    in the conspiracy and described that role in broader terms.  If

24    honest remorse inquires real intersection, then I can tell you

25    this regarding my conversations with my client:  Wolf has

Case 23-370, Document 49, 11/13/2023, 3589727, Page104 of 178

1   engaged in the necessary searching analysis of his own behavior

2   and here are the salient facts:  My client was involved in this

3   conspiracy from the end of 2017 to approximately July of 2018,

4   a period of about six months.  He was recruited by Mr.Erkan.

5   Before the defendant became involved, the system was in place

6   and Erkan was already referring customers to suppliers.  The

7   defendant told by Erkan that he could look to those suppliers

8   to obtain the heroin.  During the period that my client was

9   involved in the conspiracy, he was using heroin, he was

10  suicidally depressed, he was unemployed, he was away from his

11  family and other sources of emotional support.  While the

12  defendant was involved, he purchased heroin from suppliers two

13  to three bundles at a time; and when delivering the drugs, he

14  marked up the price and sold the drugs at a profit.

15          I do not dispute that, Ms. Bracewell.

16          Your Honor, I do not dispute that that was the nature

17  of his involvement.

18          In some instances, however, it is worthy of note that

19  he kicked back money to Mr. Erkan.  With respect to the events

20  of February 2nd, 2018, and the fatal dose of heroin, with

21  respect to that particular delivery, which is the engine that

22  drives the guideline calculation, while the defendant has no

23  recollection of this delivery, the texts make it clear.  In the

24  very initial portions of the text conversation between Victim-2

25  and Mr. Erkan, Erkan and the victim agree on the quantity and

JC26WOLS

1   price of the drugs.  To quote Mr. Erkan:

2            "Delivery.  The first is via a service denoted as

3   Hope.  80/bun." B-u-n; $80 a bundle.  "Very high quality.

4   Fent-free."

5            Victim No. 3:  "Cool.  I want three bun."

6            That is before my client even receives the,

7   recommendation, before he is ever contacted, which in the

8   Court's analysis of what the likely consequences for Erkan and

9   what the likely consequence is for my client is worthy of

10  consideration.

11           Your Honor, this wasn't Open Table.  You want a

12  reservation for a meal, I can recommend a variety of

13  restaurants.  The menu was decided upon before my client was

14  ever contacted.  My client obtained the drugs only after

15  receiving the order from Victim-2.  We know that because the

16  word "re-up" appears in the text conversation.  When the victim

17  wants the drugs delivered earlier, my client can't do it

18  because he has to re-up.  There was no opportunity for Wolf to

19  become aware of the potency of the heroin, the potentially

20  lethal effect of the heroin.  As to this transaction when I

21  referred to him as a deliveryman in my submission, the

22  government took issue with that; but I respectfully submit to

23  you whatever you want to call him as to this transaction, the

24  one that resulted in the fatal overdose, he was an

25  intermediary.

1        I have made my argument about the need to avoid

2    unwarranted sentencing disparities in light of Wolf's limited

3    tenure, his role in the offense, his state of mind in the

4    broadest sense at the time he became involved, and his lack of

5    knowledge with regard to the fatal delivery.  Here is another

6    way to look at it:  If the defendant or Erkan or the ultimate

7    supplier of this fatal dose had been charged with the

8    substantive offense, the 841 count, he would have been facing a

9    statutory minimum of 20 to life.  Had any the co-conspirators

10   pled guilty with a stipulation that that individual would be

11   sentenced within the guideline range, he would be sentenced to

12   a minimum term of 14 and a half and a maximum of 17 years.  As

13   it stands, the supplier is not charged.  Mr. Erkan is in a

14   diversion program with a serious opportunity to avoid any

15   felony conviction in exchange for this conduct, and my client

16   has the opportunity to seek a variance with due consideration

17   for his personal history and the impact of his conduct not only

18   on the victims but on his own family and his own life.

19       I hope, your Honor, you don't find it impertinent for

20   me to suggest that there are sections of the guidelines that

21   cover such a broad swath of behavior that they give outsized

22   importance to a single factor such as the death or serious

23   injury resulting factor that the Court should give extra weight

24   to the 3553(a) analysis in order to ensure that it does justice

25   in a case like this.  This is one of these cases.

Case 23-370, Document 49, 11/13/2023, 3589727, Page107 of 178

1          As to the possession of child pornography count, the

2     government begins with the conclusory statement that the nature

3     of Wolf's conduct, and I quote, "Demonstrates that he presents

4     an ongoing risk to the community."  To make this argument, one

5     must establish that because Wolf possessed child pornography

6     and child erotica, he is likely to reoffend.  Presumably this

7     means by continuing to seek, possess or distribute child porn

8     or by engaging in sexual conduct with children or underaged

9     victims.  Yet the government in its submission offers no

10    evidence or arguments regarding that causal linkage.

11          When I argue that the linkage depends in large measure

12    on the defendant's motive in possessing an image or series of

13    images, the government responds that this argument ignores the

14    harm to victims of these images; but the importance of

15    examining motivation of the defendant is acknowledged by

16    Dr. Greif, our expert, and by Dr. McCarthy herself in her prior

17    comments before the Sentencing Commission where she herself

18    cites to experts in identifying six disparate motivating

19    factors for the collection of child pornography.  They include

20    collection as a means to achieving sexual arousal, but also

21    collection is a means of avoiding real-life problems,

22    especially in the -- essentially if the offender creates a new

23    different online reality that may be better than their off-line

24    reality.  Collection is a means of facilitating social

25    relationships with like-minded individuals.  Collection is

JC26WOLS

1    therapy for exploring and dealing with one's problems.

2              For the record, Wolf expressed a strong aversion to

3    the idea of sexual contact with children.  During the

4    psychosexual evaluation, Dr. McCarthy quotes wolf as saying, "I

5    feel really dumb for doing what I did.  I am capable of

6    controlling myself.  I was being stupid.  This is the worse

7    thing I have experienced" -- meaning jail.  "I'd never do

8    anything to get back here.  I don't want to have sex with kids.

9    I don't want a kid to go through what I went through."  Yet the

10   government suggests that -- well, when I described the one

11   video that contains images of child pornography found on the

12   defendant's phone in the context of the surrounding text

13   messaging and I argue that the defendant identifies with the

14   powerless child victim rather than with the adult male

15   perpetrator, the government described my interpretation as

16   strained and speculative.

17             Here is what Dr. McCarthy says during the clinical

18   interview about my client.  "Also noteworthy is the presence of

19   anxiety-ridden and painful memories that are easily reactivated

20   by minor social stressors further complicating this picture is

21   the fact that he has few avenues of psychic gratification,

22   tension relief or conflict resolution.  He feels trapped in the

23   worst of his inner and outer worlds seeking to avoid both the

24   distress that interpersonal relationships bring and the

25   emptiness and wounds that exist within."  And then later in the

Case 23-370, Document 49, 11/13/2023, 3589727, Page109 of 178

JC26WOLS

1    clinical interview: "Also noteworthy is the lack of mature

2    confidence and his tendency to act helpless and seek nurturance

3    from others in a childlike manner.  Characteristically

4    withdrawing from adult responsibilities.  He is docile and

5    passive.  Displays few functional competencies and avoids

6    self-assertion."  The Probation Department's expert, her words.

7    The government goes further and with all due respect resorts to

8    the specious argument that Wolf cannot view the video without

9    prior knowledge of what it contained and they cite as evidence

10   that the defendant participated in online forums with those

11   whose names were "Young Lovers," "TabooPervDaddy" and "Cecil B.

12   Demented."  But as I understand it, it was on the very same

13   occasion when the young lady who transmitted the link to the

14   video suggested that Wolf look at it by saying, *Bitch, you*

15   *alone?* and then sending the link.  When Wolf accessed the link,

16   it was then that he was placed in the chat room with the

17   individuals whose names I just gave you.  There is nothing in

18   those names, with all due respect, that suggests on the face of

19   it that they were trafficking in child pornography involving

20   infants and young children.

21           Now, to be fair Wolf acknowledged in that diary entry

22   that was seized at the border that he has viewed child

23   pornography on other occasions; but, your Honor, motive

24   matters.  Motive affects the need for deterrence.  Motive,

25   affects the calculation of what is just punishment.  My client

JC26WOLS

1    does not have a predilection to go after adolescence and young

2    children.

3          The government argues, and I quote, "Even accepting

4    that the defendant's emotional troubles and gender confusion

5    were a cause of his conduct, the defense submission does not

6    explain why child pornography was his chosen palliative rather

7    than therapy or medical intervention."  This argument, most

8    respectfully, ignores the fact that his chosen palliatives

9    included not only child pornography but adult pornography, sex

10   controlled substances, attempts at gender reassignment, music,

11   writing, and even suicide was on the table.  We have every hope

12   that in the future a combination of therapy, music, writing,

13   art, human contact with age appropriate companions will provide

14   the key to his rehabilitation.

15         Finally, in advancing the argument that the likelihood

16   that Wolf may reoffend calls for a lengthy jail sentence, the

17   government ignores the judgment of the two experts that

18   examined my client.  Dr. McCarthy's recommendation at the end

19   of the psychosexual evaluation, all of them, can be

20   accomplished during a period of supervised release.  I don't

21   need to repeat all of them.  The Court is fully aware of them.

22         Dr. Greif in his responsive submission states that

23   Wolf is unlikely to reoffend.  In his words, contrary to

24   Dr. McCarthy's conclusion, *In my professional opinion, the*

25   *likelihood of Mr. Margolies ever committing a contact offense*

JC26WOLS

1    *with a young child is extremely low.  There is scant evidence*

2    *that he is sexually interested in prepubescent children.  He*

3    *reported that he finds images of prepubescent sex disturbing*

4    *and not sexually arousing and nauseating.  He also made it*

5    *clear he believes that corsive sex is harmful and he knows that*

6    *young children are not capable of consent.  Mr. Margolies is*

7    *not a sexual predator.*

8              Finally on the subject of child pornography in the one

9    count in that regard with which the defendant was convicted,

10   rather than I relying on the experts, either one of them, the

11   government points to the fact that the defendant had

12   significant family support, that the defendant had numerous

13   opportunities to retrieve treatment and yet in their words he

14   chose to reoffend.  Your Honor, I respectfully submit to you

15   that having a supportive family, having an extended family like

16   the family that fills the first three rows of this courtroom,

17   does not inoculate you against all of life's tragedies.  From

18   early childhood Liz noticed that Wolf was different.  His

19   vulnerabilities, these differences led to a lifetime cycle of

20   abuse further exacerbating his vulnerabilities and further

21   leading to additional abuse.  I acknowledge that he never

22   lacked for the opportunity to receive treatment.  What was

23   lacking was the will -- the will to surmount his anxiety, his

24   depression, his gender dystonia.

25              But, your Honor, two things have changed.  First, Wolf

Case 23-370, Document 49, 11/13/2023, 3589727, Page112 of 178

**A-108**

1   was always been at war with with himself, has become more

2   receptive to changing his life.  It doesn't happen overnight.

3   It doesn't happen all at once, but I respectfully submit that

4   it began to happen in July and August and September of 2018

5   when he made a commitment to leave the drug conspiracy, when he

6   left New York and the toxic environment in which he was

7   leaving, when he sought solitude on the Appalachian Trail, when

8   he sought contact with his roots on the birthright trip, when

9   he sought a home in New Orleans, a skill in his coding lessons,

10  and useful employment, when he sought a relationship with a

11  young woman -- albeit one who was young within the age of

12  consent but young -- things had already begun to change for my

13  client.

14          Second, whatever the period of incarceration that is

15  imposed, it will include a period where my client is walled off

16  from drugs, walled off from pornography, one in which he

17  receives treatment, a supervised release period in which there

18  is a gradual return to society with strict limit on his

19  internet usage and his access to minors and continuing

20  treatment.  The issue before us today is how long must he be

21  walled off before he can receive world-class, one-on-one

22  outpatient treatment while obtaining employment, living amongst

23  family and sources of emotional support and seeking meaningful

24  relationship with adults.  The issue in the language of the law

25  is what period of incarceration is, and I quote, "sufficient

Case 23-370, Document 49, 11/13/2023, 3589727, Page113 of 178

**A-109**

1   but not greater than necessary to meet the goals of

2   sentencing."

3         If the Court will allow me this, your Honor, this is a

4   case where there is so much pain for so many that it almost a

5   default proposition that the actors retreat to an area of

6   comfort.  I respectfully submit that this has some bearing on a

7   psychosexual evaluation in which Dr. McCarthy says that there

8   is nothing in the clinical interview of the defendant to

9   suggest that he has a sexual attraction towards young children;

10  but, and I quote, "the matter must be looked into further."  To

11  be fair, when Dr. Greif is asked about the impact of a jail

12  sentence on my client, he is the one that raises the specter in

13  the issue that my client may decompensate or that suicide may

14  be a problem here.  They feel necessary and they feel

15  comfortable in raising these issues so that they are covered in

16  case, God forbid, the worst occurs.

