# 23-370

In the
## United States Court of Appeals
### For the Second Circuit



WOLFE MARGOLIES,

*Petitioner-Appellant,*

v.

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

## APPELLANT'S APPENDIX
### Volume II of II (Pages A-175 – A-316)

BENJAMIN WHITE, ESQ.
BLOCH & WHITE LLP
*Attorney for Petitioner-Appellant*
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 901-3825

i

# Table of Contents

**Page**

Docket Entries for Case #: 1:19-cr-00178-KMW ........................ A-1

Docket Entries for Case #: 1:22-cr-03489-KMW ........................ A-9

Criminal Complaint, Sworn to February 13, 2019
    (Case #: 1:19-cr-00178-KMW) .................................................. A-11

Indictment, Filed on March 13, 2019
    (Case #:19-cr-00178-KMW) .................................................... A-22

Transcript of Bail Hearing, Dated March 19, 2019
    (Case #:19-cr-00178-KMW) .................................................... A-27

Decision of Honorable Kimba M. Wood,
    Dated March 20, 2019 (Case #:19-cr-00178-KMW) .............. A-32

Agreement Letter from Geoffrey S. Berman to
    Maurice H. Sercarz, Dated June 4, 2019
    (Case #:19-cr-00178-KMW) .................................................... A-54

Transcript of Agreement, Dated June 24, 2019
    (Case #:19-cr-00178-KMW) .................................................... A-61

Memorandum in Aid of Sentencing on Behalf of
    Wolfe Margolies, Dated November 1, 2019
    (Case #:19-cr-00178-KMW)
    (Reproduced in Sealed Appendix at pp. SA-1–SA-37)............. A-86

Letter from Mollie Bracewell to Honorable Kimba M. Wood,
    Dated November 11, 2019
    (Case #:19-cr-00178-KMW) .................................................... A-87

Transcript of Proceeding, Dated December 2, 2019
    (Case #:19-cr-00178-KMW) .................................................... A-94

Ex Parte Motion to Authorize Toxicology Report and
    E-Mail from Mollie Bracewell to Alessandra DeBlasio,
    Dated August 17, 2020, with Attachments
    (Case #:19-cr-00178-KMW) ..................................................A-126

Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside or
    Correct Sentence by a Person in Federal Custody,
    Executed on April 19, 2022, with Memorandum of
    Law in Support of Motion, Filed on April 27, 2022
    (Case #:19-cr-00178-KMW) ..................................................A-132

ii

**Page**

Letter from Mollie Bracewell to Honorable Kimba M. Wood,
    Dated July 1, 2022
    (Case #1:19-cr-00178-KMW) ....................................................A-160

Exhibit A to Letter -
Agreement Letter from Geoffrey S. Berman to
Maurice H. Sercarz, Dated June 4, 2019
(Case #1:19-cr-00178-KMW) ....................................................A-168

Exhibit B to Letter -
Transcript of Agreement, Dated June 24, 2019
(Case #1:19-cr-00178-KMW) ....................................................A-175

Exhibit C to Letter -
Sentencing Transcript, Dated December 2, 2019
(Case #1:19-cr-00178-KMW) ....................................................A-200

Reply to Government's Response to Motion,
    Filed on August 9, 2022
    (Case #1:19-cr-00178-KMW) ....................................................A-232

Letter from Mollie Bracewell to Honorable Kimba M. Wood,
    Dated September 21, 2022
    (Case #1:19-cr-00178-KMW) ....................................................A-241

Presentence Investigation Report, Prepared by Ashley E. Geiser,
    Dated November 18, 2019
    (Case #1:19-cr-00178-KMW)
    (Reproduced in Sealed Appendix at pp. SA-38–SA-73)...........A-245

Motion for Appointment of Counsel Pursuant to
    18 U.S.C. § 3006A(g), Filed on April 27, 2022, with
    Financial Affidavit of Wolfe Margolies,
    Sworn to April 18, 2022
    (Case #1:22-cv-03489-KMW) ...................................................A-246

Reply to Government's Response to *Ex Parte* Motion Related
    to Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside,
    or Correct a Sentence, Filed October 4, 2022
    (Case #1:22-cv-03489-KMW) ...................................................A-251

Transcript of Bail Hearing, Dated March 20, 2019
    (Case #1:19-cr-00178-KMW) ....................................................A-254

Judgment of Honorable Kimba M. Wood,
    Dated January 7, 2020
    (Case #1:19-cr-00178-KMW) ....................................................A-296

iii

**Page**

Notice of Appeal, Dated January 8, 2020
(Case #1:19-cr-00178-KMW) ....................................................A-304

Opinion and Order of Honorable Kimba M. Wood,
Dated January 17, 2023
(Case #1:22-cv-03489-KMW) ..................................................A-306

Notice of Appeal, Filed on March 16, 2023
(Case #1:22-cv-03489-KMW) ..................................................A-316

J6O8MARP

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                        19 Cr. 178 (KMW)

 5    WOLFE MARGOLIES,

 6              Defendant.

 7    ------------------------------x
                                        New York, N.Y.
 8                                      June 24, 2019
                                        10:50 a.m.
 9
      Before:
10
                    HON. ROBERT W. LEHRBURGER,
11
                                        Magistrate Judge
12
                         APPEARANCES
13
      GEOFFREY S. BERMAN
14         United States Attorney for the
           Southern District of New York
15    MOLLIE BRACEWELL
           Assistant United States Attorney
16
      MAURICE SERCARZ
17         Attorney for Defendant

18

19

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J6O8MARP

```
1                (Case called)

2                THE DEPUTY CLERK:  Counsel, please state your name for

3      the record, starting with the government.

4                MS. BRACEWELL:  Good morning, your Honor.  Mollie

5      Bracewell for the government.

6                THE COURT:  Good morning.

7                MR. SERCARZ:  For the defendant Margolies, Maurice

8      Sercarz.  Good morning, your Honor.

9                THE COURT:  Good morning.

10               All right.  So I understand we are here for a plea,

11     and let me ask the defendant, how do you intend to plead today?

12               MR. SERCARZ:  The defendant intends to plead guilty to

13     the charges.  Do you want to hear it from the defendant?

14               THE COURT:  No.  That's OK.

15               So I am going to need to ask you a number of questions

16     under oath.  So I am going to ask my courtroom deputy to swear

17     you in.

18               (Defendant sworn)

19               THE COURT:  So Mr. Margolies, let me just remind you,

20     because you will be giving answers under oath, if any of your

21     statements are false, they could be used in a prosecution for

22     perjury which would carry its own additional penalty.  So let's

23     proceed.

24               So I have before me a document that's entitled,

25     Consent to Proceed before a United States Magistrate Judge on a
```

**A-177**

J6O8MARP

1   Felony Plea Allocution that you have signed.  This form says

2   that you know you have the right to have your plea taken by a

3   United States district judge, but you are agreeing to have your

4   plea taken by a United States magistrate judge.  As a

5   magistrate judge, I have the authority to take your plea, with

6   your consent, and you will still be entitled to all the same

7   rights and protections as if you were before a district judge.

8   Among other things, you will be sentenced by a district judge.

9           Did you indeed sign a consent to proceed before a

10   United States magistrate judge?

11          THE DEFENDANT:  Yes, your Honor.

12          THE COURT:  Did you do so voluntarily?

13          THE DEFENDANT:  Yes, your Honor.

14          THE COURT:  Before you signed the form, did your

15   lawyer explain it to you?

16          THE DEFENDANT:  Yes, your Honor.

17          THE COURT:  Do you in fact wish to proceed with your

18   plea before a United States magistrate judge?

19          THE DEFENDANT:  Yes, your Honor.

20          THE COURT:  I am accepting your consent.

21          So the purpose of this proceeding is to make sure that

22   you understand your rights, to decide whether you are pleading

23   guilty of your own free will, and to make sure you are pleading

24   because you are guilty and not for some other reason.

25          So I am going to start by asking you a number of

J6O8MARP

1     questions that go to your competency to give a plea.  And

2     again, listen very carefully and answer honestly, and if you

3     don't understand anything, just let me know.

4                 What is your full name?

5                 THE DEFENDANT:  Wolfe Barrett Margolies.

6                 THE COURT:  How old are you?

7                 THE DEFENDANT:  26.

8                 THE COURT:  Can you read and write in English?

9                 THE DEFENDANT:  Yes.

10                THE COURT:  How far did you go in school, Mr.

11    Margolies?

12                THE DEFENDANT:  Some college.

13                THE COURT:  Are you currently or have you recently

14    been under the care of a doctor, psychiatrist, psychologist or

15    other mental health care provider for any reason?

16                THE DEFENDANT:  Yes, your Honor.

17                THE COURT:  You are currently under care of a doctor

18    or psychiatrist?

19                THE DEFENDANT:  Yes.

20                THE COURT:  What type of doctor?

21                THE DEFENDANT:  Psychologist.

22                THE COURT:  Has the psychologist prescribed any

23    medication for you or asked you to get any medication?

24                THE DEFENDANT:  No, your Honor.

25                THE COURT:  Do you have any condition that affects

J6O8MARP

1    your ability to see or to hear?

2              THE DEFENDANT:  No, your Honor.

3              THE COURT:  Do you have any condition that affects

4    your ability to think or to understand or to make judgments or

5    decisions on your own behalf?

6              THE DEFENDANT:  No, your Honor.

7              THE COURT:  Have you ever been hospitalized for mental

8    illness, alcoholism or narcotics addiction?

9              THE DEFENDANT:  Yes, your Honor.

10             THE COURT:  When were you hospitalized?

11             THE DEFENDANT:  2011.

12             THE COURT:  Have you been hospitalized since then?

13             THE DEFENDANT:  No.

14             THE COURT:  As you sit here today, are you under the

15   influence of any mind-altering drugs or alcohol?

16             THE DEFENDANT:  No, your Honor.

17             THE COURT:  How do you feel today?

18             THE DEFENDANT:  Fine.

19             THE COURT:  Is your mind clear?

20             THE DEFENDANT:  Yes, your Honor.

21             THE COURT:  Do you understand what is happening in

22   this proceeding?

23             THE DEFENDANT:  Yes, your Honor.

24             THE COURT:  All right.  So you were charged pursuant

25   to an indictment.  Have you seen the indictment that has the

J6O8MARP

1    charges against you?

2            THE DEFENDANT:  Yes, your Honor.

3            THE COURT:  Did you read it?

4            THE DEFENDANT:  Yes, your Honor.

5            THE COURT:  You understand what it says you did?

6            THE DEFENDANT:  Yes, your Honor.

7            THE COURT:  Have you had enough time to talk about the

8    case with your attorney and how you wish to plead?

9            THE DEFENDANT:  Yes, your Honor.

10           THE COURT:  Has your attorney told you the

11   consequences of pleading guilty?

12           THE DEFENDANT:  Yes, your Honor.

13           THE COURT:  Are you satisfied with your attorney's

14   representation of you?

15           THE DEFENDANT:  Yes, your Honor.

16           THE COURT:  Does either counsel have any objections or

17   concerns about the defendant's competence to plead at this

18   time?

19           Government.

20           MS. BRACEWELL:  No, your Honor.

21           THE COURT:  Defense.

22           MR. SERCARZ:  No, your Honor.

23           THE COURT:  All right.

24           Now, Mr. Margolies, I want to explain to you certain

25   rights you have and are waiving, or giving up, by entering into

J6O8MARP

1    this plea.

2            First, under the Constitution and the laws of the

3    United States, you have a right to plead not guilty to the

4    charges contained in the indictment.

5            Do you understand that?

6            THE DEFENDANT:  Yes, your Honor.

7            THE COURT:  If you plead not guilty, you would be

8    entitled under the Constitution to a speedy and public trial by

9    a jury of those charges.

10           At that trial, you would be presumed innocent, and the

11   government would be required to prove your guilt beyond a

12   reasonable doubt before you could be found guilty.  And you

13   could not be convicted unless a jury of 12 people agreed

14   unanimously that you are guilty beyond a reasonable doubt.

15           Do you understand that?

16           THE DEFENDANT:  Yes, your Honor.

17           THE COURT:  If you decided to go to trial, at that

18   trial, and at every stage of your case, you would have the

19   right to be represented by an attorney, and if you could not

20   afford one, an attorney would be appointed to represent you at

21   the government's expense.  And even if you retained a private

22   attorney, but ran out of money and could no longer afford one,

23   again, the government would appoint an attorney for you.  So

24   you would be entitled to an attorney all the way through trial

25   and not just for a guilty plea.  And your decision to plead

J6O8MARP

1    guilty should not depend on whether you could afford to hire an

2    attorney.

3             Do you understand that?

4             THE DEFENDANT:  Yes, your Honor.

5             THE COURT:  During a trial, the witnesses for the

6    prosecution would have to come to court and testify in your

7    presence, where you could see and hear them, and your lawyer

8    could cross-examine witnesses.  If you wanted, your lawyer

9    could offer evidence on your behalf, and you would be able to

10   use the court's power to compel witnesses to come to court to

11   testify in your defense even if they did not want to come.

12            Do you understand that?

13            THE DEFENDANT:  Yes, your Honor.

14            THE COURT:  Now, at the trial, you would have the

15   right to testify in your own defense, if you wanted to.  But

16   you would also have the right not to testify, and if you chose

17   not to testify, that could not be used against you in any way.

18   No inference or suggestion of guilt would be permitted from the

19   fact that you chose not to testify.

20            Do you understand that?

21            THE DEFENDANT:  Yes, your Honor.

22            THE COURT:  If you were convicted at trial, you would

23   have the right to appeal that verdict to a higher court.

24            Do you understand that?

25            THE DEFENDANT:  Yes, your Honor.

J6O8MARP

1              THE COURT:  As I said before, you have the right to

2    plead not guilty.  Even now, you have the right to plead or

3    continue to plead not guilty and go to trial.  But if you do

4    plead guilty, and if I accept your plea, you will give up the

5    rights I have just described.  If you plead guilty, there will

6    be no trial.  All that will remain to be done will be to impose

7    a sentence.  You and the government will have a chance to make

8    arguments about what sentence you should get, but there will

9    not be any further trial to determine whether you are guilty or

10   not guilty of the charges against you.

11             Do you understand that?

12             THE DEFENDANT:  Yes, your Honor.

13             THE COURT:  Finally, if you do plead guilty, you are

14   also giving up the right not to incriminate yourself, and I

15   will ask you questions about what you did in order to satisfy

16   myself that you are actually guilty.  And by pleading guilty,

17   you will be admitting your factual as well as legal guilt.

18             Do you understand?

19             THE DEFENDANT:  Yes, your Honor.

20             THE COURT:  So I now want to review with you the

21   charges against you and the consequences of pleading guilty to

22   them.  I understand that you intend to plead to Count One and

23   Two of the indictment.

24             Count One charges you with conspiring to distribute

25   and possess with intent to distribute mixtures and substances

Case 23-370, Document 50, 11/13/2023, 3589731, Page14 of 146

J6O8MARP

1    containing a detectable amount of heroin, in violation of Title

2    21 U.S.C., Sections 846 and 841(b)(1)(C).

3            So I am now going to ask the Assistant U.S. Attorney

4    to state the elements of this charge.  The elements are what

5    the government would have to prove in order to establish your

6    guilt.

7            Please proceed.

8            MS. BRACEWELL:  Count One has two elements:

9            First, that there was an unlawful agreement to

10   distribute controlled substances or to possess controlled

11   substances with the intent to distribute them; and

12           Second, the defendant knowingly became a member of the

13   conspiracy; that is, knowingly associated with the conspiracy

14   and participated in the conspiracy to distribute or possess

15   with the intent to distribute controlled substances.

16           THE COURT:  How do you intend to plead to Count One?

17           THE DEFENDANT:  Guilty.

18           THE COURT:  I now want to explain to you what the

19   potential penalties are in connection with Count One.  I am

20   going to explain what the maximum penalty is that the court can

21   impose.  The maximum means the most that could possibly be

22   imposed.  It does not mean that is what necessarily you would

23   receive.  But by pleading guilty, you are exposing yourself to

24   the possibility of receiving any combination of punishments up

25   to the maximum that I am about to describe.

Case 23-370, Document 50, 11/13/2023, 3589731, Page15 of 146

1              Do you understand that?

2              THE DEFENDANT:  Yes, your Honor.

3              THE COURT:  So Count One carries a maximum sentence of

4    20 years' imprisonment.  It also includes a maximum term of

5    supervised release of life.

6              Supervised release means that after you are released

7    from prison, you may be subject to the supervision of the

8    probation department, and if you are placed on supervised

9    release, but thereafter commit a violation of any condition of

10   your supervised release, the district judge can revoke the term

11   of your supervised release previously imposed and return you to

12   prison without giving you any credit for time previously served

13   on post-release supervision.

14             In addition to the restrictions on your liberty that I

15   have just described, Count One also carries a maximum fine of

16   the greatest of $1 million or twice the gross pecuniary gain

17   derived from the offense or twice the gross pecuniary loss to

18   persons other than you resulting from the offense, whichever of

19   these three is greater.  It also carries a mandatory special

20   assessment of $100.  And in addition, the court is required to

21   order restitution if applicable.

22             Count Two charges you with possession of child

23   pornography, in violation of Title 18 U.S.C., Sections

24   2252A(a)(5)(B), (b)(2) and 2.

25             Ms. Bracewell, can you recite the elements of Count

Case 23-370, Document 50, 11/13/2023, 3589731, Page16 of 146

J6O8MARP

1   Two, please.

2           MS. BRACEWELL:  Yes.  Count Two has three elements:

3           First, the defendant knowingly possessed any matter

4   that contained an image of child pornography, as defined in

5   Title 18, United States Code, Section 2256(8);

6           Second, that such child pornography had been

7   transported in interstate or foreign commerce by any means

8   including by computer, or that such child pornography had been

9   produced using materials that had been mailed or shipped or

10  transported in interstate or foreign commerce by any means

11  including a computer; and

12          Third, the defendant knew that such items constituted

13  child pornography.

14          THE COURT:  So Count Two -- by the way, what is your

15  intent to plead with respect to Count Two?

16          THE DEFENDANT:  Guilty.

17          THE COURT:  Count Two carries a maximum sentence of 20

18  years' imprisonment, a mandatory minimum term of supervised

19  release of five years -- a minimum meaning that at least that

20  number has to be imposed -- a maximum term of supervised

21  release of life, and a maximum fine of the greatest of

22  $250,000, twice the gross pecuniary gain derived from the

23  offense or twice the gross pecuniary loss to persons other than

24  you resulting from the offense, and again, a $100 special

25  assessment and any restitution that is applicable.

J6O8MARP

1              Additionally, if -- and I have to apprise all

2    defendants of this -- if you are not a citizen of the United

3    States, then your guilty plea may also have adverse

4    consequences for your ability to remain in or return to the

5    United States, including removal, deportation, denial of

6    citizenship and denial of admission to the United States in the

7    future.  If that does happen, you will still be bound by your

8    guilty plea, that is, you will not be able to withdraw it,

9    regardless of any advice you have received from your counsel or

10   others regarding the immigration consequences of your plea.

11             Do you understand that?

12             THE DEFENDANT:  Yes, your Honor.

13             THE COURT:  Do you understand the charges against you

14   and the consequences of pleading guilty?

15             THE DEFENDANT:  Yes, your Honor.

16             THE COURT:  So as I referred to earlier, there is a

17   plea agreement between you and the government.

18             Did you sign this plea agreement?

19             THE DEFENDANT:  Yes, your Honor.

20             THE COURT:  Did you read the agreement before you

21   signed it?

22             THE DEFENDANT:  Yes, your Honor.

23             THE COURT:  Did you discuss it with your attorney

24   before you signed it?

25             THE DEFENDANT:  Yes, your Honor.

J6O8MARP

```
 1            THE COURT:  Did your attorney explain to you all of
 2   its terms and conditions?
 3            THE DEFENDANT:  Yes, your Honor.
 4            THE COURT:  Do you understand those terms and
 5   conditions?
 6            THE DEFENDANT:  Yes, your Honor.
 7            THE COURT:  The letter says that you and the
 8   government have reached an agreement as to the appropriate
 9   calculation of your sentence under a part of our law known as
10   the sentencing guidelines, and that the appropriate guideline
11   sentencing range is 168 months to 210 months' imprisonment and
12   a fine in the range of $40,000 to $1 million.
13            Do you understand that?
14            THE DEFENDANT:  Yes, your Honor.
15            THE COURT:  So under this agreement, neither you nor
16   the government is allowed to argue to the sentencing judge for
17   a calculation that is different than the one in this agreement.
18   However, the sentencing judge is not bound by the calculation
19   in this letter, and he or she will be free to do his or her own
20   calculation, which may result in a sentencing range that
21   differs from the one in this letter.
22            Do you understand that?
23            THE DEFENDANT:  Yes, your Honor.
24            THE COURT:  Do you understand that the sentencing
25   range is just one of many factors the judge will consider in
```

J6O8MARP

1   determining your sentence and the judge has discretion to give

2   a prison sentence below or above the range, anywhere up to the

3   maximum I told you about earlier?

4             THE DEFENDANT:  Yes, your Honor.

5             THE COURT:  Do you understand as long as the

6   sentencing judge sentences you to a prison term of no longer

7   than 210 months, you are giving up your right to challenge your

8   sentence, whether by direct appeal, writ of habeas corpus, or

9   otherwise?

10            THE DEFENDANT:  Yes, your Honor.

11            THE COURT:  Do you understand that by pleading guilty,

12  you also will not be able to appeal any fine up to $1 million,

13  any lawful sentence of supervised release, or any restitution

14  which the court orders?

15            THE DEFENDANT:  Yes, your Honor.

16            THE COURT:  Do you understand that under the terms of

17  this plea agreement, even if you later learn that the

18  government withheld from your counsel certain information that

19  would have been helpful to you in defending yourself at trial,

20  you will not be able to complain about that or withdraw your

21  guilty plea on that basis?

22            THE DEFENDANT:  Yes, your Honor.

23            THE COURT:  Let me ask counsel, starting with the

24  government, is there any other provision of the plea agreement

25  you would like me to review with the defendant?