17        I ask and I raise it in the form of a question whether

18  there is some level of comfort for the government in saying in

19  a case where somebody died as a result of a heroin overdose and

20  a toddler was subjected to that horrible, horrible act which

21  resulted in the sexual image here, whether the comfortable

22  thing to do isn't to stand beside those victims and recommend a

23  sentence within the guidelines.  I am trying very hard, your

24  Honor, but I can't find a comfortable position for myself in

25  this case.  We recognize the harm that was done, but we

Case 23-370, Document 49, 11/13/2023, 3589727, Page114 of 178

**A-110**

JC26WOLS

1    recognize the tragedy that occurred in the life of my client,

2    Wolf Margolies.

3          I don't think there has been a case -- and I have been

4    doing this 43 years -- where I stood before the Court where

5    there was no mandatory minimum sentence and yet I provided the

6    Court with information regarding an appropriate location to

7    house my client if he is incarcerated.  I recognize that a term

8    of incarceration is necessary here; but for the reasons that I

9    have described, I respectfully submit, your Honor, that even

10   the sentence proposed by the Probation Department is excessive.

11         Dr. Greif in his own way speaks directly to the

12   government in an article that he wrote called The Challenge of

13   Viewing Sexual Offenders as Both Perpetrators and Victims.

14   While this defendant has not been charged with a contact sexual

15   offense, I think that much of what Dr. Greif says applies here

16   in connection with the defendant's conviction of child

17   pornography and the fact that his abuse was clearly a large

18   component in his behavior with regard to the sale of narcotics.

19   Dr. Greif says in the article:

20         *Evaluating a sex offender's risk for sexually*

21   *reoffending involves unique psychological challenges.  It*

22   *forces us to grapple with a difficult task described by F.*

23   *Scott Fitzgerald as the ability to hold two opposed ideas in*

24   *mind and the same time and still retain the ability to*

25   *function, which Fitzgerald referred to as the test of the first*

Case 23-370, Document 49, 11/13/2023, 3589727, Page115 of 178

JC26WOLS

1    *grade intelligence.  Evaluators must understand this because*

2    *offenders themselves in order to deeply change must recognize*

3    *that they are both perpetrators and victims.  Offenders must*

4    *understand how and why they perpetrate, how and why sexual*

5    *aggression became not just thinkable but doable.  They must*

6    *understand that they were traumatized as children and know the*

7    *harm done to them in order to recognize in a visceral way the*

8    *harm they did to others.  This recognition is pivotal for not*

9    *perpetrating in the future.*

10          *Only if an offender empathizes with himself as a child*

11   *victim can he empathize with other people, including those he*

12   *offended against as potential victims.  The ability to put*

13   *oneself in the mind, heart and sole of another human being is*

14   *an essential bulwark against violence.  Therefore, evaluators*

15   *must understand the perpetrator as a whole person in order to*

16   *assess whether the perpetrator recognizes himself and others as*

17   *whole people.*

18          Your Honor, in my conversations with Wolf, it is clear

19   that he displays empathy both for himself as a victim of

20   bullying and sexual abuse and for those he later victimized,

21   including the individuals to whom he delivered heroin and the

22   child depicted in the erotic video and it the others in the

23   pornographic images that he has viewed.  In conclusion I ask

24   the Court to apply this sort of empathy in imposing sentence on

25   my client, Wolf Margolies.

Case 23-370, Document 49, 11/13/2023, 3589727, Page116 of 178

**A-112**

1          Thank you, your Honor.

2          THE COURT:  Thank you very much.

3          Ms. Bracewell, would the government like to be heard?

4          MS. BRACEWELL:  Yes, your Honor.  If you don't mind, I

5     will stay here because I have my papers.

6          THE COURT:  That's fine if you speak into the mic.

7          MS. BRACEWELL:  Of course.  Thank you.

8          This a difficult case and the government acknowledges

9     that the defendant has had a difficult life with difficult

10    circumstances.  That being said, the defendant has caused

11    tremendous harm and not just with respect to the drug

12    trafficking conspiracy but also with respect to an entirely

13    different type of harm and that is the possession of child

14    pornography and that is the related conduct that came to light

15    through our investigation.  So that is not at all to undercut

16    what defense has said.  We are aware of the difficulties here.

17         However, a guideline sentence is necessary and

18    appropriate here.  I would like to start with the narcotics

19    conspiracy and the defendant's role in that conduct.  The

20    defense submission and the defense today reiterates that this

21    is Erkan's drug trafficking operation.  That is just not

22    consistent with the facts as we know them.  The defendant,

23    Mr. Margolies, had an independent revenue stream.  He

24    independently interacted with his customers.  He independently

25    delivered drugs.  He obtained them.  He collected revenue that

JC26WOLS

1    was separate and apart from Erkan's revenue obtained through

2    the online types.

3          Erkan's conduct is serious and it has yet to be

4    addressed at sentencing.  His involvement in the Young Adult

5    Opportunity Program was decided by the Court.  Our office has

6    made no representations about how this case will be disposed

7    of, and so I just stress that that is not a variable that needs

8    or is appropriately addressed today.

9          Mr. Margolies's conduct was clearly independently

10   undertaken and operated over a period of months.  Today the

11   defense said six months.  This was not a single delivery on a

12   single occasion.  This was a sustained course of conduct.  What

13   makes it particularly troubling is that the defendant himself

14   concedes that he has struggled with addiction, that he has lost

15   friends to addiction.  He was aware firsthand of the harms that

16   occur when heroin is taken and delivered to users.

17         You see that in the course of the conversation with

18   the person identified as Victim-2, a user anxious to get a

19   delivery as soon as possible.  The defendant re-ups; goes to

20   his suppliers.  He then takes the drugs to Victim-2.  That is

21   the last communication.  Tremendous harm has resulted from the

22   defendant's conduct.  The defendant made these choices to

23   engage in this conduct even while knowing from his own

24   experience that grave danger was presented to his customers.

25         I would like to turn to the CP conduct in Count Two

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    and I want to make one point about the guidelines range, which

2    we're seeking a guideline sentence of 168 to 210 months.

3    Because of the grouping under Section 3D1.4, the CP conduct is

4    nine levels or more less serious than the narcotics trafficking

5    in Count One.  That means it has no affect on the guidelines

6    range.  There is a note in the guidelines in Section 3D1.4(c)

7    which provides that because those lower groups are entirely

8    disregarded that may provide a reason at sentencing to seek a

9    sentence at the higher end of the applicable guidelines range.

10   We're not doing that here, but I bring this out just to make

11   the point that the guidelines range here is accounting for two

12   very different types of harm.  It represents a lengthy

13   potential sentence, but that is because there is significant

14   harm from both facets of this conduct.

15        As I mentioned before, the defense submission and as

16   defense counsel today described the defendant's history of

17   trauma, and we have no reason to doubt that or have any dispute

18   with that.  However, it overlooks that the defendant has become

19   himself a danger to others, that he has become a threat to

20   others and in many sense a victimizer himself.  I point out

21   that the defendant's own diary, which is quoted in the defense

22   submission, he describes having raped a girl.  The defense adds

23   some context that that happened at age 16, but I bring it out

24   that this is a long and deep history of difficulties that the

25   defendant has responded to by transgressing rules in an

JC26WOLS

1   increasingly significant and substantial ways.

2          There was a video of CP that we described, the

3   correspondence leading up to the transmission of the video to

4   the defendant.  That is not the entirety of the information we

5   now know.  We know, for example, that the defendant was also in

6   possession of a library of child erotica, images that raise

7   questions as to whether he has a predilection for toddlers or

8   younger children.  That was flagged in the psychologist's

9   court-ordered evaluation.  I defer to the psychologist, who is

10  much more informed than we are.

11         We don't know.  That is the truth.  But what we do

12  know is that in life the defendant has transgressed boundaries.

13  For example, at the time of his arrest, he was in the presence

14  of a 17-year-old girl who he was cohabiting with.  He had been

15  involved with her for eight months, a lengthy period of time

16  and a lengthy age gap.  That is not the only instance we're

17  aware of where there was communication, actual conduct between

18  the defendant and minors.  The defendant's devices seized at

19  the time of his arrest contained screen shots of communications

20  referencing interactions -- seemingly inappropriate

21  interactions -- with minors.  We know they were inappropriate

22  because one of these miner's fathers took the phone and sent a

23  message to the defendant telling him to stay away.

24         Additionally, the lyrics of his songs, which we

25  pointed out in the submission that we prepared.  The defense

JC26WOLS

1    submission concedes and insists that the defendant is troubled,

2    but it doesn't acknowledge that the defendant continues to

3    present a risk.  It says that our concern about deterrence is

4    speculative.  As I described, everything that we know provides

5    a basis to really question whether the community is safe while

6    the defendant is out.

7              I just point out that paragraphs 95 to 99 some of Dr.

8    McCarthy's evaluations provide a more substantial analysis of

9    why the defendant continues to present a risk.  I just

10   highlight a few of them that test resulted suggest he has

11   pro-offending attitudes about adults having sex with children.

12   That is paragraph 96.  In paragraph 97 Dr. McCarthy notes that

13   he has problems controlling his interests in adolescence.  This

14   isn't speculative and this is not a comfortable position that

15   the government is trying to take to cover itself in later

16   litigation.  To the contrary, the offense conduct here gives

17   rise to substantial and grave concern that the defendant as he

18   has demonstrated presents a risk to the community.  For that

19   reason a guidelines sentence is appropriate and necessary here.

20             I am happy to answer any questions the Court has.

21             THE COURT:  Thank you, Ms. Bracewell.  I don't have

22   any questions for you.

23             Mr. Sercarz, I believe you said that your client would

24   like to speak.

25             MR. SERCARZ:  Thank you.

1          THE COURT:  Mr. Margolies, there no requirement for

2     you to speak; but if you would like to speak, I would be glad

3     to hear you.

4          THE DEFENDANT:  Your Honor, since I was arrested, I

5     had much -- I have had much time to be introspective and search

6     my sole for how the events of my past shaped the decisions that

7     led me here.  For much of the period from 2013 to 2017, I was

8     sober, legitimately employed and/or enrolled in school.  In

9     2017 after losing my job, getting raped, my best friend dying,

10    and my own failed (inaudible), I relapsed on heroin which led

11    to my involvement in a narcotics conspiracy for several months.

12    At the time I did not concern myself with the consequences of

13    my actions.  I felt I had nothing to lose since I planned to

14    kill myself anyway.

15         In July of 2018 after having some time to recover and

16    come to my senses, I quit cold turkey and discontinued my

17    involvement in the conspiracy.  I made every effort to change

18    my lifestyle's perspective and environment traveling to

19    Pennsylvania, Massachusetts, Rhode Island, Israel, Palestine,

20    and finally moving to Louisiana where I attended a coding boot

21    camp to pursue a career as a developer.  When I was arrested in

22    February of this year, I was in the process of starting a new

23    life.

24         My dream is to one day have a stable job, a house and

25    a family of my own.  I am still planning for my future.  I am

Case 23-370, Document 49, 11/13/2023, 3589727, Page122 of 178

1  not sure what field I will go into exactly, but I have been

2  using the following programs to prepare myself for any

3  opportunity I can find:  Customer service, budget, financial

4  reports, developing creativity, 10 soft skills, marketing

5  basics, business ethics, sales fundamental, leadership and

6  influence, entrepreneurship, and music appreciation.  And I

7  have all these certificates here.

8          THE COURT:  Very good.

9          THE DEFENDANT:  Since I was remanded, I have read over

10  40 books and have been working on my writing.  I plan to finish

11  my degree and improve my coding skills.  I have been medicating

12  and meeting with the prison psychologist.

13          Your Honor, I know that deep in my heart I never meant

14  for any harm to come to anyone.  I have many problems, things

15  that will take time, effort and therapy to overcome.  The

16  amount of abusive I have suffered at the hands of others is

17  beyond what I know how to cope with on my own.  I also know

18  that I am responsible for my actions.  In my case -- in my

19  case, my actions caused irreparable harm.  As a person who has

20  been victimized for most of my life and as someone who was lost

21  loved ones to overdoses, the gravity of this is not lost on me.

22  My conscience is heavy with guilt, remorse and regret for every

23  person this terrible sequence of events has touched.

24          I ask that you find it in your heart to see that I am

25  placed into an environment where I can spend my time learning

A-119

JC26WOLS

1    to forgive those who have abused me, to forgive my mother who

2    despite our issues only wanted the best for me, and to forgive

3    myself.  This is my first time ever getting arrested and it

4    will be my last.

5            Thank you.

6            THE COURT:  Thank you very much for your moving

7    statement.  I am required to begin by calculating the advisory

8    sentencing guidelines.  They are the same as set forth in the

9    presentence report, which is a total offense level of 35 and a

10   criminal history category of one.

11           Turning to the factors under Section 3553(a), I begin

12   with how serious the offense was.  Of course there is more than

13   one offense here as defense counsel has indicated to the Court.

14   The offenses of dealing drugs to the extent that Mr. Margolies

15   did with what appear to be disregard for those who were

16   ingesting the drugs, notwithstanding that he himself had been

17   addicted, and then his collection of child pornography as well

18   as his actions with respect to children are extraordinarily

19   serious.  They present a very, very serious danger to the

20   public.  Thus, I turn to the defendant's history and

21   characteristics.

22           I accept the defense representations of all of the

23   trauma that Mr. Margolies was subject to as a child -- sexual

24   abuse, terribly difficult interactions with others, and that

25   deserves to be considered in this sentence.  Probably the most

A-120

JC26WOLS

1    significant consideration is whether Mr. Margolies will present

2    a danger to others when he is released from prison.  I have no

3    way of knowing that.  I have to rely on experts for assistance

4    in assessing this.