J6O8MARP

```
 1              MS. BRACEWELL:  Yes, your Honor.  If he could be
 2    allocuted on the Sex Offender Registration and Notification
 3    Act.
 4              THE COURT:  That does apply to this offense?
 5              MS. BRACEWELL:  On page 6, yes.
 6              THE COURT:  Mr. Margolies, do you understand as a
 7    result of your guilty plea, you will be required to register as
 8    a sex offender under the Sex Offender Registration and
 9    Notification Act?
10              THE DEFENDANT:  Yes, your Honor.
11              THE COURT:  Do you understand -- let me ask the
12    government.  Would you like me to read further?
13              MS. BRACEWELL:  No, that's sufficient.
14              THE COURT:  OK.
15              Is there anything else the defense would like me to
16    bring to the attention of the defendant?
17              MR. SERCARZ:  No, your Honor.
18              THE COURT:  Apart from what is contained in the plea
19    agreement, have any promises been made to you in order to get
20    you to plead guilty?
21              THE DEFENDANT:  No, your Honor.
22              THE COURT:  Has anyone threatened, forced, or coerced
23    you in any way, either directly or indirectly, to get you to
24    plead guilty?
25              THE DEFENDANT:  No, your Honor.
```

J6O8MARP

1          THE COURT:  So now that you have been advised of the

2    charges against you, the possible penalties you face, and the

3    rights you are giving up, is it still your intention to plead

4    guilty to Counts One and Two of the indictment?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  Is your plea voluntary and made of your

7    own free will?

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  So Mr. Margolies, with respect to Count

10   One of the indictment, how do you plead, guilty or not guilty?

11         THE DEFENDANT:  Guilty.

12         THE COURT:  With respect to Count Two of the

13   indictment, how do you plead, guilty or not guilty?

14         THE DEFENDANT:  Guilty.

15         THE COURT:  Mr. Margolies, can you please tell me in

16   your own words what you did that makes you guilty of the crimes

17   charged in the indictment?

18         THE DEFENDANT:  During the period described in the

19   indictment, I agreed with others to distribute controlled

20   substances, including those containing heroin, to retail

21   customers of Ekin Erkan.

22         I have reviewed those portions of the complaint which

23   alleges that on February 2, 2018, I delivered a controlled

24   substance containing heroin to an individual identified as

25   Victim-2, and that this individual subsequently died after

Case 23-370, Document 50, 11/13/2023, 3589731, Page22 of 146

J6O8MARP

1    having ingested some of the heroin included in that delivery.

2          I do not have a specific recollection of this

3    delivery.  However, I have reviewed with my attorney the

4    relevant portions of the complaint, an affidavit in support

5    electronic eavesdropping authority on certain cell phones, and

6    the death certificate prepared by the office of the chief

7    medical examiner.  Based upon my review of these materials and

8    my conversations with my attorney, I am prepared to admit the

9    following:

10          I recall that on February 2, 2018, I was the

11   individual who possessed the cell phone described in the

12   complaint as the "Hope 2549 phone";

13          I recall that during the period, I engaged in

14   deliveries of controlled substances to retail customers of Ekin

15   Erkan;

16          That on February 2, 2018, Victim-2 placed an order for

17   three bundles of heroin to me on my cell phone;

18          That shortly after this delivery, the deceased stopped

19   making outgoing calls or sending text messages from his cell

20   phone;

21          That on February 3, 2018, Victim-2's roommate

22   discovered the body of the deceased.  In close proximity to the

23   deceased were two open glassines and 19 unopened glassines.

24          That according to the death certificate prepared by

25   the office of the chief medical examiner, on February 3, 2018

Case 23-370, Document 50, 11/13/2023, 3589731, Page23 of 146

1    at 6:12 p.m., Victim-2 was pronounced dead of acute heroin

2    intoxication.

3            During the period alleged in the indictment, I

4    possessed an image of child pornography.

5            Specifically, on or about October 25, 2018, I

6    communicated by text message with an individual known to me.

7    This individual sent to me a text message and a link to a chat

8    room.  When I entered the chat room, I received a video

9    containing child pornography.  Upon receiving the video, I

10   viewed it and sent a responsive text message.

11           Although I subsequently deleted the video, both the

12   video and accompanying text were extracted from my phone during

13   a border search that took place on January 13, 2019 when I

14   returned to the United States from a trip to Israel.

15           MR. SERCARZ:  For the sake of completing the

16   allocution, may I ask the defendant one or two additional

17   questions?

18           THE COURT:  Sure.

19           MR. SERCARZ:  Wolfe, during the period on or about

20   February 2, 2018, do you have any reason to believe that anyone

21   else was in possession of or made text messages or received

22   text messages on the Hope 2549 phone?

23           THE DEFENDANT:  No.

24           MR. SERCARZ:  Do you have any reason to believe that

25   anyone else used that phone to engage in the distribution of

**A-194**

J6O8MARP

1    drugs to any individual?

2              THE DEFENDANT:  No.

3              THE COURT:  OK.  Where did your activity take place?

4    Was it in New York?

5              THE DEFENDANT:  Yes.

6              THE COURT:  You mentioned distribution of drug

7    substances.  What were those drugs that you distributed and

8    delivered?

9              THE DEFENDANT:  Heroin.

10             THE COURT:  All right.  Ms. Bracewell, are there any

11   additional questions you would like me to ask the defendant?

12             MS. BRACEWELL:  Your Honor had mentioned venue, but I

13   would just ask for specification as to the possession of the

14   child pornography, that it continued into the Southern District

15   of New York and that some portion of the drug trafficking

16   occurred in Manhattan or New York City.

17             THE COURT:  Did any of your distribution or delivery

18   of drugs take place in New York, in Manhattan?

19             THE DEFENDANT:  Yes, your Honor.

20             THE COURT:  Did you possess the child pornography

21   while you were in Manhattan?

22             THE DEFENDANT:  Yes, your Honor.

23             THE COURT:  Satisfied, Ms. Bracewell?

24             MS. BRACEWELL:  Yes.

25             The government would just stipulate that Victim-2, who

**A-195**

J6O8MARP

1    was referenced in the allocution, is a particular individual

2    who died in Brooklyn, New York on or around February 3, 2018

3    and the number that was referred to in communication with the

4    victim referencing a delivery of narcotics immediately prior to

5    the death.

6          THE COURT:  I do want to ask another question before I

7    get to the defense, which is, Mr. Margolies, did you know at

8    the time that you committed these acts that what you were doing

9    was wrong and against the law?

10         THE DEFENDANT:  Yes.

11         THE COURT:  All right.  Ms. Bracewell, does the

12   government represent that it has sufficient evidence to

13   establish guilt beyond a reasonable doubt at trial?

14         MS. BRACEWELL:  Yes, your Honor.

15         THE COURT:  Do you believe there is a sufficient

16   factual predicate for a guilty plea?

17         MS. BRACEWELL:  Yes, your Honor.

18         THE COURT:  Would you like to make a proffer?

19         MS. BRACEWELL:  Yes.  At trial, the government would

20   offer evidence including, but not limited to, recordings of

21   buys made by the defendant to an undercover officer of heroin,

22   lab reports confirming that the substance sold was heroin, cell

23   phone communications between the defendant and the undercover

24   officer prior to those sales.  We would also offer, with

25   respect to Count Two, records of the border search of the

1    defendant's cell phone, including the video that constitutes

2    child pornography.

3            Finally, with respect to the victim that was

4    referenced in the allocution, the government would offer phone

5    records showing communications between the defendant and the

6    victim, as well as the medical records showing that the cause

7    of the victim's death was acute heroin intoxication.

8            THE COURT:  Thank you.

9            Let me ask defense counsel, are there any additional

10   questions you would like me to ask the defendant?

11           MR. SERCARZ:  No, your Honor.

12           THE COURT:  Do you believe there is a sufficient

13   factual predicate for a guilty plea?

14           MR. SERCARZ:  Yes, your Honor.

15           THE COURT:  Do you know of any defense that would

16   prevail at trial or other reason why your client should not be

17   permitted to plead guilty?

18           MR. SERCARZ:  No, your Honor.

19           THE COURT:  Mr. Margolies, on the basis of your

20   responses to my questions and my observations of your demeanor,

21   I find that you are competent to enter an informed guilty plea

22   and that there is a factual basis for it.  I am satisfied that

23   you understand your rights, that you are aware of the

24   consequences of your plea, including the sentence that may be

25   imposed, and that you are voluntarily pleading guilty and that

Case 23-370, Document 50, 11/13/2023, 3589731, Page27 of 146

J6O8MARP

1    you have admitted that you are guilty as charged in Counts One

2    and Two of the indictment.  For these reasons, I recommend that

3    the district judge accept your plea.

4            All right.  I assume the government will order a copy

5    of the transcript and submit it together with any additional

6    paperwork.

7            MS. BRACEWELL:  Yes, we will.

8            I neglected to ask earlier if the defendant could be

9    allocuted on the forfeiture allegation.

10           THE COURT:  OK.

11           The indictment against you also includes provisions

12   for forfeiture of any fruits and instrumentalities of the

13   crimes that you committed.  Do you understand that that is also

14   an additional penalty of punishment that will be imposed or

15   could be imposed with respect to any sentence that you receive

16   for both Count One and Count Two?

17           THE DEFENDANT:  Yes, your Honor.

18           THE COURT:  Knowing that, is your plea still voluntary

19   and made of your own free will?

20           THE DEFENDANT:  Yes, your Honor.

21           THE COURT:  You still in fact plead guilty to Counts

22   One and Two having heard that additional information?

23           THE DEFENDANT:  Yes, your Honor.

24           THE COURT:  Has the district judge set a sentencing

25   date?

1          MS. BRACEWELL:  No, your Honor.  We would just seek a

2     control date and be in touch with chambers following the plea

3     today.

4          THE COURT:  OK.  We will set September 24 at 11 for

5     the control date.

6          I direct that the presentence report be prepared.

7          Will you, Ms. Bracewell, be able to deliver the case

8     summary for purposes of the presentence report within 14 days?

9          MS. BRACEWELL:  Yes, we will.

10          THE COURT:  Defense, will you be available to be

11     interviewed with your client by the probation department within

12     14 days?

13          MR. SERCARZ:  Your Honor, I am scheduled to leave on a

14     vacation on Thursday.  I will be back on July 11.  If the

15     interview could be scheduled shortly after my return, that will

16     be helpful.

17          THE COURT:  Do you see any problem with that, Ms.

18     Bracewell?

19          MS. BRACEWELL:  No, we do not.

20          THE COURT:  That is fine.

21          So you return on the 11th.  Could you present yourself

22     for an interview with the defendant within a week of your

23     return?

24          MR. SERCARZ:  Yes, your Honor.

25          THE COURT:  We will do that.

**A-199**

J6O8MARP

```
 1                What are we doing with respect to detention or
 2      release, Ms. Bracewell?
 3                MS. BRACEWELL:  The government believes that following
 4      a plea detention is mandatory under the statute.
 5                THE COURT:  Does the defense have a position?
 6                MR. SERCARZ:  No, your Honor.
 7                THE COURT:  All right.  The defendant will be remanded
 8      and detained in light of his plea.
 9                That takes care of everything for today.
10                Ms. Bracewell, anything else?
11                MS. BRACEWELL:  Nothing further.  Thank you.
12                THE COURT:  Anything else from the defense?
13                MR. SERCARZ:  No, your Honor.
14                THE COURT:  Mr. Margolies, I wish you well and good
15      luck, and I hope that you are able to do better in the future
16      and learn from your mistakes.  Thank you.
17                We are adjourned.
18                (Adjourned)
19
20
21
22
23
24
25
```

JC26WOLS

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4              v.                        19 CR 178(KMW)

5  WOLF MARGOLIES,

6              Defendant.               Sentencing

7  ------------------------------x
                                       New York, N.Y.
8                                      December 2, 2019
                                       4:00 p.m.
9

10 Before:

11
                       HON. KIMBA M. WOOD,
12
                                       District Judge
13
                          APPEARANCES
14
   GEOFFREY S. BERMAN
15      United States Attorney for the
        Southern District of New York
16 BY:  MOLLIE BRACEWELL
        Assistant United States Attorney
17
   SERCARZ & RIOPELLE, LLP
18      Attorney for Defendant
   BY:  MAURICE H. SERCARZ
19

20 Also present:

21 Special Agent Patrick Magner, DHS
   Special Agent David Cheng, DHS
22 Detective Patrick Theodore, NYPD

23

24

25

                 SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

JC26WOLS

1              (Case called)

2              THE COURT:  Good afternoon.  Please have a seat.

3              THE LAW CLERK:  United States v. Wolf Margolies.

4         Will counsel please state their names for the record.

5              MS. BRACEWELL:  Good afternoon, your Honor.  Mollie

6    Bracewell for the government.  I am joined at counsel's table

7    by Special Agent Patrick Magner and David Cheng from Homeland

8    Security Investigations and NYPD Detective Patrick Theodore.

9              THE COURT:  Good afternoon, your Honor.

10         Mr. Sercarz.

11             MR. SERCARZ:  For the defendant Margolies, Maurice

12   Sercarz.  The defendant is present in court.

13             THE COURT:  Good afternoon, Mr. Margolies.

14         I have the submissions, which I have read, along with

15   of course the many letters from relatives and supporters of

16   Mr. Margolies.

17         At this point, I will ask Mr. Sercarz, have you and

18   Mr. Margolies had an adequate opportunity to review the

19   presentence report?

20             MR. SERCARZ:  We have, your Honor.  I have reviewed it

21   with my client.

22             THE COURT:  Do you wish any changes to it?

23             MR. SERCARZ:  None beyond those that are already

24   described in the final version of the presentence report

25   itself.

1              THE COURT:  Very good.

2              I would be glad to hear anything that you and your

3   client wish to say.

4              MR. SERCARZ:  You want us to go first, your Honor?

5              THE COURT:  If you would rather have the government go

6   first, I will do that.

7              MR. SERCARZ:  How is this:  If I may speak and then if

8   my client can wait until the end to address the Court and have

9   a little more time to think about what he has to say?

10             THE COURT:  That's fine.  Thank you.

11             MR. SERCARZ:  Your Honor, I want to begin by giving

12  credit where credit is due.  The government, in particular

13  Ms. Bracewell, could have insisted that my client plead guilty

14  to a substantive count involving the sale of a controlled

15  substance in which death resulted and my client would have been

16  faced with the horrible alternative of either proceeding to

17  trial in this case or pleading guilty to a count carrying a

18  minimum mandatory sentence of 20 years and a potential life

19  sentence in the case.  By providing the defendant with the

20  opportunity to plead guilty to a conspiracy, the government

21  permitted me to seek a variance based on the defendant's

22  personal history and circumstances.  I commend the government

23  for that decision and I commend Ms. Bracewell for that

24  decision.

25             That said, there are two areas in which I feel that

**A-203**

JC26WOLS

1    the government and I have a difference of opinion after reading

2    the government's submission.  First, I will say that I've been

3    aggressive in my arguments seeking a substantial variance from

4    the guidelines calculation and in responding to what I felt was

5    missing in the psychosexual evaluation of my client.  To the

6    extent that the government in their submission reviews my

7    arguments regarding the counts of conviction and suggests that

8    somehow they indicate that my client lacks an appreciation of

9    the terrible harm that befell the individual known as Victim-2,

10   or the toddler in that pornographic image, I respectfully

11   submit that they have it wrong.  My client understands the

12   damage that has been done.  My client -- and you will hear it

13   at the end of this proceeding -- is filled with remorse.  These

14   are my arguments and they should be attributed to my zealous

15   advocacy on behalf of my client.  When the government offered

16   me the invitation to seek a variance on behalf of my client and

17   a sentence that I would regard as more just and more

18   proportionate to all of the factors that the Court will

19   consider, I accepted their invitation.

20          The second quarrel I have with the government is this:

21   The Court will and must examine the 3553(a) factors.  In

22   speaking to those factors in its submission, I respectfully

23   submit the government ignores the impact of my client's prior

24   history, his history of abuse, his difficulties in life, his

25   psychosexual evaluation on everything but for the last of the

Case 23-370, Document 50, 11/13/2023, 3589731, Page34 of 146

**A-204**

1   3553(a) factors, namely, the need for a sentence to provide

2   appropriate medical care, training and the like in the most

3   just and efficacious way.  Having ignored the impact of all of

4   these factors on the other 3553(a) factors, including

5   deterrence, just punishment and the need to protect the public

6   from the crimes of the defendant, it becomes easy having

7   cabined my arguments to give them the back of the hand by

8   suggesting that the defendant has been in therapy throughout

9   his life and yet he chose to offend and therefore we have

10  little confidence that he won't offend again.

11          It's as a result of this analysis that the government

12  with their outsized emphasized on the link between the delivery

13  of the drugs and the resulting death -- I am using quotes for

14  the word "resulting" -- calls for a sentence of 14 and a half

15  to 17 years of incarceration notwithstanding that the Probation

16  Department, which ordered and had the benefit of its own

17  psychosexual evaluation of my client and a better appreciation

18  both of his personal history and the risk, if any, that he

19  might reoffend, recommends 84 months concurrently on each count

20  of conviction, a seven-year sentence.  Yet, the government

21  finds a sentence in the range of 14 and a half to 17 years to

22  be appropriate and just.

23          For the rest of my statement, and I won't go on at

24  great length, I want to review the government's arguments in

25  support of a guidelines sentence to show why they are

JC26WOLS

1    misguided.  With regard to the narcotics conspiracy, the

2    government begins by stating that the defendant's conduct has

3    caused, and I quote, "immeasurable harm."  So stipulated.  But

4    that is a very revealing choice of words -- immeasurable harm,

5    immeasurable.  The sentencing guidelines in this case and the

6    base offense level in this case for the narcotics offense are

7    an effort to quantify the immeasurable.  They give outsized

8    weight to the fact that the buyer took a fatal overdose which

9    resulted from the distribution and there is no countervailing

10   consideration in that base offense level for the fact that this

11   was a single retail delivery of a personal use quantity that

12   the defendant had no knowledge of the contents or potency of

13   this particular delivery of heroin, no intent to do more than

14   supply the drugs and that leaves out all of the information

15   regarding the factors that led my client to such a state of

16   despair that he participated in this distribution conspiracy in

17   the first place.

18        In describing my client's conduct, Ms. Bracewell and I

19   were -- I submit to a large extent -- talking past each other.

20   My focus was on the single fatal delivery of the narcotics and

21   comparing my client's role to that of Mr. Erkan while the

22   government focused as is perfectly appropriate on Wolf's role

23   in the conspiracy and described that role in broader terms.  If

24   honest remorse inquires real intersection, then I can tell you

25   this regarding my conversations with my client:  Wolf has

1    engaged in the necessary searching analysis of his own behavior

2    and here are the salient facts:  My client was involved in this

3    conspiracy from the end of 2017 to approximately July of 2018,

4    a period of about six months.  He was recruited by Mr.Erkan.

5    Before the defendant became involved, the system was in place

6    and Erkan was already referring customers to suppliers.  The

7    defendant told by Erkan that he could look to those suppliers

8    to obtain the heroin.  During the period that my client was

9    involved in the conspiracy, he was using heroin, he was

10   suicidally depressed, he was unemployed, he was away from his

11   family and other sources of emotional support.  While the

12   defendant was involved, he purchased heroin from suppliers two

13   to three bundles at a time; and when delivering the drugs, he

14   marked up the price and sold the drugs at a profit.

15           I do not dispute that, Ms. Bracewell.

16           Your Honor, I do not dispute that that was the nature

17   of his involvement.

18           In some instances, however, it is worthy of note that

19   he kicked back money to Mr. Erkan.  With respect to the events

20   of February 2nd, 2018, and the fatal dose of heroin, with

21   respect to that particular delivery, which is the engine that

22   drives the guideline calculation, while the defendant has no

23   recollection of this delivery, the texts make it clear.  In the

24   very initial portions of the text conversation between Victim-2

25   and Mr. Erkan, Erkan and the victim agree on the quantity and

JC26WOLS

 1   price of the drugs.  To quote Mr. Erkan:

 2            "Delivery.  The first is via a service denoted as

 3   Hope.  80/bun."  B-u-n; $80 a bundle.  "Very high quality.

 4   Fent-free."

 5            Victim No. 3:  "Cool.  I want three bun."

 6            That is before my client even receives the,

 7   recommendation, before he is ever contacted, which in the

 8   Court's analysis of what the likely consequences for Erkan and

 9   what the likely consequence is for my client is worthy of

10   consideration.

11            Your Honor, this wasn't Open Table.  You want a

12   reservation for a meal, I can recommend a variety of

13   restaurants.  The menu was decided upon before my client was

14   ever contacted.  My client obtained the drugs only after

15   receiving the order from Victim-2.  We know that because the

16   word "re-up" appears in the text conversation.  When the victim

17   wants the drugs delivered earlier, my client can't do it

18   because he has to re-up.  There was no opportunity for Wolf to

19   become aware of the potency of the heroin, the potentially

20   lethal effect of the heroin.  As to this transaction when I

21   referred to him as a deliveryman in my submission, the

22   government took issue with that; but I respectfully submit to

23   you whatever you want to call him as to this transaction, the

24   one that resulted in the fatal overdose, he was an

25   intermediary.

JC26WOLS

1            I have made my argument about the need to avoid

2    unwarranted sentencing disparities in light of Wolf's limited

3    tenure, his role in the offense, his state of mind in the

4    broadest sense at the time he became involved, and his lack of

5    knowledge with regard to the fatal delivery.  Here is another

6    way to look at it:  If the defendant or Erkan or the ultimate

7    supplier of this fatal dose had been charged with the

8    substantive offense, the 841 count, he would have been facing a

9    statutory minimum of 20 to life.  Had any the co-conspirators

10   pled guilty with a stipulation that that individual would be

11   sentenced within the guideline range, he would be sentenced to

12   a minimum term of 14 and a half and a maximum of 17 years.  As

13   it stands, the supplier is not charged.  Mr. Erkan is in a

14   diversion program with a serious opportunity to avoid any

15   felony conviction in exchange for this conduct, and my client

16   has the opportunity to seek a variance with due consideration

17   for his personal history and the impact of his conduct not only

18   on the victims but on his own family and his own life.