5           Looking at paragraphs 96, 97, 98, 99 of the

6    presentence report, Mr. Margolies presents a moderate to high

7    risk for re-offense, that is, should he not actively

8    participate in sex offender treatment.  He has shown in his

9    psychiatric, psychological testing that he has a sexual

10   interest in adolescent females and males.  Although he denies

11   having an interest in sexual activity with children, he

12   apparently, according to the psychiatrist, finds viewing images

13   and videos of children or teenagers to be moderately sexually

14   arousing and currently a few of his sexual fantasies are about

15   using child sexual images for sexual gratification.  The

16   conclusion of the psychiatrist is that he has pro-offending

17   attitudes about adults having sex with children.

18          Now, that is one might consider a slice in time and it

19   is an important slice in time; but the Court needs assistance

20   in evaluating the extent to which his history will make his

21   rehabilitation difficult.  It definitely will.

22          The government mentioned his music and the defense

23   also mentions that because it is salient.  His music contains

24   topics -- I am looking at paragraph 75 the PSR -- including

25   coercive sex, sexual contact with minors, and other very

1    difficult behaviors and attitudes.  Some of his lyrics include:

2    "Making babies do gay shit for pay B, all my kids pros, just

3    pick one out the van, you could be inside every child's mouth

4    like child's mouth like Toucan Sam..." and so forth including

5    the words, "I'm a rapist whose known to beat cases."

6         Looking at this, among all of the other concerns

7    stated in the presentence report, it is my belief that the

8    defendant is working when he tries to rehabilitate himself

9    against a very deep-seated problem.  As I said, I believe that

10   the defendant has a lot of work to do as he has acknowledged

11   and so has defense counsel.  I believe that that work is

12   unlikely to be effective unless it is sustained for a long

13   period of time and unless he is incapacitated.  It is with

14   great reluctance that I opine that someone needs to be

15   incarcerated in order to protect the public, but it is my view

16   that this is a case where that is required.

17        Mr. Margolies, please stand for sentencing.

18        For the reasons I have stated, I sentence you to the

19   bottom of the guideline range, which is 168 months in custody.

20   You will be on supervised release on Count One for three years

21   and on Count Two to five years.  These will run concurrently

22   with one another.

23        Please have a seat.

24        I should mention that the sentence of 168 months is on

25   each count to run concurrently.  I impose no fine because I

Case 23-370, Document 49, 11/13/2023, 3589727, Page126 of 178

**A-122**

1   have no reason to believe you could pay a fine.

2          I take it the government does not seek restitution and

3   forfeiture?

4          MS. BRACEWELL:  That's correct, your Honor.

5          THE COURT:  I impose the special assessment of $200,

6   which is mandatory.  The standard and mandatory conditions of

7   supervised release will apply.

8          In addition, the special conditions stated on pages 32

9   to page 34 of the presentence report will apply.

10          Mr. Margolies, I will not read each of these to you

11   now.  I will count on Mr. Sercarz to read them to you and will

12   count on you to read them yourself.

13          I impose the search condition, the outpatient

14   treatment program that is approved by the U.S. Probation

15   Office, the outpatient mental health treatment program approved

16   by the U.S. Probation Office, and the sex offender conditions

17   which include a sex offense specific evaluation and

18   participation in an outpatient sex offender treatment and/or

19   outpatient mental health treatment program approved by the U.S.

20   Probation Office.

21          It also includes allowing the U.S. Probation Office to

22   install any application or software that allows it to survey

23   and monitor your activity on a computer and other devices.  It

24   also includes that you must not have deliberate contact with

25   any child under 18 years of age unless approved by the

Case 23-370, Document 49, 11/13/2023, 3589727, Page127 of 178

1    Probation Office.  You're restricted from viewing, accessing,

2    possessing and/or downloading any sexually explicit material

3    involving minors.  You may not access any websites and other

4    sites where your access would render the access in violation of

5    the terms of service of that website or other site.

6              You will be supervised by the district of residence.

7              I have taken into account, Mr. Sercarz's

8    recommendation and I recommend all of them.  The first is that

9    you be incarcerated at Danbury, Connecticut, which is a very

10   crowded facility with limited resources; but they do have

11   resources that will help you, including the Resolve Program,

12   which I recommend for the reasons your attorney asked, and I

13   will recommend that you be able to participate in the RDAP

14   program.

15             Are there any charges to be dismissed?

16             MS. BRACEWELL:  There are not, but in an abundance of

17   caution to the extent there are, the government moves to

18   dismiss them.

19             MR. SERCARZ:  I couldn't hear you.

20             MS. BRACEWELL:  I don't believe there are any open

21   counts; but in abundance of caution, I would move to dismiss

22   any open counts.

23             THE COURT:  She moves to dismiss them and I grant the

24   motion.

25             Is there anything further before I read Mr. Margolies

JC26WOLS

1    his appeal rights?

2           MS. BRACEWELL:  Your Honor, I believe that Count Two

3    requires the defendant upon release to register as a sex

4    offender.  If he could just confirm that he understands his

5    reporting obligations.

6           THE COURT:  That's correct.

7           Mr. Margolies, you will be required to register as a

8    sex offender.

9           Do you understand that?

10          THE DEFENDANT:  Yes, your Honor.

11          THE COURT:  Okay.

12          Mr. Sercarz, have you discussed that with

13   Mr. Margolies?

14          MR. SERCARZ:  I am sorry?

15          THE COURT:  Have you discussed that with

16   Mr. Margolies?

17          MR. SERCARZ:  I have, your Honor.  He is familiar with

18   the conditions of supervised release.

19          THE COURT:  Thank you.

20          I will take just a moment.

21          (Pause)

22          THE COURT:  Mr. Margolies, I read every defendant his

23   appeal rights.  You can appeal your conviction if you believe

24   that your guilty plea was somehow unlawful or involuntary or if

25   there is some fundamental defect in the proceedings that was

1    not waived by your guilty plea.  You also have a statutory

2    right to appeal your sentence under certain circumstances

3    particularly if you believe the sentence is contrary to the

4    law.  With few exceptions any notice of appeal must be filed

5    within 14 days of judgment being entered in your case.

6    Judgment is likely to be entered this week.  If you wish to

7    appeal and you do not have the money to pay the cost of an

8    appeal, you may apply for leave to appeal in forma pauperis.

9    If you request, the Clerk of Court will prepare and file a

10   notice of appeal on your behalf.

11            We're adjourned.  Thank you.

12                         o0o

13

14

15

16

17

18

19

20

21

22

23

24

25

**A-126**

EX PARTE MOTION re: United States v. Wolfe Margolies 19cr178(KMW)

19-cr-178 (KMW); related case 22-cv-3489 (KMW)

COMES NOW the Defendant, appearing pro se, and moves this Honorable Court *ex parte* to authorize an expert pathologist and/or toxicologist *to obtain* the Toxicology Report of the decedent whose death triggered application of Guidelines § 2D1.1(a)(2) – which underlies this ineffective assistance of counsel claim – and *to review* the Toxicology Report in conjunction with the Autopsy Report, law enforcement affidavits in Defendant's case, and any police reports surrounding the death, and *to prepare a written expert opinion* as to whether or not Defendant's sale of heroin to the decedent approximately 20 hours before his death was or was not a "but-for" cause of death, which is required under <u>Burrage v. United States</u>, 571 U.S. 204 (2014).

Defendant's trial counsel's <u>representation was deficient</u> because, *knowing the death occurred long after Defendant's conduct*, it fell below an objective standard of reasonableness to investigate causality – whether for example the Toxicology Report indicated that the decedent ingested other drugs in the 20-hour gap, such as fentanyl or alcohol or sleeping pills not supplied by Defendant, that negated "but-for" causation – so that counsel might properly and knowingly advise the Defendant whether to accept or reject the Government's plea offer that stipulated to a Guidelines enhancement from level 12 for distribution of less than 10 grams of heroin (§ 2D1.1(a)(14)) to level 38 for distribution with a resulting death (§ 2D1.1(a)(2)).

An expert opinion that evidence was insufficient to establish by a preponderance that Defendant's conduct was the proximate or "but-for" cause of the death would constitute objective evidence in support of Defendant's claim of deficient performance. It would also support Defendant's claim that counsel's <u>deficient performance caused him prejudice</u>, *that had counsel informed him that he could plead guilty to the indictment instead of the plea offer stipulating to level 38*, there is a "reasonable probability the result of the sentencing would have been different" as he would have pleaded guilty to the indictment and offered the report into evidence at any sentencing hearing to override the Government's unsubstantiated claim that the death enhancement should apply. (The Government never obtained the Toxicology Report, according to the attached Government e-mail to my appellate lawyer.) Then, the Guidelines range would have been much lower: the adjusted total offense level for the narcotics and pornography counts combined without the "death resulting" enhancement would have been level 25 and, at Criminal History Category I, the corresponding sentencing range would have been 57 to 71 months. This Court sentenced Defendant at the <u>bottom</u> of the sentencing range it calculated with the death enhancement (168 months), suggesting that it would have imposed a lower sentence had Defendant pled guilty to the indictment without the death enhancement and the PSR properly calculated his range as 57-71 months.

Defendant also respectfully requests that the time to file a response to the Government's July 1, 2022 answer, be extended to 60 days *after* a decision on the instant motion authorizing an expert, to allow the expert time to obtain and review documents, and write a report, upon which Defendant can rely in filing his response; or in the event the instant motion is denied, that the time to respond be extended to 30 days after Defendant receives a copy of that Court order.

WHEREFORE, Defendant moves this Honorable Court <u>ex parte</u> to authorize Defendant to engage an expert, whom Defendant's CJA appellate attorney has recommended from this Court's CJA expert list, to be paid through the CJA system as Defendant is indigent and previously provided a financial affidavit to that effect.

| | |
|---|---|
| **From:** | Bracewell, Mollie (USANYS) |
| **To:** | Alessandra DeBlasio |
| **Cc:** | Bagliebter, Jamie (USANYS); Shin, Won (USANYS); Maurice Sercarz |
| **Subject:** | Re: U.S. v. Margolies, 19-cr-178 (appeal 20-60) |
| **Date:** | Monday, August 17, 2020 3:03:54 PM |

Hi Alessandra,

Thanks for your email, and hope you are also well. We should be able to have the discs re-burned and mailed to you. Where should we mail them? I believe the production includes the death certificate but I don't believe we ever obtained a toxicology report. I will double check and let you know.

Thanks,
Mollie

Mollie Bracewell
Assistant U.S. Attorney

On Aug 16, 2020, at 11:21 AM, Alessandra DeBlasio <ad@adeblasiolaw.com> wrote:

> Dear Mollie and Jamie,
> First, Mollie congratulations!, and welcome back from maternity leave, and hoping all
> went perfectly despite these extraordinary circumstances.
> I write now, having received all of the Mag Ct and Dist Ct transcripts, to request copies
> of the discovery your office provided in the *Margolies* case (19-cr-178).
> I am hoping that this is not too burdensome, that it doesn't require someone
> rummaging around your office, but is available electronically and easily forwarded to
> me (or mail-able by disc, and preferably to my home).
> I also wonder if a toxicology report was ever generated and if your office ever obtained
> it?  If so, I would like to see a copy of it.
> Wishing you all well these days, particularly as we return back to school/work in
> September.
> Best,
> Alessandra DeBlasio
> 2d Cir. CJA counsel for Wolfe Margolies
>
> **From:** Bracewell, Mollie (USANYS) [mailto:Mary.Bracewell@usdoj.gov]
> **Sent:** Tuesday, February 25, 2020 12:11 PM
> **To:** Alessandra DeBlasio <ad@adeblasiolaw.com>
> **Subject:** Automatic reply: Request for Statement of Reasons: U.S. v. Margolies, 19-cr-178
>
> Thank you for your email. I'm out of the office on maternity leave until May.
>  Please contact the other AUSA on the case, or AUSA Jamie Bagliebter at 212-637-2236.



This Cover Page can be Scanned into an ECMS Scanner or Faxed to 646-610-6900.

## Case Command :740 - NARCOTICS BOROUGH BROOKLYN SOUTH
Case Number :2018-0023
Tracking Number :43074651



http://ecms.nypd.org/ecms/reports/coversheet.jsp?sysDd5Num=43074651&sysCaseNum=...   5/10/2018

USAO_000227

17184674963            05:45:39 p.m.    05-10-2018    2/2

DATE FILED    THE CITY OF NEW YORK – DEPARTMENT OF HEALTH AND MENTAL HYGIENE

**NEW YORK CITY**
**DEPARTMENT OF HEALTH**
**AND MENTAL HYGIENE**
FEBRUARY 08, 2018 11:47 AM

**CERTIFICATE OF DEATH**    Certificate No. 156-18-006356

□ New
☒ Correction
□ Replacement

1. DECEDENT'S LEGAL NAME (First, Middle, Last)

| Place Of Death | 2a. New York City | 2b. Borough Brooklyn | 3a. Type of Place | 4 □ Nursing Home/Long Term Care Facility | 7 ■ No | 4a. Name of hospital or other facility (if not facility, street address) |
|---|---|---|---|---|---|---|

Place Of Death — 3a. Type of Place: 1 □ Hospital Inpatient, 2 □ Hospital ER/Outpatient, 3 □ Dead on Arrival, 4 □ Nursing Home/Long Term Care Facility, 5 □ Hospice Facility, 6 ■ Decedent's Residence, 8 □ Other Specify — 7. Was Hospice care in last 30 days: 5 □ Yes, 7 ■ No — ___, Brooklyn, New York 11232

| 5. Date and Time of Death or Found Dead | 3a. (Month) February | (Day) 03 | (Year-yyyy) 2018 | 5b. Time 06:12 | □ AM ■ PM | 4. Sex Male | 6. OCME Case No. K18003365 |
|---|---|---|---|---|---|---|---|

**MEDICAL CERTIFICATE OF DEATH**

PART I — a. Immediate cause: Acute Heroin Intoxication
b. Due to or as a consequence of: ***    ***
c. Due to or as a consequence of:

PART II — Other significant conditions contributing to death but not resulting in the underlying cause given in Part I. Include operation information.

| 7a. Injury Date (mm dd yyyy) Unknown | 7b. Time Unknown □ AM □ PM | 7c. At Work □ Yes □ No | 7d. Place of Injury – At home, factory, street, etc. Residence |
|---|---|---|---|
| 7f. How Injury Occurred | | | ___, Brooklyn, New York 11232 |

Substance Abuse

7g. If Transportation Injury Specify: □ Driver/Operator □ Pedestrian, □ Passenger, □ Other Specify — 9. Manner of Death: □ Pending further study, □ Natural, □ Accident, □ Homicide, □ Suicide, □ Undetermined — 8. Autopsy: ■ Yes, □ No Autopsy, □ Pursuant to Law, □ No Autopsy

10. On the basis of examination and/or investigation, in my opinion, death occurred due to the causes and manner as stated.