19            I hope, your Honor, you don't find it impertinent for

20   me to suggest that there are sections of the guidelines that

21   cover such a broad swath of behavior that they give outsized

22   importance to a single factor such as the death or serious

23   injury resulting factor that the Court should give extra weight

24   to the 3553(a) analysis in order to ensure that it does justice

25   in a case like this.  This is one of these cases.

JC26WOLS

1          As to the possession of child pornography count, the

2    government begins with the conclusory statement that the nature

3    of Wolf's conduct, and I quote, "Demonstrates that he presents

4    an ongoing risk to the community."  To make this argument, one

5    must establish that because Wolf possessed child pornography

6    and child erotica, he is likely to reoffend.  Presumably this

7    means by continuing to seek, possess or distribute child porn

8    or by engaging in sexual conduct with children or underaged

9    victims.  Yet the government in its submission offers no

10   evidence or arguments regarding that causal linkage.

11         When I argue that the linkage depends in large measure

12   on the defendant's motive in possessing an image or series of

13   images, the government responds that this argument ignores the

14   harm to victims of these images; but the importance of

15   examining motivation of the defendant is acknowledged by

16   Dr. Greif, our expert, and by Dr. McCarthy herself in her prior

17   comments before the Sentencing Commission where she herself

18   cites to experts in identifying six disparate motivating

19   factors for the collection of child pornography.  They include

20   collection as a means to achieving sexual arousal, but also

21   collection is a means of avoiding real-life problems,

22   especially in the -- essentially if the offender creates a new

23   different online reality that may be better than their off-line

24   reality.  Collection is a means of facilitating social

25   relationships with like-minded individuals.  Collection is

Case 23-370, Document 50, 11/13/2023, 3589731, Page40 of 146

**A-210**

1    therapy for exploring and dealing with one's problems.

2          For the record, Wolf expressed a strong aversion to

3    the idea of sexual contact with children.  During the

4    psychosexual evaluation, Dr. McCarthy quotes wolf as saying, "I

5    feel really dumb for doing what I did.  I am capable of

6    controlling myself.  I was being stupid.  This is the worse

7    thing I have experienced" -- meaning jail.  "I'd never do

8    anything to get back here.  I don't want to have sex with kids.

9    I don't want a kid to go through what I went through."  Yet the

10   government suggests that -- well, when I described the one

11   video that contains images of child pornography found on the

12   defendant's phone in the context of the surrounding text

13   messaging and I argue that the defendant identifies with the

14   powerless child victim rather than with the adult male

15   perpetrator, the government described my interpretation as

16   strained and speculative.

17         Here is what Dr. McCarthy says during the clinical

18   interview about my client.  "Also noteworthy is the presence of

19   anxiety-ridden and painful memories that are easily reactivated

20   by minor social stressors further complicating this picture is

21   the fact that he has few avenues of psychic gratification,

22   tension relief or conflict resolution.  He feels trapped in the

23   worst of his inner and outer worlds seeking to avoid both the

24   distress that interpersonal relationships bring and the

25   emptiness and wounds that exist within."  And then later in the

JC26WOLS

```
 1   clinical interview: "Also noteworthy is the lack of mature
 2   confidence and his tendency to act helpless and seek nurturance
 3   from others in a childlike manner.  Characteristically
 4   withdrawing from adult responsibilities.  He is docile and
 5   passive.  Displays few functional competencies and avoids
 6   self-assertion."  The Probation Department's expert, her words.
 7   The government goes further and with all due respect resorts to
 8   the specious argument that Wolf cannot view the video without
 9   prior knowledge of what it contained and they cite as evidence
10   that the defendant participated in online forums with those
11   whose names were "Young Lovers," "TabooPervDaddy" and "Cecil B.
12   Demented."  But as I understand it, it was on the very same
13   occasion when the young lady who transmitted the link to the
14   video suggested that Wolf look at it by saying, *Bitch, you*
15   *alone?* and then sending the link.  When Wolf accessed the link,
16   it was then that he was placed in the chat room with the
17   individuals whose names I just gave you.  There is nothing in
18   those names, with all due respect, that suggests on the face of
19   it that they were trafficking in child pornography involving
20   infants and young children.
21        Now, to be fair Wolf acknowledged in that diary entry
22   that was seized at the border that he has viewed child
23   pornography on other occasions; but, your Honor, motive
24   matters.  Motive affects the need for deterrence.  Motive,
25   affects the calculation of what is just punishment.  My client
```

Case 23-370, Document 50, 11/13/2023, 3589731, Page42 of 146

1  does not have a predilection to go after adolescence and young

2  children.

3         The government argues, and I quote, "Even accepting

4  that the defendant's emotional troubles and gender confusion

5  were a cause of his conduct, the defense submission does not

6  explain why child pornography was his chosen palliative rather

7  than therapy or medical intervention."  This argument, most

8  respectfully, ignores the fact that his chosen palliatives

9  included not only child pornography but adult pornography, sex

10  controlled substances, attempts at gender reassignment, music,

11  writing, and even suicide was on the table.  We have every hope

12  that in the future a combination of therapy, music, writing,

13  art, human contact with age appropriate companions will provide

14  the key to his rehabilitation.

15         Finally, in advancing the argument that the likelihood

16  that Wolf may reoffend calls for a lengthy jail sentence, the

17  government ignores the judgment of the two experts that

18  examined my client.  Dr. McCarthy's recommendation at the end

19  of the psychosexual evaluation, all of them, can be

20  accomplished during a period of supervised release.  I don't

21  need to repeat all of them.  The Court is fully aware of them.

22         Dr. Greif in his responsive submission states that

23  Wolf is unlikely to reoffend.  In his words, contrary to

24  Dr. McCarthy's conclusion, *In my professional opinion, the*

25  *likelihood of Mr. Margolies ever committing a contact offense*

A-213

JC26WOLS

1   *with a young child is extremely low.  There is scant evidence*

2   *that he is sexually interested in prepubescent children.  He*

3   *reported that he finds images of prepubescent sex disturbing*

4   *and not sexually arousing and nauseating.  He also made it*

5   *clear he believes that corsive sex is harmful and he knows that*

6   *young children are not capable of consent.  Mr. Margolies is*

7   *not a sexual predator.*

8              Finally on the subject of child pornography in the one

9   count in that regard with which the defendant was convicted,

10  rather than I relying on the experts, either one of them, the

11  government points to the fact that the defendant had

12  significant family support, that the defendant had numerous

13  opportunities to retrieve treatment and yet in their words he

14  chose to reoffend.  Your Honor, I respectfully submit to you

15  that having a supportive family, having an extended family like

16  the family that fills the first three rows of this courtroom,

17  does not inoculate you against all of life's tragedies.  From

18  early childhood Liz noticed that Wolf was different.  His

19  vulnerabilities, these differences led to a lifetime cycle of

20  abuse further exacerbating his vulnerabilities and further

21  leading to additional abuse.  I acknowledge that he never

22  lacked for the opportunity to receive treatment.  What was

23  lacking was the will -- the will to surmount his anxiety, his

24  depression, his gender dystonia.

25              But, your Honor, two things have changed.  First, Wolf

Case 23-370, Document 50, 11/13/2023, 3589731, Page44 of 146

1   was always been at war with with himself, has become more

2   receptive to changing his life.  It doesn't happen overnight.

3   It doesn't happen all at once, but I respectfully submit that

4   it began to happen in July and August and September of 2018

5   when he made a commitment to leave the drug conspiracy, when he

6   left New York and the toxic environment in which he was

7   leaving, when he sought solitude on the Appalachian Trail, when

8   he sought contact with his roots on the birthright trip, when

9   he sought a home in New Orleans, a skill in his coding lessons,

10  and useful employment, when he sought a relationship with a

11  young woman -- albeit one who was young within the age of

12  consent but young -- things had already begun to change for my

13  client.

14          Second, whatever the period of incarceration that is

15  imposed, it will include a period where my client is walled off

16  from drugs, walled off from pornography, one in which he

17  receives treatment, a supervised release period in which there

18  is a gradual return to society with strict limit on his

19  internet usage and his access to minors and continuing

20  treatment.  The issue before us today is how long must he be

21  walled off before he can receive world-class, one-on-one

22  outpatient treatment while obtaining employment, living amongst

23  family and sources of emotional support and seeking meaningful

24  relationship with adults.  The issue in the language of the law

25  is what period of incarceration is, and I quote, "sufficient

Case 23-370, Document 50, 11/13/2023, 3589731, Page45 of 146

1   but not greater than necessary to meet the goals of

2   sentencing."

3        If the Court will allow me this, your Honor, this is a

4   case where there is so much pain for so many that it almost a

5   default proposition that the actors retreat to an area of

6   comfort.  I respectfully submit that this has some bearing on a

7   psychosexual evaluation in which Dr. McCarthy says that there

8   is nothing in the clinical interview of the defendant to

9   suggest that he has a sexual attraction towards young children;

10  but, and I quote, "the matter must be looked into further."  To

11  be fair, when Dr. Greif is asked about the impact of a jail

12  sentence on my client, he is the one that raises the specter in

13  the issue that my client may decompensate or that suicide may

14  be a problem here.  They feel necessary and they feel

15  comfortable in raising these issues so that they are covered in

16  case, God forbid, the worst occurs.

17       I ask and I raise it in the form of a question whether

18  there is some level of comfort for the government in saying in

19  a case where somebody died as a result of a heroin overdose and

20  a toddler was subjected to that horrible, horrible act which

21  resulted in the sexual image here, whether the comfortable

22  thing to do isn't to stand beside those victims and recommend a

23  sentence within the guidelines.  I am trying very hard, your

24  Honor, but I can't find a comfortable position for myself in

25  this case.  We recognize the harm that was done, but we

**A-216**

JC26WOLS

1   recognize the tragedy that occurred in the life of my client,

2   Wolf Margolies.

3          I don't think there has been a case -- and I have been

4   doing this 43 years -- where I stood before the Court where

5   there was no mandatory minimum sentence and yet I provided the

6   Court with information regarding an appropriate location to

7   house my client if he is incarcerated.  I recognize that a term

8   of incarceration is necessary here; but for the reasons that I

9   have described, I respectfully submit, your Honor, that even

10  the sentence proposed by the Probation Department is excessive.

11         Dr. Greif in his own way speaks directly to the

12  government in an article that he wrote called The Challenge of

13  Viewing Sexual Offenders as Both Perpetrators and Victims.

14  While this defendant has not been charged with a contact sexual

15  offense, I think that much of what Dr. Greif says applies here

16  in connection with the defendant's conviction of child

17  pornography and the fact that his abuse was clearly a large

18  component in his behavior with regard to the sale of narcotics.

19  Dr. Greif says in the article:

20         *Evaluating a sex offender's risk for sexually*

21  *reoffending involves unique psychological challenges.  It*

22  *forces us to grapple with a difficult task described by F.*

23  *Scott Fitzgerald as the ability to hold two opposed ideas in*

24  *mind and the same time and still retain the ability to*

25  *function, which Fitzgerald referred to as the test of the first*

Case 23-370, Document 50, 11/13/2023, 3589731, Page47 of 146

1   *grade intelligence.  Evaluators must understand this because*

2   *offenders themselves in order to deeply change must recognize*

3   *that they are both perpetrators and victims.  Offenders must*

4   *understand how and why they perpetrate, how and why sexual*

5   *aggression became not just thinkable but doable.  They must*

6   *understand that they were traumatized as children and know the*

7   *harm done to them in order to recognize in a visceral way the*

8   *harm they did to others.  This recognition is pivotal for not*

9   *perpetrating in the future.*

10          *Only if an offender empathizes with himself as a child*

11  *victim can he empathize with other people, including those he*

12  *offended against as potential victims.  The ability to put*

13  *oneself in the mind, heart and sole of another human being is*

14  *an essential bulwark against violence.  Therefore, evaluators*

15  *must understand the perpetrator as a whole person in order to*

16  *assess whether the perpetrator recognizes himself and others as*

17  *whole people.*

18          Your Honor, in my conversations with Wolf, it is clear

19  that he displays empathy both for himself as a victim of

20  bullying and sexual abuse and for those he later victimized,

21  including the individuals to whom he delivered heroin and the

22  child depicted in the erotic video and it the others in the

23  pornographic images that he has viewed.  In conclusion I ask

24  the Court to apply this sort of empathy in imposing sentence on

25  my client, Wolf Margolies.

Case 23-370, Document 50, 11/13/2023, 3589731, Page48 of 146

**A-218**

1          Thank you, your Honor.

2          THE COURT:  Thank you very much.

3          Ms. Bracewell, would the government like to be heard?

4          MS. BRACEWELL:  Yes, your Honor.  If you don't mind, I

5    will stay here because I have my papers.

6          THE COURT:  That's fine if you speak into the mic.

7          MS. BRACEWELL:  Of course.  Thank you.

8          This a difficult case and the government acknowledges

9    that the defendant has had a difficult life with difficult

10   circumstances.  That being said, the defendant has caused

11   tremendous harm and not just with respect to the drug

12   trafficking conspiracy but also with respect to an entirely

13   different type of harm and that is the possession of child

14   pornography and that is the related conduct that came to light

15   through our investigation.  So that is not at all to undercut

16   what defense has said.  We are aware of the difficulties here.

17          However, a guideline sentence is necessary and

18   appropriate here.  I would like to start with the narcotics

19   conspiracy and the defendant's role in that conduct.  The

20   defense submission and the defense today reiterates that this

21   is Erkan's drug trafficking operation.  That is just not

22   consistent with the facts as we know them.  The defendant,

23   Mr. Margolies, had an independent revenue stream.  He

24   independently interacted with his customers.  He independently

25   delivered drugs.  He obtained them.  He collected revenue that

Case 23-370, Document 50, 11/13/2023, 3589731, Page49 of 146

1   was separate and apart from Erkan's revenue obtained through

2   the online types.

3       Erkan's conduct is serious and it has yet to be

4   addressed at sentencing.  His involvement in the Young Adult

5   Opportunity Program was decided by the Court.  Our office has

6   made no representations about how this case will be disposed

7   of, and so I just stress that that is not a variable that needs

8   or is appropriately addressed today.

9       Mr. Margolies's conduct was clearly independently

10  undertaken and operated over a period of months.  Today the

11  defense said six months.  This was not a single delivery on a

12  single occasion.  This was a sustained course of conduct.  What

13  makes it particularly troubling is that the defendant himself

14  concedes that he has struggled with addiction, that he has lost

15  friends to addiction.  He was aware firsthand of the harms that

16  occur when heroin is taken and delivered to users.

17      You see that in the course of the conversation with

18  the person identified as Victim-2, a user anxious to get a

19  delivery as soon as possible.  The defendant re-ups; goes to

20  his suppliers.  He then takes the drugs to Victim-2.  That is

21  the last communication.  Tremendous harm has resulted from the

22  defendant's conduct.  The defendant made these choices to

23  engage in this conduct even while knowing from his own

24  experience that grave danger was presented to his customers.

25      I would like to turn to the CP conduct in Count Two

Case 23-370, Document 50, 11/13/2023, 3589731, Page50 of 146

JC26WOLS

1   and I want to make one point about the guidelines range, which

2   we're seeking a guideline sentence of 168 to 210 months.

3   Because of the grouping under Section 3D1.4, the CP conduct is

4   nine levels or more less serious than the narcotics trafficking

5   in Count One.  That means it has no affect on the guidelines

6   range.  There is a note in the guidelines in Section 3D1.4(c)

7   which provides that because those lower groups are entirely

8   disregarded that may provide a reason at sentencing to seek a

9   sentence at the higher end of the applicable guidelines range.

10  We're not doing that here, but I bring this out just to make

11  the point that the guidelines range here is accounting for two

12  very different types of harm.  It represents a lengthy

13  potential sentence, but that is because there is significant

14  harm from both facets of this conduct.

15        As I mentioned before, the defense submission and as

16  defense counsel today described the defendant's history of

17  trauma, and we have no reason to doubt that or have any dispute

18  with that.  However, it overlooks that the defendant has become

19  himself a danger to others, that he has become a threat to

20  others and in many sense a victimizer himself.  I point out

21  that the defendant's own diary, which is quoted in the defense

22  submission, he describes having raped a girl.  The defense adds

23  some context that that happened at age 16, but I bring it out

24  that this is a long and deep history of difficulties that the

25  defendant has responded to by transgressing rules in an

JC26WOLS

1   increasingly significant and substantial ways.

2           There was a video of CP that we described, the

3   correspondence leading up to the transmission of the video to

4   the defendant.  That is not the entirety of the information we

5   now know.  We know, for example, that the defendant was also in

6   possession of a library of child erotica, images that raise

7   questions as to whether he has a predilection for toddlers or

8   younger children.  That was flagged in the psychologist's

9   court-ordered evaluation.  I defer to the psychologist, who is

10  much more informed than we are.

11          We don't know.  That is the truth.  But what we do

12  know is that in life the defendant has transgressed boundaries.

13  For example, at the time of his arrest, he was in the presence

14  of a 17-year-old girl who he was cohabiting with.  He had been

15  involved with her for eight months, a lengthy period of time

16  and a lengthy age gap.  That is not the only instance we're

17  aware of where there was communication, actual conduct between

18  the defendant and minors.  The defendant's devices seized at

19  the time of his arrest contained screen shots of communications

20  referencing interactions -- seemingly inappropriate

21  interactions -- with minors.  We know they were inappropriate

22  because one of these miner's fathers took the phone and sent a

23  message to the defendant telling him to stay away.

24          Additionally, the lyrics of his songs, which we

25  pointed out in the submission that we prepared.  The defense

1    submission concedes and insists that the defendant is troubled,

2    but it doesn't acknowledge that the defendant continues to

3    present a risk.  It says that our concern about deterrence is

4    speculative.  As I described, everything that we know provides

5    a basis to really question whether the community is safe while

6    the defendant is out.

7            I just point out that paragraphs 95 to 99 some of Dr.

8    McCarthy's evaluations provide a more substantial analysis of

9    why the defendant continues to present a risk.  I just

10   highlight a few of them that test resulted suggest he has

11   pro-offending attitudes about adults having sex with children.

12   That is paragraph 96.  In paragraph 97 Dr. McCarthy notes that

13   he has problems controlling his interests in adolescence.  This

14   isn't speculative and this is not a comfortable position that

15   the government is trying to take to cover itself in later

16   litigation.  To the contrary, the offense conduct here gives

17   rise to substantial and grave concern that the defendant as he

18   has demonstrated presents a risk to the community.  For that

19   reason a guidelines sentence is appropriate and necessary here.

20           I am happy to answer any questions the Court has.

21           THE COURT:  Thank you, Ms. Bracewell.  I don't have

22   any questions for you.

23           Mr. Sercarz, I believe you said that your client would

24   like to speak.

25           MR. SERCARZ:  Thank you.

Case 23-370, Document 50, 11/13/2023, 3589731, Page53 of 146

1           THE COURT:  Mr. Margolies, there no requirement for

2      you to speak; but if you would like to speak, I would be glad

3      to hear you.

4           THE DEFENDANT:  Your Honor, since I was arrested, I

5      had much -- I have had much time to be introspective and search

6      my sole for how the events of my past shaped the decisions that

7      led me here.  For much of the period from 2013 to 2017, I was

8      sober, legitimately employed and/or enrolled in school.  In

9      2017 after losing my job, getting raped, my best friend dying,

10     and my own failed (inaudible), I relapsed on heroin which led

11     to my involvement in a narcotics conspiracy for several months.

12     At the time I did not concern myself with the consequences of

13     my actions.  I felt I had nothing to lose since I planned to

14     kill myself anyway.

15          In July of 2018 after having some time to recover and

16     come to my senses, I quit cold turkey and discontinued my

17     involvement in the conspiracy.  I made every effort to change

18     my lifestyle's perspective and environment traveling to

19     Pennsylvania, Massachusetts, Rhode Island, Israel, Palestine,

20     and finally moving to Louisiana where I attended a coding boot

21     camp to pursue a career as a developer.  When I was arrested in

22     February of this year, I was in the process of starting a new

23     life.

24          My dream is to one day have a stable job, a house and

25     a family of my own.  I am still planning for my future.  I am

Case 23-370, Document 50, 11/13/2023, 3589731, Page54 of 146

1    not sure what field I will go into exactly, but I have been

2    using the following programs to prepare myself for any

3    opportunity I can find:  Customer service, budget, financial

4    reports, developing creativity, 10 soft skills, marketing

5    basics, business ethics, sales fundamental, leadership and

6    influence, entrepreneurship, and music appreciation.  And I

7    have all these certificates here.

8              THE COURT:  Very good.

9              THE DEFENDANT:  Since I was remanded, I have read over

10   40 books and have been working on my writing.  I plan to finish

11   my degree and improve my coding skills.  I have been medicating

12   and meeting with the prison psychologist.

13             Your Honor, I know that deep in my heart I never meant

14   for any harm to come to anyone.  I have many problems, things

15   that will take time, effort and therapy to overcome.  The

16   amount of abusive I have suffered at the hands of others is

17   beyond what I know how to cope with on my own.  I also know

18   that I am responsible for my actions.  In my case -- in my

19   case, my actions caused irrepairable harm.  As a person who has

20   been victimized for most of my life and as someone who was lost

21   loved ones to overdoses, the gravity of this is not lost on me.

22   My conscience is heavy with guilt, remorse and regret for every

23   person this terrible sequence of events has touched.

24             I ask that you find it in your heart to see that I am

25   placed into an environment where I can spend my time learning

Case 23-370, Document 50, 11/13/2023, 3589731, Page55 of 146

**A-225**

JC26WOLS

1    to forgive those who have abused me, to forgive my mother who

2    despite our issues only wanted the best for me, and to forgive

3    myself.  This is my first time ever getting arrested and it

4    will be my last.

5         Thank you.

6         THE COURT:  Thank you very much for your moving

7    statement.  I am required to begin by calculating the advisory

8    sentencing guidelines.  They are the same as set forth in the

9    presentence report, which is a total offense level of 35 and a

10   criminal history category of one.

11        Turning to the factors under Section 3553(a), I begin

12   with how serious the offense was.  Of course there is more than

13   one offense here as defense counsel has indicated to the Court.