Certifier Signature _Gene Maya_   I.D. No. ___   M.D. Date FEB-05-2018
Certifier Name (Print) _Gene Maya_   **Medical Examiner** (Deputy Chief) (Chief) (Medical Examiner)

| 11a. Decedent's Residence State New York | 11b. County Erie | 11c. City or Town East Aurora | 11d. Street and Number ___ Apt. No. | ZIP Code 14052 | 11e. Inside City Limits? □ Yes ■ No |
|---|---|---|---|---|---|
| 12. Date of Birth (Month) August | (Day) 23 | (Year-yyyy) 1989 | 13a. Age at last birthday (yrs) 28 | Under 1 Year Months Days Hours Minutes | 14. Social Security No. ___ |

16. Usual Occupation (Type of work done during most of working life, NOT retired) Computer Programmer    Kind of business or industry Online Retail    16. Abuse or Rich

17. Birthplace (City & State or Foreign Country) Buffalo, New York — 18. Education (Check the box that best describes the highest degree or level of school completed at the time of death): 1 □ 8th grade or less; 2 □ 9th-12th grade, no diploma; 3 □ High school graduate or GED; 4 □ Some college credit, but no degree; 5 □ Associate degree (e.g., AA, AS); 6 □ Bachelor's degree (e.g., BA, AB, BS); 7 □ Master's degree (e.g., MA, MS, MEng, MEd, MSW, MBA); 8 □ Doctorate (e.g., PhD, EdD) or Professional degree (e.g., MD, DDS, DVM, LLB, JD)

**PERSONAL PARTICULARS**

19. Ever in U.S. Armed Forces? □ Yes ■ No — 20. Marital/Partnership Status at time of death: 1 □ Married, 2 □ Married, but separated, 3 □ Domestic Partnership, 5 □ Never Married, 4 □ Divorced, 6 □ Widowed, 7 □ Unknown — 21. Surviving Spouse's/Partner's Name (If wife, name prior to first marriage) (First, Middle, Last) *** ***

22. Father's Name (First, Middle) ___ — 23a. Relationship to Decedent Father — 23. Mother's Maiden Name (First, Middle) ___ — 24a. Address (Street and Number) Apt. No. ___ City & State East Aurora, New York ZIP Code 14052

25a. Method of Disposition: □ Burial, ■ Cremation, □ Entombment, □ Other Specify, □ City Cemetery — 25b. Place of Disposition (Name of cemetery, crematory, other place) Forest Lawn Crematory

25c. Location of Disposition (City & State or Foreign Country) Buffalo, New York — 25d. Date of Disposition: mm 02 dd 12 yyyy 2018

27. Funeral Establishment International Funeral Service of New York, Inc. — 28b. Address (Street and Number) 4123 4th Avenue, Brooklyn, New York 11232 (City & State, ZIP Code)

Certifier-Last Name– formerly Pesquie-Styles; approved by Deputy City Registrar J. Hicks on Feb-20-2018; Certifier-First Name– formerly Medina; approved by Deputy City Registrar J. Hicks on Feb-20-2018; Certifier-Title– formerly Deputy Chief Medical Examiner; approved by Deputy City Registrar J. Hicks on Feb-20-2018; Cause of Death-Line A Description – formerly Pending Further Studies; approved by Deputy City Registrar J. Hicks on Feb-20-2018; Injury-Date/Time of Injury– formerly blank; approved by Deputy City Registrar J. Hicks on Feb-20-2018; Injury-Place of Injury Description– formerly blank; approved by Deputy City Registrar J. Hicks on Feb-20-2018; Injury-Street Address Number– formerly blank; approved by Deputy City Registrar J. Hicks on Feb-20-2018; Injury-Address City– formerly blank; approved by Deputy City Registrar J. Hicks on Feb-20-2018; Injury-Address State– formerly blank; approved by Deputy City Registrar J. Hicks on Feb-20-2018; Injury-Address Zip Code– formerly blank; approved by Deputy City Registrar J. Hicks

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE CITY OF NEW YORK – DEPARTMENT OF HEALTH AND MENTAL HYGIENE
**MEDICAL EXAMINER'S SUPPLEMENTARY REPORT**

VR 16 (Rev. 01/00)    Certificate No. 156-18-006356

To be filed by FUNERAL DIRECTOR in case of City Burial, by OCME

27. Ancestry (Check one box and specify): □ Hispanic (Mexican, Puerto Rican, Cuban, Dominican, etc.) Specify: Unknown; □ NOT Hispanic (Italian, African American, Haitian, Pakistani, Ukrainian, Nigerian, Taiwanese, etc.) Specify: Unknown

28. Race as defined by the U.S. Census (Check one or more to indicate what the decedent considered himself or herself to be): 01 ■ White, 02 □ Black or African American, 03 □ American Indian or Alaska Native (Name of enrolled or principal tribe), 04 □ Asian Indian, 05 □ Chinese, 06 □ Filipino, 07 □ Japanese, 08 □ Korean, 09 □ Vietnamese, 10 □ Other Asian-Specify, 11 □ Native Hawaiian, 12 □ Guamanian or Chamorro, 13 □ Samoan, 14 □ Other Pacific Islander-Specify, 18 □ Other-Specify

**DECEDENT'S LEGAL NAME** (Type or Print)

29a. If Female: 1 □ Not pregnant within 1 year of death, 2 □ Pregnant at time of death, 3 □ Not pregnant, but pregnant within 42 days of death, 4 □ Not pregnant at death, but pregnant 43 days to 1 year before death, 9 □ Unknown if pregnant within 1 year of death — 29b. If pregnant within one year of death, outcome of pregnancy: 1 □ Live Birth, 2 □ Spontaneous Termination / Ectopic Pregnancy, 3 □ Induced Termination, 4 □ Unknown — 29c. Date of Outcome: mm dd yyyy

30. Did tobacco use contribute to death? 1 □ Yes, 2 □ No, 3 □ Probably, 4 □ Unknown — 31. For infant under one year: Name and address of hospital or other place of birth

**Cleared For Cremation If Family Requests**

I certify that I personally examined the body on ___ (Date) at ___ (Location)
SIGNATURE: ___ (Medical Investigator) (Deputy Chief) (Chief) (Medical Examiner)
or
I did not personally examine the body after death.
SIGNATURE: _Gene Maya_ (Deputy Chief) (Chief) (Medical Examiner)

System Case Id 18356170

_Gene Maya_
M.E. Signature

USAO_000228

WESTCHESTER NY 105

7 JUL 2022   PM 2   L

Wolfe Margolies 37756-039
F.C.I Danbury
Route 37
Danbury, CT 06811

The Honorable Barbara Moses
U.S. Magistrate Judge
U.S. Courthouse
500 Pearl Street
New York, NY 10007-1312

10007-131599

Legal Mail

Legal Mail

FEDERAL CORRECTIONAL INSTITUTION DANBURY
33 1/2 PEMBROKE ROAD DANBURY N. 06811
DATE:

THE ... CLOSED LETTER WAS PROCESSED THROUGH
SPE ... U PROCE DURES FOR FORWARDING TO YOU.
THE L... RE... RE IN NEITHER OPENED NOR INSPECTED.
IF TH... RE ... RESENTS A QUESTION OR PROBLEM OVER
... ... ... FACILITY HAS JURISDICTION, YOU
... ... RETURN THE MATERIAL FOR FURTHER
... ... RIFICATION IF THE WRITER
... ... AMPAIGNING FOR FORWARDING
... ... ... ... RETURN
... ... RED TO THE ABOVE ADDRESS.

**A-132**

Case 1:19-cr-00178-KMW   Document 50   Filed 04/27/22   Page 1 of 28

Page 2

## MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
## SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court | District | Southern District of New York |
|---|---|---|
| Name (under which you were convicted):<br>Wolfe Margolies | | Docket or Case No.:<br>1:19-cr-00178 (KMW) |
| Place of Confinement:<br>FCI Danbury | | Prisoner No.:<br>37756-034 |
| UNITED STATES OF AMERICA | Movant (include name under which you were convicted)<br>Wolfe Margolies | |
| v. | | |

## MOTION

1.  (a) Name and location of court that entered the judgment of conviction you are challenging:

    The Hon. Kimba M. Wood, United States District Court
    500 Pearl Street
    New York, NY 10007

    (b) Criminal docket or case number (if you know):   Case No. 1:19-cr-00178 (KMW)

2.  (a) Date of the judgment of conviction (if you know):   1/7/2020

    (b) Date of sentencing:   1/7/2020

3.  Length of sentence:   168 months, to be followed by 5 years of supervised release

4.  Nature of crime (all counts):

    Count 1: a violation of 21 U.S.C. § 846, to wit, conspiracy to distribute narcotics, and

    Count 2: a violation of 18 U.S.C. § 2252A, to wit, possession of child pornography.

5.  (a) What was your plea? (Check one)

    (1)   Not guilty ☐            (2)   Guilty ☑            (3)   Nolo contendere (no contest) ☐

    (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count
    or indictment, what did you plead guilty to and what did you plead not guilty to?

6.  If you went to trial, what kind of trial did you have? (Check one)       Jury ☐       Judge only ☐

RECEIVED
APR 27 2022
CHAMBERS OF KIMBA M. WOOD
U.S.D.J.-S.D.N.Y.

**A-133**

Page 3

7.  Did you testify at a pretrial hearing, trial, or post-trial hearing?    Yes ☐    No ☑

8.  Did you appeal from the judgment of conviction?    Yes ☑    No ☐

9.  If you did appeal, answer the following:

    (a) Name of court:   United States Court of Appeals for the Second Circuit

    (b) Docket or case number (if you know):  Case No. 20-60

    (c) Result:   Denied (pursuant to Plea Agreement appellate waiver)

    (d) Date of result (if you know):  6/28/2021

    (e) Citation to the case (if you know):  Unknown

    (f) Grounds raised:

    (g) Did you file a petition for certiorari in the United States Supreme Court?    Yes ☐    No ☑

    If "Yes," answer the following:

    (1) Docket or case number (if you know):

    (2) Result:

    (3) Date of result (if you know):

    (4) Citation to the case (if you know):

    (5) Grounds raised:

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?

    Yes ☐    No ☑

11. If your answer to Question 10 was "Yes," give the following information:

    (a)  (1) Name of court:

        (2) Docket or case number (if you know):

        (3) Date of filing (if you know):

Page 4

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?   Yes ❑  No ❑

(7) Result:

(8) Date of result (if you know):

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?   Yes ❑  No ❑

(7) Result:

(8) Date of result (if you know):

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1) First petition:      Yes ❑  No ❑

(2) Second petition:    Yes ❑  No ❑

Page 5

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the <u>facts</u> supporting each ground.

**GROUND ONE:**

Please see below.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

PETITIONER'S "PLEA-PROCESS" REPRESENTATION FELL BELOW AN OBJECTIVE STANDARD OF REASONABLENESS AND THUS THERE EXISTS A REASONABLE PROBABILITY THAT THE OUTCOME OF THE PLEA PROCESS WOULD HAVE BEEN DIFFERENT WITH COMPETENT ADVICE.

Please see attached Memorandum of Law.

(b) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐   No ☑

(2) If you did not raise this issue in your direct appeal, explain why:

The Supreme Court of the United States has determined that ineffective assistance of counsel claims are best brought under 28 U.S.C. § 2255. See Memorandum of Law at 2.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐  No ☑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

**A-136**

Page 6

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ❏   No ❏

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❏   No ❏

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❏   No ❏

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND TWO:**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

A-137

Page 7

**(b) Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❑    No ❑

(2) If you did not raise this issue in your direct appeal, explain why:

**(c) Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ❑    No ❑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ❑    No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❑    No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❑    No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

Page 8

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND THREE:**

(a) Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

(b) **Direct Appeal of Ground Three:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

    Yes ❏   No ❏

    (2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

    Yes ❏   No ❏

    (2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Page 9

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

    Yes ☐   No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

    Yes ☐   No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

    Yes ☐   No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND FOUR:**

(a) Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Case 23-370, Document 49, 11/13/2023, 3589727, Page144 of 178

A-140

**(b) Direct Appeal of Ground Four:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

    Yes ❑  No ❑

    (2) If you did not raise this issue in your direct appeal, explain why:


**(c) Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

    Yes ❑  No ❑

    (2) If your answer to Question (c)(1) is "Yes," state:

    Type of motion or petition:

    Name and location of the court where the motion or petition was filed:


    Docket or case number (if you know):

    Date of the court's decision:

    Result (attach a copy of the court's opinion or order, if available):


    (3) Did you receive a hearing on your motion, petition, or application?