14   The offenses of dealing drugs to the extent that Mr. Margolies

15   did with what appear to be disregard for those who were

16   ingesting the drugs, notwithstanding that he himself had been

17   addicted, and then his collection of child pornography as well

18   as his actions with respect to children are extraordinarily

19   serious.  They present a very, very serious danger to the

20   public.  Thus, I turn to the defendant's history and

21   characteristics.

22        I accept the defense representations of all of the

23   trauma that Mr. Margolies was subject to as a child -- sexual

24   abuse, terribly difficult interactions with others, and that

25   deserves to be considered in this sentence.  Probably the most

JC26WOLS

1    significant consideration is whether Mr. Margolies will present

2    a danger to others when he is released from prison.  I have no

3    way of knowing that.  I have to rely on experts for assistance

4    in assessing this.

5         Looking at paragraphs 96, 97, 98, 99 of the

6    presentence report, Mr. Margolies presents a moderate to high

7    risk for re-offense, that is, should he not actively

8    participate in sex offender treatment.  He has shown in his

9    psychiatric, psychological testing that he has a sexual

10   interest in adolescent females and males.  Although he denies

11   having an interest in sexual activity with children, he

12   apparently, according to the psychiatrist, finds viewing images

13   and videos of children or teenagers to be moderately sexually

14   arousing and currently a few of his sexual fantasies are about

15   using child sexual images for sexual gratification.  The

16   conclusion of the psychiatrist is that he has pro-offending

17   attitudes about adults having sex with children.

18        Now, that is one might consider a slice in time and it

19   is an important slice in time; but the Court needs assistance

20   in evaluating the extent to which his history will make his

21   rehabilitation difficult.  It definitely will.

22        The government mentioned his music and the defense

23   also mentions that because it is salient.  His music contains

24   topics -- I am looking at paragraph 75 the PSR -- including

25   coercive sex, sexual contact with minors, and other very

Case 23-370, Document 50, 11/13/2023, 3589731, Page57 of 146

JC26WOLS

1    difficult behaviors and attitudes.  Some of his lyrics include:

2    "Making babies do gay shit for pay B, all my kids pros, just

3    pick one out the van, you could be inside every child's mouth

4    like child's mouth like Toucan Sam..." and so forth including

5    the words, "I'm a rapist whose known to beat cases."

6          Looking at this, among all of the other concerns

7    stated in the presentence report, it is my belief that the

8    defendant is working when he tries to rehabilitate himself

9    against a very deep-seated problem.  As I said, I believe that

10   the defendant has a lot of work to do as he has acknowledged

11   and so has defense counsel.  I believe that that work is

12   unlikely to be effective unless it is sustained for a long

13   period of time and unless he is incapacitated.  It is with

14   great reluctance that I opine that someone needs to be

15   incarcerated in order to protect the public, but it is my view

16   that this is a case where that is required.

17         Mr. Margolies, please stand for sentencing.

18         For the reasons I have stated, I sentence you to the

19   bottom of the guideline range, which is 168 months in custody.

20   You will be on supervised release on Count One for three years

21   and on Count Two to five years.  These will run concurrently

22   with one another.

23         Please have a seat.

24         I should mention that the sentence of 168 months is on

25   each count to run concurrently.  I impose no fine because I

JC26WOLS

1    have no reason to believe you could pay a fine.

2            I take it the government does not seek restitution and

3    forfeiture?

4            MS. BRACEWELL:  That's correct, your Honor.

5            THE COURT:  I impose the special assessment of $200,

6    which is mandatory.  The standard and mandatory conditions of

7    supervised release will apply.

8            In addition, the special conditions stated on pages 32

9    to page 34 of the presentence report will apply.

10           Mr. Margolies, I will not read each of these to you

11   now.  I will count on Mr. Sercarz to read them to you and will

12   count on you to read them yourself.

13           I impose the search condition, the outpatient

14   treatment program that is approved by the U.S. Probation

15   Office, the outpatient mental health treatment program approved

16   by the U.S. Probation Office, and the sex offender conditions

17   which include a sex offense specific evaluation and

18   participation in an outpatient sex offender treatment and/or

19   outpatient mental health treatment program approved by the U.S.

20   Probation Office.

21           It also includes allowing the U.S. Probation Office to

22   install any application or software that allows it to survey

23   and monitor your activity on a computer and other devices.  It

24   also includes that you must not have deliberate contact with

25   any child under 18 years of age unless approved by the

Case 23-370, Document 50, 11/13/2023, 3589731, Page59 of 146

JC26WOLS

1  Probation Office.  You're restricted from viewing, accessing,

2  possessing and/or downloading any sexually explicit material

3  involving minors.  You may not access any websites and other

4  sites where your access would render the access in violation of

5  the terms of service of that website or other site.

6          You will be supervised by the district of residence.

7          I have taken into account, Mr. Sercarz's

8  recommendation and I recommend all of them.  The first is that

9  you be incarcerated at Danbury, Connecticut, which is a very

10  crowded facility with limited resources; but they do have

11  resources that will help you, including the Resolve Program,

12  which I recommend for the reasons your attorney asked, and I

13  will recommend that you be able to participate in the RDAP

14  program.

15          Are there any charges to be dismissed?

16          MS. BRACEWELL:  There are not, but in an abundance of

17  caution to the extent there are, the government moves to

18  dismiss them.

19          MR. SERCARZ:  I couldn't hear you.

20          MS. BRACEWELL:  I don't believe there are any open

21  counts; but in abundance of caution, I would move to dismiss

22  any open counts.

23          THE COURT:  She moves to dismiss them and I grant the

24  motion.

25          Is there anything further before I read Mr. Margolies

JC26WOLS

1    his appeal rights?

2         MS. BRACEWELL:  Your Honor, I believe that Count Two

3    requires the defendant upon release to register as a sex

4    offender.  If he could just confirm that he understands his

5    reporting obligations.

6         THE COURT:  That's correct.

7         Mr. Margolies, you will be required to register as a

8    sex offender.

9         Do you understand that?

10        THE DEFENDANT:  Yes, your Honor.

11        THE COURT:  Okay.

12        Mr. Sercarz, have you discussed that with

13   Mr. Margolies?

14        MR. SERCARZ:  I am sorry?

15        THE COURT:  Have you discussed that with

16   Mr. Margolies?

17        MR. SERCARZ:  I have, your Honor.  He is familiar with

18   the conditions of supervised release.

19        THE COURT:  Thank you.

20        I will take just a moment.

21        (Pause)

22        THE COURT:  Mr. Margolies, I read every defendant his

23   appeal rights.  You can appeal your conviction if you believe

24   that your guilty plea was somehow unlawful or involuntary or if

25   there is some fundamental defect in the proceedings that was

Case 23-370, Document 50, 11/13/2023, 3589731, Page61 of 146

JC26WOLS

1    not waived by your guilty plea.  You also have a statutory

2    right to appeal your sentence under certain circumstances

3    particularly if you believe the sentence is contrary to the

4    law.  With few exceptions any notice of appeal must be filed

5    within 14 days of judgment being entered in your case.

6    Judgment is likely to be entered this week.  If you wish to

7    appeal and you do not have the money to pay the cost of an

8    appeal, you may apply for leave to appeal in forma pauperis.

9    If you request, the Clerk of Court will prepare and file a

10   notice of appeal on your behalf.

11           We're adjourned.  Thank you.

12                          o0o

13

14

15

16

17

18

19

20

21

22

23

24

25

**A-232**



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                      Case No. 22-cv-3489 (KMW)

           -against-

                                        Case No. 19-cr-178 (KMW)

WOLFE MARGOLIES,
           Defendant/Movant.
------------------------------------------------------------------X

## REPLY TO GOVERNMENT'S RESPONSE TO
## MOTION UNDER U.S.C. § 2255
## TO VACATE, SET ASIDE, OR CORRECT A SENTENCE

COMES NOW the Defendant, appearing *pro se*, and responds to the Government's Response to

the underlying motion to set aside his conviction and sentence pursuant to 28 U.S.C. § 2255.

## BACKGROUND

On April 27, 2022, the Movant, Wolfe Margolies, filed a motion before the Hon. Allyne R.

Ross to set aside his conviction and sentence pursuant to 28 U.S.C. § 2255. After a careful review

of the petition and the extensive supporting Memorandum of Law, the Court, on May 6, 2022,

"having concluded that the motion brought under 28 U.S.C. 2255 should not be summarily

dismissed as being without merit," ordered the Government to reply to "file an answer or other

pleadings in response to the motion" within sixty days.

The Government filed its response in a letter to the Court on July 1, 2022. ECF 53. The

Court granted the Movant thirty days from the date on which Movant was served with

Government's answer to file a response. The Movant received service from the Government on July 11th, 2022. The Movant is filing this reply accordingly.

## REJOINDER

It is unnecessary to restate the claims made in the initial motion, but it is worth noting that the Government, in its boilerplate response, is wholly unresponsive to the unique merits of the case that passed initial muster with the Court. The Government gives extensive space to a straw man argument; the Movant is not challenging the validity of the plea procedure but rather the damaging Plea Agreement. ECF 53 at 2-3; *see* ECF 50, Memorandum of Law at 2 ("Movant's failure to have been properly advised as to the full consequences of his guilty plea pursuant to the Plea Agreement, most notably the degree to which the Sentencing Guidelines would be inflated relative to a guilty plea sans Plea Agreement or proceeding to trial with an affirmative defense to the second count, requires that his conviction and sentence be vacated due to ineffective assistance of counsel"). See also *Lafler v. Cooper*, 132 S.Ct. 1376 (2012); *Missouri v. Frye*, 132 S.Ct. 1399 (2012); *Hill v. Lockhart*, 474 U.S. 52 (1985). The attempt to muddy the waters should not be rewarded.

Perhaps more troubling, the Government also makes significant misrepresentations in its Response. These misrepresentations serve to confuse the issues at hand, obscure the scope of the ineffective representation by counsel, and assert causal links when none were proven.

Crucially, the Government makes a material factual misstatement in its description of the circumstances leading to the death of the individual (hereinafter "the Victim") who died from an apparent heroin overdose on February 3, 2018. The Government claims that the Victim had communicated with the Movant "right before" his death. ECF 53 at 2. This is not an off-hand

misrepresentation; the Government uses misleading language elsewhere in its Response when it claims that "shortly after" a heroin delivery, the Victim died, and that text messages were exchanged "right before" the Victim's overdose. ECF 53 at 3, 6. And this is a pattern that presented itself at the change of plea hearing as well; counsel's failure to object to this misleading language at the time is further evidence of his deficiency. See, e.g., Transcript of Change of Plea Hearing before Magistrate Judge Robert W. Lehrburger (June 24, 2019), at 21 (claiming, misleading, that the Movant was "in communication with the victim referencing a delivery of narcotics immediately prior to the death"). The Government cites the Presentence Report ("PSR") to support this description, but is glossing over the details and misrepresenting what the PSR records. Indeed, the texts were exchanged at 6:12 PM on February 2, *at least eighteen hours* prior to the Victim's death. PSR ¶ 17.

The Government also misrepresents the manner in which "law enforcement officers discovered a video file constituting child pornography" on the Movant's cell phone. ECF 53 at 2. The Movant had long before deleted the video he had received; indeed, the law enforcement officers discovered it in a deleted cache. PSR ¶ 24-27.

As noted in the Movant's Memorandum, the law governing ineffective assistance of counsel is both well-known and well-defined. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984), cited in Memorandum at 3-4. Despite the Government's claims to the contrary, the Movant easily meets the first prong of the *Strickland* test. Relying on a single quotation from *Missouri v. Frye*, supra, 132 S.Ct. 1399 (2012), the Government suggests that defense counsel's "duty" is simply to "communicate formal offers from the prosecution." ECF 53 at 6. Defense counsel plainly has more than the "duty to communicate formal offers"; counsel also has a duty to consider the relative strength of the offer both to other potential offers and to a simple plea of guilty to the

3

Indictment. The Movant does not have to show that there is a reasonable probability that he would not have pleaded guilty and gone to trial, but that *he would not have pleaded guilty to the plea agreement but instead to the Indictment*. This is explained in detail in the Petition and the Memorandum of Law—see, e.g., Memorandum of Law at 9-10—and ignored entirely by the Government in favor of a single quotation from *Frye* that is lacking all context.

As the Supreme Court noted elsewhere in *Frye*, the "simple reality" is that "the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant," and, in fact, "The reality is that plea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages." *Frye*, 132 S.Ct. at 1407 (brackets and emphasis in original and citations omitted). The Supreme Court in *Frye* concisely explains why Movant's counsel was deficient in the immediate case: "defense counsel has the duty to communicate formal offers from the prosecution *to accept a plea on terms and conditions that may be favorable to the accused*." *Frye* at 145 (emphasis added).

Even by the Government's exceedingly narrow representation of a defense attorney's responsibilities to his client, counsel failed the Movant because he urged him to accept a Plea Agreement on terms that were expressly *unfavorable* to the accused. As explained in detail in the Memorandum, and as the Government fails to address in its own Response, had the Movant pled guilty to the two-count indictment *without* a Plea Agreement, the base offense level for the heroin count would have been 12 (not 38), and when combined with the offense level for the child pornography, Movant's total offense level with acceptance of responsibility would have been 25, with a corresponding sentencing range of 57 to 71 months. In satisfaction of the first prong of the

4

*Strickland* test, counsel plainly "failed to provide objectively reasonable advice" to the decision to plead guilty pursuant to the plea agreement. *Davis v. United States*, No. 18-cv-01308, 2019 WL 3429509, at *5 (S.D.N.Y. 2019).

The Government describes the Movant's easily demonstrated claims as "self-serving assertions." ECF 53 at 6. The Movant is simply describing facts; what is self-serving is the misrepresentation of the record in the Response. To reiterate, without obtaining an expert opinion, counsel could not provide objectively reasonable advice whether to accept the plea agreement. The plea agreement stipulated that the Movant was directly responsible for the death of the Victim. Counsel did not even bother to request a *Fatico* hearing, let alone the advice of an independent toxicologist.

Text messages sent at least eighteen hours prior to a death do not establish causality—rather, they show a gap approaching a day's length, which is precisely why an expert opinion was needed. Memorandum of Law at 8-9. The Government says that the Movant's view that the Government could not have proven causality at a *Fatico* hearing is "simply speculative," but that is *exactly* why an expert was needed, and precisely why counsel's representation was deficient. ECF 53 at 6. The Government's proof then, and indeed in its Response, is not remotely fulsome, despite its description otherwise.[1] A *Fatico* hearing and an evaluation by an expert were needed. Counsel failed to request either.

Having not provided any proof of causality, the Government then claims that, at the time of his plea, "the defendant has offered statements that detail his involvement with the offense,"

---

[1] Indeed, even at the change of plea hearing, the Government did not detail any evidence that proved causality. "[W]ith respect to the victim that was referenced in the allocution the government would offer phone records showing communications between the defendant and the victim, as well as the medical records showing that the cause of the victim's death was acute heroin intoxication." Transcript at 22. This, of course, does not prove that the acute heroin intoxication was caused by the same heroin sold by the Movant nearly a full day prior to the Victim's death.

which, the Southern District has found elsewhere, should "carry a strong presumption of verity."

ECF 53 at 7, citing *Rosa v. United States*, 170 F. Supp. 2d 388, 402 (S.D.N.Y. 2001). This is a

gross misrepresentation of the Movant's actual statements at his change of plea hearing.

> THE DEFENDANT: During the period described in the indictment, I agreed with others to distribute controlled substances, including those containing heroin, to retail customers of Ekin Erkan.
>
> I have reviewed those portions of the complaint which alleges that on February 2, 2018, I delivered a controlled substance containing heroin to an individual identified as Victim-2, and that this individual subsequently died after having ingested some of the heroin included in that delivery.
>
> I do not have a specific recollection of this delivery. However, I have reviewed with my attorney the relevant portions of the complaint, an affidavit in support electronic eavesdropping authority on certain cell phones, and the death certificate prepared by the office of the chief medical examiner. Based upon my review of these materials and my conversations with my attorney, I am prepared to admit the following:
>
> I recall that on February 2, 2018, I was the individual who possessed the cell phone described in the complaint as the "Hope 2549 phone";
>
> I recall that during the period, I engaged in deliveries of controlled substances to retail customers of Ekin Erkan;
>
> That on February 2, 2018, Victim-2 placed an order for three bundles of heroin to me on my cell phone;
>
> That shortly after this delivery, the deceased stopped making outgoing calls or sending text messages from his cell phone;
>
> That on February 3, 2018, Victim-2's roommate discovered the body of the deceased. In close proximity to the deceased were two open glassines and 19 unopened glassines.
>
> That according to the death certificate prepared by the office of the chief medical examiner, on February 3, 2018 at 6:12 p.m., Victim-2 was pronounced dead of acute heroin intoxication.

Transcript at 17-19. At no point did the Movant acknowledge causality. And, in fact, the Movant

specifically noted that he had no memory of the sale in question.

**A-238**

The Government entirely fails to substantively address the argument that counsel failed to pursue an affirmative defense against the charge of a single count of possession of child pornography. Instead, it misrepresents the argument as "speculative." ECF 53 at 7. This is untrue. It is not speculative because it is not fact-based. It is a pure statement of the law. Pursuant to 18 U.S.C. § 2552(c)(1) specifically recognizes an affirmative defense used if the defendant "[p]ossessed less than three matters containing child pornography." (The Movant also has grounds for a second affirmative defense, as he "[p]romptly took reasonable steps to destroy each item containing child pornography.")

No reasonable person would describe the Plea Agreement which the counsel presented to the Movant as "favorable," despite claims to the otherwise in the Government's Response. ECF 53 at 7. A simple plea *without an agreement* would have resulted in lesser Sentencing Guidelines. The Movant's claim is simple and straightforward. The Movant's dissatisfaction with his counsel's deficient performance is not a non-specific instance of sour grapes. Rather, it is based on specific shortcomings. The Movant's attorney failed to pursue a break in causality via a report by an expert, and to advise the Movant that he had an affirmative defense against the child pornography charge, both of which would either have led to trial and acquittal, or to a plea to the indictment and a far lower sentence. Plainly, counsel's deficiency led to prejudice.

So, yes, counsel's "representation fell below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." The Movant demonstrated both in his Memorandum. *Strickland*, 466 U.S. at 694.

WHEREFORE, Movant respectfully maintains that counsel's representation was ineffective in violation of his Sixth Amendment right to effective assistance of counsel during the

plea-process stage of the proceedings and, as a result, prays that this Honorable Court vacate his

conviction and sentence or provide any other relief it deems necessary and proper.


                                    Respectfully submitted,


                                    WOLFE MARGOLIES
                                    Defendant/Movant, *Pro Se*

8





A-241

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 21, 2022

**BY ECF**

The Honorable Kimba M. Wood
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

     Re:    *United States v. Wolfe Margolies*, 19 Cr. 178 (KMW)

Dear Judge Wood:

     The Government writes in response to the Court's order issued on August 22, 2022 (*see* Dkt. No. 56), that the Government respond to the defendant Wolfe Margolies's supplemental *pro se* motion (*see* Dkt. No. 54, "Def. Supp. Mtn."). As set forth below, the defendant's supplemental motion should be denied.

**I.    Background**

     The Government incorporates the factual background previously set forth in its initial response, which was filed on July 5, 2022. (*See* Dkt. No. 53, "Opp.").

     As previously described in the Government Response, and set forth in the Presentence Report, law enforcement linked Margolies to a February 2018 heroin overdose death of an individual in Brooklyn, New York (the "Victim"). In the hours prior to the Victim's death, Margolies was in communication with the Victim about arranging a delivery of heroin. Specifically, on February 2, 2018, the Victim communicated with Margolies and arranged to purchase three bundles of heroin. (PSR ¶ 18). The Victim tried to move forward the meeting time and Margolies indicated that he had to restock before he could meet ("Gotta reup. Going to u soon as I can."). (PSR ¶ 18). Margolies communicated with the Victim to provide an update on his arrival time ("walking from train"). The Victim responded "Alright" – which was the last outgoing message from the Victim's phone. (PSR ¶ 19). The Victim was found dead in his Brooklyn, New York apartment on February 3, 2018. (PSR ¶ 22). Among the discovery materials was paperwork from the medical examiner showing that the Victim died of acute heroin intoxication.

     The defendant pleaded guilty before Magistrate Judge Lehrburger on June 24, 2019, pursuant to a plea agreement with the Government (the "Plea Agreement," *see* Opp., Ex. A at 5), and this Court accepted the guilty plea on June 27, 2019.

**A-242**

The Plea Agreement acknowledged he was pleading guilty because he was in fact guilty, and waived his right to make discovery-related challenges to his plea or conviction:

> The defendant hereby acknowledges that he has accepted this Agreement and decided to plead guilty because he is in fact guilty. By entering this plea of guilty, the defendant waives any and all right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, Jencks Act material, exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, or impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

The defendant was sentenced by this Court on December 2, 2019. The Court confirmed that parties had reviewed the Presentence Report and did not have any additional objections to the facts as set forth. The defendant did not object to the facts setting forth the narcotics related offense conduct.[1]

Despite the appellate waiver in the Plea Agreement, the defendant challenged the Plea Agreement and his within-Guidelines sentence on direct appeal. At the time of the appeal, the defendant was represented by new counsel. At appellate counsel's request, the Government reproduced the death certificate that showed the cause of death for the Victim (what is attached as an exhibit to Defendant's Motion).

On May 14, 2021, the Second Circuit dismissed Margolies's appeal as barred by the appellate waiver in the Plea Agreement. *See United States v. Wolfe Margolies*, Case No. 20-60, Doc. 83.

## II.   Section 2255 Petition

The defendant initially filed a *pro se* motion under 18 U.S.C. § 2255 on or about April 27, 2022, claiming that his attorney's representation was ineffective. (Dkt. No. 50, "Def. Mtn."). The defendant argued that he was not properly advised as to the "full consequences of his guilty plea pursuant to the Plea Agreement." In his initial petition, the defendant alleged two errors: (i) that with respect to the drug trafficking charge, his offense level would have been 12 rather than 38 and thus that his Guidelines were "inflated" as a result of his plea agreement, (*see* Def. Mtn. at 15-16, 21-23), and (ii) that he had an affirmative defense to the child pornography count, (*see* Def.