    Yes ❑  No ❑

    (4) Did you appeal from the denial of your motion, petition, or application?

    Yes ❑  No ❑

    (5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

    Yes ❑  No ❑

    (6) If your answer to Question (c)(4) is "Yes," state:

    Name and location of the court where the appeal was filed:


    Docket or case number (if you know):

    Date of the court's decision:

    Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

13. Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the judgment you are challenging?      Yes ☐   No ☑
   If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:
   (a) At preliminary hearing:
   Maurice H. Sercarz, 810 Seventh Avenue, Suite 620, New York, NY 10019
   (b) At arraignment and plea:
   Maurice H. Sercarz, 810 Seventh Avenue, Suite 620, New York, NY 10019
   (c) At trial:
   N/A
   (d) At sentencing:
   Maurice H. Sercarz, 810 Seventh Avenue, Suite 620, New York, NY 10019

A-142

Page 12

(e) On appeal:

 Alessandra DeBlasio, 299 Broadway, Suite 1803 New York, NY 10007

(f) In any post-conviction proceeding:


(g) On appeal from any ruling against you in a post-conviction proceeding:


16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?      Yes ☑ No ☐

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?      Yes ☐ No ☑

(a)  If so, give name and location of court that imposed the other sentence you will serve in the future:


(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?      Yes ☐   No ☐

A-143

Page 13

18. **TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.\***

The judgment of conviction became final on June 28, 2021. (See attached order from the United States Court of Appeals for the Second Circuit.) Thus, the Petition is timely.

---

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

A one-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of —

(1) the date on which the judgment of conviction became final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

A-144

Page 14

Therefore, movant asks that the Court grant the following relief:

Counsel's representation was ineffective in violation of his Sixth Amendment rights and, as a result, this Honorable Court should vacate his conviction and sentence,

or any other relief to which movant may be entitled.

provide any

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on

(month, date, year).

Executed (signed) on  4/19/22  (date).

_____
Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

**A-145**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————X

  UNITED STATES OF AMERICA,

          -against-                   Case No. 1:19-cr-00178 (KMW)

  WOLFE MARGOLIES,
      Defendant/Movant.
————————————————————————X

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION UNDER U.S.C. § 2255
## TO VACATE, SET ASIDE, OR CORRECT A SENTENCE

COMES NOW the Defendant, appearing *pro se*, and moves this Honorable Court to vacate and

set aside his conviction and sentence pursuant to 28 U.S.C. § 2255.

### PROCEDURAL HISTORY

     On February 13, 2019, the Movant, Wolfe Margolies, together with his co-defendant, Ekin

Erkan, were charged in a sealed Complaint in the Southern District of New York. ECF 1. On the

following day, February 14, 2019, Movant and his co-defendant were both arrested. Movant, who

was living in New Orleans at the time, was arrested in the Eastern District of Louisiana and first

appeared in the Southern District of New York on March 6, 2019.

     On March 13, 2019, Movant was indicted on two counts: a violation of 21 U.S.C. § 846,

to wit, conspiracy to distribute narcotics, and a violation of 18 U.S.C. § 2252A, to wit, possession

of child pornography. On March 20, 2019, Movant was ordered released on bail. Just over three

months later, on June 24, 2019, Movant entered a guilty plea before Magistrate Judge Robert

Lehrburger to both counts of the two-count Indictment, pursuant to a Plea Agreement. ECF 30.

Following the plea allocution, Movant was remanded into custody. On June 27, 2019, this

Honorable Court accepted the guilty plea. Through these proceedings, Movant was represented by

Maurice H. Sercarz, Esq.

On January 7, 2020, less than a year later, Movant was sentenced to a term of 168 months

on each of Counts 1 and 2, to run concurrently. He was additionally sentenced to three years of

supervised release on Count 1 and five years of supervised release on Count 2, to run concurrently.

On January 9, 2020, Movant filed a notice of appeal. ECF 48. On February 12, the United States

Court of Appeals for the Second Circuit granted counsel's motion to withdraw and appointed

Alessandra DeBlasio, Esq. as appellate counsel under the Criminal Justice Act.

Movant's failure to have been properly advised as to the full consequences of his guilty

plea pursuant to the Plea Agreement, most notably the degree to which the Sentencing Guidelines

would be inflated relative to a guilty plea sans Plea Agreement or proceeding to trial with an

affirmative defense to the second count, requires that his conviction and sentence be vacated due

to ineffective assistance of counsel. See *Lafler v. Cooper*, 132 S.Ct. 1376 (2012); *Missouri v. Frye*,

132 S.Ct. 1399 (2012); *Hill v. Lockhart*, 474 U.S. 52 (1985).

Movant filed a timely notice of appeal on January 9, 2020. ECF 48; see also *United States*

*v. Margolies*, Case No. 20-0060. On June 28 of the following year, a two-judge panel of the Court

of Appeals—the chief judge, Debra Ann Livingston, having recused herself for unstated reasons—

determined that the appeal was barred by the waiver of appellate rights contained in the Plea

Agreement. ECF 49. And so, while Movant appealed his conviction and lost, the appeal was not

lost on the substance; rather, it was simply barred for procedural reasons. Specifically, the

Government invoked the appeal waiver included in the Plea Agreement rather than address the

2

arguments contained in the appeal *about* the Plea Agreement. And it is for this reason that the Movant has proceeded, pursuant to 28 U.S.C. § 2255, to file the instant Motion.

In short, there never should have been a binding Plea Agreement in the first place, because counsel was ineffective in advising Movant to accept the Agreement; acceptance of the Agreement prejudiced Movant at sentencing due to stipulations that resulted in unnecessarily inflated Sentencing Guidelines. This ineffectiveness violated his Sixth Amendment rights under the United States Constitution. Pursuant to statute, this Honorable Court must review the substantive issues.

The Supreme Court of the United States has determined that ineffective assistance of counsel claims are best brought under 28 U.S.C. § 2255 because a district court's assessment of a § 2255 claim provides "the forum best suited to developing the facts necessary to determining the adequacy of representation." *Massaro v. United States*, 538 U.S. 505 (2003).

## ARGUMENT

MOVANT'S "PLEA-PROCESS" REPRESENTATION FELL BELOW AN OBJECTIVE STANDARD OF REASONABLENESS AND THUS THERE EXISTS A REASONABLE PROBABILITY THAT THE OUTCOME OF THE PLEA PROCESS WOULD HAVE BEEN DIFFERENT WITH COMPETENT ADVICE.

The law governing ineffective assistance of counsel is both well-known and well-defined. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984) requires Movant to show that trial counsel's "representation fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

3

**A-148**

would have been different." Movant can demonstrate both. A "reasonable probability" is defined as a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In the context of plea negotiations, "the outcome" relates to the decision to plead guilty or not guilty, not the actual guilt or innocence of the defendant, see *Lalfer v. Cooper*, *supra*, 132 S.Ct. 1376, 1384, 1388 (2012), and "any amount of actual jail time has Sixth Amendment significance." *Glover v. United States*, 531 U.S. 198, 203 (2001).

The bar established by *Strickland* is high, but not *so* high as to prevent "[i]neffective assistance [from being] demonstrated where counsel performs competently in some respects, but not in others." *Thomas v. Kulhman*, 255 F.Supp.2d 99, 107 (E.D.N.Y. 2003) (Weinstein, J.), citing *Eze v. Senkowski*, 321 F.3d 110, 114 (2nd Cir. 2003). "Although there is 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' the court must keep in mind that 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" *Thomas*, 255 F.Supp.2d at 107, quoting *Strickland*, 466 U.S. at 689, 696.

Here, the question is not whether the absence of counsel's errors would have resulted in an acquittal after trial—though, as it will be demonstrated, that *was* a likely result as well in one of the charges levied—but rather whether Movant's decision to accept the Government's plea offer and waive his right to trial would have been different had he received effective *plea-process* representation.

In two companion decisions, the Supreme Court made clear that criminal defendants possess a Constitutional right to effective assistance of counsel during plea negotiations. See *Missouri v. Frye*, *supra*, 132 S.Ct. 1399 (2012); *Lafler v. Cooper*, *supra*, 132 S.Ct. 1376 (2012).

*Frye* addresses ineffective assistance leading to a defendant failing to be alerted to a plea offer, and *Lafler* addresses the rendering of a decision on a plea offer based of inaccurate legal advice.

In *Frye*, the Supreme Court explained:

> The reality is that plea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages. Because ours "is for the most part a system of pleas, not a system of trials," it is insufficient simply to point to the guarantee of a fair trial as a backstop that inoculates any errors in the pretrial process. "To a large extent ... horse trading [between prosecutor and defense counsel] determines who goes to jail and for how long. That is what plea bargaining is. It is not some adjunct to the criminal justice system; it *is* the criminal justice system."

*Frye*, 132 S.Ct. at 1407 (brackets and emphasis in original and citations omitted). Under those circumstances, the Supreme Court concluded that the right to counsel must extend to the plea-bargaining process because the "simple reality" is that "the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant." *Frye*, 132 S.Ct. at 1407. Similarly, in *Lafler*, the Supreme Court explained that "the right to adequate assistance of counsel cannot be defined or enforced without taking account of the central role plea bargaining

5

plays in securing convictions and determining sentences." *Lafler*, 132 S.Ct. at 1388, citing *Frye*, 132 S.Ct. at 1407.

In *Lafler*, the Supreme Court concluded that ineffective assistance of counsel could be found when a defense attorney convinced a defendant to render a decision on a plea offer based upon the attorney's inaccurate or faulty legal advice. In doing so, the Supreme Court made clear that "Defendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process." *Lafler*, 132 S.Ct. at 1384, citing *Frye*, 132 S.Ct. at 1407-08, *Padilla v. Kentucky*, 130 S.Ct. 1473, Slip Op. at 16 (2010), *Hill v. Lockhart, supra*, 474 U.S. 52, 57 (1985).

Similarly, and as is directly relevant here, in *Hill v. Lockhart* the Supreme Court held that when "a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" *Hill*, 474 U.S. at 56, quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970). In such circumstances, the Supreme Court held that "the two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel." *Hill*, 474 U.S. at 58. The Supreme Court continued:

> In the context of guilty pleas, the first half of the *Strickland v. Washington* test is nothing more than a restatement of the standard of attorney competence already set forth in *Tollett v. Henderson*, [411 U.S. 258 (1973)] and *McMann v. Richardson*, [397 U.S. 759 (1970)]. The second, or "prejudice," requirement, on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other

6

**A-151**

> words, in order to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

*Hill*, 474 U.S. at 58-59 (footnote omitted).

In *Lafler*, by way of explaining its decisions in *Hill* and *Strickland*, the Court restated the test: "In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice." *Lafler*, 132 S.Ct. at 1384 (citations omitted). The reason for this is straightforward: the decision whether or not to accept a plea offer is "a proceeding in which defendants cannot be presumed to make critical decisions without counsel's advice." *Id.* at 1385. Indeed, the Court's holdings in *Frye* and *Lafler* are a logical extension of its holding in *Padilla v. Kentucky, supra,* 130 S.Ct. 1473 (2010). In *Padilla*, the Court made clear, "Before deciding whether to plead guilty, a defendant is entitled to "the effective assistance of competent counsel." Padilla, 130 S.Ct. at 1480-81 (emphasis added), citing *McMann*, 397 U.S. at 771, *Strickland*, 466 U.S. at 686.

Turning to the first prong of the *Strickland* test, the Court explained, "The first prong—constitutional deficiency—is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Padilla*, 130 S.Ct. at 1482, quoting *Strickland*, 466 U.S. at 688. The Supreme Court noted that it accepted "as true" Padilla's allegations that his attorney had given him incorrect advice regarding the consequences of his guilty plea, and as such had "sufficiently

alleged constitutional deficiency to satisfy the first prong of Strickland." *Padilla*, 130 S.Ct. at 1283. The same should hold in the instant matter.

Here, counsel failed to inform Movant that had he gone to trial on the child pornography count as charged, he would have had an affirmative defense to said count because Movant was charged with possessing "less than three images" (a video is considered a single image for the purpose of the affirmative defense), which Movant "took reasonable steps to destroy" without allowing "any person, other than a law enforcement agency, to access." *See* 18 U.S.C. § 2252A(d). These facts would have been easily proved at trial, and thus Movant could not have been found guilty on this count.

Counsel failed to inform Movant that had he gone to trial on the heroin count as charged, and been convicted, his offense level would have been 12 (not the level 38 to which he pled guilty), and that had Movant indeed been acquitted of the pornography count, given the affirmative defense, the corresponding Sentencing Guidelines range would have been ten (10) to sixteen (16) months, instead of the *168 to 210* months Movant stipulated to by the Plea Agreement.

Counsel further failed to inform Movant that had he gone to trial, and had the Government successfully superseded the heroin count of the indictment to include a "death resulting" from such a sale, it would have had to prove beyond a reasonable doubt that Movant's sale of a personal-use amount of heroin *directly* resulted in an individual's death. Reasonable counsel would have noted that the Government had no evidence beyond a reasonable doubt linking the sale to the death, having failed to obtain the autopsy, toxicology reports, police reports, and/or witness statements.