---

[1] Defense counsel had submitted written objections to the Probation Department with respect to several paragraphs that related to the child pornography offense. Those paragraphs did not affect the Guidelines calculation. Specifically, the defendant objected to the Presentence Report's description of the number of files constituting "child erotica" on the defendant's cellphone (¶ 30); the case agent's description of the material on the defendant's laptop and an external hard drive as being substantially "sexual in nature" (¶ 31), and a description of screenshots of the defendant's chats with individuals under 18 insofar as it gave rise to a possible inference that the defendant had intimate contact with such individuals, which the defendant disputed (¶ 33).

A-243

Mtn. at 15-16, 21).  As set forth in the Government's earlier response, both arguments are without merit.

The defendant has now filed a supplemental *pro se* motion arguing, in essence, that the Government's causation proof with respect to the overdose death of the Victim was inadequate. The defendant first requests that the Court authorize an expert pathologist and/or toxicologist to investigate the Victim's death and second argues that defense counsel's failure to investigate causality rendered his representation deficient.  (*See* Def. Mtn. at 1).

The defendant's demand for a toxicology or pathologist should be denied.  There is no basis for the defendant to make what amounts to a discovery demand given that he has already admitted his factual guilt and waived discovery-related challenges to his plea and sentence.

The defendant's argument about defense counsel's failure to investigate relies entirely on appellate counsel's email correspondence with the Government requesting previously produced discovery materials.  The defendant does not address, nor could he possibly refute, the other evidence that overwhelmingly established his culpability for the overdose death of the Victim as he otherwise admitted during his plea allocution, including the following proof:

1) The defendant's communications with the Victim shortly before the Victim's death, during which the Victim urged the defendant to come as soon as the defendant was able;

2) The defendant's communications with the Victim indicating that the defendant needed to "re-up" – *i.e.*, that the defendant had to obtain additional heroin to sell to the Victim;

3) The defendant's communications with the Victim indicating that they were about to meet;

4) The fact that the Victim's outgoing communications cease after his final communications confirming the imminent meeting with the defendant; and

5) The medical examiner's report showed the cause of death as acute heroin intoxication, meaning that the Victim died of the very drugs that the defendant provided him with.

A-244

The defendant's new argument for why his counsel was ineffective fails for all the reasons previously set forth in the Government's response; the defendant's dissatisfaction with his sentence does not mean that his counsel was deficient in negotiating the plea. The defendant's supplemental motion should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:____/s/ Mollie Bracewell_____
Mollie Bracewell
Assistant United States Attorney
(212) 637-2218

cc:    Wolfe Margolies (by mail)

A-245

**PRESENTENCE INVESTIGATION REPORT, PREPARED BY
ASHLEY E. GEISER, DATED NOVEMBER 18, 2019
(CASE #1:19-CR-00178-KMW)
(REPRODUCED IN SEALED APPENDIX AT PP. SA-38-SA-73)**

**A-246**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————X
   UNITED STATES OF AMERICA,

              -against-                       Case No. 1:19-cr-00178 (KMW)

   WOLFE MARGOLIES,
        Defendant/Petitioner.
————————————————————————————X

**MOTION FOR APPOINTMENT OF COUNSEL PURSUANT TO 18 U.S.C. § 3006A(g)**

COMES NOW the Defendant, appearing *pro se*, and moves this Honorable Court to appoint counsel to represent him in proceedings related to the Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correction [His] Sentence submitted together with this request.

     The Movant is a party in this case and is unable to afford the services of an attorney. He was previously appointed counsel pursuant to the Criminal Justice Act for his appeal. Movant does not possess a legal education and the arguments underlying the Motion are complex. While he was grateful to have the support of a fellow inmate in composing the text of his motion, and while he was particularly grateful that the inmate did not charge him anything for this assistance, he recognizes the limitations of what is often called a "jailhouse lawyer," and is certain this Honorable Court does as well. Given the potential need to access transcripts, prepare affidavits, depose witnesses, e.g., trial counsel, an attorney is plainly necessary to fully expound the facts in this matter.

     The Movant has sought *pro bono* counsel at several university-sponsored legal clinics but has been unable to secure one, whether due to the profession's lack of willingness to defend people charged with a sex offense (Count 2) or whether due to factors beyond his consideration. In any

event, the Movant's many requests have not been rebuffed; they have simply been met with silence. The one attorney who seems intimately knowledgeable with the facts of Movant's case is unavailable. According to the Criminal Justice Act (CJA) rules, an attorney appointed to handle a direct appeal may *not* be retained by the client to subsequently file a motion pursuant to 28 U.S.C. § 2255 on the client's behalf. The *Court*, however, is permitted to appoint such counsel pursuant to the Criminal Justice Act.

Movant recognizes there is no *right* to counsel in such a proceeding, but also recognizes that this Honorable Court has discretion to do so if it pleases. Movant respectfully suggests that the facts underlying the case and the Plea Agreement are complex enough that appointment of counsel is warranted. Movant further suggests that the Court appoint Alessandra DeBlasio, given her familiarity with the case and the relationship established between counsel and Movant. Such appointment would be more cost effective for the Court, and further the interests of justice, as it would avoid a *third* attorney being appointed. A new attorney would have to spend significant time (and resources) to review all the documents and get caught up on the matter.

Movant has appended a financial affidavit, pursuant to the CJA, to this motion.

**PRAYER**

WHEREFORE, the Movant respectfully requests that this Honorable Court appoint counsel to represent him in his Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correction [His] Sentence.

2

A-248

Respectfully submitted,


WOLFE MARGOLIES

Petitioner, *Pro Se*

3

**A-249**

SDNY
CJA-23
(Rev 3/21)

# FINANCIAL AFFIDAVIT
### IN SUPPORT OF REQUEST FOR ATTORNEY, EXPERT, OR OTHER SERVICES WITHOUT PAYMENT OF FEE

| IN THE UNITED STATES | ☑ DISTRICT COURT | ☐ COURT OF APPEALS | ☐ OTHER *(Specify Below)* |
|---|---|---|---|

IN THE CASE OF

| United States of America | v. | Wolfe Margolies | FOR | LOCATION NUMBER |
|---|---|---|---|---|
| | | | AT | |

PERSON REPRESENTED *(Show your full name)*

Wolfe Margolies
Register No. 37756-034
Federal Correctional Institution (Danbury, CT)

| 1 ☐ Defendant - Adult | DOCKET NUMBERS |
|---|---|
| 2 ☐ Defendant - Juvenile | Magistrate Judge |
| 3 ☐ Appellant | 1:19-mj-01520 |
| 4 ☐ Probation Violator | District Court |
| 5 ☐ Supervised Release Violator | 1:19-cr-00178 |
| 6 ☐ Habeas Petitioner | Court of Appeals |
| 7 ☑ 2255 Petitioner | |
| 8 ☐ Material Witness | |
| 9 ☐ Other *(Specify)* | |

CHARGE/OFFENSE *(Describe if applicable & check box→)*  ☑ Felony  ☐ Misdemeanor

21 U.S.C. § 846, 18 U.S.C. § 2252A

## ANSWERS TO QUESTIONS REGARDING ABILITY TO PAY

| | | |
|---|---|---|
| **INCOME & ASSETS** | **EMPLOYMENT** | Do you have a job? ☐ Yes ☑ No<br>IF YES, how much do you earn per month? _____ Will you still have a job after this arrest? ☐ Yes ☐ No ☐ Unknown |

**PROPERTY**

Do you own any of the following, and if so, what is it worth?

| | APPROXIMATE VALUE | DESCRIPTION & AMOUNT OWED |
|---|---|---|
| Home | $ | no |
| Car/Truck/Vehicle | $ | no |
| Boat | $ | no |
| Stocks/bonds | $ | no |
| Other property | $ | no |

**CASH & BANK ACCOUNTS**

Do you have any cash, or money in savings or checking accounts? ☑ Yes ☐ No IF YES, give the total approximate amount after monthly expenses $ 155.13 (BOP Commissary Account)

**OBLIGATIONS, EXPENSES, & DEBTS**

How many people do you financially support? 0

| BILLS & DEBTS | MONTHLY EXPENSE | TOTAL DEBT |
|---|---|---|
| Housing | $ 0 | $ 0 |
| Groceries | $ 0 | $ 0 |
| Medical expenses | $ 0 | $ 0 |
| Utilities | $ 0 | $ 0 |
| Credit Cards | $ 0 | $ 0 |
| Car/Truck/Vehicle | $ 0 | $ 0 |
| Childcare | $ 0 | $ 0 |
| Child Support | $ 0 | $ 0 |
| Insurance | $ 0 | $ 0 |
| Loans | $ 35 | $ 4,188.82 |
| Fines | $ 0 | $ 0 |
| Other | $ 0 | $ 0 |

I certify, under penalty of perjury that the foregoing is true and correct.

SIGNATURE OF DEFENDANT (OR PERSON SEEKING REPRESENTATION)     Date 4/18/22

☐ APPROVED     ☐ DENIED

FD/CJA/RET. ATTORNEY                    (PRINT)

ASSISTANT UNITED STATES ATTORNEY        (PRINT)     SIGNATURE OF JUDICIAL OFFICER     DATE

A-250



The Hon. Kimba M. Wood
United States District Court
500 Pearl Street
New York, NY 10007

Wolfe Maragolies 37756-034
FCI Danbury
Route 37
Danbury, CT 06811

A-251

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA,

                                                              Case No. 22-cv-3489 (KMW)

                    -against-

                                                              Case No. 19-cr-178 (KMW)

WOLFE MARGOLIES,
            Defendant/Movant.
------------------------------------------------------------X

## REPLY TO GOVERNMENT'S RESPONSE TO
## *EX PARTE* MOTION RELATED TO MOTION UNDER 28 U.S.C. § 2255
## TO VACATE, SET ASIDE, OR CORRECT A SENTENCE

COMES NOW the Defendant, appearing *pro se*, and replies to the Government's Response to his

Ex Parte Motion related to the underlying motion to set aside his conviction and sentence pursuant

to 28 U.S.C. § 2255.

    The Petitioner's request for authorization to obtain the toxicology report, and to hire an

expert to interpret the results, does not amount to a "discovery demand" as the Government

suggests. ECF 57 at 3.

    First, there is no demand of the Government as it apparently never obtained the toxicology

report.

    Second, the request for authorization to obtain the report and provide the court with an

expert opinion as to causality is *not* a discovery request for the sake of the underlying case, but

rather is to establish one of the main claims on this petition pursuant to 28 U.S.C. § 2255:  the

prejudice caused by counsel's ineffective performance in failing to obtain the report, and a related

expert opinion, to enable counsel to provide informed advice as to whether his client should plead

guilty pursuant to the plea agreement (admitting causality for the death), or to instead simply plead to the indictment (not agreeing to the enhancement for a death resulting).

Third, the toxicology report, and an explanatory expert opinion, would override (and "refute") what the Government mischaracterizes as "evidence overwhelmingly establish[ing] his culpability for the overdose death." ECF 57 at 3. (Reply at 3). The evidence did *not* overwhelmingly establish temporal causality (there was an eighteen-hour gap between delivery and death), nor did it convincingly establish substance causality. What did "overwhelmingly" establish culpability was the Movant's guilty plea, upon the advice of counsel, now under challenge.

The toxicology report will establish an approximate time of death (if a few hours after delivery, or *eighteen* hours later, which an expert could then interpret for the court), as well as whether other toxic substances were present, such as fentanyl (which the Movant did not supply), an intervening factor which an expert could interpret for the Court.

WHEREFORE, the Movant respectfully maintains that appointment of an expert toxicologist is appropriate, and that, regardless of the ruling on this request, that counsel's representation was ineffective in violation of his Sixth Amendment right to effective assistance of counsel during the plea-process stage of the proceedings and, as a result, prays that this Honorable Court vacate his conviction and sentence or provide any other relief it deems necessary and proper.

Respectfully submitted,

WOLFE MARGOLIES
Defendant/Movant, *Pro Se*

2

WESTCHESTER NY 105
29 SEP 2022 PM 5 L
FOREVER USA

John Marquois 51776-054
CI Danbury
route 37
Danbury CT 06811

Hon. Barbara Moses
U.S. Courthouse
500 Pearl St
New York, NY 10007-1312

10007-131699

FEDERAL CORRECTIONAL INSTITUTION DANBURY
33 1/2 PEMBROKE ROAD DANBURY, CT, 06811
DATE
THE ENCLOSED LETTER WAS PROCESSED THROUGH
SPECIAL MAIL PROCEDURES FOR FORWARDING TO YOU.
THE LETTER HAS BEEN NEITHER OPENED NOR INSPECTED.
IF THE WRITER RAISES A QUESTION OR PROBLEM OVER
WHICH THIS FACILITY HAS JURISDICTION, YOU
MAY WISH TO RETURN THE MATERIAL FOR FURTHER
INFORMATION OR CLARIFICATION. IF THE WRITER
ENCLOSES CORRESPONDENCE FOR FORWARDING
TO ANOTHER ADDRESSEE, PLEASE RETURN
THE ENCLOSURES TO THE ABOVE ADDRESS.

A-254

```
                  UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK

In re:                             :
                                       Docket #1:19-cr-00178-
 UNITED STATES OF AMERICA,         : KMW All Defendants

                  Plaintiff,       :

  - against -                      :

 MARGOLIES, WOLFE,                 : New York, New York
                                     March 20, 2019
                  Defendant.        :

----------------------------------- : BAIL HEARING

                     PROCEEDINGS BEFORE
              THE HONORABLE JUDGE JAMES L. COTT,
                 UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          UNITED STATES ATTORNEY'S OFFICE
                        BY:  MARY E. BRACEWELL, ESQ.
                        One St. Andrew's Plaza
                        New York, New York 10007
                        212-637-2218

For the Defendant:      SERCARZ & RIOPELLE, L.L.P.
                        BY:  MAURICE H. SERCARZ, ESQ.
                        810 Seventh Avenue, Suite 620
                        New York, New York 10019
                        212-586-4900




Transcription Service:  Carole Ludwig, *Transcription Services*
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

A-255

<u>INDEX</u>

**E X A M I N A T I O N S**

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | <u>Re-Direct</u> | <u>Re-Cross</u> |
|---|---|---|---|---|
| None | | | | |

**E X H I B I T S**

| <u>Exhibit Number</u> | Description | <u>ID</u> | <u>In</u> | <u>Voir Dire</u> |
|---|---|---|---|---|
| None | | | | |

**A-256**

| 1 | PROCEEDINGS                                      3

2          THE CLERK:  United States of America v. Wolfe

3   Margolies.

4          Counsel, state your name for the record.

5          MS. MARY E. BRACEWELL:  Good morning, your Honor.

6   Mollie Bracewell for the government.

7          HONORABLE JAMES L. COTT (THE COURT):  Good

8   morning, Ms. Bracewell -- or good afternoon, Ms. Bracewell.

9          Everyone may be seated.

10          MR. MAURICE SERCARZ:  And for defendant Margolies,

11   Maurice Sercarz, your Honor.  And the defendant is present

12   in court.

13          THE COURT:  Good afternoon, gentlemen.

14   Mr. Sercarz, you were here yesterday, right, for the

15   arraignment?  How come we didn't do this yesterday?

16          MR. SERCARZ:  Your Honor --

17          THE COURT:  And are you seeing Judge Wood later

18   today?

19          MR. SERCARZ:  It was Judge Wood's decision to farm

20   this out, and that decision wasn't finalized until this

21   afternoon.

22          And I also would note that I requested any bail

23   application be held today.  On the subject of community

24   ties, five people have made plans --

25          THE COURT:  To be here today?

**A-257**

```
 1                        PROCEEDINGS                    4

 2            MR. SERCARZ:  -- to be here for an appearance

 3   before Judge Wood, because she was going to do the bail

 4   application this afternoon.

 5            THE COURT:  Okay.

 6            MR. SERCARZ:  For those reasons, I apologize

 7   for --

 8            THE COURT:  No, that's fine.  I'm just -- you

 9   know, I'm always in favor of efficiency purposes, that's

10   all -- as well as the Court.

11            But you're here before Judge Wood this afternoon,

12   in any event, for an initial conference at which you

13   originally thought the bail application would be made?

14            MR. SERCARZ:  Yes, your Honor.

15            THE COURT:  But she referred the application to

16   magistrates court?

17            MR. SERCARZ:  Yes, your Honor.

18            THE COURT:  So here we --

19            MR. SERCARZ:  She didn't do that until late

20   yesterday afternoon, when she heard I was going to make a

21   bail application.

22            THE COURT:  I see.

23            MR. SERCARZ:  (Indiscernible)

24            MS. BRACEWELL:  That's my understanding, yes, your

25   Honor.
```

**A-258**

```
1                    PROCEEDINGS                    5

2          THE COURT:  All right, and the government

3    continues to see detention in the case?

4          MS. BRACEWELL:  Yes, we do continue to seek

5    detention.

6          THE COURT:  Okay, well, let me hear from the

7    government as to why that is first; and then, Mr. Sercarz,

8    you can respond.

9          MS. BRACEWELL:  Yes, your Honor.  So the

10   government is seeking detention based both on dangerousness

11   and risk of flight.  So I'll start with risk of flight.

12   Understanding that there are significant community ties and

13   a demonstrated family presence, the government,

14   nevertheless, views the charges as very serious.  The

15   defendant was arrested in New Orleans at the time of these

16   charges.  He's sort of demonstrated his mobility.  In

17   addition, I'll note that there was a completeness action

18   that includes some of the details about the underlying

19   offenses.  The defendant is charged with possession of

20   child pornography as well as narcotic trafficking.  So

21   these are two separate offenses that have been happening at

22   the same time.

23          With respect to the narcotics trafficking, as set

24   forth in the complaint, the defendant has been linked to an

25   overdose.  So the likelihood of very substantial penalties
```

|     | PROCEEDINGS                                              6 |
| --- | --- |

1       PROCEEDINGS                              6

2    being possible here is quite real.  And we --

3         THE COURT:  I'm sorry, unfortunately, I wasn't

4    presented with the complaint.  I haven't read the

5    complaint; I just was given the indictment.  So as is

6    typical, the indictment doesn't have a level of detail as

7    the complaint.  So I haven't read it.

8         MS. BRACEWELL:  I have a copy --

9         THE COURT:  I can read it if you'd like me to, but

10   you'll have to assume I haven't read it --

11        MS. BRACEWELL:  Of course.

12        THE COURT:  -- and so you'll have to speak in a

13   little bit more detail about it than otherwise.

14        MS. BRACEWELL:  Understood.  So let me explain

15   just in greater detail.  The defendant was charged with

16   narcotics trafficking relating to various undercover sales

17   made to -- sales made to an undercover officer.

18        THE COURT:  Sales he's alleged to have made?

19        MS. BRACEWELL:  He's alleged to have made.  And he

20   was identified by the undercover officer as being the

21   individual identified as "Hope."  That was the street name

22   he was using the context of those sales.

23        THE COURT:  The name was what?

24        MS. BRACEWELL:  Hope.

25        THE COURT:  Hope.

```
 1                        PROCEEDINGS                    7

 2              MS. BRACEWELL:  Hope, H-o-p-e.

 3              THE COURT:  Okay, and this was in Manhattan?

 4              MS. BRACEWELL:  This was -- many of the sales

 5    happened in Queens.

 6              THE COURT:  In Queens.

 7              MS. BRACEWELL:  The cellphone tracking

 8    demonstrates that the defendant originally started in

 9    Manhattan and traveled to Astoria, Queens, to make the

10    sales.