Furthermore, given the absence of evidence underscoring the Government's accusations, counsel failed to independently obtain a copy of the autopsy, toxicology reports, police reports, and/or witness statements, and instead simply accepted the Government's position for purposes of

8

a Plea Agreement—based solely on text messages more than twenty hours before the death—that *as a direct result* of heroin Movant provided to an individual (of which Movant had no independent memory) that individual died, where the toxicology report likely would have shown other substances ingested in the twenty hours from the time of sale to time of death that would have been an intervening cause of death such that the sentencing court could not have enhanced the base offense level from 12 to 38.

In light of the above, it is inexplicable that counsel failed to ask for a *Fatico* hearing to require the government to produce proof by a preponderance of the evidence that the sale of heroin directly resulted in a death such that base offense level 38 was warranted. This is particularly vital given that the Government had no autopsy, toxicology reports, police reports, and/or witness statements. Thus, counsel advised Movant to plead guilty to a Plea Agreement that set the base offense level for the heroin count at 38 (instead of 12), without proof by a preponderance of the evidence that the death resulted from Movant's conduct.

Counsel failed to inform Movant that had he pled guilty to the two-count indictment *without* a Plea Agreement, the base offense level for the heroin count would have been 12 (not 38), and when combined with the offense level for the child pornography, Movant's total offense level with acceptance of responsibility would have been 25, with a corresponding sentencing range of 57 to 71 months. Indeed, even though the Indictment did not charge Movant with distributing heroin that resulted in a death, in the Plea Agreement, the parties stipulated to the application of Guidelines § 2D1.1(a)(2), which sets the base offense level at 38 where "the offense of conviction establishes that death . . . resulted from the use of the substance." There was no indication in the Plea Agreement of anything foregone, that the Government would have superseded with the "death resulting" charge and mandatory minimum, but in consideration for Movant's guilty plea and

9

appeal waiver the Government would refrain. See, e.g., *United States v. Russow*, Case No. 3:14-cr-84, 2015 WL 1057513, at *1 (D. Conn. 2015) ("The Government…*in its plea agreement*…agreed not to charge under 21 U.S.C. §841(b)(1)(C) that "death or serious bodily injury result[ed] from the use of such substance") (citing Plea Agreement at 5, ECF 51) (emphasis added, brackets in original). Indeed, the Government never indicted Movant with a charge carrying a mandatory minimum for death resulting, so of course Government never then agreed to supersede with an Information without the mandatory minimum in exchange for Movant's plea and appeal waiver, as they did a few years earlier in *United States v. Oleksowicz*. See *United States v. Oleksowicz*, Case No. 13-cr-003, 2017 WL 729724, at *1 (S.D.N.Y. 2017), *compare* ECF 2 (Indictment, January 2, 2013) with Dkt. #34 (Superseding Information October 11, 2013). The two-level decrease for acceptance of responsibility under § 3E1.1(a) of the Sentencing Guidelines was warranted whether or not Movant pled guilty pursuant to the Plea Agreement; the Government's stipulation that it would recommend a one-level reduction pursuant to Sentencing Guidelines § 3E1.1(b) for Movant's timely notification of his intention to plead guilty would have applied even if he had simply pled guilty to the Indictment as charged rather than pursuant to the Plea Agreement, and even if it did not, this "stipulation" pales in comparison to all of the stipulations agreed to on the poor advice of counsel. Counsel, in other words, made stipulations that *hurt* his client at sentencing in exchange for nothing.

Counsel for Erkan, Movant's co-defendant, pursued diversion for his client, applying for his participation in the Southern District of New York's judicially-supervised Young Adult Opportunity Program, with dismissal of the indictment upon successful completion. The Program was designed for non-violent young adults between the ages of eighteen (18) and twenty-five (25), but defendants twenty-five and over could be considered as well, on a case-by-case basis. *See*

https://www.nysd.uscourts.gov/programs/young-adult-opportunity-program. Erkan was accepted and entered into the Program on August 5, 2019. Movant, who was twenty-six (26) years old, was not admitted. So, although Erkan founded the drug-referral conspiracy underlying Count 1 of the Indictment, was involved far longer than Movant, and had three deaths attributed to him (two before Movant became involved), he would qualify for a no sentence upon completion of the Program while Movant would not. In lieu of zealously advocating for Movant's participation, counsel for Movant instead negotiated a Plea Agreement with the Government whereby Movant would plead guilty to both counts of the Indictment.

Counsel's deficient performance prejudiced Movant because the sentencing range to which he had Movant stipulate (168-210 months) was *far* higher than it would have been had Movant either simply pled to the indictment (57-71 months) or gone to trial with an affirmative defense and been convicted only on the narcotics count of the indictment (10-16 months). Movant received no consideration for agreeing to the Plea Agreement; indeed, he was *worse* off for having signed it. The clause not to prosecute Movant further for the same conduct to which he was agreeing to plead guilty was entirely boilerplate and no concession at all. Movant's finite conduct ended *months* before he was charged (the narcotics conspiracy in May 2018, and the pornography possession in October 2018); the extent of his behavior was known to the Government by the time of the Plea Agreement in June 2019. Put simply, there was nothing ongoing for the prosecution to forego, and so there was no concession. See, e.g., *United States v. Walsh*, Cases No. 09-cr-722, 17-cv-6651, 2019 WL 2117648 (S.D.N.Y. 2019) (finding Plea Agreement devoid of consideration despite the Government's language that it would not pursue additional charges, given that the Government did not assert it was pursuing investigations outside the scope of the indictment).

11

**A-156**

Since this Honorable Court ultimately sentenced Movant within the Guidelines range, even at the bottom of that range, it is more than likely that this Honorable Court would have sentenced Movant within and at the bottom of the lower Guidelines ranges, whichever was applicable (57-71 months or 10-16 months).

This Honorable Court faced a similar issue in *Williams v. United States,* Case No. 14-cv-0829 (KMW) (S.D.N.Y. 2015). Like Williams, Movant's sentencing guidelines range was significantly higher than it would have been without the errors promulgated by counsel, and that range was relied upon by the Court. Like Williams, Movant was given a sentence on the "low end" of the sentencing guidelines range, suggesting that Movant would have received a lower sentence had his base offense level been 12 (not 38). This Honorable Court's reasoning provides direct and persuasive authority for the ineffective assistance of counsel upon which the instant Motion relies.

But for counsel's ineffectiveness, Movant would either have pled guilty without the Plea Agreement, or he would have maintained his not guilty plea and continued to insist on availing himself of his Constitutional right to trial, as the Government would have been unable to prove beyond a reasonable doubt any hypothetical "death resulting" enhancement to Count 1 and as he would have been able to present an affirmative defense to Count 2. The Plea Agreement set Movant up for a greatly *enhanced* sentence, instead of providing him with a "chance at a reduced sentence." *United States v. Lutchman*, 910 F.3d at 38 (2nd Cir. 2018). As such, due to counsel's ineffectiveness, it cannot be said that Movant's guilty plea pursuant to the Plea Agreement was entered into knowingly, intelligently, and voluntarily.

## PRAYER

WHEREFORE, Movant respectfully submits that counsel's representation was ineffective in violation of his Sixth Amendment right to effective assistance of counsel during the plea-process stage of the proceedings and, as a result, prays that this Honorable Court vacate his conviction and sentence or provide any other relief it deems necessary and proper.

Respectfully submitted,

WOLFE MARGOLIES
Defendant/Movant, *Pro Se*

13

Case 23-370, Document 49, 11/13/2023, 3589727, Page162 of 178

**A-158**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————X

  UNITED STATES OF AMERICA,

           -against-                     Case No. 1:19-cr-00178 (KMW)

  WOLFE MARGOLIES,
      Defendant/Movant.
————————————————————————X

## CERTIFICATE OF SERVICES

I, Wolfe Margolies, the Defendant and Movant in the above-captioned case, declare under the

penalty of perjury, pursuant to the provisions of 28 U.S.C. § 1746, that a true and correct copy of

the foregoing Motion Under 28 U.S.C. § 22255 to Vacate, Set Aside or Correct Sentence by a

Person in Federal Custody, along with the annexed Memorandum of Law, Motion for Appointment

of Counsel, and Financial Affidavit in support thereof, was placed into the mailbox at the Federal

Correctional Institution at Danbury, Connecticut on this ___19th___ day of ___April___, 2022, in

accordance with the prison mailbox rules set forth in *Houston v. Lack*, 489 U.S. 266 (1988), and

mailed to the following individuals.


     The Hon. Kimba M. Wood           Mary Elizabeth Bracewell, Esq.
     United States District Court          Assistant United States Attorney
     500 Pearl Street                   1 Saint Andrew's Plaza
     New York, NY 10007            New York, NY 10007


                                Respectfully submitted,

                                  WOLFE MARGOLIES
                                  Defendant/Movant, *Pro Se*



The Hon. Kimba M. Wood
United States District Court
500 Pearl Street
New York, NY 10007

Wolfe Margolies 37756-034
FCI Danbury
Route 37
Danbury, CT 06811

A-160

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 1, 2022

**BY ECF**

The Honorable Kimba M. Wood
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

   Re: *United States v. Wolfe Margolies*, 19 Cr. 178 (KMW)

Dear Judge Wood:

  The Government writes in response to the Court's order issued on May 6, 2022, that the Government respond to the defendant Wolfe Margolies's *pro se* motion, pursuant to 28 U.S.C. § 2255. (Dkt. No. 52). For the reasons set forth below, the defendant's motion should be denied.

**I.** **Background**

  **A.** **The Offense Conduct**

  On March 13, 2019, a grand jury returned Indictment 19 Cr. 178 (KMW) (the "Indictment") charging Wolfe Margolies in two counts. Count One charged Margolies with conspiracy to distribute heroin, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C). Count Two charged Margolies with possession of child pornography, in violation of 18 U.S.C. §§ 2252(a)(5)(B), (b)(2), and 2, with one count of being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1).

  The charge in the Indictment arose from an investigation of a drug referral business operated by Ekin Erkan, through which Erkan offered customers referrals to drug dealers in exchange for an online payment or "tip." (PSR ¶ 11). Among the dealers to whom Erkan directed customers was Margolies. (PSR ¶¶ 12-13). Over the course of the investigation, an undercover officer (the "UC") posed as a drug customer and communicated with Erkan to receive referrals. (PSR ¶¶ 12-13).

  In or around December 2017, Erkan referred the UC to "Hope," described as a "new plug w fire," referring to a new drug dealer with potent narcotics. (PSR ¶ 12). In February 2018, in response to a question from the UC about a dealer in Queens, New York, Erkan again referred the UC to "Hope" and provided a telephone number in exchange for a tip. (PSR ¶ 13). The phone number for "Hope" was identified as belonging to Margolies. (PSR ¶ 13). On six occasions

between approximately March 2018 and May 2018, the UC arranged to meet Margolies and purchase heroin from him in exchange for cash payments. (PSR ¶¶ 14-16).

Law enforcement officers linked Margolies to a February 2018 heroin overdose death of an individual in Brooklyn, New York (the "Victim"). (PSR ¶¶ 17-22). Officers recovered a phone belonging to the Victim, which showed that the Victim had communicated with Erkan and Margolies about buying drugs right before the Victim's death. (PSR ¶¶ 17-22). On February 2, 2018, Erkan referred the Victim to "Hope," *i.e.* Margolies. (PSR ¶ 17). Later the same day, the Victim communicated with Margolies and arranged to purchase three bundles of heroin. (PSR ¶ 18). The Victim tried to move forward the meeting time and Margolies indicated that he had to restock before he could meet ("Gotta reup. Going to u soon as I can."). (PSR ¶ 18). Later the same day, Margolies indicated that he was on his way to the Victim ("walking from train"), and the Victim responded "Alright," in what was the last message sent from the Victim's phone. (PSR ¶ 19). The Victim was found dead in his Brooklyn, New York apartment on February 3, 2018, and the cause of death was found to be a heroin overdose. (PSR ¶ 22).

On January 13, 2019, Margolies arrived on an international flight into John F. Kennedy Airport in Queens, New York. (PSR ¶ 23). Law enforcement officers conducted a border search of a cellphone in Margolies's possession. (PSR ¶ 23). During a review of the cellphone's contents, law enforcement officers discovered a video file constituting child pornography that Margolies had received in an online chat exchange on October 25, 2018. (PSR ¶¶ 24-27).

## B. The Plea Agreement and Plea Proceeding

On June 24, 2019, Margolies appeared before Judge Lehrburger and pleaded guilty to the two counts of the Indictment pursuant to a written plea agreement with the Government (the "Plea Agreement").