11              THE COURT:  Okay.

12              MS. BRACEWELL:  There was an overdose victim that

13    was located in Brooklyn.  Our understanding is that the

14    defendant travels in narcotics trafficking; he travels to

15    the various customers.  There was an overdose victim, and

16    in the victim's phone there were communications with Hope

17    at the same number that our undercover officer communicated

18    with this individual.  During the course of the

19    communications it's very clear the victim was arranging a

20    sale.  Hope sends a message saying, "I'm here.  Where are

21    you?"  "A block away."  And then they meet.  Those are the

22    last communications in the defendant's -- I mean -- the

23    victim's phone.  So he was found dead approximately 24

24    hours later.  Our belief -- and this is confirmed by the

25    toxicology report -- is that Hope, the defendant, sold the
```

**A-261**

| | PROCEEDINGS | 8 |

1            PROCEEDINGS           8

2  drugs that killed this individual.  It was a lethal

3  overdose, and various heroin and I believe Fentanyl was

4  found in the defendant's -- in the victim's system.

5          The defendant's sales to the undercover consisted

6  of heroin and, on one occasion the drugs tested positive

7  for Fentanyl.  So this is a defendant who is selling

8  narcotics, and he's selling dangerous narcotics that are

9  potentially lethal in many circumstances -- that can be

10  lethal and have demonstrated themselves to be lethal.

11          THE COURT:  Speak a little slower.  Sorry.

12          MS. BRACEWELL:  Sure.

13          THE COURT:  I didn't understand the last thing you

14  said.

15          MS. BRACEWELL:  I said the defendant is selling

16  dangerous narcotics that have demonstrated themselves to be

17  lethal, in our view.

18          THE COURT:  Okay.

19          MS. BRACEWELL:  So that's with respect to the

20  narcotics trafficking.  The defendant is also charged with

21  possession of child pornography.  In late December of this

22  past year, the defendant traveled to Israel and then came

23  back in early January.  A border search was conducted when

24  the defendant returned to this country.  HSI copied the

25  defendant's phone and was reviewing its contents and

| | PROCEEDINGS 9 |
|---|---|
| 1 | |
| 2 | located a number of pornographic images and a particular |
| 3 | video that constitutes child pornography.  In the |
| 4 | video -- I'll just briefly describe it as an approximately |
| 5 | 30-second-long video -- and a toddler is raped by an adult |
| 6 | male.  It's very -- it's clearly child pornography. |
| 7 | In addition, in the defendant's phone there were a |
| 8 | number of sexually explicit child erotica is the category |
| 9 | typically used.  So there's other types of materials that |
| 10 | demonstrate he's been having communications on the Kik |
| 11 | website with other individuals whose screen names suggest |
| 12 | they traffic in child pornography. |
| 13 | THE COURT:  What website did you say? |
| 14 | MS. BRACEWELL:  Kik, K-i-k.  It's an online forum |
| 15 | where individuals can join group chats.  It's known to be, |
| 16 | in other cases and other investigations, a forum where |
| 17 | child pornographers can distribute material and share |
| 18 | material. |
| 19 | The defendant's phone that was searched had been |
| 20 | deleted substantially, its history, prior to, I believe, |
| 21 | October or November of 2018.  So the content on the phone |
| 22 | was limited, but that's not surprising in light of the fact |
| 23 | that you can tell from the library of images and the |
| 24 | library of chats that it was deleted. |
| 25 | Why the officers were able to locate this |

**A-263**

| | PROCEEDINGS | 10 |
|---|---|---|

1   PROCEEDINGS                                    10

2   particular video is that it was cached within the chat on

3   Kik.  So it would have been deleted but for the fact that

4   it was saved by the app as sort of an automatic function,

5   is how they've explained it to me.

6           THE COURT:  And this is the basis for the charge

7   in the second count?

8           MS. BRACEWELL:  This is the basis for the charge

9   in the second count.

10          THE COURT:  Okay.

11          MS. BRACEWELL:  And so this is all by way of

12  background to explain a little bit more about the

13  dangerousness.

14          THE COURT:  Well, you had started with risk, but I

15  think you --

16          MS. BRACEWELL:  I segued.  I segued.

17          THE COURT:  All right, you segued to danger.

18  Okay.

19          MS. BRACEWELL:  To dangerousness.  So --

20          THE COURT:  Your point about risk is simply that

21  he's someone who has had the means to travel, as is

22  reflected in the trip to Israel, that he was in New

23  Orleans, etc.

24          MS. BRACEWELL:  Exactly.

25          THE COURT:  That's essentially your risk point.

**A-264**

|     | PROCEEDINGS                                              11 |
| --- | --- |
| 1   |  |
| 2   | And everything else you've said really goes to danger. |
| 3   | MS. BRACEWELL:  That's correct.  And I was setting |
| 4   | forth the background of the charges just to make the point |
| 5   | of the possible penalties here.  So the overdose death, and |
| 6   | in addition, the likelihood of finding additional materials |
| 7   | that would carry a mandatory minimum with the child |
| 8   | possession, those are both possibilities that the complaint |
| 9   | sets forth.  So I just wanted to provide that background. |
| 10  | The penalties goes to risk of flight, I would argue. |
| 11  | THE COURT:  Okay. |
| 12  | MS. BRACEWELL:  With respect to dangerousness, as |
| 13  | I described with the drug trafficking, the lethal Fentanyl |
| 14  | is a real concern.  But, additionally, with the child |
| 15  | pornography materials, the defendant's phone suggests that |
| 16  | he has crossed the line into action.  There were chats with |
| 17  | individuals who identified themselves as being 15 or 16 |
| 18  | years old in which one chat in particular was flagged to |
| 19  | me, the girl reached out, the minor reached out to the |
| 20  | defendant and said something to the effect of, "Leave my |
| 21  | friends alone.  We're underage.  We're 16."  My |
| 22  | understanding from the overarching content of the phone is |
| 23  | that there had been communications either through social |
| 24  | media or through chats that we didn't have access to but |
| 25  | that show that the defendant was in fact in communication |

```
 1                    PROCEEDINGS                    12
 2   with minor victims -- with minors.  And the defendant is --
 3             THE COURT:  Just to probe a little bit more about
 4   that, he was in communication with minors to what end,
 5   though?  I mean, what does that mean exactly?
 6             MS. BRACEWELL:  Trying to arrange a meet-up.  So
 7   my understanding is that they were substantially -- the
 8   victim -- I should call her a victim -- the minor that
 9   reached out in the telephone communication to say, "Leave
10   my friends alone," seemed to be alluding to romantic
11   overtures that the defendant had been making to her
12   friends, hitting on them sort of in a colloquial sense.
13             THE COURT:  Okay.
14             MS. BRACEWELL:  And then I'd also note that the
15   defendant was arrested in New Orleans in this case.  We
16   believe he was in the company of a minor, a 17-year-old, at
17   the time of his arrest.  Those charges are, obviously,
18   something we're not pursuing, but it just -- it's
19   consistent with the conduct that the phone --
20             THE COURT:  I'm not sure I understand -- I mean, I
21   think I understand the implication you're making, but it's
22   not illegal for an adult to be with a minor.  So if he's
23   with a 17-year-old without more, that's not an issue.
24             MS. BRACEWELL:  So let me be more clear.  My
25   understanding is that they had been living together and
```

**A-266**

```
 1                    PROCEEDINGS              13
 2   that the Instagram -- the defendant's Instagram shows a
 3   relationship, and they refer to each other in a romantic
 4   relationship.
 5             THE COURT:  Okay, well, that's something different
 6   than what you said.
 7             MS. BRACEWELL:  Yeah, I should be more clear.
 8             THE COURT:  Okay.
 9             MS. BRACEWELL:  So our understanding, based on
10   both the arrest of the defendant, who was with this girl at
11   the time, and in addition, the social media -- a review of
12   the defendant's social media, publicly-available content,
13   is that the minor was involved with the defendant.
14             THE COURT:  Okay, although that's not part of the
15   charges in the case.
16             MS. BRACEWELL:  It's not part of the charges.  But
17   I just -- we have limited information available based on
18   the review of the defendant's phone.  But what we do know
19   is that the defendant has crossed over into action in the
20   sense that he is pursuing romantic relationships with
21   underage girls.
22             THE COURT:  Okay.  Mr. Sercarz, I think it's your
23   turn.
24             MR. SERCARZ:  Your Honor, perhaps I can do it this
25   way.  The defendant was interviewed by Pretrial Services
```

```
 1                    PROCEEDINGS                    14
 2  after his initial presentment to the complaint.  And with
 3  full knowledge of the allegations in the complaint and
 4  after a thorough-going interview with the defendant and his
 5  mother, Pretrial Services recommends that the defendant be
 6  released --
 7            THE COURT:  Hold on a second.  When you say "with
 8  full knowledge of the complaint," I'm not sure that's
 9  necessarily so.  My understanding -- I can be corrected if
10  I'm wrong -- is the Pretrial Services officer who prepares
11  the report often does not see the complaint, is that not
12  right?
13            PRETRIAL SERVICES:  Your Honor, I did not prepare
14  the report, but Officer Jonathan Laterre did.  So I can't
15  speak to --
16            THE COURT:  Do you typically see the complaint
17  when you prepare a report?  My understanding is you don't.
18            PRETRIAL SERVICES:  Sometimes we don't have time
19  to do that.
20            THE COURT:  Right.  I don't think we can assume
21  that.  Okay?
22            MR. SERCARZ:  I won't assume it.  Nonetheless, I
23  will note that Pretrial Services with a great deal of
24  experience in these matters --
25            THE COURT:  And if they had recommended detention,
```

```
 1                        PROCEEDINGS              15

 2   would you be talking about their great experience in these

 3   matters?  I don't think so.

 4            MR. SERCARZ:  I would be talking about why in this

 5   particular instance --

 6            THE COURT:  They were wrong.

 7            MR. SERCARZ:  -- they came up short.

 8            THE COURT:  I know.

 9            MR. SERCARZ:  But they have recommended release

10   pursuant to some very onerous conditions to which we are

11   prepared to consent.

12            With regard to risk of flight and dangerousness,

13   let me address dangerousness first, your Honor.  With

14   regard to the narcotics offense, a careful reading of the

15   complaint will demonstrate, first of all, that the

16   defendant is charged pursuant to (b)(1)(C).  There is no

17   mandatory minimum.  The defendant is not charged with

18   having provided the causal link to the death of any

19   particular individual.  And the government just made

20   reference to the 24-hour interval between the alleged sale

21   and the occasion upon which this individual was

22   unfortunately found to have suffered from a fatal drug

23   overdose.  But perhaps more importantly for the Court's

24   purposes, the conspiracy alleged in detail in the complaint

25   is one that involves -- it's a -- in essence, it's a hub-
```

| | PROCEEDINGS | 16 |

1
2 and-spoke conspiracy in which the hub is an individual
3 named in the complaint named Eakin Urkin, who is the one
4 who interacted with customers and referred them for the
5 purpose of making these sales. These are sales of
6 personal-use quantities of heroin. And in the complaint it
7 is Mr. Urkin, who in his conversations with potential
8 customers is touting the quality of the heroin.
9     THE COURT: But Ms. Bracewell told me that there's
10 communications with your client and the individual who
11 passed away. So --
12     MR. SERCARZ: There are some --
13     THE COURT: -- how do we reconcile the two?
14     MR. SERCARZ: And individual calls Mr. Urkin,
15 according to the complaint, and says, "I want drugs."
16 Mr. Urkin says, "You're going to have to pay me a tip. I'm
17 going to need to know something about you, and then I'm
18 going to refer you to somebody who's going to meet you and
19 sell you the heroin."
20     THE COURT: Okay.
21     MR. SERCARZ: And it is at this later stage that
22 my client is allegedly involved, that telephone traffic
23 allegedly intercepts my client engaged with the individual
24 who purchases the drugs.
25     THE COURT: Why is that a good fact for you?

```
 1                          PROCEEDINGS                    17

 2              MR. SERCARZ:  What is a good fact for me, I

 3     respectfully submit, is that in this instance, the

 4     customers were supplied by Mr. Urkin, and I have reason to

 5     believe that the drugs were also supplied with his

 6     participation.  I distinguish a case like this from one

 7     where, first of all, the defendant is involved in the sale

 8     of large quantities of drugs; and secondly, from one in

 9     which the defendant has a customer base or his own captive

10     source of the heroin.

11              The reason we're looking at the nature of the

12     crime is to make a determination of the likelihood that the

13     defendant will reoffend if he is subjected to the terms and

14     conditions of bail that are recommended by Pretrial

15     Services and that we would recommend.  And where we're

16     headed here, your Honor, is we're going to request that the

17     defendant be required to live in the home of his mother

18     subject to electronic monitoring, very close supervision,

19     and the like.  And I respectfully submit that in a

20     situation like that, the defendant is extremely unlikely to

21     reoffend.  He lacks the sources to attract customers, and

22     he lacks access to the drugs that were being sold, I

23     respectfully submit.

24              He --

25              THE COURT:  If someone has a drug problem and
```

PROCEEDINGS                    18

they're allowed to live in their mother's apartment and

their mother works, so the mother is not going to be

present in the apartment during the course of the day, what

is to prevent the individual who has a drug problem from

somehow trying to gain access to getting drugs, which then

would lead that person to contact the very people he's

alleged to have been involved with before he was charged?

        MR. SERCARZ:  The answer in this case is as

follows, your Honor.  The defendant's mother, Liz

Margolies, who is a psychotherapist, works out of her home.

I have spoken to her about ensuring that she is home for

virtually all of the day; and that if on a rare occasion

she is required to travel, she would have somebody else

living in the household.  The Pretrial Services Report

recommends that, in addition to signing the bond, that she

be obligated to report his disappearance --

        THE COURT:  As a third-party custodian.

        MR. SERCARZ:  That's right.

        THE COURT:  Yes.  But --

        MR. SERCARZ:  She --

        THE COURT:  -- the recommendation is for home

detention.  So home detention, as opposed to home

incarceration, suggests that Mr. Margolies, if he had a

job, could go to a job; if he were taking classes, he could

```
 1                    PROCEEDINGS                    19
 2   do that.  But I see no evidence that he either has a job,
 3   there's any prospect of a job or that he's taking any
 4   classes.  So why should it be home detention; why shouldn't
 5   it be home incarceration, if you appreciate the distinction
 6   I'm making?  Do you?
 7           MR. SERCARZ:  I do.  I do.  And here's -- first of
 8   all, if the Court rules that it wants a more stringent
 9   condition and it wants home incarceration, the defendant
10   will abide by that condition, and we will make steps to
11   make it happen.
12           But if I can just go a little bit further --
13           THE COURT:  Yes.
14           MR. SERCARZ:  -- and maybe a little bit of
15   background --
16           THE COURT:  Okay.
17           MR. SERCARZ:  -- about my client that will deal
18   both with the issue of risk of flight and why these
19   conditions will suffice, that would be --
20           THE COURT:  Go right ahead.  Take your time.
21           MR. SERCARZ:  Your Honor, there is in the Pretrial
22   Services Report reference to the defendant's mental health.
23   And without laboring the details in a public courtroom, I
24   will say that the defendant has been suffering from
25   symptoms that have led Ms. Margolies to have him repeatedly
```

```
 1                    PROCEEDINGS              20
 2  examined since the age of six years old.  I will also say
 3  that we have reason to believe the defendant was raped at
 4  the age of six and that this is, at least in some measure,
 5  responsible for much of the defendant's difficulty in
 6  adjusting to life throughout the aftermath.
 7            When the Court considers the charge of child
 8  pornography, I would point out -- and I think it's useful
 9  to do it right now -- the defendant is alleged primarily
10  with being an end-user of the pornography.  The defendant
11  is not alleged to have enticed young children to be
12  photographed in these kinds of poses, to have set them up,
13  to have made a business of selling this kind of child
14  pornography.  And I respectfully submit that any finding
15  that the defendant was involved in narcotics and/or child
16  pornography is a collateral consequence of the defendant's
17  mental health issues.  And I think that that's important.
18            I think it's also worthy of note that
19  Ms. Margolies, who is acutely aware of the defendant's
20  disabilities and difficulties, made an effort for the
21  defendant to get out of the environment that he was in in
22  New York, and it was at her behest, through her good
23  auspices, with her resources, that the defendant made a
24  trip to Israel pursuant to a birthright program.  That's
25  why he was there for a couple of months.
```

**A-274**

|    |                                                             |
|----|-------------------------------------------------------------|
| 1  | PROCEEDINGS                                    21           |
| 2  | The people with whom he resided in New Orleans              |
| 3  | were people that he met on the trip to Israel, and          |
| 4  | Ms. Margolies had the defendant apply to coding school in   |
| 5  | New Orleans, all in the effort to have him change his life, |
| 6  | get on a constructive course.  It has been a continuing     |
| 7  | ordeal for Ms. Margolies (indiscernible).  This defendant,  |
| 8  | while he has been abroad, while he has lived in another     |
| 9  | city, does not have the wherewithal, I respectfully submit, |
| 10 | to plan that kind of life apart from having the help and    |
| 11 | assistance of his family, which will now be in the position |
| 12 | of having to monitor his whereabouts and ensure that the    |
| 13 | defendant remains in the Margolies household.               |
| 14 | THE COURT:  What is the current status of his               |
| 15 | passport location?                                          |
| 16 | MR. SERCARZ:  Here's what I understand, your                |
| 17 | Honor.  At the time of his arrest, he surrendered his       |
| 18 | passport.  I have been told that somebody on his behalf     |
| 19 | went to New Orleans in the attempt to pick it up, and it    |
| 20 | was supposed to have been sent to Ms. Margolies,            |
| 21 | Ms. Margolies here in New York.  She does not have it yet.  |
| 22 | But, frankly, that --                                       |
| 23 | THE COURT:  Well, I'm confused, though; you said            |
| 24 | it was surrendered to law enforcement?                      |
| 25 | MR. SERCARZ:  That's -- this is what I have been            |

**A-275**

```
 1                    PROCEEDINGS              22
 2  told.
 3         THE COURT:  So if it's surrendered to law
 4  enforcement, they wouldn't be sending it to his mother;
 5  they would be sending it to the U.S. Attorney's Office.
 6         MR. SERCARZ:  Agreed.  That's why the explanation
 7  that I've been given is lacking.  I don't understand why
 8  that passport isn't sitting with the authorities in New
 9  Orleans.  But my client doesn't have it, Ms. Margolies does
10  not have it, we don't have it.
11         THE COURT:  Okay.
12         MR. SERCARZ:  The defendant doesn't have access to
13  it at the present time, and he'll understand that it would
14  be a violation of his bail conditions should he ever come
15  into position of the passport and fail immediately to turn
16  it over to me or to his mother or agents of law
17  enforcement.  And we abide by that condition, your Honor.
18         THE COURT:  All right, what do you say to
19  Ms. Bracewell's point about him crossing the into action,
20  if you will, with his interactions with minors?
21         MR. SERCARZ:  Your Honor, I -- let me preface this
22  by saying that I am not very facile with computers, but I
23  understand that the defendant's interest in this kind of
24  material led him to websites where, among other things, one
25  is capable of looking at images, sharing descriptions of
```

```
1                    PROCEEDINGS                    23
```

2  images with others; and if we're talking about the volume

3  of images that he had, I think that is in part the

4  explanation.  If we're talking about contact with minors, I

5  believe the minor that Ms. Bracewell is referring to is a

6  17-year-old young woman, and I believe that 17 -- and I'm

7  saying this subject to having somebody take a look -- is

8  the age of consent in Louisiana.  Does my client for

9  reasons relating to his psychiatric profile find it easier

10 to be in the company of people who are less old than he --

11 he is 26 years old and has never been convicted of a crime?

12 Yes, that may be true.  But, again, is there a danger of

13 reoffending under the present circumstances, given the

14 strictures of the proposed bail?  I respectfully submit

15 that there is not, your Honor.

16          And he did not have contact with this young lady

17 in Louisiana with a predatory intent.  Ms. Bracewell did

18 not make that representation, and I don't think that it is

19 consistent with the facts, your Honor.

20          THE COURT:  Is the defendant's mother present in

21 court?

22          MR. SERCARZ:  Yes, she is.

23          Liz, can you stand up?

24          THE COURT:  Can I ask you, Ms. Margolies, the

25 Pretrial Services office has recommended, among conditions,

**A-277**

| | PROCEEDINGS | 24 |

1

2 that you serve as a third-party custodian. Have you

3 discussed what that means with Mr. Sercarz were I to set

4 such a condition? Do you understand what that means?

5       MS. MARGOLIES: As far as I understand, it means

6 that if he breaks any of the restrictions that are imposed,

7 I must report it.

8       THE COURT: Okay. And you're prepared to accept

9 that responsibility?

10       MS. MARGOLIES: Okay. Thank you very much.

11       Anything else, Mr. Sercarz?

12       MR. SERCARZ: Your Honor, if there are any other

13 questions or concerns you have, I'm prepared to address

14 them.

15       THE COURT: Well, I want to read the complaint.

16 One of the main concerns that I think anyone sitting where

17 I'm sitting would have is the incident involving the person

18 who overdosed on drugs and the defendant's interaction with

19 that person and how, if at all, that should be accounted

20 for in evaluating dangerousness in a case like this. That

21 to me is what stands out, frankly, more than anything else.

22 And, obviously, you don't know all the facts, and I'm sure

23 Ms. Bracewell, frankly, doesn't know all the facts, either.

24 But I haven't even read what is charged in that regard from

25 the complaint, and I'd like to read that. And if you have

```
 1                    PROCEEDINGS                    25
 2   anything more you want to say about that, I think that's
 3   among the most serious things that have been raised and
 4   something that I have to ruminate over when I determine
 5   whether conditions really should be set or not set.
 6           MR. SERCARZ:  If this is what the Court has in
 7   mind, may I propose we take a brief recess for the Court to
 8   examine the complaint?
 9           THE COURT:  I am most definitely going to be
10   taking a recess, I can assure you of that.  I almost always
11   do that in any bail proceeding of this kind.
12           MR. SERCARZ:  May I request that, when the Court
13   takes the bench again, that if there are any further
14   questions, I be given an opportunity to address them?
15           THE COURT:  Sure.
16           MR. SERCARZ:  And in the meantime, I'll look this
17   over, as well.
18           THE COURT:  All right, that's fine.
19           Ms. Bracewell, can I ask you to submit a copy of
20   the complaint for me to review during the recess?
21           MS. BRACEWELL:  Sure, I certainly can.
22           THE COURT:  Okay.  What else would you like to
23   say?
24           MS. BRACEWELL:  I just --
25           THE COURT:  Well, hold on.
```

| 1 | PROCEEDINGS | 26 |

2          Were you finished otherwise?

3          MR. SERCARZ:  That's fine, your Honor.

4          THE COURT:  Okay.  Go right ahead.

5          MS. BRACEWELL:  I want to make just two clarifying

6     points.  One, with respect to Mr. Urkin, Eakin Urkin, and

7     Wolfe Margolies, their respective roles, our evidence, it's

8     very clear that Eakin Urkin functioned as an intermediary.

9     The communications with the undercover officer and as found

10    in the victim's phone show that Mr. Urkin provided a phone

11    number for a dealer in exchange for a tip.  And then the

12    dealers, like Mr. Margolies, proceeded to have

13    communications directly with the actual end consumers.

14         THE COURT:  The dealer not being Mr. Margolies?

15         MS. BRACEWELL:  Sorry -- yes, Mr. Margolies.

16    Mr. Urkin ran a -- referred other dealers to our undercover

17    over the course of this investigation.

18         THE COURT:  He was a referral service?

19         MS. BRACEWELL:  He was a --

20         THE COURT:  He referred dealers.  And you're

21    alleging that Mr. Margolies is the dealer in this

22    interaction?

23         MS. BRACEWELL:  Exactly.

24         THE COURT:  Okay.

25         MS. BRACEWELL:  And the interactions between the

**A-280**

1                    PROCEEDINGS                    27

2  customer, who ultimately ended up being the overdose

3  victim, were with Mr. Margolies.  So there was an exchange

4  between victim and Mr. Margolies in relation to the drug

5  sale.

6           THE COURT:  But Mr. Sercarz has said that the

7  government is not charging the defendant with a crime that

8  would include the death resulting from his conduct; is that

9  not accurate?

10          MS. BRACEWELL:  We have at this -- it's entirely

11 accurate that, as of now, he has been charged with a

12 (b)(1)(C) conspiracy.  But the allegations are set forth,

13 and we are considering it; it requires approval from the

14 supervisors in our office, which we have not yet obtained.

15 But the underlying allegations which support that charge

16 are set forth in the complaint.

17          THE COURT:  All right.  What else?

18          MS. BRACEWELL:  And then I just want to add one

19 more factual detail.  So with respect to the minor who was

20 in the company of the defendant at the time of his arrest

21 in New Orleans, my understanding from post -- her

22 statements made to the authorities, that she was 17 at that

23 time, but that she had been in communication with

24 Mr. Margolies since she was 16 years old and that he had

25 initially reached out to her through the internet and