In the Plea Agreement, the parties stipulated to the applicable United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range as follows. (Ex. A at 2-3). With respect to Count One, pursuant to U.S.S.G. § 2D1.1(a)(2), because the offense of conviction established that death or serious bodily injury resulted from the use of the substance, the base offense level was 38. (Ex. A at 2-3). With respect to Count Two, pursuant to U.S.S.G. § 2G2.2(a)(1), the base offense level was 18; pursuant to U.S.S.G. § 2G2.2(b)(2), because the material involved a prepubescent minor or a minor who had not attained the age of 12 years, the offense level was increased by two levels; pursuant to U.S.S.G. § 2G2.2(b)(4)(B), because the offense involved sexual abuse or exploitation of an infant or toddler, the offense level was increased by four levels; and pursuant to U.S.S.G. § 2G2.2(b)(6), because the offense involved the use of a computer or an interactive computer service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material, two levels were added. (Ex. A at 3). Accordingly, the adjusted offense level for Count Two was 26. (Ex. A at 3). Pursuant to U.S.S.G. § 3D1.2, Counts One and Two constituted separate groups. (Ex. A at 3). Pursuant to U.S.S.G. § 3D1.4(a), because the offense level for Count One was at least nine levels more serious than the offense level for Count Two, Count Two was disregarded for purposes of the Guidelines calculation, resulting in a combined offense level of 38. (Ex. A at 3). After applying a three-point reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1, the applicable offense

level was 35. (Ex. A at 3). The Plea Agreement further specified that Margolies had zero criminal history points, placing him in Criminal History Category I. (Ex. A at 4). As a result, the Plea Agreement stipulated that Margolies's Stipulated Guidelines Range was 168 to 210 months' imprisonment (the "Stipulated Guidelines Range"). (Ex. A at 4).

Before accepting Margolies's guilty plea, Judge Lehrburger conducted a careful allocution. (Ex. B at 2-25). At the outset of the proceeding, after placing Margolies under oath, Judge Lehrburger established that Margolies was competent to plead guilty. (Ex. B at 2-5). Judge Lehrburger confirmed that Margolies had a sufficient opportunity to confer with his counsel about his case and pleading guilty, and that Margolies was satisfied with his attorney's representation. (Ex. B at 6). Judge Lehrburger then explained the rights that Margolies would give up by pleading guilty, including his rights to persist in his previously entered plea of not guilty; to a speedy and public jury trial where he would be presumed innocent and the Government would bear the burden of proving his guilt beyond a reasonable doubt; to the assistance of counsel at trial and at every other stage of the proceedings; to confront and cross-examine witnesses; to testify, present evidence, and compel the attendance of witnesses; and against compelled self-incrimination. (Ex. B at 7-9). Margolies confirmed that he understood the rights he would give up by pleading guilty. (Ex. B at 7-9). Judge Lehrburger explained the charges to which Margolies was pleading guilty and the maximum penalties he would face following his guilty plea. (Ex. B at 11-14). Judge Lehrburger also addressed the Plea Agreement. Margolies confirmed that he had read the Plea Agreement, discussed it with his attorney, and understood its contents. (Ex. B at 13-16). Margolies also confirmed that he had entered into the Plea Agreement freely and voluntarily, and that no promises had been made other than what was set forth in the Plea Agreement. (Ex. B at 16). Judge Lehrburger confirmed that Margolies understood that the Plea Agreement included a Stipulated Guidelines Range of 168 to 210 months' imprisonment. (Ex. B at 15). Judge Lehrburger also explained that the District Court was not bound by the parties' Guidelines calculations and would make its own determination of the Guidelines range when imposing sentence. (Ex. B at 15).

Judge Lehrburger ensured that an adequate factual basis supported Margolies's plea. Judge Lehrburger directed the Government to set forth the elements of the offense, and the Government did so. (Ex. B at 10, 12). Margolies was asked to describe in his own words what he did to make him guilty. (Ex. B at 17). Among other things, Margolies admitted that he agreed with others to distribute heroin, that he was in fact the drug dealer who had communicated with the Victim about a heroin sale, and that shortly after this heroin delivery, the Victim died. (Ex. B at 17-21). Margolies also allocuted that he possessed an image of child pornography. (Ex. B at 19). Judge Lehrburger asked the Government to describe what the Government would prove if the case went to trial, which the Government did. (Ex. B at 21-22). Judge Lehrburger confirmed that Margolies still wished to plead guilty, that he was so pleading because he was in fact guilty, and that he was doing so voluntarily. (Ex. B at 17, 23).

On June 27, 2019, the District Court accepted the guilty plea on Judge Lehrburger's recommendation. (Dkt. 32).

### C.  The Sentencing Proceeding

On December 2, 2019, Margolies appeared before this Court for sentencing.

In advance of Margolies's sentencing, the Probation Office prepared a Presentence Report. Consistent with the Plea Agreement, the Presentence Report calculated an applicable Guidelines range of 168 to 210 months' imprisonment.  (PSR ¶ 121).  The Presentence Report recommended a below-Guidelines sentence of 84 months' imprisonment.  (PSR at 28).

The Court acknowledged having reviewed the Presentence Report and the parties' sentencing submissions, including multiple letters from relatives and friends of Margolies.  (Ex. C at 2).  The Court heard oral presentations from Margolies's counsel, the Government, and from Margolies himself.  (Ex. C at 3-26).  Margolies requested a below-Guidelines sentence, principally based on Margolies's history of abuse, his difficulties in life, his psychosexual evaluation, and the fact that with respect to the "transaction . . . that resulted in the fatal overdose [of the Victim]," Margolies "was an intermediary" in delivering the fatal heroin.  (Ex. C at 3-18, 8).  The Government requested a sentence within the Stipulated Guidelines Range based principally on the "tremendous harm" caused by Margolies with respect to both the drug trafficking that resulted in a fatal overdose and the possession of child pornography in which a minor was victimized.  (Ex. C at 19-23).  The Government also emphasized that because of the grouping analysis, the child pornography offense had no effect on the Guidelines range.  (Ex. C at 21).  Margolies addressed the Court, emphasizing his difficult life circumstances as well as the "irrepairable [sic] harm" caused by his actions.  (Ex. C at 24-25).

After hearing from the parties, the Court considered the sentencing factors set forth in 18 U.S.C. § 3553(a) and emphasized the seriousness of the offense and the need to protect the public.  (Ex. C at 26-28).  While considering the defendant's individual circumstances and difficult childhood, the Court found that the defendant needed to be incapacitated for some significant period of time in order to protect the public.  (Ex. C at 26-28).

In light of those factors, the Court imposed a sentence of 168 months' imprisonment, at the bottom of the Stipulated Guidelines Range, to be followed by five years' supervised release.  (Ex. C at 28).  The Court advised Margolies that he had a right to appeal his conviction and sentence except to the extent he had waived that right through his guilty plea.  (Ex. C at 31-32).

### D.  The Direct Appeal

The defendant then appealed his plea and sentence.  Margolies argued that the appellate waiver in his plea agreement was unenforceable because the Government purportedly conferred no benefit on Margolies in exchange for his guilty plea, and that his sentence was substantively unreasonable.

The Government argued that the Plea Agreement was supported by adequate consideration and that Margolies's waiver of appeal was thus valid and enforceable.  The Government pointed to at least four provisions of the Plea Agreement that constituted sufficient consideration to enforce the Plea Agreement: (1) the Government stipulated to an applicable Guidelines range that was

below the statutory maximum on either count of the Indictment, (Ex. A at 1-4); (2) as part of the calculation of the Stipulated Guidelines Range, the Government agreed that Margolies was entitled to a three-level offense level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1, (Ex. A at 3); (3) the Plea Agreement precluded the Government from seeking an "upward departure from the Stipulated Guidelines Range," (Ex. A at 4); and (4) the Government waived its ability "to appeal any sentence imposed that is within or above the Stipulated Guidelines Range." (Ex. A at 5).

The Government further argued that because Margolies's plea agreement was valid, and the appellate waiver contained therein, it precluded Margolies's challenges to the reasonableness of his sentence.

On May 14, 2021, the Second Circuit dismissed Margolies's appeal as barred by the appellate waiver in the Plea Agreement. *See United States v. Wolfe Margolies*, Case No. 20-60, Doc. 83.

### E.  The Section 2255 Petition

On or about April 27, 2022, the defendant filed a *pro se* motion under 18 U.S.C. § 2255 for relief claiming that his attorney's representation was ineffective.  (Dkt. No. 50).

The defendant argued that he was not properly advised as to the "full consequences of his guilty plea pursuant to the Plea Agreement."  The defendant alleges that there were two errors. The defendant contends that, with respect to the drug trafficking charge, his offense level would have been 12 rather than 38 and thus that his Guidelines were "inflated" as a result of his plea agreement. (Dkt. No. 50 at 15-16, 21-23).  The defendant also contends that he had an affirmative defense to the child pornography count. He describes that he could have had an affirmative defense because he possessed less than three images and "took reasonable steps to destroy" the image without allowing any other person to access it.  (Dkt. No. 50 at 15-16, 21).

## II.  Applicable Law

To prevail on a claim of ineffective assistance of counsel, a defendant must overcome a "strong presumption" that his counsel's conduct was reasonable and show that his representation "fell below an objective standard of reasonableness" under "prevailing professional norms," and "affirmatively prove prejudice."  *Strickland v. Washington*, 466 U.S. 668, 688–89, 693 (1984); *accord Chhabra v. United States*, 720 F.3d 395, 406 (2d Cir. 2013).  The right to effective counsel guaranteed by the Sixth Amendment extends to the plea-bargaining process.  *See Lafler v. Cooper*, 566 U.S. 156, 162 (2012) (holding that counsel's advise "to reject the plea offer on the grounds [the defendant] could not be convicted at trial" was deficient performance by counsel).

Under *Strickland*, a defendant must show to a reasonable probability that (1) "counsel's performance was deficient" and that (2) "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.  Only if both elements are satisfied can a defendant demonstrate that his counsel "was not functioning as the 'counsel' guaranteed the defendant by the Sixth

Amendment," and that the defendant was, as a result, deprived of a fair proceeding. *Strickland*, 466 U.S. at 687; *accord Bennett v. United States*, 663 F.3d 71, 85 (2d Cir. 2011).

To establish the first prong, the deficiency of counsel's performance, the defendant must show that counsel's conduct and advisement fell outside the "wide range of professionally competence assistance." *Id.* at 688.   During the plea-bargaining process, "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Missouri v. Frye*, 566 U.S. 134, 145 (2012).   Counsel's duty to communicate includes communicating the potential consequences of accepting the terms of the plea agreement. *See Padilla v. Kentucky*, 559 U.S. 356, 369 (2010) (holding that defense counsel's failure to inform his client of the deportation consequences as part of his plea is a deficiency that satisfies the first prong of *Strickland*, falling below the reasonable competences of counsel).

The second prong of the *Strickland* test is dependent on whether the counsel's assistance prejudiced the outcome of the matter. *Id.* at 688.   To meet the prejudice requirement of the *Strickland* in the plea-bargaining process, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart* 472 U.S. 52, 58-59 (1985).

## III.   **Argument**

The defendant cannot satisfy either prong of the *Strickland* test.

*First*, the defendant must offer support for the allegation of deficient advice.   Within the context of plea negotiations, a defendant "must establish that his attorney either failed to communicate a plea offer of failed to provide objectively reasonable advice about the decision to plead guilty." *Davis v. United States*, No. 18-CV-01308, 2019 WL 3429509, at *5 (SDNY 2019). The defendant's self-serving assertions about the strength of the evidence and the consequences an open plea or of a trial are inadequate and incorrect.

The defendant repeatedly claims that had he pleaded guilty to the Indictment without the Plea Agreement his base offense level for Count One would have been 12, instead of 38.   That is incorrect.   If disputed, the Government would have proved at a *Fatico* hearing the facts set forth in the Presentence Report (including the text messages between Margolies and the Victim right before the Victim's death), stipulated in the Plea Agreement, and admitted by Margolies at the plea hearing: that death resulted from the use of the substance sold by the defendant, resulting in an offense level of 38 pursuant to U.S.S.G. § 2D1.1(a)(2).   (Ex. A at 2-3; (PSR ¶¶ 17-22); Ex. B at 17-21).

The defendant's assertion that the Government could not have proved at a *Fatico* that a death resulted is simply speculative and belied by the Government's fulsome recitation of its proof in the Presentence Report and the defendant's own admissions at the time of the plea. *See DeCarlo v. U.S.*, 2013 WL 1700921, at *5 (S.D.N.Y 2013) (finding that "'purely speculative' arguments about the impact of an error do not establish prejudice.") (quoting *United States v. Weiss*, 930 F.2d 185, 199 (2d Cir. 1991)).   When the defendant has offered statements that detail his involvement

with the offense, as the defendant did at the time of his plea, such statements should "carry a strong presumption of verity." *Rosa v. United States*, 170 F.Supp.2d 388, 402 (S.D.N.Y 2001).

In addition, the defendant's claim that he had an affirmative defense to the child pornography count again is speculative and ignores the content of the Plea Agreement. There is no evidence that the defendant had any meritorious affirmative defense. Furthermore, because of the grouping analysis in the Plea Agreement, the child pornography count did not factor into the offense level calculation.[1] (Ex. A at 3). *See DeCarlo*, 2013 WL 1700921, at *4 - *5 (finding that accepting a favorable plea was not sufficient to establish deficiency for the first prong of the *Strickland* test when there was "nothing in [the defendant's] papers to support the allegation that [counsel] was ineffective in advising [the defendant] to accept the plea offer because the offer was beneficial to [the defendant]").

*Second*, the defendant cannot show that there was prejudice. To meet the prejudice requirement of the *Strickland* test, the defendant must show that "but for his attorney's claimed ineffectiveness, he would have gone to trial and been acquitted, or that he would have gotten a sentence lower than one he actually received." *Davis*, 2019 WL 3429509 at *5. In a case such as this one, where "[t]he bottom line is that [the defendant] received and accepted a favorable plea offer" and that the defendant's complaints "are completely contrary to the satisfaction that he expressed with [counsel] at the time of his guilty plea," the defendant cannot show such prejudice. *DeCarlo*, 2013 WL 1700921 at *6; *see also United States v. Parker*, 2022 WL 1093710 at *10 (S.D.N.Y 2022) (dismissing the ineffective assistance of counsel claim where, among other things, the defendant has previously expressed his satisfaction with counsel during his plea hearing).