```
 1                    PROCEEDINGS                    28
 2   solicited nude photographs from her.  That was her
 3   statement to law enforcement.  We're continuing to
 4   investigate it.  But I bring it up because I think home
 5   detention or home incarceration does not adequately account
 6   for the kind of danger that's posed when individuals have
 7   access to the internet and are able to solicit --
 8               THE COURT:  Well, if he doesn't have access to the
 9   internet, though -- and Pretrial Services is proposing that
10   he not have any access to the internet unless they approve
11   it -- and I'm told at least in the Pretrial Services Report
12   that the computer that his mother has is one that only she
13   can access by her fingerprint, which means that he couldn't
14   access her computer.  If she went out to go grocery
15   shopping, he couldn't get on it.  So there would be
16   limitations, presumably.  And if he somehow had a cell
17   phone or otherwise that had internet access, he would be in
18   violation of his conditions, and he'd find himself back in
19   the other side of that door.
20               MS. BRACEWELL:  It is true that there can be
21   limitations imposed on the internet.  I simply bring it up
22   because it's quite easy to access the internet through any
23   number of devices.  And so, to the extent that the
24   defendant can have access either through anybody else's
25   phone or through anybody else's computer or his own, I
```

```
 1                      PROCEEDINGS                    29
 2   just -- I think it presents a significant risk.
 3           THE COURT:  Well, but if we set a condition, it
 4   means he's violating the condition, and it means that he
 5   would be detained if there was a violation.
 6           MS. BRACEWELL:  It's difficult to monitor an
 7   internet restriction because of the ubiquity of those
 8   devices.  So --
 9           THE COURT:  I've had many cases with more serious
10   defendants -- with more serious charges facing defendants
11   in which we have set conditions along these lines.  So I'm
12   not worried about that per se because while no system is
13   infallible, defendants, you know, act at their own
14   jeopardy, if you will.  So that in and of itself doesn't
15   worry me.
16           What worries me, frankly, more here is the drug
17   charge here and his involvement and managing that because a
18   lot of that occurred in New York.  I gather, Mr. Sercarz,
19   was the defendant living with his mother at the time of the
20   alleged allegations in the complaint, or was he living
21   elsewhere?
22           MR. SERCARZ:  Your Honor, I'd have to ask
23   Ms. Margolies --
24           THE COURT:  Well, why don't you ask that because I
25   suspect the answer is he was at least in part under her
```

**A-283**

| | PROCEEDINGS | 30 |

1       PROCEEDINGS      30

2 supervision at that point.  If he wasn't, then I'd like to

3 know that.

4      Where was he living?

5      MR. SERCARZ:  The defendant indicates to me that,

6 when we're talking about the period from June 2017 to

7 January of 2019, the defendant was living in Harlem at that

8 time --

9      THE COURT:  Not with his mother.

10      MR. SERCARZ:  -- not with his mother.  But I want

11 to confirm that.

12      MS. MARGOLIES:  He has an apartment in Harlem.

13      THE COURT:  Okay.  All right.  Anything else?

14      MS. BRACEWELL:  Nothing further.

15      THE COURT:  All right.  Why don't you hand up the

16 complaint, and we'll take a recess.

17      (Recess taken.)

18      THE COURT:  First of all, I'd like to thank

19 everybody who came today on behalf of Mr. Margolies to show

20 your support.  That's never lost on the Court.  I always

21 think that's very important.  Especially his mother and all

22 of the other friends and family who are here, I appreciate

23 your coming and taking the time to show your support.

24      The decision as to whether someone should be

25 released on conditions is definitely the hardest decision

| 1 | PROCEEDINGS | 31 |

2   that magistrate judges have to make, especially when we do

3   it, you know, on a relatively short time frame on a record

4   that is, you know, only modestly developed by the nature of

5   the proceedings here. As I said, I hadn't even been given

6   the complaint to read -- but I have now read it.

7        Let me just say, perhaps in part for the benefit

8   of the people who are here in the audience, as well as for

9   Mr. Margolies, let me explain to you a little bit about how

10   the law works here. The statute that I have to apply is

11   called the Bail Reform Act. And in deciding whether there

12   are conditions of release that will reasonably assure the

13   appearance of the person and the safety of the community,

14   the Court is required to consider the following factors:

15   the nature and circumstances of the offense charged,

16   including whether the offense is a crime of violence or

17   involves a narcotic drug; the weight of the evidence

18   against the person; the history and characteristics of the

19   person, including the person's character, physical and

20   mental condition, family ties, employment, financial

21   resources, length of residence in the community, community

22   ties, past conduct, history related to drug or alcohol

23   abuse, criminal history, and the person's record, if it's

24   relevant, concerning their appearances at court

25   proceedings, and whether at any -- at the time of the

| | PROCEEDINGS | 32 |

1          

2 current offense or arrest, the person was on probation or

3 parole; and finally, the nature and seriousness of the

4 danger to any person or the community that would be posed

5 by the person's release.

6    I think, having just recited those factors, you

7 all can understand why I've just taken a lengthy recess,

8 because in considering all those factors here, there are a

9 number of things that give the Court a lot of pause.  The

10 nature and the circumstances of the offense charged here

11 are very serious.  And I've read the complaint, and this is

12 not a case of just someone who is alleged to be a drug

13 user; this is a case of someone who is alleged to be a drug

14 dealer.  Now, the government has not yet charged this

15 defendant, as Ms. Bracewell said, with responsibility for

16 the death of anyone, and they may never charge that, but

17 the allegations with respect to that charge are serious, as

18 are, obviously, any charge related to pornography, child

19 pornography possession, or worse.

20    Having said all of that and accounting for the

21 fact that the weight of the evidence against Mr. Margolies,

22 at least from reviewing the complaint, seems quite strong,

23 on the other side of the ledger are my assessment of the

24 defendant's history and characteristics, in particular, the

25 fact that he doesn't have a criminal history, in fact, that

```
1                    PROCEEDINGS                 33

2    he does have strong community ties, as are reflected by

3    everyone who's here today, as is reflected by the fact that

4    his mother is here and willing to serve as a third-party

5    custodian if I do set conditions.  And so I have been

6    struggling as to whether the result that Pretrial has

7    recommended and Mr. Sercarz has essentially adopted is the

8    right course of action or whether the government's

9    arguments with respect to detention should carry the day.

10   It's a very --

11          MR. SERCARZ:  Forgive me, your Honor, I need to

12   correct the record in one respect, and you may want to hear

13   it before you render your decision.  I just thought I ought

14   to let you know.

15          THE COURT:  Okay.

16          MR. SERCARZ:  Is now the time?

17          THE COURT:  I guess so.

18          MR. SERCARZ:  I apologize for interrupting you.

19          THE COURT:  Go ahead.

20          MR. SERCARZ:  You asked me a question about

21   whether or not my client was residing in the apartment with

22   Ms. Margolies.

23          THE COURT:  You said -- you told me he was

24   residing in Harlem.

25          MR. SERCARZ:  That's correct.  That is correct as
```

| 1 | PROCEEDINGS 34 |

2    to what I said.  I subsequently went out in the hall during

3    the recess with my client's mother; and as I understand the

4    facts, between August of 2018 and January of 2019, my

5    client was living intermittently with his mother,

6    Ms. Margolies.  However, I hasten to add that a review of

7    the complaint indicates that the sales that took place that

8    are described in the complaint took place between February

9    of 2018 and May of 2018, before my client commenced to live

10   intermittently with Ms. Margolies, his mother.  I wanted

11   you to have that for the record --

12           THE COURT:  Okay.  I think that's an important

13   fact because if I'm going to set conditions here and one of

14   them is that he maintains his residence at his mother's

15   apartment, if the evidence had been such that all of the

16   alleged activities had occurred while he was living under

17   her roof before, that would give the Court some greater

18   concern.  I assume that's why you're addressing it with the

19   precision that you are.

20           Okay.  So having sort of weighed everything in the

21   balance here and also mindful that -- well, let me say this

22   first.  I initially need to make a finding as to whether

23   the defendant presents a risk of flight if he's not

24   detained.  And if I do find that he is a risk of flight,

25   then the question becomes whether there are any conditions

```
 1                    PROCEEDINGS                    35
 2   or combinations of conditions which will reasonably assure
 3   his presence.  I think this case is one that is much more a
 4   danger case than a risk of flight case.  There's a modest
 5   issue with respect to risk of flight, given that
 6   Mr. Margolies has moved around a fair amount in the last
 7   couple of years, both with respect to his travel abroad to
 8   Israel and his living in New Orleans and the like; but I
 9   don't find, at least on the record presented before me,
10   that I could conclude that he is likely to flee, and
11   especially, even if I were to conclude that there is some
12   likelihood that he might flee, I think that the conditions
13   that Pretrial has proposed would reasonably assure his
14   presence.  So I do not find on the record before me that
15   the defendant is a risk of flight.
16            The danger to the community issue is the harder
17   question.  And I think what I want to say now is something
18   that's important for everybody to understand, which is that
19   the Bail Reform Act charges judicial officers with the
20   responsibility that, if there are any conditions or
21   combination of conditions that can be set, then I'm
22   obligated to do so.  It's only if I don't think there are
23   any set of conditions that can be set to assure the safety
24   of the community, then conditions have to be -- then no
25   conditions will be imposed.  I'm also mindful that the
```

```
 1                        PROCEEDINGS                    36
 2   legislative history of the act makes it clear that it's
 3   only a limited group of offenders who should be denied bail
 4   pending trial.
 5           This is a very close case, as I've now said a
 6   couple of times.  I think at the end of the day I'm
 7   prepared to set conditions, slightly more onerous, even,
 8   than what Pretrial has proposed.  And let me review with
 9   you what I plan to set as conditions.  And let me also say
10   I agree with Pretrial that the conditions that I am going
11   to set all must be met before the defendant can be
12   released.  And, moreover, since you all are seeing Judge
13   Wood in an hour, the government, should it choose to, can
14   appeal the conditions I'm about to set to Judge Wood either
15   in an hour or at some other proceeding that she wishes to
16   set because she may wish to get a transcript of this
17   proceeding -- and we don't have a court reporter; it is
18   being recorded, so it can be transcribed, and you all
19   obviously can summarize for her the nature of the arguments
20   and ultimately what the disposition is here, but you may
21   well want to have your own separate presentation before her
22   this afternoon.  But, obviously, I leave that to counsel,
23   and I leave that to Judge Wood.
24           But the conditions I'm going to set are the
25   following.  It's going to be a $200,000 bond; it's going to
```

```
 1                    PROCEEDINGS                    37
 2   be cosigned by three financially responsible persons; it's
 3   going to be secured by $10,000 in cash.  The defendant is
 4   going to be subject to strict pretrial supervision, which
 5   will include home incarceration, as opposed to home
 6   detention, to make that distinction.
 7          And let me pause there to say precisely what home
 8   incarceration means.  Home incarceration means essentially
 9   that the defendant cannot leave the residence except to
10   come to court, to meet with his attorney or to meet any
11   medical appointments he may have, with the permission of
12   Pretrial Services.  Otherwise, he's essentially restricted
13   to the residence.
14          He is to surrender any travel documents that may
15   come into his possession.  We've had that colloquy about
16   that already.  I gather he doesn't currently have his
17   passport; he may not have his passport in the future, but
18   to the extent they come into his possession or his family's
19   possession, they must be surrendered.  And he may make no
20   new applications.  His travel is restricted to the Southern
21   and Eastern Districts of New York.  But it's really
22   restricted beyond that for purposes of the conditions I've
23   set because of home incarceration.
24          As we've also discussed previously, his mother
25   will serve as a third-party custodian.  I have satisfied
```

PROCEEDINGS                              38

myself, based on the earlier discussions we had, that she
understands what that entails.  And Pretrial Services can
educate her even further beyond that.

        The defendant is to maintain his residence at his
mother's apartment, and he cannot relocate unless Pretrial
Services would permit that.

        He is to be subject both to drug testing and
treatment and mental health evaluation and treatment as
directed by Pretrial.

        Very importantly, he is not to have any internet
access available to him.  And let me be more precise than
that.  He is not to have any cellular device, phone or
computer or anything that would have any internet access
available to him in his possession.  It's been represented
to the Court that his mother's computer is individually
protected, I'll say, so that only she has access to it.
And I am assuming that for these purposes, which means that
Mr. Margolies cannot have any access to the computer, and
his mother has to be vigilant in ensuring when she is not
utilizing it, it is not left open or accessible in any way.
I am told there is a landline in the apartment, and the
landline is the way that the Pretrial Services officer will
expect to have communications with Mr. Margolies.  But I do
not anticipate there being the need for Mr. Margolies to

PROCEEDINGS                    39

have any access to any means of communication. Another

concern I have is any communication he might have using the

landline with individuals, and so I am precluding him from

making outgoing calls unless it is to Pretrial Services or

to a medical professional in terms of some sort of

treatment he is receiving. But other than that, he cannot

be utilizing the phone.

He may also not possess, subscribe to or view any

media depicting children in the nude and/or in sexually

explicit positions. He is to have no contact with any

alleged victims and potential witnesses. He is to have no

contact with his co-defendant unless in the presence of

counsel. He is to have no unsupervised contact with

minors, and he is to refrain from possessing a firearm,

destructive device or other dangerous weapon. And as I

said earlier, he'll be detained until all of these

conditions are met.

So, Mr. Margolies, I want to make it clear to you

that, as I've said, it's a very close case. I am erring on

the side of setting these conditions, but I want to be

crystal clear with you that, if you violate any of them,

you will face a separate crime, which is called bail

jumping, which is a felony. And if you are found to have

violated any of these conditions, I or Judge Wood or

```
1                    PROCEEDINGS                40
2    another magistrate judge, whoever it may be brought to,
3    will undoubtedly remand you to detention.  So I want to
4    make sure you understand how important it is that you
5    comply with these conditions.  And, in addition, you'll be
6    putting your mother, financially and otherwise, in jeopardy
7    and others who signed the bond in jeopardy, as well.  So do
8    you understand all of that?
9            MR. WOLFE MARGOLIES (THE DEFENDANT):  Yes.
10           THE COURT:  Okay.  All right.  So that is my --
11   those are the conditions that I'm going to set.  And,
12   Ms. Bracewell, if you want to appeal them, you can talk to
13   Judge Wood about that in 45 minutes.
14           MS. BRACEWELL:  One clarification question.
15           THE COURT:  Yes
16           MS. BRACEWELL:  So with respect to the home
17   incarceration, will that be enforced by any kind of
18   location --
19           THE COURT:  Electronic monitoring.
20           MS. BRACEWELL:  Electronic monitoring.  Thank you.
21           THE COURT:  I'm sorry, by GPS monitoring.
22           MS. BRACEWELL:  GPS.
23           THE COURT:  Yes.  I'm sorry, I meant to say that.
24           MR. SERCARZ:  Your Honor, one question?
25           THE COURT:  Yes.
```

```
 1                    PROCEEDINGS                 41

 2              MR. SERCARZ:  With regard to those parties that

 3    Mr. Margolies is permitted to call on the landline, does

 4    that include defense counsel?

 5              THE COURT:  Yes, yes.  Defense counsel, Pretrial,

 6    medical professionals.  Okay?

 7              Anything else from the government at this time?

 8              MS. BRACEWELL:  Nothing.  Thank you, your Honor.

 9              THE COURT:  Anything else, Mr. Sercarz?

10              MR. SERCARZ:  No.  Thank you very much for your

11    time.

12              THE COURT:  All right.  Have a good day,

13    everybody.

14              (Whereupon, the matter is adjourned.)

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                                              42
 2
 3                     C E R T I F I C A T E
 4
 5          I, Carole Ludwig, certify that the foregoing
 6  transcript of proceedings in the case of USA v. Margolies,
 7  Docket #19-cr-00178-KMW All Defendants, was prepared using
 8  digital transcription software and is a true and accurate
 9  record of the proceedings.
10
11
12
13  Signature_____
14                  Carole Ludwig
15  Date:    July 13, 2020
16
17
18
19
20
21
22
23
24
25
```

A-296

AO 245B (Rev. 09/19)    Judgment in a Criminal Case    (form modified within District on Sept. 30, 2019)
Sheet 1

UNITED STATES DISTRICT COURT

Southern District of New York

| | |
|---|---|
| USDC SDNY | |
| DOCUMENT | |
| ELECTRONICALLY FILED | |
| DOC #: _____ | |
| DATE FILED: 1/7/20 | |

UNITED STATES OF AMERICA

v.

WOLFE MARGOLIES

)
)
)
)
)
)
)
)
)

JUDGMENT IN A CRIMINAL CASE

Case Number:  19 CR 178 (KMW)

USM Number:  37756-034

Maurice Sercarz, Esq. (AUSA Mary Bracewell)
Defendant's Attorney

**THE DEFENDANT:**

☑ pleaded guilty to count(s)    1 (one) and 2 (two)

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☐ was found guilty on count(s) _____
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21 USC 846 [21 USC 841(b)(1)(C) | Conspiracy to Possess with Intent to Distribute Heroin | 1/31/2019 | 1 |
| 18 USC 2252A(a)(5)(B) and (b)(2) | Possession of Child Pornography | 1/31/2019 | 2 |

The defendant is sentenced as provided in pages 2 through ___8___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

12/2/2019
Date of Imposition of Judgment

_Kimba M. Wood_
Signature of Judge

KIMBA M. WOOD, U.S.D.J.
Name and Title of Judge

1/7/20
Date

**A-297**

Case 1:19-cr-00178-KMW   Document 47   Filed 01/07/20   Page 2 of 8

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

| | Judgment — Page | **2** | of | **8** |

DEFENDANT:   WOLFE MARGOLIES
CASE NUMBER:   19 CR 178 (KMW)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
168 months on each of Counts 1 and 2, to run concurrently.

☑ The court makes the following recommendations to the Bureau of Prisons:

The Court recommends to the Bureau of Prisons that the defendant be incarcerated at FCI Danbury, and be allowed to participate in the Resolve and RDAP programs.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ ☐ a.m. ☐ p.m.   on _____ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on _____ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____   to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

A-298

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
     Sheet 3 — Supervised Release

| | | | |
|---|---|---|---|
| | Judgment—Page | 3 | of | 8 |

DEFENDANT:   WOLFE MARGOLIES
CASE NUMBER:   19 CR 178 (KMW)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

  3 years on Count 1, and 5 years on Count 2, to run concurrently.

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   - ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.   ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.   ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.   ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

Case 1:19-cr-00178-KMW   Document 47   Filed 01/07/20   Page 4 of 8

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

| | | | |
|---|---|---|---|
| | Judgment—Page | 4 | of | 8 |

DEFENDANT:  WOLFE MARGOLIES
CASE NUMBER:  19 CR 178 (KMW)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.  You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____   Date _____

A-300

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3B — Supervised Release

| | Judgment—Page | 5 | of | 8 |

DEFENDANT:   WOLFE MARGOLIES
CASE NUMBER:   19 CR 178 (KMW)

## ADDITIONAL SUPERVISED RELEASE TERMS

You must not have deliberate contact with any child under 18 years of age, unless approved by the U.S. Probation Office. You must not loiter within 100 feet of places regularly frequented by children under the age of 18, such as schoolyards, playgrounds, and arcades. You must not view and/or access any web profile of users under the age of 18. This includes, but is not limited to, social networking websites, community portals, chat rooms or other online environment (audio/visual/messaging), etc. which allows for real time interaction with other users, without prior approval from your probation officer.

You are restricted from viewing, accessing, possessing, and/or downloading any sexually explicit material involving minors, including those created via the method of morphing or other image creation format. You will not view or possess any "visual depiction" (as defined in 18 USC 2256), including any photograph, film, video, picture, or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of "sexually explicit conduct" by a minor under the age of 18.

The defendant will not access any websites, chatrooms, instant messaging, or social networking sites where the defendant's criminal history-including this conviction-would render such access in violation of the terms of service of that website, chatroom, instant messaging, or social networking site.

The defendant shall be supervised by the district of residence.

**A-301**

Case 1:19-cr-00178-KMW   Document 47   Filed 01/07/20   Page 6 of 8

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

| | Judgment—Page 6 of 8 |

DEFENDANT: WOLFE MARGOLIES
CASE NUMBER: 19 CR 178 (KMW)

## SPECIAL CONDITIONS OF SUPERVISION

The standard and mandatory conditions of supervised release apply, along with the following special conditions:

You shall submit your person, and any property, residence, vehicle, papers, computer, other electronic communication, data storage devices, cloud storage or media, and effects to a search by any United States Probation Officer, and if needed, with the assistance of any law enforcement. The search is to be conducted when there is reasonable suspicion concerning violation of a condition of supervision or unlawful conduct by the person being supervised. Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search shall be conducted at a reasonable time and in a reasonable manner.

You will participate in an outpatient treatment program approved by the United States Probation Office, which program may include testing to determine whether you have reverted to using drugs or alcohol. You must contribute to the cost of services rendered based on your ability to pay and the availability of third-party payments. The Court authorizes the release of available drug treatment evaluations and reports, including the presentence investigation report, to the substance abuse treatment provider.

You must participate in an outpatient mental health treatment program approved by the United States Probation Office. You must continue to take any prescribed medications unless otherwise instructed by the health care provider. You must contribute to the cost of services rendered based on your ability to pay and the availability of third-party payments. The Court authorizes the release of available psychological and psychiatric evaluations and reports, including the presentence investigation report, to the health care provider.

You shall undergo a sex-offense-specific evaluation and participate in an outpatient sex offender treatment and/or outpatient mental health treatment program approved by the U.S. Probation Office. You shall abide by all rules, requirements, and conditions of the sex offender treatment program(s), including submission to polygraph testing and refraining from accessing websites, chatrooms, instant messaging, or social networking sites to the extent that the sex offender treatment and/or mental health treatment program determines that such access would be detrimental to your ongoing treatment. You will not view, access, possess, and/or download any pornography involving adults unless approved by the sex-offender specific treatment provider. You must waive your right of confidentiality in any records for mental health assessment and treatment imposed as a consequence of this judgment to allow the U.S. Probation Office to review the course of treatment and progress with the treatment provider. You must contribute to the cost of services rendered based on your ability to pay and the availability of third-party payments. The Court authorizes the release of available psychological and psychiatric evaluations and reports, including the presentence investigation report, to the sex offender treatment provider and/or mental health treatment provider.

You shall permit the U.S. Probation Office to install any application or software that allows it to survey and/or monitor all activity on any computer(s), automated service(s), or connected devices that you will use during the term of supervision and that can access the internet (collectively, the "Devices"), and the U.S. Probation Office is authorized to install such applications or software. Tampering with or circumventing the U.S. Probation Office's monitoring capabilities is prohibited. To ensure compliance with the computer monitoring condition, you must allow the probation officer to conduct initial and periodic unannounced examinations of any Device(s) that are subject to monitoring. You must notify any other people who use the Device(s) that it is subject to examination pursuant to this condition. You must provide the U.S. Probation Office advance notification of planned use of any Device(s), and will not use any Device(s) without approval until compatibility (i.e., software, operating system, email, web-browser) is determined and installation is completed. Applications for your Device(s) shall be approved by the U.S. Probation Office once the Probation Office ensures compatibility with the surveillance/monitoring application or software. Websites, chatrooms, messaging, and social networking sites shall be accessed via the Device(s) web browser unless otherwise authorized. You will not create or access any internet service provider account or other online service using someone else's account, name, designation or alias. You will not utilize any peer-to-peer and/or file sharing applications without the prior approval of your probation officer. The use of any Device(s) in the course of employment will be subject to monitoring or restriction as permitted by the employer.

**A-302**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page    7    of    8

DEFENDANT: WOLFE MARGOLIES
CASE NUMBER: 19 CR 178 (KMW)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 200.00 | $ | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| **TOTALS** | $ _____ 0.00 | $ _____ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

     ☐ the interest requirement is waived for the    ☐ fine    ☐ restitution.

     ☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

A-303

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

DEFENDANT:  WOLFE MARGOLIES
CASE NUMBER:  19 CR 178 (KMW)

Judgment — Page ___8___ of ___8___

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ __200.00__ due immediately, balance due

      ☐  not later than _____ , or
      ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
      term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
      imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number Defendant and Co-Defendant Names (including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**A-304**

Local Criminal Notice of Appeal Form.

**NOTICE OF APPEAL**
**United States District Court**

_____SOUTHERN_____ District of __NEW YORK__

UNITED STATES OF AMERICA

v.

WOLFE MARGOLIES

Docket No.: __19 CR 178__

Hon. __KIMBA M. WOOD__
(District Court Judge)

Notice is hereby given that __WOLFE MARGOLIES__ appeals to the United States Court of Appeals for the Second

Circuit from the judgment [_____], other __XX__ __SENTENCE__
(specify)

entered in this action on __12/2/2019__
(date)

Offense occurred after November 1, 1987     Yes [✓]    No [ ]

This appeal concerns: Conviction only [ ]    Sentence only [✓]    Conviction and Sentence [ ]

Date __JANUARY 8, 2020__
TO

__MAURICE H. SERCARZ__
(Counsel for Appellant)

Address  __SERCARZ & RIOPELLE LLP__

__810 SEVENTH AVENUE, STE. 620__

__NEW YORK, NEW YORK 10019__

ADD ADDITIONAL PAGE (IF NECESSARY)     Telephone Number: __212-586-4900__

| TO BE COMPLETED BY ATTORNEY | TRANSCRIPT INFORMATION - FORM B |
|---|---|

▶ **QUESTIONNAIRE**      ▶ **TRANSCRIPT ORDER**      ▶ DESCRIPTION OF PROCEEDINGS FOR WHICH TRANSCRIPT IS REQUIRED (INCLUDE DATE)

[✓] I am ordering a transcript
[ ] I am not ordering a transcript
  Reason
  [ ] Daily copy is available
  [ ] U.S. Attorney has placed order
  [ ] Other. Attach explanation

Prepare transcript of
[ ] Prepare proceedings
[ ] Trial
[✓] Sentencing  December 2, 2019
[ ] Post-trial proceedings

Dates

The attorney certifies that he/she will make satisfactory arrangements with the court reporter for payment of the cost of the transcript. (FRAP 10(b)). ▶
Method of payment     [ ] Funds [✓]     CJA Form 24 [ ]

ATTORNEY'S SIGNATURE     DATE __1/8/2020__

▶ **COURT REPORTER ACKNOWLEDGMENT**     To be completed by Court Reporter and forwarded to Court of Appeals.

| Date order received | Estimated completion date | Estimated number of pages |
|---|---|---|
| | Date _____   Signature _____ (Court Reporter) | |

**DISTRIBUTE COPIES TO THE FOLLOWING:**

1. Original to U.S. District Court (Appeals Clerk).
2. Copy U.S. Attorney's Office.
3. Copy to Defendant's Attorney

4. U.S. Court of Appeals
5. Court Reporter (District Court)

USCA-2
FORM A REV. 8-05

**A-305**

Case 1:19-cr-00178-KMW   Document 48   Filed 01/09/20   Page 2 of 2