The defendant's allegations of error amount to nothing more than dissatisfaction with the "content of the offers, not because he misunderstood counsel's explanation of [the] law." *Antomattei v. United States*, 2020 WL 3969964, at *6 (S.D.N.Y. 2020). His complaints rest on speculative assertions about the strength of the Government's proof and the viability of an affirmative defense. Accordingly, the prejudice requirement of the *Strickland* test has not been met.

---

[1] In addition, the Government agreed in the Plea Agreement not to seek an upward departure despite the fact that the child pornography count – which represented serious criminal conduct completely different in kind from the drug trafficking conduct — did not factor into the offense level calculation as a result of the grouping analysis. (Ex. A at 3); *see* U.S.S.G. §3D1.4 cmt. backg'd. ("Ordinarily, the court will have latitude to impose added punishment by sentencing toward the upper end of the range authorized for the most serious offense. Situations in which there will be inadequate scope for ensuring appropriate additional punishment for the additional crimes are likely to be unusual and can be handled by departure from the guidelines."); *see also, e.g.*, *United States v. MacLeod*, 80 F.3d 860, 866 (3d Cir. 1996) (upholding departure pursuant to U.S.S.G. § 3D1.4 where, by virtue of grouping analysis, "close to half of a defendant's crimes may go unpunished").

A-167

For all these reasons, the defendant's motion should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: __/s/ Mollie Bracewell_____
Mollie Bracewell
Assistant United States Attorney
(212) 637-2218

cc:    Wolfe Margolies (by mail)

**A-168**

ORIGINAL

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 4, 2019

**BY EMAIL**

Maurice H. Sercarz, Esq.
Sercarz & Riopelle, LLP
810 Seventh Avenue, Suite 620
New York, NY 10019
(212) 586-4900
msercarz@sercarzandriopelle.com

Re:   *United States v. Wolfe Margolies*, 18 Cr. 178 (KMW)

Dear Mr. Sercarz:

On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will accept a guilty plea from Wolfe Margolies ("the defendant") to Counts One and Two of the above-referenced Indictment (the "Indictment").

Count One charges the defendant with conspiring to distribute and possess with intent to distribute mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(C). Count One carries a maximum sentence of twenty years' imprisonment; a maximum term of supervised release of life; a mandatory minimum term of three years' supervised release; a maximum fine, pursuant to Title 18, United States Code, Section 3571 and Title 21, United States Code, Section 841(b)(1)(C), of the greatest of $1,000,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a mandatory $100 special assessment. In addition to the foregoing, the Court must order restitution as specified below.

Count Two charges the defendant with possession of child pornography, in violation of Title 18, United States Code, Sections 2252A(a)(5)(B), (b)(2), and 2. Count Two carries a maximum sentence of twenty years' imprisonment; a mandatory minimum term of supervised release of five years; a maximum term of supervised release of life; a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a $100 special assessment. In addition to the foregoing, the Court must order restitution as specified below.

In consideration of the defendant's plea to the above offenses, the defendant will not be further prosecuted criminally by this Office (except for criminal tax violations, if any, as to which

Case 23-370, Document 49, 11/13/2023, 3589727, Page173 of 178

this Office cannot, and does not, make any agreement) for conspiring to distribute and possess with intent to distribute mixtures and substances containing a detectable amount of heroin, from in or about December 2017 through in or about January 2019, as charged in Count One of the Indictment, and for possession of child pornography from in or about October 2018 up to in or about January 2019, as charged in Count Two of the Indictment, it being understood that this Agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 *et seq.* In addition, at the time of sentencing, the Government will move to dismiss any open Counts against the defendant. The defendant agrees that with respect to any and all dismissed charges he is not a "prevailing party" within the meaning of the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), and will not file any claim under that law.

It is further understood that the defendant shall make restitution in an amount to be ordered by the Court in accordance with 18 U.S.C. §§ 3663, 3663A, and 3664.

The defendant furthermore admits the forfeiture allegations with respect to Counts One and Two of the Indictment. The defendant agrees to forfeit to the United States, pursuant to Title 21, United States Code, Section 853, any and all property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense in Count One, and any and all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense. The defendant furthermore agrees to forfeit to the United States, pursuant to Title 21, United States Code, Section 2253(a): (1) any visual depiction described in Title 18, United States Code, Section 2252A, or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction, which was produced, transported, mailed, shipped or received in violation of Title 18, United States Code, Chapter 110; (2) any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from the offense in Count Two; and (3) any property, real or personal, used or intended to be used to commit or to promote the commission of such offense, or any property traceable to such property. It is further understood that any forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon him in addition to forfeiture.

In consideration of the foregoing and pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") Section 6B1.4, the parties hereby stipulate to the following:

**A. Offense Level**

1.    The November 2018 edition of the Guidelines Manual applies to this case.

**Count One**

2.    The Sentencing Guideline applicable to Count One is U.S.S.G. § 2D1.1.

3.      Pursuant to U.S.S.G. § 2D1.1(a)(2), the base offense level is 38 because the offense of conviction establishes that death or serious bodily injury resulted from the use of the substance.

**Count Two**

4.      The Sentencing Guideline applicable to Count Two is U.S.S.G. § 2G2.2.

5.      Pursuant to U.S.S.G. § 2G2.2(a)(1), the base offense level is 18.

6.      Pursuant to U.S.S.G. § 2G2.2(b)(2), because the material involved a prepubescent minor or a minor who had not attained the age of 12 years, the offense level is increased by two levels.

7.      Pursuant to U.S.S.G. § 2G2.2(b)(4)(B), because the offense involved sexual abuse or exploitation of an infant or toddler, the offense level is increased by four levels.

8.      Pursuant to U.S.S.G. § 2G2.2(b)(6), two levels are added because the offense involved the use of a computer or an interactive computer service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material.

9.      Accordingly, the adjusted offense level for Count Two is 26.

**Grouping Analysis**

10.      Pursuant to U.S.S.G. § 3D1.2, Count One constitutes a group ("Group One"), and Count Two constitutes a separate group ("Group Two").

11.      Pursuant to U.S.S.G. § 3D1.4(a), Group One counts as one Unit because it is the Group with the highest offense level.  Pursuant to § 3D1.4(c), Group Two is disregarded because it is nine or more levels less serious than Group One.  Accordingly, the combined offense level is 38.

12.      Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a).  Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

In accordance with the above, the applicable Guidelines offense level is 35.

### B. Criminal History Category

Based upon the information now available to this Office (including representations by the defense), the defendant has zero criminal history points. Accordingly, the defendant's Criminal History Category is I.

### C. Sentencing Range

Based upon the calculations set forth above, the defendant's Guidelines range is 168 to 210 months' imprisonment (hereinafter "the Stipulated Guidelines Range"). In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines level 35, pursuant to U.S.S.G. §§ 5E1.2(c)(3) and (4), the applicable fine range is $40,000 to $1,000,000.

The parties agree that neither a downward nor an upward departure from the Stipulated Guidelines Range set forth above is warranted. Accordingly, neither party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein. Nor will either party in any way suggest that the Probation Office or the Court consider such a departure or adjustment under the Guidelines.

The parties agree that either party may seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).

Except as provided in any written Proffer Agreement(s) that may have been entered into between this Office and the defendant, nothing in this Agreement limits the right of the parties (i) to present to the Probation Office or the Court any facts relevant to sentencing; (ii) to make any arguments regarding where within the Stipulated Guidelines Range (or such other range as the Court may determine) the defendant should be sentenced and regarding the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a); (iii) to seek an appropriately adjusted Guidelines range if it is determined based upon new information that the defendant's criminal history category is different from that set forth above; and (iv) to seek an appropriately adjusted Guidelines range or mandatory minimum term of imprisonment if it is subsequently determined that the defendant qualifies as a career offender under U.S.S.G. § 4B1.1. Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, regardless of any stipulation set forth above, if the defendant fails clearly to demonstrate acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence. Similarly, nothing in this Agreement limits the right of the Government to seek an enhancement for obstruction of justice, *see* U.S.S.G. § 3C1.1, regardless of any stipulation set forth above, should it be determined that the defendant has either (i) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice or (ii) committed another crime after signing this Agreement.

It is understood that pursuant to U.S.S.G. § 6B1.4(d), neither the Probation Office nor the Court is bound by the above Guidelines stipulation, either as to questions of fact or as to the

determination of the proper Guidelines to apply to the facts. In the event that the Probation Office or the Court contemplates any Guidelines adjustments, departures, or calculations different from those stipulated to above, or contemplates any sentence outside of the stipulated Guidelines range, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

It is understood that the sentence to be imposed upon the defendant is determined solely by the Court. It is further understood that the Guidelines are not binding on the Court.  The defendant acknowledges that his entry of a guilty plea to the charged offense authorizes the sentencing Court to impose any sentence, up to and including the statutory maximum sentence. This Office cannot, and does not, make any promise or representation as to what sentence the defendant will receive.  Moreover, it is understood that the defendant will have no right to withdraw his plea of guilty should the sentence imposed by the Court be outside the Guidelines range set forth above.

It is agreed (i) that the defendant will not file a direct appeal; nor bring a collateral challenge, including but not limited to an application under Title 28, United States Code, Section 2255 and/or Section 2241; nor seek a sentence modification pursuant to Title 18, United States Code, Section 3582(c), of any sentence within or below the Stipulated Guidelines Range of 168 to 210 months' imprisonment, and (ii) that the Government will not appeal any sentence within or above the Stipulated Guidelines Range. This provision is binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, it is agreed that any appeal as to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) the above stipulation. The parties agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with the undischarged portion of any other sentence of imprisonment that has been imposed on the defendant at the time of sentencing in this case. The defendant further agrees not to appeal any term of supervised release that is less than or equal to the statutory maximum.  The defendant also agrees not to appeal any fine that is less than or equal to $1,000,000, and the Government agrees not to appeal any fine that is greater than or equal to $40,000. Notwithstanding the foregoing, nothing in this paragraph shall be construed to be a waiver of whatever rights the defendant may have to assert claims of ineffective assistance of counsel, whether on direct appeal, collateral review, or otherwise. Rather, it is expressly agreed that the defendant reserves those rights.

The defendant hereby acknowledges that he has accepted this Agreement and decided to plead guilty because he is in fact guilty. By entering this plea of guilty, the defendant waives any and all right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, *Jencks* Act material, exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, or impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

The defendant recognizes that, if he is not a citizen of the United States, his guilty plea and conviction make it very likely that his deportation from the United States is presumptively

Page 6

mandatory and that, at a minimum, he is at risk of being deported or suffering other adverse immigration consequences. If the defendant is a naturalized citizen of the United States, he recognizes that pleading guilty may have consequences with respect to the defendant's immigration status. For example, under federal law, an individual may be subject to denaturalization and removal if his naturalization was procured by concealment of a material fact or by willful misrepresentation, or otherwise illegally procured. The defendant acknowledges that he has discussed the possible immigration consequences (including removal or denaturalization) of his guilty plea and conviction with defense counsel. The defendant affirms that he wants to plead guilty regardless of any immigration or denaturalization consequences that may result from the guilty plea and conviction, even if those consequences include denaturalization and/or removal from the United States. The defendant understands that denaturalization and other immigration consequences are typically the subject of a separate proceeding, and the defendant understands that no one, including his attorney or the District Court, can predict with certainty the effect of the defendant's conviction on the defendant's immigration or naturalization status. It is agreed that the defendant will have no right to withdraw his guilty plea based on any actual or perceived adverse immigration consequences (including removal or denaturalization) resulting from the guilty plea and conviction. It is further agreed that the defendant will not challenge his conviction or sentence on direct appeal, or through litigation under Title 28, United States Code, Section 2255 and/or Section 2241, on the basis of any actual or perceived adverse immigration consequences (including removal or denaturalization) resulting from his guilty plea and conviction.

The defendant understands and acknowledges that, under the Sex Offender Registration and Notification Act, a federal law, he must register and keep the registration current in each of the following jurisdictions: where he resides, where he is employed, and where he is a student. The defendant understands that the requirements for registration include providing his true name, residence address, and the names and addresses of any places where he is or will be an employee or student. The defendant further understands that the requirement to keep the registration current includes informing at least one of the aforementioned jurisdictions not later than three days after any change of name, residence, employment, or student status. The defendant understands that failure to comply with these obligations subjects him to prosecution for failure to register under federal law, Title 18, United States Code, Section 2250, which is punishable by a fine, imprisonment, or both.

It is further agreed that should the conviction following the defendant's plea of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement (including any counts that the Government has agreed to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

It is further understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office.

Case 23-370, Document 49, 11/13/2023, 3589727, Page178 of 178

Apart from any written Proffer Agreement(s) that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and the defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

By:

Mollie Bracewell
Assistant United States Attorney
(212) 637-2218

APPROVED:

Shawn Crowley
Co-Chief, Narcotics Unit

AGREED AND CONSENTED TO:

Wolfe Margolies

DATE   6/24/19

APPROVED:

Maurice Sercarz, Esq.
Attorney for Wolfe Margolies

DATE   6/24/19