```
Court Name: District Court
Division: 1
Receipt Number: 465401252023
Cashier ID: Swooten
Transaction Date: 01/09/2020
Payer Name: SERCARZ RIOPELLE LLP
------------------------------------
NOTICE OF APPEAL/DOCKETING FEE
 For: WOLFE MARGOLIES
 Amount:        $505.00
------------------------------------
CHECK
 Check/Money Order Num: 218
 Amt Tendered: $505.00
------------------------------------
Total Due:       $505.00
Total Tendered: $505.00
Change Amt:      $0.00

19CR00178
```

A-306

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED:   1/17/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA,

              -against-

WOLFE MARGOLIES,

                     Defendant.

-------------------------------------------------------X

19-CR-178 (KMW)
22-CV-3489 (KMW)

**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge:

    Petitioner Wolfe Margolies, proceeding *pro se*, moves to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (Pet'r's Mot., ECF No. 50.) Margolies argues that his Sixth Amendment right to effective assistance of counsel was violated because defense counsel failed to competently advise him during the plea-bargaining process. (*Id.*) Margolies moves for appointment of counsel to represent him during this habeas proceeding. (Pet'r's Mot. for Counsel, ECF No. 51.) Margolies also moves for authorization to hire a toxicologist or pathologist to investigate matters related to his sentencing. (Pet'r's Suppl. Mot., ECF No. 54.) For the reasons below, Margolies' motions are DENIED.

**BACKGROUND**

    Margolies was a drug dealer in Queens, New York. (Presentence Investigation Rep. ("PSR") ¶¶ 13-16, ECF No. 39.) Law enforcement linked Margolies to a February 2018 heroin overdose death after finding text messages on the victim's phone indicating that the victim had purchased heroin from Margolies the day before his death. (*Id.* ¶¶ 17-22.) Law enforcement officials conducted a search of Margolies's cell phone and discovered images and a video file constituting child pornography. (*Id.* ¶¶ 23-33.) Margolies was charged with conspiracy to

distribute heroin in violation of 21 U.S.C. §§ 846, 841(b)(1)(C) ("Count One") and possession of

child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B), (b)(2) ("Count Two").  (ECF No.

12.)

On June 24, 2019, Margolies appeared before Magistrate Judge Lehrburger and pleaded

guilty to both counts pursuant to a plea agreement with the Government.  (Plea Agreement, ECF

No. 53-1; Plea Tr., ECF No. 33.)  The Plea Agreement stipulated that the offense level for Count

One was 38 because a death resulted from the use of the heroin.  (Plea Agreement at 3.)  With

respect to Count Two, the Plea Agreement stated that the offense level was 26.  (*Id.* at 3.)  Given

that the offense level for Count One was at least nine levels higher than the offense level for

Count Two, the Plea Agreement properly provided for Count Two to be disregarded for the

purposes of calculating the combined offense level.  (*Id.; see* U.S.S.G. § 3D1.4(c).)  This

resulted in a combined offense level of 35 after applying a three-point reduction for Margolies's

acceptance of responsibility.  (Plea Agreement at 3.)  The Plea Agreement stipulated that the

Sentencing Guidelines range was 168 to 210 months' imprisonment.  (*Id.* at 4.)

During his plea allocation, Margolies swore under oath that he had an opportunity to

confer with his attorney about his case and that he was satisfied with his attorney's

representation.  (Plea Tr. 6:7-15.)  Margolies confirmed that he had read the Plea Agreement,

discussed it with his attorney, and understood its contents.  (*Id.* 13:16-14:6.)  He stated that he

understood the charges to which he was pleading guilty, the rights he was giving up, and that his

Plea Agreement included a stipulated Guidelines range of 168-210 months' imprisonment.  (*Id.*

6:24-9:19; 13:13-15; 14:7-14.)  He attested that he was pleading guilty because he was guilty of

distributing heroin to various individuals, including the overdose victim, and of possessing child

pornography.  (*Id.* 17:18-19:4.)

2

Based on these affirmations, Magistrate Judge Lehrburger concluded that Margolies was "competent to enter an informed guilty plea," that he "underst[ood] [his] rights. . . [and] the consequences of his plea," and that he was "voluntarily pleading guilty." (*Id.* 22:19-23:3.) This Court subsequently accepted Margolies's guilty plea on Magistrate Judge Lehrburger's recommendation and sentenced Margolies to 168 months' imprisonment. (*See* ECF Nos. 32, 45.)

## LEGAL STANDARD

Pursuant to 28 U.S.C. § 2255(a), a federal prisoner may move to "vacate, set aside, or correct [his] sentence" if he believes his "sentence was imposed in violation of the Constitution or laws of the United States." 28. U.S.C. § 2255(a). A petitioner may properly raise an ineffective assistance of counsel claim in a § 2255 motion. *See Massaro v. United States*, 538 U.S. 500, 508 (2003); *United States v. DeLaura*, 858 F.3d 738, 743-44 (2d Cir. 2017). Such a motion requires a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

To succeed on an ineffective assistance of counsel claim, a petitioner must show that: (1) his "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms," and (2) he was "prejudiced" by his counsel's deficient performance. *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir 2005) (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). When considering the first prong, courts "strongly presume[] [that counsel] rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Jackson v. Conway*, 763 F.3d 115, 152 (2d Cir. 2014) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011)). With respect to the second prong,

3

courts consider whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 153 (quoting *Strickland*, 466 U.S. at 694.)

## DISCUSSION

The Sixth Amendment right to counsel extends to the plea-bargaining process. *Lafler v. Cooper*, 566 U.S. 156, 162 (2012). Margolies argues that habeas relief is warranted because his attorney failed to competently represent him during plea negotiations. First, Margolies argues that his counsel "failed to inform him that had he gone to trial on the heroin count . . . his offense level would have been 12," not 38, because the Government would have been unable to prove that his drug dealing caused the victim's death. (Pet'r's Mem. at 8-9, ECF No. 50.) According to Margolies, his counsel should have "independently obtain[ed] a copy of the [victim's] autopsy, toxicology, police reports, and/or witness statements" instead of accepting the Government's position that Margolies's sale of heroin caused the victim's death for the purposes of advising him during plea negotiations. (*Id.*) Second, Margolies claims that his attorney neglected to advise him that he had an affirmative defense to the child pornography charge pursuant to § 18 U.S.C. 2252A(d). (*Id.* at 8.)[1]

Margolies moves for appointment of counsel to represent him during this habeas proceeding. (Pet'r's Mot. for Counsel.) Margolies also moves for the appointment of a toxicologist or pathologist to investigate the victim's death which resulted in the base offense level of 38 for Count One. (Pet'r's Suppl. Mot.) The Court will address the need for a hearing,

---

[1] Section 2252A(d) provides that a defendant has an affirmative defense to a child pornography charge if he: (1) "possessed less than three images of child pornography" and (2) "promptly and in good faith . . . took reasonable steps to destroy each such image . . . or reported the matter to a law enforcement agency and afforded that agency access to each such image." 18 U.S.C. § 2252A(d).

4

Margolies's motion for counsel, and Margolies's request for an expert before turning to the merits of Margolies's § 2255 motion.

**I.      No Hearing is Required to Rule on Margolies's § 2255 Motion.**

Section 2255 requires a court to grant a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). In assessing whether a hearing is warranted, a court "looks primarily to the affidavit or other evidence proffered in support of the application in order to determine whether, if the evidence should be offered at a hearing, it would be admissible proof entitling the petitioner to relief." *Dalli v. United States*, 491 F.2d 758, 760 (2d Cir. 1974). Based on the parties' submissions, the Court finds that no hearing is required.

First, the record is sufficient to dispose of Margolies's argument that counsel failed to adequately advise him as to the consequences of, and alternatives to, pleading guilty to Count One. During his plea allocation, Margolies stated that he had discussed his case with his attorney, that he understood the consequences of pleading guilty, and that he was well-informed about the contents of his Plea Agreement. (Plea Tr. 6:7-15; 13:16-14:12.) Additionally, Margolies confirmed that he understood that he had a right to plead not guilty and go to trial, where the government would be required to prove all elements beyond a reasonable doubt. (*Id.* 7:2-8:21.) Margolies's statements are preserved in the record, and the parties do not present any new information that raises a dispute as to these facts.

Second, as to Margolies's argument that his attorney should have informed him that he had an affirmative defense to Count Two, the record is also sufficient to make a determination. As discussed below, the facts agreed to by the parties in the Presentence Investigation Report demonstrate that Margolies could not have satisfied the elements of a § 2252A(d) affirmative

A-311

defense.  (*See* PSR.)  Furthermore, even if Margolies could have met the requirements for a §

2252A(d) affirmative defense, that would not have impacted his stipulated Sentencing

Guidelines because the Plea Agreement disregarded the child pornography charge for the

purposes of calculating Margolies's combined offense level.  (Plea Agreement at 3.)

Since additional testimony would not clarify or meaningfully add to the record, the Court

concludes that the written submissions are sufficient, and no hearing is required.  Doing so

"avoid[s] the delay, the needless expenditure of judicial resources, the burden on trial counsel

and the government . . . that would have resulted from a full testimonial hearing."  *Chang v.*

*United States*, 250 F.3d 79, 86 (2d Cir. 2001).

## II.    As No Hearing is Required to Resolve Margolies's § 2255 Motion, the Court Does Not Need to Appoint Counsel.

Margolies moves for appointment of counsel to represent him in proceedings related to

his § 2255 motion.  (Pet'r's Mot. for Counsel.)  In a habeas corpus proceeding, the appointment

of counsel is discretionary.  28 U.S.C. § 2255(g).  Where an evidentiary hearing is unnecessary,

courts generally find that the appointment of counsel is not warranted.  *See, e.g.*, *Snyder v.*

*Graham*, No 09-CV-10307, 2010 WL 3469847, *1 (S.D.N.Y. July 22, 2010) (Fox, J.).  Here,

because a hearing is not required to rule on the issues presented in Margolies's § 2255 motion,

Margolies's motion for counsel is denied.

## III.    Margolies's Request for an Expert Pathologist or Toxicologist is Unwarranted.

Margolies moves for appointment of a pathologist or toxicologist to obtain and analyze

the toxicology, autopsy, and police reports for the victim whose death resulted in a base offense

level of 38 for Count One.  (*See* Pet'r's Suppl. Mot.)  Margolies contends that, if an expert were

to conclude that there was insufficient evidence to prove that Margolies's dealing was the cause

6

of the victim's death, such a conclusion would strengthen his claim that he was prejudiced by his counsel's deficient performance.  (*Id.*)  Because Margolies's request for an expert report essentially amounts to a discovery demand, Margolies's motion is denied.

A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course and must show "good cause" for every discovery request.  *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).  To establish good cause, a petitioner must present "specific allegations" that give the Court "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief."  *Id.* at 908-09.

Here, there is no reason to believe that an expert report would indicate that Margolies's dealing was not the cause of the victim's death.  There is extensive evidence in the record establishing Margolies's culpability for the victim's death, including text messages showing that the victim bought heroin from the defendant 18 hours before his death and a medical examiner's report concluding that the victim's death was caused by acute heroin intoxication.  (PSR at ¶¶ 19-22.)  Furthermore, Margolies admitted during this plea allocution that he sold heroin to the victim resulting in the victim's overdose.  (*See* Plea Tr. 18:2-19:2; *see also* Plea Agreement.)  Accordingly, the Court denies Margolies's motion for an expert pathologist or toxicologist.

**IV.  Margolies's Arguments for Habeas Relief Lack Merit.**

In his § 2255 motion, Margolies argues that his attorney failed to competently represent him during plea negotiations in two ways.  First, Margolies alleges that his counsel "failed to inform him that had he gone to trial on the heroin count . . . his offense level would have been 12," not 38, because the Government would have been unable to prove that his drug dealing caused the victim's death.  (Pet'r's Mem. at 8-9.)  Second, Margolies claims that his attorney did not advise him that he had an affirmative defense as to the child pornography charge.  (*Id.*)  Both

7

**A-313**

of Margolies's arguments lack merit.

### A. Margolies Knowingly and Intelligently Pled Guilty to Count One.

As to Count One, Margolies essentially argues that his attorney neglected to inform him that he could have received a lower offense level if he went to trial rather than pleading guilty pursuant to the Plea Agreement.  Liberally construed, Margolies's claim amounts to an allegation that his plea to Count One was not made knowingly and intelligently.  It is well-settled law that a plea is invalid if it is not made knowingly and intelligently.  *See Wilson v. McGinnis*, 413 F.3d 196, 199 (2d Cir. 2005) (citing *Brady v. United States*, 397 U.S. 742, 748 (1970)).  When deciding whether a plea was made knowingly and intelligently, a district court may look to the plea allocation transcript.  "[S]worn testimony given during a plea colloquy 'carries such a strong presumption of accuracy that a district court does not, absent a substantial reason to find otherwise, abuse its discretion in discrediting later self-serving and contradictory testimony as to whether a plea was knowingly and intelligently made.'"  *United States v. Rivernider*, 828 F.3d 91, 105 (2d Cir. 2016) (quoting *United States v. Juncal*, 245 F.3d 166, 171 (2d Cir. 2001)).

During his plea allocation, Margolies made many statements under oath demonstrating that he understood his Plea Agreement, the consequences of pleading guilty, and the alternatives to entering a guilty plea.  Specifically, Margolies affirmed that he was "satisfied with [his] attorney's representation," that he "had enough time to talk about the case with [his] attorney and how [he] wish[ed] to plead," and that "[his] attorney told him the consequences of pleading guilty."  (Plea Tr. 6:7-15.)  He also affirmed that he had read and discussed his Plea Agreement with his attorney and that he "underst[ood] [its] terms and conditions," which included a stipulated base offense level of 38 for Count One and a guidelines range of 168 to 210 months' imprisonment.  (*Id.* 13:16-14:14.)  Additionally, Margolies confirmed that he was

8

aware that he had a right to plead not guilty and go to trial, where he would be presumed

innocent and the government would be required to prove all elements beyond a reasonable doubt.

(*Id.* 7:2-8:21.)

Based on such statements, Magistrate Judge Lehrburger concluded that Margolies was

"competent to enter an informed guilty plea," and that he "underst[ood] [his] rights . . . [and] the

consequences of his plea." (*Id.* 22:19-23:3.)  Accordingly, this Court declines to credit

Margolies's present self-serving argument that he did not knowingly and intelligently plead

guilty to Count One.

**B.  Margolies Did Not Have an Affirmative Offense as to Count Two.**

In addition, Margolies contends that his attorney was ineffective in neglecting to advise

him that he had an affirmative defense as to the child pornography charge pursuant to 18 U.S.C.

§ 2252A(d).  Since Margolies could not have satisfied the elements for a § 2252A(d) affirmative

defense, this argument also fails.

Section 2252A(d) provides that a defendant has an affirmative defense to a child

pornography charge if he: (1) "possessed less than three images of child pornography" and (2)

"promptly and in good faith . . . took reasonable steps to destroy each such image . . . or reported

the matter to a law enforcement agency and afforded that agency access to each such image." 18

U.S.C. § 2252A(d).  Here, the Presentence Investigation Report shows that Margolies possessed

greater than three images of child pornography[2] on his phone.  (PSR ¶¶ 23-32.)  There is no

evidence that Margolies took reasonable steps to destroy the images or report them to law

enforcement personnel.  (*Id.*)  Because Margolies could not have met the requirements for a

---

[2] The parties dispute the exact number of pornographic images that were on Margolies's phone.  Law enforcement
contends that Margolies's phone contained "approximately 35,000 images constituting child erotica." (PSR ¶ 30).
Margolies maintains that only some of those images constituted child pornography.  (*Id.*)

**A-315**

Section 2252A(d) affirmative defense, his counsel was not ineffective in neglecting to advise him that he had an affirmative defense as to Count Two.  Moreover, Margolies was not prejudiced by his counsel's decision not to raise such a defense.

## CONCLUSION

For the foregoing reasons, Margolies's motions are DENIED.  Because Margolies has not made a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability.  *See* 28 U.S.C. § 2253.  Furthermore, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that an appeal from this Order would not be taken in good faith and thus Margolies may not proceed *in forma pauperis* for any such appeal.  *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Clerk is respectfully directed to close the motions at ECF Nos. 50, 51, and 54.

SO ORDERED.

Dated: New York, New York
       January 17, 2023                                  _/s/ Kimba M. Wood_
                                                         KIMBA M. WOOD
                                                         United States District Judge

**A-316**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

WOLFE MARGOLIES,

                 *Petitioner-Appellant,*

   -against-

THE UNITED STATES OF AMERICA,

                 *Respondent-Appellee.*

No. 19-cr-178 (KMW)
No. 22-cv-3489 (KMW)

**NOTICE OF APPEAL**

---

        Notice is hereby given that Wolfe Margolies hereby appeals to the United States Court of Appeals for the Second Circuit from any and all parts of an opinion and order entered in this action on the 17th day of January, 2023 denying his motions pursuant to 28 U.S.C. § 2255.  *See* Dkt. Nos. 50, 51, 54.

 

Benjamin D. White

BLOCH & WHITE LLP
Michael L. Bloch
Benjamin D. White
Cristina Alvarez
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 702-8670
mbloch@blochwhite.com
bwhite@blochwhite.com
calvarez@blochwhite.com

*Attorneys for Wolfe Margolies*