# 23-370

*To Be Argued By*:
ADAM SOWLATI

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 23-370

————◆◆◆————

WOLFE MARGOLIES,

*Petitioner-Appellant,*

—v.—

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR RESPONDENT-APPELLEE

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for Respondent-Appellee.*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

ADAM SOWLATI,
NATHAN REHN,
  *Assistant United States Attorneys,*
    *Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.   The Offense Conduct . . . . . . . . . . . . . . . . . .  2

        1.   Margolies Participates in a Narcotics
              Distribution Scheme that Results in the
              Overdose Death of a Victim. . . . . . . . .  2

        2.   Margolies Possesses Child
              Pornography . . . . . . . . . . . . . . . . . . . . . .  4

    B.   The Plea Agreement and the Guilty Plea . .  5

    C.   The Sentencing . . . . . . . . . . . . . . . . . . . . . . . .  8

    D.   The Section 2255 Motion . . . . . . . . . . . . . . .  9

ARGUMENT:

POINT I—Defense Counsel's Representation
        Did Not Fall Below Objective Standards of
        Reasonableness . . . . . . . . . . . . . . . . . . . . . . . . . .  11

    A.   Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  11

        1.   Standard of Review . . . . . . . . . . . . . . .  11

        2.   Ineffective Assistance of Counsel Claims
              Generally . . . . . . . . . . . . . . . . . . . . . . . .  12

        3.   Ineffective Assistance of Counsel Claims
              in the Plea Context . . . . . . . . . . . . . . .  13

ii

PAGE

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . 16

  1. The Death Resulting Enhancement . . 16

    a. Margolies Did Not Argue in the
       District Court That His Attorney
       Had Failed to Advise Him of the
       *Burrage* Standard . . . . . . . . . . . . 16

    b. The Parties Understood But For
       Causation Under *Burrage* . . . . . . 17

    c. The Evidence Was Ample to
       Support But For Causation Under
       *Burrage* . . . . . . . . . . . . . . . . . . . . 22

    d. Defense Counsel Did Not Improperly
       Fail to Investigate the Applicability
       of the Death Resulting
       Enhancement . . . . . . . . . . . . . . . . 30

    e. Even if Counsel Were Deficient,
       Margolies Was Not Prejudiced . . . 33

  2. Margolies Did Not Receive Ineffective
     Assistance in Connection With
     the Section 2252A(d) Affirmative
     Defense . . . . . . . . . . . . . . . . . . . . . . . . 35

POINT II—The District Court Did Not Err in Denying
  Margolies an Evidentiary Hearing . . . . . . . . . . 39

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . 39

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . 40

iii

PAGE

POINT III—There Is No Basis For Remand to a
Different Judge . . . . . . . . . . . . . . . . . . . . . . . .  42

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  42

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  43

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

## TABLE OF AUTHORITIES

*Cases*:

*Anderson v. United States*,
    981 F.3d 565 (7th Cir. 2020) . . . . . . . . . . . . . 31, 32

*Bennett v. United States*,
    663 F.3d 71 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . 11

*Blackledge v. Allison*,
    431 U.S. 63 (1977). . . . . . . . . . . . . . . . . . . . . . . . . 26

*Bloomer v. United States*,
    162 F.3d 187 (2d Cir. 1998) . . . . . . . . . . . . . . . . . 42

*Burrage v. United States*,
    571 U.S. 204 (2014). . . . . . . . . . . . . . . . . . . . . . 16, 18

*Campusano v. United States*,
    442 F.3d 770 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 42

*Chang v. United States*,
    250 F.3d 79 (2d Cir. 2001) . . . . . . . . . . . . . . . 39, 40

iv

PAGE

*Chhabra v. United States*,
   720 F.3d 395 (2d Cir. 2013) . . . . . . . . . . . . . . . . 15

*Cox v. Donnelly*,
   387 F.3d 193 (2d Cir. 2004) . . . . . . . . . . . . . . . . 42

*Foster v. Warden Fort Dix FCI*,
   No. 22-1011, 2022 WL 3098677 (3d Cir. Aug. 4,
   2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Gaylord v. United States*,
   829 F.3d 500 (7th Cir. 2016) . . . . . . . . . . . . . 32, 33

*Gersten v. Senkowski*,
   426 F.3d 588 (2d Cir.2005) . . . . . . . . . . . . . . . . . 33

*Gonzalez v. United States*,
   722 F.3d 118 (2d Cir. 2013) . . . . . . . . . . . . . . . . 11

*Harrington v. United States*,
   689 F.3d 124 (2d Cir. 2012) . . . . . . . . . . . . . . . . 12

*Hawkins v. United States*,
   No. 16 CR. 691 (GHW), 2021 WL 3501375
   (S.D.N.Y. Apr. 20, 2021) . . . . . . . . . . . . . . . . . . . 26

*Hill v. Lockhart*,
   474 U.S. 52 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Lee v. United States*,
   582 U.S. 357(2017) . . . . . . . . . . . . . . . . . . . . . . . . 15

*Linder v. Lammer*,
   No. 18-2812, 2022 WL 19835739 (7th Cir. June 17,
   2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

v

PAGE

*Osborne v. Tulis*,
  594 F. App'x 39 (2d Cir. 2015) . . . . . . . . . . . . . . 42

*Panuccio v. Kelly*,
  927 F.2d 106 (2d Cir. 1991) . . . . . . . . . . . . . . . . 38

*Parisi v. United States*,
  529 F.3d 134 (2d Cir. 2008) . . . . . . . . . . . . . . . . 12

*Phillip v. United States*,
  804 F. App'x 91 (2d Cir. 2020) . . . . . . . . . . . . . . 41

*Phillips v. United States*,
  No. 22-1742, 2023 WL 5499543 (6th Cir. May 25,
  2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Premo v. Moore*,
  562 U.S. 115 (2011). . . . . . . . . . . . .   13, 14, 24, 32

*Puglisi v. United States*,
  586 F.3d 209 (2d Cir. 2009) . . . . . . . . . . . . . . . . 31

*Rivera v. United States*,
  716 F.3d 685 (2d Cir. 2013) . . . . . . . . . . . . . . . . 11

*Singleton v. Wulff*,
  428 U.S. 106 (1976). . . . . . . . . . . . . . . . . . . . . . . 17

*Sparman v. Edwards*,
  154 F.3d 51 (2d Cir. 1998) . . . . . . . . . . . . . . . . . 41

*Strickland v. Washington*,
  466 U.S. 668 (1984). . . . . . . . . . . . . . . .   12, 13, 31

*Thomas E. Hoar, Inc. v. Sara Lee Corp.*,
  900 F.2d 522 (2d Cir. 1990) . . . . . . . . . . . . . . . . 17

vi

PAGE

*United States v. Accime,*
  No. 21-52, 2021 WL 5286303 (2d Cir. Nov. 15,
  2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Alvarado,*
  816 F.3d 242 (4th Cir. 2016) . . . . . . . . . . . . . 21, 29

*United States v. Arteca,*
  411 F.3d 315 (2d Cir. 2005) . . . . . . . . . . . . . . . . 15

*United States v. Cameron,*
  No. 22-12591, 2023 WL 8842054 (11th Cir. Dec.
  21, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Campo,*
  140 F.3d 415 (2d Cir. 1998) . . . . . . . . . . . . . . . . 44

*United States v. Cathey,*
  997 F.3d 827 (8th Cir. 2021) . . . . . . . . . . . . . 19, 28

*United States v. City of New York,*
  717 F.3d 72 (2d Cir. 2013) . . . . . . . . . . . . . . . . . 42

*United States v. Cordoba-Murgas,*
  233 F.3d 704 (2d Cir. 2000) . . . . . . . . . . . . . . . . 27

*United States v. Davis,*
  970 F.3d 650 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Ewing,*
  749 F. App'x 317 (6th Cir. 2018) . . . . . . . . . . . . 27

*United States v. Ford,*
  750 F.3d 952 (8th Cir. 2014) . . . . . . . . . . . . . . . 27

*United States v. Hernandez,*
  604 F.3d 48 (2d Cir. 2010) . . . . . . . . . . . . . . . . . 44

vii

PAGE

*United States v. Hicks-Bailey*,
   740 F. App'x 751 (2d Cir. 2018) . . . . . . . . . . . . . 18

*United States v. Jeffries*,
   No. 21-4197, 2023 WL 3035354 (6th Cir. Apr. 21,
   2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*United States v. Morgan*,
   406 F.3d 135 (2d Cir. 2005) . . . . . . . . . . . . . . 34, 38

*United States v. Nersesian*,
   824 F.2d 1294 (2d Cir. 1987) . . . . . . . . . . . . . . . . 31

*United States v. Padilla*,
   186 F.3d 136 (2d Cir. 1999) . . . . . . . . . . . . . . . . . 44

*United States v. Patasnik*,
   89 F.3d 63 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . 31

*United States v. Pena*,
   742 F.3d 508 (1st Cir. 2014) . . . . . . . . . . . . . . . . . 27

*United States v. Reap*,
   391 F. App'x 99 (2d Cir. 2010) . . . . . . . . . . . . . . . 34

*United States v. Regalado*,
   518 F.3d 143 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 13

*United States v. Rivernider*,
   828 F.3d 91 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . 22

*United States v. Robin*,
   553 F.2d 8 (2d Cir. 1977) . . . . . . . . . . . . . . . . 43, 44

*United States v. Rosemond*,
   958 F.3d 111 (2d Cir. 2020) . . . . . . . . . . . . . . . . . 13

viii

PAGE

*United States v. Schwartz,*
    535 F.2d 160 (2d Cir. 1976) . . . . . . . . . . . . . . 42, 43

*United States v. Seals,*
    915 F.3d 1203 (8th Cir. 2019) . . . . . . . . . . . . . . . 29

*United States v. Sica,*
    676 F. App'x 81 (2d Cir. 2017) . . . . . . . . . . . 18, 20

*United States v. Tessina,*
    No. 15-CR-130, 2017 WL 6345400 (W.D.N.Y. Dec.
    12, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*United States v. Vargas,*
    961 F.3d 566 (2d Cir. 2020) . . . . . . . . . . . . . . 42, 43

*United States v. Venturella,*
    391 F.3d 120 (2d Cir. 2004) . . . . . . . . . . . . . . . . . 12

*United States v. Wlylie,*
    201 F.3d 433, 1999 WL 1295852 (2d Cir. 1999) . 38

*United States v. Woltmann,*
    610 F.3d 37 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . 44

*United States v. Wyche,*
    No. 18-CR-561(DLI), 2023 WL 6890112 (E.D.N.Y.
    Oct. 19, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*WalMart Stores, Inc. v. Visa U.S.A., Inc.,*
    396 F.3d 96 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . 17

*Statutes:*

18 U.S.C § 2252A(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . 39

18 U.S.C § 2252A(b) . . . . . . . . . . . . . . . . . . . . . . . . . . 39

ix

                                                                    PAGE

18 U.S.C § 2252A(d) . . . . . . . . . . . . . . . . . . . .  9, 35, 38

18 U.S.C. § 2252A(a)(5) . . . . . . . . . . . . . . . . . . . . . 35

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . 38

21 U.S.C § 841(b) . . . . . . . . . . . . . . . . . . . . .  8, 27, 34

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . .  1, 2, 39, 40

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 23-370

———

Wolfe Margolies,

*Petitioner-Appellant,*

—v.—

United States of America,

*Respondent-Appellee.*

———

## BRIEF FOR THE UNITED STATES OF AMERICA

———

### Preliminary Statement

Wolfe Margolies appeals from an order entered on January 17, 2023, in the United States District Court for the Southern District of New York, by the Honorable Kimba M. Wood, United District Court Judge, denying his motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255.

Indictment 19 Cr. 178 (KMW) (the "Indictment") was filed on March 13, 2019, charging Margolies with one count of narcotics conspiracy, in violation of 21 U.S.C. § 846, and one count of possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B), (b)(2), and 2.

2

On June 24, 2019, Margolies pleaded guilty, pursuant to a plea agreement to both counts in the Indictment.

On December 2, 2019, Judge Wood sentenced Margolies to 168 months' imprisonment, five years' supervised release, and a $200 special assessment. On May 14, 2021, this Court dismissed Margolies' appeal as barred by the waiver of appellate rights contained in the Plea Agreement.

On April 27, 2022, Margolies filed a motion seeking relief under 28 U.S.C. § 2255. On January 17, 2023, the District Court denied the motion.

Margolies is serving his sentence.

## Statement of Facts

### A. The Offense Conduct

#### 1. Margolies Participates in a Narcotics Distribution Scheme that Results in the Overdose Death of a Victim

Margolies worked with a co-conspirator, Ekin Erkan, to distribute narcotics. (PSR ¶ 11).[1] Erkan would

---

[1]   "PSR" or "Presentence Report" refers to the Presentence Investigation Report filed by the Probation Office in the Southern District of New York in connection with Margolies' sentencing, which can be found starting at SA. 38; "Br." refers to Margolies' brief on appeal; "A." refers to the appendix filed with Margolies' brief; "SA" refers to the sealed appendix filed

3

send narcotics customers to Margolies, who went by
the nickname "Hope," in exchange for a finder's fee.
Law enforcement originally identified Erkan after
finding his cellphone number in the cellphone of an
overdose victim who was found dead in his apartment
on January 15, 2017. (PSR ¶ 11). Subsequently, an un-
dercover agent ("UC-1") reached out to Erkan to pur-
chase narcotics, and Erkan referred UC-1 to Mar-
golies. (PSR ¶ 13). UC-1 later reached out to Margolies
and, on March 2, 2018, arranged a purchase of five
bundles of heroin in Queens, New York, for $420. (PSR
¶ 15). After that first purchase, on five different occa-
sions, from March 9, 2018, through May 11, 2018, UC-
1 met with Margolies in Queens to purchase heroin.
(PSR ¶ 16).

Margolies' involvement in narcotics distribution
also resulted in the overdose death of a victim (the
"Victim"). On February 2, 2018, the Victim texted Er-
kan that he was "Lookin for 300 of H." (PSR ¶ 17). In
response, Erkan said that he would connect the Victim
with "Hope," who would provide a product that was
"[v]ery high quality. Fent free." (PSR ¶ 17). Erkan
then provided the victim with a number for "Hope"
that was Margolies' cellphone number. (PSR ¶ 17).

Later that same day, the Victim messaged Mar-
golies, requesting three bundles of heroin. (PSR ¶ 18).

--------

with Margolies' brief; and "Dkt." refers to an entry on
the Southern District of New York's docket for this
case. Unless otherwise noted, quotations omit internal
quotation marks, citations, alterations, and footnotes.

4

They agreed to meet that evening at a location in Brooklyn, New York. (PSR ¶ 18). When the Victim tried to move up the meeting time, Margolies indicated that he had to restock his supply of heroin and that he was coming to meet the Victim "soon as I can." (PSR ¶ 18). Margolies later sent a message indicating that he was "walking from train," to which the Victim replied, "Alright." (PSR ¶ 19). This was the last outgoing message sent by the Victim's phone. (PSR ¶ 19). Approximately five minutes later, Margolies texted the Victim, "here." (PSR ¶ 19). The Victim was found dead in his apartment in Brooklyn on the following day, February 3, 2018. (PSR ¶ 22). A New York City medical examiner determined that the cause of death was "Acute Heroin Intoxication." (A. 129).

### 2. Margolies Possesses Child Pornography

On January 13, 2019, Margolies traveled on a commercial flight from Tel Aviv, Israel, to New York. (PSR ¶ 23). At John F. Kennedy International Airport, Department of Homeland Security officers conducted a border search of Margolies and copied the data from his phone. (PSR ¶ 23).

In Margolies' phone, law enforcement found a video (the "Toddler Rape Video") of a toddler being raped, with vaginal penetration, by an unidentified adult male. (PSR ¶ 26). The 31-second video was sent to Margolies on October 25, 2018, by another person. (PSR ¶ 26; SA 23). After receiving the video, Margolies responded, "lolll," or laugh out loud, and "me." (PSR ¶ 27). The Toddler Rape Video remained in Margolies'

5

phone until at least January 13, 2019, when the border search was conducted. (PSR ¶ 27).

In addition, Margolies was part of a group chat forum where participants discussed and exchanged child pornography. (PSR ¶¶ 28-29). Over 35,000 images of child erotica were found on Margolies' phone. (PSR ¶ 30). While law enforcement had not completed its forensic analysis of Margolies' laptop and external hard drive at the time the PSR was prepared, more than 90% of the reviewed material in those devices was sexual in nature. (PSR ¶ 31). This included sexual and pornographic material featuring children. For example, one approximately seven-minute-long video depicted an adult male and female engaging intercourse in a bed; next to the bed was a crib with an infant crying. (PSR ¶ 32). In addition, law enforcement found three "Eurocamp style videos" depicting naked adults and naked children running around. (PSR ¶ 32).

## B.   The Plea Agreement and the Guilty Plea

The parties negotiated a plea agreement (the "Plea Agreement") in which Margolies agreed to plead guilty to both counts in the Indictment. (A. 168). Under the terms of the Plea Agreement, the parties stipulated that the offense level for Count One (the narcotics distribution charge) was 38 because, pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") Section 2D.1.1(a)(2), the Victim's death "resulted from the use of" the heroin distributed by Margolies (the "Death Resulting Enhancement"). (A. 170). The parties additionally stipulated that the offense level for Count Two (the child pornography charge)

was 26. (A. 170). Because the offense level for Count Two was nine or more levels less serious than the offense level for Count One, the parties agreed that Count Two would be disregarded and that the combined offense level was 35 after the credit given for the defendant's acceptance of responsibility. (A. 170). The parties stipulated that the defendant's United States Sentencing Guidelines range was 168 to 210 months' imprisonment. (A. 171). The Plea Agreement acknowledged that the Margolies was pleading guilty because he was in fact guilty, and waived his right to make discovery-related challenges to his plea or conviction. (A. 172).

On June 24, 2019, Margolies appeared before the Honorable Robert W. Lehrburger, United States Magistrate Judge, and pleaded guilty pursuant to the Plea Agreement. (A. 61). As part of a detailed plea colloquy, Margolies confirmed that he had an adequate opportunity to consult with his attorney and was satisfied with his representation. (A. 66). Margolies also affirmed that he had read and reviewed the Plea Agreement with his attorney before signing it and understood its terms and conditions, including the Plea Agreement's calculation of the Guidelines range. (A. 74).

Margolies additionally allocuted to his offense conduct. With respect to Count One, Margolies acknowledged that he had distributed narcotics to customers of Erkan. (A. 77). Margolies also admitted that, on February 2, 2018, he delivered three bundles of heroin to the Victim, and that, "shortly after this delivery, the [Victim] stopped making outgoing calls or sending text

7

messages from his cell phone." (A. 78). Margolies
acknowledged that, the day after the delivery, the Vic-
tim's roommate found the Victim dead, and, "[i]n close
proximity to the [Victim] were two open glassines and
19 unopened glassines." (A. 78). Margolies admitted
that, "according to the death certificated prepared by
the office of the chief medical examiner, on February
3, 2018 at 6:12 p.m., [the Victim] was pronounced dead
of acute heroin intoxication." (A. 78-79). Margolies also
acknowledged he had caused the Victim's death, ex-
plaining that the Victim "died after having ingested
some of the heroin included in [his] delivery." (A. 77-
78).

With respect to Count Two, Margolies admitted
that on October 25, 2018, he received from "an individ-
ual known to [him]" a link to a chat room, where he
downloaded "a video containing child pornography,"
and that he "viewed it and sent a responsive text mes-
sage." (A. 79). Margolies also said that he "subse-
quently" deleted the video from his phone, but
acknowledged that it was recovered from his cellphone
by law enforcement on January 13, 2019, during a bor-
der search. (A. 79).

After Margolies' attorney said that he saw no de-
fense that would prevail at trial, and Judge Lehr-
burger found that Margolies plea was knowing, volun-
tary, and supported by an adequate factual basis and
accepted the plea. (A. 82). On June 27, 2019, Judge
Wood, after reviewing the plea transcript, determined
that Margolies had "entered the guilty plea knowingly
and voluntarily and that there is a factual basis for the
guilty plea," and accepted the plea. (A. 5; Dkt. 32).

8

## C. The Sentencing

On December 2, 2019, the parties appeared before Judge Wood for sentencing. (A. 94). Judge Wood first confirmed that the parties had reviewed the Presentence Report and did not have any additional objections to the facts set forth. (A. 95). Judge Wood then calculated the Guidelines, reaching the same Guidelines calculation as found in the Plea Agreement and the Presentence Report. (A. 119). Prior to sentencing, counsel for Margolies thanked the Government for not charging Margolies with narcotics distribution resulting in death, which would have resulted in a 20-year mandatory minimum under 21 U.S.C § 841(b):

> The government ... could have insisted that my client plead guilty to a substantive count involving the sale of a controlled substance in which death resulted and my client would have been faced with the horrible alternative of either proceeding to trial in this case or pleading guilty to a count carrying a minimum mandatory sentence of 20 years and a potential life sentence in this case. By providing the defendant with the opportunity to plead guilty to a conspiracy, the government permitted me to seek a variance based on the defendant's personal history and circumstances.

(A. 96). After hearing argument from the parties, Judge Wood sentenced Margolies principally to 168 months' imprisonment, stressing that the defendant had dealt drugs with "disregard for those who were

9

ingesting the drugs" and finding that Margolies posed a danger to the community, having shown "pro-offending attitudes about adults having sex with children." (A. 119-20).

On May 14, 2021, this Court dismissed Margolies' appeal as barred by the waiver of appellate rights contained in the Plea Agreement. (Dkt. 49).

## D. The Section 2255 Motion

On April 27, 2022, Margolies filed a *pro se* Section 2225 motion. (A. 132-59). Liberally construed, the motion alleged that Margolies' counsel had provided constitutionally ineffective assistance in three ways: (1) by not informing Margolies that the Government would be required to show that the "heroin *directly* resulted [in the Victim's] death," (2) by failing to investigate the death resulting enhancement by "obtain[ing] a copy of the autopsy, toxicology reports, police reports, and/or witness statements," and (3) by not informing Margolies that he would have had an affirmative defense, under 18 U.S.C § 2252A(d), to his possession of child pornography because he possessed "less than three images of child pornography" and "took reasonable steps to destroy" the images. (A. 152).

On January 17, 2023, Judge Wood denied the motion. (A. 306). In a written opinion, Judge Wood addressed each of Margolies arguments in turn. First, with respect to Count One, Judge Wood noted that in his plea allocution, "Margolies made many statements under oath demonstrating he understood his Plea agreement, the consequences of pleading guilty, and the alternatives to entering a guilty plea." (A. 313).

10

Moreover, "Margolies affirmed that he had read and discussed his Plea Agreement with his attorney and that he 'under[ood] [its] terms and conditions.'" (A. 313). The Court additionally found that there was "extensive evidence in the record establishing Margolies's culpability for the victim's death, including text messages showing that the victim bought heroin from the defendant 18 hours before his death and a medical examiner's report concluding that the victim's death was caused by acute heroin intoxication." (A. 312). Judge Wood additionally noted that "Margolies admitted during his plea allocution that he sold heroin to the victim resulting in the victim's overdose." (A. 312).

With respect to Count Two, Judge Wood found that Margolies would not have been eligible for the Section 2252A(d) affirmative defense because "the Presentence Investigation Report shows that Margolies possessed greater than three images of child pornography" and "[t]here is no evidence that Margolies took reasonable steps to destroy the images or report them to law enforcement personnel." (A. 314). Finally, Judge Wood noted that, even if Margolies could have met the requirements of the Section 2252A(d) affirmative defense, he "was not prejudiced by his counsel's decision not to raise such a defense." (A. 315).

11

**A R G U M E N T**

**POINT I**

**Defense Counsel's Representation Did Not Fall Below Objective Standards of Reasonableness**

Margolies argues that defense counsel's representation fell below an objective standard of reasonableness in two ways. First, Margolies argues that defense counsel failed to advise him that the Death Resulting Enhancement requires *but for* causation and, relatedly, failed to investigate whether Margolies' sale of heroin was the *but for* cause of the Victim's death. Second, Margolies argues that defense counsel failed to advise him of the Section 2252A(d) affirmative defense. Both arguments are meritless.

**A.   Applicable Law**

**1.   Standard of Review**

When reviewing a district court's denial of relief under Section 2255, this Court reviews legal conclusions *de novo* while deferring to the district court's findings of fact unless clearly erroneous. *Rivera v. United States*, 716 F.3d 685, 687 (2d Cir. 2013). Ineffective assistance claims present mixed questions of law and fact, which are reviewed *de novo*. *Bennett v. United States*, 663 F.3d 71, 85 (2d Cir. 2011). This Court may affirm a district court's decision on any ground appearing in the record, including one "different from that adopted by the district court." *Gonzalez v. United States*, 722 F.3d 118, 131 (2d Cir. 2013).

12

### 2. Ineffective Assistance of Counsel Claims Generally

To prevail on a claim of ineffective assistance of counsel, a defendant must both (1) demonstrate that counsel's performance fell below an "objective standard of reasonableness" under "prevailing professional norms"; and (2) "affirmatively prove prejudice" arising from the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687-88, 693-94 (1984). The burden is on a defendant to establish both elements. *Id.* at 687. "This test is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on it." *Parisi v. United States*, 529 F.3d 134, 140-41 (2d Cir. 2008).

In evaluating counsel's performance under the first prong of *Strickland*, "a reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Venturella*, 391 F.3d 120, 135 (2d Cir. 2004). "The determinative question at this step is not whether counsel deviated from best practices or most common custom, but whether his representation amounted to incompetence under prevailing professional norms." *Harrington v. United States*, 689 F.3d 124, 129-30 (2d Cir. 2012). A petitioner claiming ineffective assistance bears a heavy burden. "When analyzing whether an attorney's performance was objectively reasonable, courts must avoid the distorting effects of hindsight and consider the lawyer's perspective at the time the decision was made. If an attorney made a strategic choice after thoughtful consideration, that decision will be virtually unchallengeable."

13

*United States v. Rosemond*, 958 F.3d 111, 121 (2d Cir. 2020).

To demonstrate prejudice under the second prong of the *Strickland* test, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. A defendant cannot establish prejudice by showing merely that counsel's errors had "some conceivable effect" on the result, for "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Strickland*, 466 U.S. at 693. Needless to say, "failure to make a meritless argument does not amount to ineffective assistance." *United States v. Regalado*, 518 F.3d 143, 149 n.3 (2d Cir. 2008) (per curiam).

### 3. Ineffective Assistance of Counsel Claims in the Plea Context

When a defendant claims that counsel was ineffective in connection with a guilty plea, a court evaluating counsel's performance must be careful to "respect the latitude that *Strickland* requires." *Premo v. Moore*, 562 U.S. 115, 125 (2011). This requires avoiding "hindsight perspective," and recognizing that "[p]lea bargains are the result of complex negotiations suffused with uncertainty, and defense attorneys must make careful strategic choices in balancing opportunities and risks." *Id.* at 124-25. Specifically, a defense counsel must consider the substantial potential benefit

14

from "pleading to a lesser charge and obtaining a lesser sentence, as compared with what might be the outcome not only at trial but also from a later plea offer if the case grows stronger and prosecutors find stiffened resolve." *Id.* at 124

To show prejudice in the plea bargaining context, the defendant "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). In particular, in evaluating prejudice in the context of a guilty plea, the Supreme Court has explained that the prejudice inquiry "will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial," that is, an evaluation of whether, absent the error, the defendant would have succeeded had he gone to trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the prejudice inquiry depends largely on whether the affirmative defense likely would have succeeded at trial. *Id.*

15

Some of the other factors considered in determining whether a defendant would have insisted on going to trial rather than plead guilty include:

> (a) whether the defendant pleaded guilty in spite of knowing that the advice on which he claims to have relied might be incorrect, (b) whether pleading guilty gained him a benefit in the form of more lenient sentence, (c) whether the defendant advanced any basis for doubting the strength of the government's case against him, and (d) whether the government would have been free to prosecute the defendant on counts in addition to those on which he pleaded guilty.

*Chhabra v. United States*, 720 F.3d 395, 408 (2d Cir. 2013). As the Supreme Court has explained, "[c]ourts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." *Lee v. United States*, 582 U.S. 357, 369(2017); *see also United States v. Arteca*, 411 F.3d 315, 322 (2d Cir. 2005) (recognizing that "[t]he weight of authority . . . holds that a self-serving and conclusory statement of this kind is insufficient in itself to show prejudice in the context of guilty pleas").

16

## B. Discussion

### 1. The Death Resulting Enhancement

#### a. Margolies Did Not Argue in the District Court That His Attorney Had Failed to Advise Him of the *Burrage* Standard

In his brief on appeal, Margolies characterizes his argument as a claim that his attorney failed to advise him of the but for causation standard set forth by the Supreme Court in *Burrage v. United States*, 571 U.S. 204 (2014), and even suggests that his attorney may not have been aware of the *Burrage* standard. (Br. 31). That argument was never raised in Margolies' Section 2255 motion in the District Court, even under a liberal construction of the motion. Neither Margolies' initial motion, nor his reply brief in support of his motion in the District Court, even cited *Burrage* or mentioned the "but for" causation standard. (A. 132-57, 232-39). Instead, Margolies argued in the District Court that his attorney had failed to advise him that the Government would have to prove that his sale of heroin had "*directly* resulted in an individual's death." (A. 152). That claim, however, contains no assertion of deficient performance. The *Burrage* standard requires a showing of "but for" causation, but does not adopt the ambiguous concept of "directly resulting." *See Burrage*, 571 U.S. at 218-19.

Accordingly, neither the Government in its opposition to Margolies' Section 2255 motion, nor Judge Wood in her opinion denying the motion, addressed whether counsel had advised Margolies of the *Burrage* standard. Instead, Judge Wood construed his

17

argument as an argument about whether he under-
stood the consequences of his guilty plea and the terms
of the Plea Agreement, which included the Guidelines
calculation and the Death Resulting Enhancement.
Judge Wood properly held that the record demon-
strated that Margolies had been properly advised re-
garding these issues. (A. 310, 312-14). Margolies' ap-
pellate arguments about a purported failure to advise
him of the *Burrage* standard, however, are new and
the Court should decline to consider them because he
failed to raise them below. *See, e.g., Singleton v. Wulff*,
428 U.S. 106, 120 (1976) ("[A] federal appellate court
does not consider an issue not passed upon below.").
Indeed, "[t]he law in [the] Circuit is clear that where a
party has shifted his position on appeal and advances
arguments available but not pressed below, . . . waiver
will bar raising the issue on appeal." *WalMart Stores,
Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 124 n.29 (2d Cir.
2005). Courts may deviate from the general rule only
in limited circumstances, such as when deviation is
necessary to remedy obvious injustice. *See, e.g.,
Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522,
527 (2d Cir. 1990).

### b. The Parties Understood But For Causation Under *Burrage*

Even if it had been raised below, Margolies' claim
that defense counsel's performance was constitution-
ally deficient with respect to the Death Resulting En-
hancement is meritless. The record shows that,
throughout the underlying proceedings, defense coun-
sel (and the parties more generally) understood the

18

holding of *Burrage*, repeatedly invoking the correct standard for causation.

In *Burrage*, the Supreme Court held that the "death results" enhancement of the Controlled Substances Act only applies where the defendant's distribution of narcotics was a but-for cause of a victim's death. 571 U.S. at 211. Margolies appears to contend that there can be no but for causation if multiple factors contributed to the Victim's death. But the Supreme Court rejected that very argument in *Burrage*, holding that but for causation can be found "if the predicate act combines with other factors to produce the result, so long as the other factors alone would have not done so—if, so to speak, it was the straw that broke the camel's back." *Id.* To explain this concept, the Supreme Court provided the following illustration: "[I]f poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived." *Id.*

In interpreting *Burrage*, this Court has confirmed that the distributed narcotics need only be "a but-for cause of the death," not the "sole cause." As this Court explained, "*Burrage* distinguished between instances in which the defendant's narcotics trafficking merely played a nonessential contributing role in the death, which does not suffice to establish causation, and instances in which the incremental effect of the drugs was the straw that broke the camel's back, which does suffice." *United States v. Sica*, 676 F. App'x 81, 83-84 (2d Cir. 2017); *see also United States v. Hicks-Bailey*,

19

740 F. App'x 751, 752 (2d Cir. 2018) (finding evidence sufficient to support the Death Resulting Enhancement even though the victim "ingested drugs other than heroin, [where] heroin alone was sufficient to cause death"); *see also United States v. Cathey*, 997 F.3d 827, 834 (8th Cir. 2021) ("The drugs [the defendant] distributed did not need to be the sole cause of injury or death; the drugs needed only to be one link in the chain of events necessary for the injury or death to occur."); *United States v. Wyche*, No. 18-CR-561(DLI), 2023 WL 6890112, at *6-8 (E.D.N.Y. Oct. 19, 2023) (denying defendant's Rule 29 motion where cause of death in the victim's death certificate was listed as "the *combined effects* of cocaine, fentanyl, and alprazolam" where the distributed fentanyl was the "straw that broke the camel's back").

For the first time on appeal, Margolies argues that his defense counsel recited the wrong standard in his sentencing submission. (Br. 32). Not so. Defense counsel simply noted that the Death Resulting Enhancement "applies regardless of the additional contributing causes which may have resulted in the death or serious physical injury of the user," which is exactly in line with *Burrage* and the cases cited above applying *Burrage*. (SA. 19). Similarly, Margolies points to a series of questions asked by defense counsel, including whether the Victim may have "bing[ed] on multiple doses of the lethal drugs," or "combine[d] the drugs with other controlled substances to create a fatal cocktail?" (SA. 20). None of this is inconsistent with *Burrage*. Defense counsel was merely stating the obvious —that there could have been other contributing factors to the Victim's death. But even if there were other

20

contributing factors, the question under *Burrage* is whether the heroin sold by Margolies was the "incremental . . . straw that broke the camel's back." *Sica*, 676 F. App'x at 83-84. At no point did defense counsel ever suggest that he did not understand this fundamental requirement of *Burrage*, let alone that he was unaware of *Burrage*.[2]

Quite to the contrary—the record in the underlying proceedings is replete with references to causation that make it clear that defense counsel *did* understand the causation standard as articulated in *Burrage* and *Sica*. For example, at Margolies' initial bail hearing, defense counsel noted that to bring a death-resulting charge, the Government would have to show that Margolies had "provided the *causal link* to the death of any particular individual." (A. 268 (emphasis added)). And at the subsequent bail hearing before Judge Wood,

_____

[2]   Margolies suggests that defense counsel should have recited *Burrage* or the *but for* standard explicitly in his sentencing submission. (Br. 32). Typically, a sentencing submission is not a brief; it is a submission written after a defendant has pled guilty and admitted to the essential elements of the offense. It would be atypical, indeed, for a defendant to recite the legal standards for the elements of an offense (or a sentencing enhancement) outside of the context of an impending *Fatico* hearing, where there is a dispute whether the elements have been met. At any rate, the sentencing submission, in calculating the Guidelines, acknowledged that the Victim's death "resulted" from Margolies' distribution of heroin. (SA. 3).

21

after the Indictment had been returned, defense counsel noted that the Indictment did not charge the death-resulting offense, in that it did "not contain the language alleging a *causal link* between a drug sale by my client and the death of an individual." (A. 40 (emphasis added)).

Moreover, the Plea Agreement recited the correct legal standard, explaining that the base offense level was 38 because "death or serious bodily injury *resulted* from the use of the substance." (A. 170 (emphasis added)). And Margolies' sentencing submission, in outlining the Guidelines calculation, acknowledged that "death or serious bodily injury *resulted* from the use of the controlled substance." (SA. 3 (emphasis added)). Similarly, at sentencing, defense counsel acknowledged that "the buyer took a fatal overdose which *resulted from* the distribution," but argued for a below-Guidelines sentence on the basis that Margolies had not intended to do anything more than deliver a "personal use quantity." (A. 99) (emphasis added). These repeated references to the "results from" standard demonstrate that counsel understood the requirement to prove but for causation. *See Linder v. Lammer*, No. 18-2812, 2022 WL 19835739, at *2 (7th Cir. June 17, 2022), *cert. denied*, 143 S. Ct. 2481, 216 L. Ed. 2d 443 (2023) ("We have said that in most if not all cases, simply repeating the statute's 'results from' language will adequately alert jurors that but-for or sufficient causation is needed."); *United States v. Alvarado*, 816 F.3d 242, 248 (4th Cir. 2016) (holding that the district court did not err in failing to clarify for the jury meaning of the "death results from" statutory enhancement because "[t]he *Burrage* Court held that 'results from'

22

in § 841(b)(1)(C) invokes the 'ordinary, accepted meaning' of the phrase . . . and the ordinary meaning of 'results from' is but-for causation").

The defendant's own statements, in his plea allocution and at sentencing, indicate that he also understood the requisite causal standard. At his plea, Margolies detailed the sequence of events leading to the overdose and acknowledged that the Victim "died after having ingested some of the heroin included in [Margolies'] delivery." (A. 77-78). And at sentencing, Margolies acknowledged that his "actions *caused* irreparable harm." (A. 118 (emphasis added)). The record demonstrates that Margolies fully understood that the Plea Agreement included an acknowledgement that his offense caused the Victim's death. Judge Wood was entirely within her discretion to conclude that Margolies was properly advised and entered a knowing plea, and not to credit his *post hoc* assertions that he was not informed by defense counsel about the causation requirement. *See, e.g.*, *United States v. Rivernider*, 828 F.3d 91, 105 (2d Cir. 2016) ("[S]worn testimony given during a plea colloquy carries such a strong presumption of accuracy that a district court does not, absent a substantial reason to find otherwise, abuse its discretion in discrediting later self-serving and contradictory testimony as to whether a plea was knowingly and intelligently made.").

### c. The Evidence Was Ample to Support But For Causation Under *Burrage*

Margolies' ineffective-assistance claim rests on his assertions that the evidentiary record was not

23

sufficient to support the application of the Death Re-
sulting Enhancement, arguing "the Government will
only meet its 'but for' burden when armed with robust
scientific and eyewitness evidence carefully and unam-
biguously connecting the defendant's specific drug sale
as a but-for cause of the decedent's death." (Br. 21-22).
Not so. Margolies sets forth an almost impossible to
meet standard which is not the law. In doing so, he ig-
nores the powerful evidence of guilt here. More specif-
ically, Margolies' argument rests on four crucial er-
rors.

First, Margolies ignores the posture of the case: he
pleaded guilty just three months after indictment. In
doing so, he gained the substantial benefit of assuring
that he would not be charged with the statutory death-
resulting offense, which carries a 20-year mandatory
minimum sentence. And in return for that benefit,
among other things, he specifically "waive[d] any and
all right to withdraw his plea or to attack his convic-
tion, either on direct appeal or collaterally, on the
ground that the Government has failed to produce any
discovery material [or] Jencks Act material." (A. 172).
As a result, Margolies did not obtain a full picture of
the strength of the Government's case, much less the
prospect that the Government would have continued
to investigate if the case had gone to trial or a *Fatico*
hearing.

For example, had there been a trial or hearing, the
Government would almost assuredly have introduced
additional expert testimony regarding the cause of the
Victim's death, as well as "testimony from police and
eyewitnesses as to the circumstances of the decedent's

24

drug usage, drug purchasing practices, and death," the
very things that Margolies claims were missing here.
(Br. 21-22). But because the defendant bargained for a
favorable early plea agreement, the Government did
not produce notes from any such witnesses. This was
not the "red flag" that Margolies attempts to claim.
(Br. 29-30). The vast majority of criminal defendants
plead guilty before they receive Jencks Act material,
and as a predictable result, the record regarding their
guilt is less developed than the record that follows a
trial or even a later-in-time plea. Defense counsel, a
seasoned practitioner with decades of experience, as-
suredly knew that in counseling Margolies to plead
guilty. *See Premo*, 562 U.S. at 124 (cautioning that
guilty pleas should not be "too easily set aside based
on facts and circumstances not apparent to a compe-
tent attorney when actions and advice leading to the
plea took place"). All of Margolies' factual arguments
on appeal rest on this fundamental misapprehension
about the posture of his case when he made the deci-
sion to plead guilty.[3]

—————

[3]  Margolies    claims    that    "the    Government
acknowledged that it had no further causation evi-
dence to wield in this case." (Br. 48). That is simply
wrong. In responding to Margolies' Section 2255 mo-
tion in the District Court, the Government argued that
"[t]he defendant's assertion that the Government
could not have proved at a *Fatico* that death resulted
is simply speculative and belied by the Government's
fulsome recitation of its proof in the Presence Report
and the defendant's own admission at the time of the

Second, even setting aside the procedural posture, the record is more than sufficient to support the inference that Margolies' heroin distribution was the but-for cause of the Victim's death. There was clear evidence that Margolies sold heroin to the Victim shortly before his death, a fact that Margolies does not dispute. Moreover, the Victim's messages, in which he urged Margolies to come as soon as possible and even promised an extra tip if Margolies moved the delivery time up, indicate that the Victim did not already have a stash of heroin he could use or access to another ready supplier. (PSR ¶ 18). It is also noteworthy that the Victim stopped using his cellphone immediately after meeting with Margolies and was found dead the following day, strongly indicating that it was the drugs delivered by Margolies that caused the death. In his brief, Margolies makes much of the fact that the Victim was found dead 18 hours after meeting with Margolies. (Br. 36). But regardless of when the Victim's body was found, the Victim's lack of *any* outbound cellular communications after meeting with Margolies strongly suggest that he in fact died shortly after the meeting. In addition, the medical examiner's report concluded that the cause of death was acute heroin

——————

plea." (A. 165). Of course, in responding to a habeas petition, the Government must rely on the record as it exists, and its argument correctly noted that the record was more than ample to reject Margolies' claims. That is in no way a concession that the Government could not have introduced additional evidence if the case had proceeded to trial.

26

intoxication, meaning that the Victim died of the very drugs that Margolies provided him with. (A. 129). The medical examiner did not list any "[o]ther significant conditions contributing to death." (A. 129).[4]

All of this was buttressed by Margolies' plea allocution. During the allocution, Margolies specifically outlined and acknowledged the evidence against him, and said that, "on February 2, 2018, I delivered a controlled substance containing heroin to an individual identified as [the Victim], and that this individual subsequently died having ingested some of the heroin included in that delivery." (A. 191-92). Margolies' acknowledgment that the evidence indicated that he had caused the Victim's death "carr[ies] a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977); *see, e.g.*, *Hawkins v. United States*, No. 16 CR. 691 (GHW), 2021 WL 3501375, at *9 (S.D.N.Y. Apr. 20, 2021) (rejecting defendant's assertion that his counsel had failed to investigate whether he was the *but for* cause of a victim's death where the defendant

--------

[4]    In his brief, Margolies repeatedly references a stray comment at his bail hearing, where the Government stated that "various heroin and I believe fentanyl" had been found in the Victim. (Br. 29-30 (citing A. 261)). Given that the only drug identified in the medical examiner's report was heroin, it appears that the Government simply misspoke in the course of unprepared remarks at an early stage of the case, and this is not the "red flag" that defense counsel attempts to make it into.

27

"admitted that he sold heroin to [the victim], and that [the victim's] death resulted from the drugs [he] sold him").

Third, to the extent that Margolies is arguing that his lawyer should have advised him to attempt to plead without agreeing to a Guidelines range, he ignores two key facts. First, without a plea agreement, he would have had no way of preventing the Government from superseding with the statutory death-resulting charge. Second, at a *Fatico* hearing, the Government could meet its burden of supporting the Death Resulting Enhancement by simply a preponderance of the evidence. *United States v. Cordoba-Murgas*, 233 F.3d 704, 710 (2d Cir. 2000). Just the nontestimonial evidence in the Government's possession would have easily met this burden. Many of the cases cited by the defendant are not only distinguishable on the facts, but also because they were decided in the context of evaluating a trial on the "death results" penalty provision of 21 U.S.C. § 841(b), which required proof beyond a reasonable doubt. *See, e.g.*, *United States v. Ewing*, 749 F. App'x 317, 320 (6th Cir. 2018) (vacating jury verdict where trial evidence showed that defendant sold victim fentanyl-laced heroin but only fentanyl was found in the decedent's system); *United States v. Ford*, 750 F.3d 952, 955 (8th Cir. 2014) (vacating conviction where medical examiner testified at trial that heroin was only a "contributing factor" to death and could not testify as to but for causation).[5]

--------

    [5]  Margolies also cites the First Circuit's opinion in *United States v. Pena*, 742 F.3d 508 (1st Cir. 2014).

Fourth, Margolies misstates the law in an attempt to highlight the burden that the Government would have faced if the case had proceeded. There is no requirement, for example, for a toxicology report. *See Foster v. Warden Fort Dix FCI*, No. 22-1011, 2022 WL 3098677, at *2 (3d Cir. Aug. 4, 2022). Margolies also cites this Court's decision in *United States v. Accime*, No. 21-52, 2021 WL 5286303 (2d Cir. Nov. 15, 2021), but in that case the Court noted that it would have been appropriate for the Government to charge "the penalty enhancement provision of Section 841(b)(1)(C)" if the medical examiner were able "to pinpoint [the drug distributed by the defendant] as the but-for cause of [the victim's] death." 2021 WL 5286303, at *1 n.3. That is exactly what happened here, where the medical examiner's report concluded that heroin was the sole cause of the Victim's death. (A. 129). Indeed, courts have routinely affirmed convictions based on evidence that is similar to, or even less powerful than, the evidence here that Margolies' offense caused the Victim's death. *See, e.g., United States v. Cathey*, 997 F.3d 827, 832 (8th Cir. 2021) (evidence was sufficient to establish *but for* causation where "a medical expert testifies that a victim 'would be alive' were it not for the drugs the defendant sold to

_____

In that case, however, the court did not opine on the sufficiency of the evidence under *Burrage*. Instead, it found that the district court had applied the wrong standard by solely examining whether the drug in question "played a significant causal role." *Id.* at 511 n.3

29

the victim"); *United States v. Alvarado*, 816 F.3d 242, 248 (4th Cir. 2016) (affirming conviction based solely on testimony of medical examiner that heroin caused the death of the victim); *United States v. Davis*, 970 F.3d 650, 658 (6th Cir. 2020 (affirming conviction based on the sequence of events leading to the victim's death, corroborated by "text messages, call records, and cell-site data," and the coroner's testimony that fentanyl caused the death). Courts have also rejected arguments like Margolies' speculation that there could have been another source of heroin for the Victim and his insistence that there were "evidentiary gaps" about who else might have "visited the decedent." (Br. 37); *see, e.g., United States v. Seals*, 915 F.3d 1203, 1206 (8th Cir. 2019) (rejecting argument that the government must disprove another potential cause of an overdose in order to prove the overdose was caused by the defendant's distribution of heroin); *United States v. Jeffries*, No. 21-4197, 2023 WL 3035354, at *4 (6th Cir. Apr. 21, 2023) (rejecting defendant's argument that the Government's case was deficient because the victim was in contact "with multiple other drug dealers who could have distributed the fentanyl," and because the Government "fail[ed] to test all the drugs and drug paraphernalia found in [the victim's] attic to confirm their source").[6]

---

[6]  Margolies also cites *United States v. Tessina*, No. 15-CR-130, 2017 WL 6345400 (W.D.N.Y. Dec. 12, 2017), but the facts of Tessina are inapposite. The district court based its decision on the testimony of the medical examiner, who testified that fentanyl—not the

### d. Defense Counsel Did Not Improperly Fail to Investigate the Applicability of the Death Resulting Enhancement

Margolies argues that, given the number of "red flags," defense counsel should have made more robust efforts to investigate possible defenses. (Br. 23; 29-30). Again, many of these supposed red flags are in the form of supposed absences of expert or witness testimony that the Government would have expected to present at a hearing or trial. As noted, the Government was under no obligation to produce its witness statements or make expert disclosures at this phase of the proceedings; their absence, in other words, was not a "red flag." Margolies' allegations about his counsel's supposed failure to investigate are also entirely speculative, and he cites nothing in the record, aside from his own self-serving habeas motion, that supports, for example, his assertion that his counsel did not try to speak to any witnesses. (Br. 28-29). The District Court

––––––––––

heroin-fentanyl mixture allegedly sold by the defendant—caused the victim's death. *Id.* at \*10. Here, the medical examiner's report said the Victim's cause of death was heroin—precisely the drug that Margolies sold the Victim. Moreover, in *Tessina*, the Government's proof relied primarily on the testimony of a middleman, who said he sold drugs purchased from the defendant to the victim. *Id.* at \*11. That testimony was not corroborated and contradicted by other evidence. *Id.* That plainly is not the case here, where the undisputed evidence showed that Margolies directly sold the Victim heroin shortly before his death.

31

properly rejected these claims. *See Puglisi v. United States*, 586 F.3d 209, 213-14 (2d Cir. 2009) (affirming denial of § 2255 claim without hearing where petitioner failed to introduce any objective evidence in support of his claims).

But even accepting Margolies' unsupported factual allegations, his claim fails. At bottom, where a claim of ineffectiveness is predicated on a failure to investigate, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. 668 at 691. As explained above, the evidence was overwhelming that Margolies did in fact cause the death of the Victim under the standard set forth in *Burrage* and its progeny. In light of that, any failure by defense counsel to investigate further would have been "objectively reasonable." *United States v. Patasnik*, 89 F.3d 63, 68 (2d Cir. 1996); *see also United States v. Nersesian*, 824 F.2d 1294, 1321-22 (2d Cir. 1987) ("Where the evidence against a defendant is overwhelming, even numerous missteps by trial counsel—including "waiver of an opening statement, brief summation, failure to raise objections, . . . failure to file certain motions, and failure to adequately investigate, prepare, and vigorously pursue a defense"—do not amount to ineffective assistance.").

In support of his argument that defense counsel failed to sufficiently investigate the Victim's cause of death, Margolies cites *Anderson v. United States*, 981 F.3d 565, 576 (7th Cir. 2020), which Margolies curiously claims is "on all fours" with his case. (Br. 27). But

32

the nature of the plea agreement here is entirely un-
like in *Anderson*, where the defendant had been
charged with and entered a guilty plea to the statutory
death-resulting count, which carried a 20-year manda-
tory minimum sentence. 981 F.3d at 569-70. Here, by
contrast, Margolies reaped a substantial benefit in
agreeing to plead to a lesser offense which did not
carry a mandatory minimum, and it was reasonable
for his attorney to advise him to take the plea rather
than conducting extensive further investigation, given
that the delay associated with such investigation
would likely also have led the Government to investi-
gate further and increased the likelihood that Mar-
golies could be charged with the more serious crime.
As noted, the record shows that this was a key consid-
eration for defense counsel, and in reaching an early
plea agreement to a lesser offense, he achieved a sub-
stantial benefit for his client. (A. 96); *see Premo*, 562
U.S. at 125 (a defense attorney "often has insights
borne of past dealings with the same prosecutor or
court" that inform the plea bargaining decision). For
the same reason, Margolies' citation to *Gaylord v.
United States*, 829 F.3d 500, 504 (7th Cir. 2016), in
which the defendant pleaded to the statutory death-
resulting offense with the 20-year mandatory mini-
mum sentence, is entirely inapposite.

In addition, the facts of this case are entirely unlike
those in *Anderson* and *Gaylord*. In *Anderson*, there
was evidence that the victim "ingested two heroin
doses the day he died; only one came from [the defend-
ant]," the victim also had Benadryl in his system, and
the postmortem report simply listed the cause of death
as "opiate intoxication." 981 F.3d at 573. Similarly, in

33

*Gaylord*, the defendant sold the victim only oxycodone, but the victim's "cause of death was 'oxycodone *and cocaine* intoxication." 829 F.3d at 507. In contrast, here, the evidence indicated that Margolies was the Victim's only source of heroin. And the link between the drugs distributed by Margolies and the Victim's death was much more direct, because the Victim stopped using his cellphone shortly after receiving the heroin from Margolies. Finally, unlike in *Anderson* and *Gaylord*, the medical examiner's report here was unambiguous that a single source, "Acute Heroin Intoxication," was the cause of death. (A. 129). Faced with this powerful evidence, it was entirely reasonable for Margolies' defense counsel to advise Margolies to take a favorable plea agreement rather than running the risk of a lengthy mandatory minimum sentence.

### e. Even if Counsel Were Deficient, Margolies Was Not Prejudiced

For the reasons above, Margolies' defense counsel did not provide ineffective assistance: defense counsel clearly understood the correct standard of but for causation under *Burrage* and did not improperly fail to investigate potential defenses. But even if the Court were to find defense counsel's assistance deficient, there was no prejudice.

To begin, courts have repeatedly found that, even in the face of "serious errors," *habeas* relief is inappropriate where, as here, there is overwhelming evidence of guilt. *See Gersten v. Senkowski*, 426 F.3d 588, 611 (2d Cir.2005) ("[W]here there is overwhelming

34

evidence of guilt, even serious errors by counsel will not warrant granting a writ of habeas corpus.").

Moreover, Margolies reaped substantial benefits by pleading guilty pursuant to the Plea Agreement. To begin, he "[l]imite[d] his criminal exposure" in a way that "was of considerable value to him." *United States v. Morgan*, 406 F.3d 135, 137 (2d Cir. 2005). He avoided the very real risk that the Government would supersede the Indictment and charge him with the death of the Victim under 21 U.S.C § 841(b), which carries a 20-year mandatory minimum. Defense counsel emphasized that because of the plea agreement, Margolies had forestalled "the horrible alternative of either proceeding to trial in this case or pleading guilty to a count carrying a minimum mandatory sentence of 20 years and a potential life sentence in this case." (A. 96). As a result, the defense counsel was free to argue, as he vigorously did, for a substantial variance from the Guidelines. Ultimately, the defendant received a within-Guidelines sentence of 168 months' imprisonment. But even that sentence was substantially lower than what he would have faced had he been convicted for narcotics distribution resulting in death under 21 U.S.C § 841(b). As this Court has recognized, a defendant is not prejudiced by entering into a plea agreement that allows him to avoid trial and meaningful sentencing enhancements. *See, e.g., United States v. Reap*, 391 F. App'x 99, 102 (2d Cir. 2010) (noting that the defendant benefited from his plea deal because he, *inter alia*, "avoided having to defend against the government's case . . . [and] eliminated any element of risk in proceeding to trial").

### 2. Margolies Did Not Receive Ineffective Assistance in Connection With the Section 2252A(d) Affirmative Defense

Margolies claims that defense counsel's failure to inform him of a defense under Section 2252A(d) constituted constitutionally ineffective assistance of counsel. Margolies is wrong. Even accepting for the sake of argument his unsworn assertion that he was not advised of this defense, the record indicates that Margolies would almost certainly not have been able to meet his burden to make out an affirmative defense under Section 2252A(d). And even if he could, he reaped substantial benefits by agreeing to the Plea Agreement and can hardly claim now to have been prejudiced.

Section 2252A(d) provides an affirmative offense to a charge of possessing child pornography, in violation of 18 U.S.C. § 2252A(a)(5), if the defendant (1) "possessed less than three images of child pornography," and (2) "promptly and in good faith . . . took reasonable steps to destroy each such image." 18 U.S.C. § 2252A(d).

There is sparse case law interpreting Section 2252A(d). But here, Margolies would have difficulty in making out any of the elements of the affirmative defense. First, there is no evidence that he "promptly" destroyed the Toddler Rape Video. Prior to filing his habeas petition, Margolies himself never made any such claim, stating instead at his plea that he "subsequently deleted the video." (A. 262-63). The Government also never made any such representation and there is no evidence in the record to that effect. The

36

record simply shows that Margolies, at some point, deleted the Toddler Rape Video along with other contents of his cellphone, not that he did so promptly. (A. 35) (noting Margolies phone had "much of its history . . . deleted through something like October"); (A. 262-63) (noting that the content of Margolies phone "had been deleted substantially"); SA. 55 (noting that Margolies "reportedly deleted the video"). Importantly, there is also no evidence that the Toddler Rape Video was singled out for deletion by Margolies; instead, he "substantially" deleted the entirety of his phone through October or November 2018. (A. 262).

Moreover, the evidence belies any suggestion by Margolies that he accidentally received the video, or that he deleted it "in good faith." To the contrary, Margolies participated in an online chat forum with other internet users who, through their screen names, trumpeted their interest in child pornography (*e.g.*, with online usernames like "young lovers," "Taboo Pervaddy," and "Cecil B. Demented"). (PSR ¶ 28). Margolies' positive reaction ("lolll") to receiving the Toddler Rape Video suggests he was pleased to receive it, and that he was desensitized to the harm represented by the video. (PSR ¶ 27). Moreover, Margolies assembled an extensive collection of child erotica, which showed children in sexualized contexts or with text that graphically described sexual contact with children. (PSR ¶¶ 30, 32). And Margolies wrote songs with lyrics that reflected an interest in sexual contact with minors, including one that said "[m]aking babies do gay shit for pay B, all my kids pros, just pick one out the van, you could be inside every child's mouth like Toucan Sam." (PSR ¶ 75). The record thus amply

showed that Margolies' possession of the child pornography was not a result of happenstance, but instead, reflected a deliberate interest in the material and association with others with an interest in this material. Thus, any claim that he deleted the Toddler Rape Video in "good faith" would have been highly unlikely to succeed.

Indeed, it is far from clear that Margolies would even have been able to show that he only possessed three or fewer images of child pornography. Because Margolies pleaded relatively early, he did so before his computer had been fully analyzed. (PSR ¶ 31). While the Probation Office could thus only conclude that Margolies possessed large volumes of "child erotica" and "sexual material," there was every reason to believe that some of the material would have proven to contain child pornography had the investigation continued. (PSR ¶¶ 30-31). Notably, the initial analysis showed there were certain videos that could well have constituted child pornography, such as a video of adults having sex in close proximity to an infant and other videos of naked children. (PSR ¶ 32). In pleading guilty with the benefit of an agreement that only required him to admit to possession of the single video, but gave him coverage for all of his "possession of child pornography from in or about October 2018 up to in or about January 2019" (A. 169), Margolies put an end to the Government's investigation, which could have resulted in the discovery of additional images and substantially increased his sentencing exposure.

In light of this record, it can hardly be said that defense counsel failed "to advise [Margolies] of the

38

availability of affirmative defenses that likely would have succeeded." *United States v. Wlylie*, 201 F.3d 433, 1999 WL 1295852, at *2 (2d Cir. 1999). This Court has held that when there is "a high likelihood that [an affirmative] defense would not have succeeded at trial and would have exposed [the defendant] to significant additional punishment while only providing the potential for a reduction in prison time," defense counsel has "no duty to disclose the [affirmative] defense under these circumstances." *Panuccio v. Kelly*, 927 F.2d 106, 109-10 (2d Cir. 1991). That is exactly the situation here.

And even if the defense had been viable, there was no prejudice. To begin, Count Two did not affect Margolies' Guidelines calculation. (A. 170). The substantive allegations of Count Two were, in effect, only relevant to Judge Wood's consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a). But Judge Wood could just as well have taken this conduct into account at sentencing as relevant conduct even if Margolies had succeeded in making out a Section 2252A(d) defense. *Cf. United States v. Cameron*, No. 22-12591, 2023 WL 8842054, at *1 (11th Cir. Dec. 21, 2023) (no prejudice where error in applying offense level enhancement did not ultimately affect defendant's Guidelines calculation).

Moreover, the Plea Agreement *drastically* limited Margolies' criminal liability, providing him a tangible benefit. *See Morgan*, 406 F.3d 135 at 137. As noted above, Margolies entered his plea before the Government had finished analyzing his devices, and it was certainly possible—perhaps likely—that the

39

Government would have found additional child pornography. On top of that, if Margolies had not entered his plea and had instead asserted the affirmative defense, the Government could have filed a superseding indictment charging Margolies with receipt of child pornography, in violation of 18 U.S.C § 2252A(a)(2), which is not eligible for the Section 2252A(d) affirmative defense and carries a five-year mandatory minimum. *See* 18 U.S.C § 2252A(b). Indeed, the evidence showed that Margolies received the Toddler Rape Video through a means of interstate commerce, as he received it while chatting with someone on an online messaging forum that was routinely used by people who traffic in child pornography. (PSR ¶¶ 22-26; A. 35, A. 79). Instead of charging Margolies with receipt of child pornography, the Plea Agreement offered Margolies a windfall—the ability to avoid what assuredly would have been a five-year mandatory minimum sentence.

For all of these reasons, the defendant cannot now say he was prejudiced by a Plea Agreement which he bargained for and substantially benefited from.

## POINT II

### The District Court Did Not Err in Denying Margolies an Evidentiary Hearing

#### A.   Applicable Law

Review of a district court's denial of a hearing on a Section 2255 motion is review for abuse of discretion. *Chang v. United States*, 250 F.3d 79, 82 (2d Cir. 2001).

40

Where a Section 2255 motion cannot be decided from the face of the motion and the record of the case, a prompt hearing is required. 28 U.S.C. § 2255 ("Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of facts and conclusions of law with respect thereto."). The hearing requirement contained within Section 2255, however, "does not imply that a movant must always be allowed to appear in a district court for a full hearing if the record does not conclusively and expressly belie his claim, no matter how vague, conclusory, or palpably incredible his allegations may be." *Chang*, 250 F.3d at 85.

### B. Discussion

Judge Wood did not abuse her discretion in denying Margolies' habeas petition without a hearing. There was simply no need for a hearing. As described above, the record evidence conclusively establishes that defense counsel did not provide ineffective assistance. With respect to the Death Resulting Enhancement, there is no evidence that defense counsel was unaware of the correct standard of but for causation under *Burrage*, even if Margolies had presented that claim to Judge Wood. To the contrary, all of the evidence suggests that the parties were aware of the correct causation standard. Moreover, any failure to investigate was entirely reasonable in light of the powerful evidence that Margolies' drug distribution was the but-for cause of the Victim's death. As for the 2252A(d) affirmative defense, there is no evidence that Margolies

"promptly" deleted the Toddler Rape Video. Moreover, his deletion of the video was almost assuredly not in "good faith."

The only basis in the record that Margolies offers for his argument that a hearing was required are the assertions in his unsworn 2255 petition, where he claimed, for example, that his attorney failed to interview witnesses. (A. 152). That was plainly not enough "to create a factual dispute warranting an evidentiary hearing." *See Phillip v. United States*, 804 F. App'x 91, 93 (2d Cir. 2020) (district court did not err in denying habeas petition without a hearing where defendant asserted in "conclusory fashion that his counsel was ineffective in (1) failing to investigate his case . . . and (2) failing to properly advise him" on a potential defense); *Phillips v. United States*, No. 22-1742, 2023 WL 5499543, at *2 (6th Cir. May 25, 2023) (where the defendant "did not submit any evidence in support of his ineffective-assistance claim" and "his unsworn allegations were contradicted by evidence in the record . . . the district court did not abuse its discretion in declining to conduct an evidentiary hearing).[7]

---

[7] Even if the Court were inclined to find potential merit in Margolies' claims, remand would be necessary to afford prior counsel an opportunity to explain his representation of Margolies. *See Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998) ("We believe that a district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in

42

**POINT III**

**There Is No Basis For Remand to a Different Judge**

**A.   Applicable Law**

"Remanding a case to a different judge is a serious request rarely made and rarely granted." *United States v. Vargas*, 961 F.3d 566, 584 (2d Cir. 2020); *see United States v. City of New York*, 717 F.3d 72, 99 (2d Cir. 2013) (reassignment to a different judge upon remand "is an extreme remedy, rarely imposed."). "Adverse rulings, standing alone, do not establish judicial bias or prejudice, nor create a reasonable question of judicial impartiality." *United States v. Schwartz*, 535 F.2d 160, 165 (2d Cir. 1976); *accord Osborne v. Tulis*, 594 F. App'x 39, 41 (2d Cir. 2015).

Absent proof of personal bias requiring recusal, the principal factors this Court considers in determining whether to remand a case to a different judge are "(1)

––––––––––

the form of live testimony, affidavits, or briefs."); *see also, e.g., Cox v. Donnelly*, 387 F.3d 193, 201 (2d Cir. 2004) (even where ineffective assistance claim appeared meritorious, trial counsel needed to be "afforded an opportunity to explain his deficient performance as required by *Sparman*"); *Bloomer v. United States*, 162 F.3d 187, 194 (2d Cir. 1998) (same). And even if this Court were to determine that the prejudice prong of *Strickland* could be satisfied here, remand would still be required to determine whether the performance prong is satisfied. *See Campusano v. United States*, 442 F.3d 770, 776 (2d Cir. 2006).

43

whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *United States v. Robin*, 553 F.2d 8, 10 (2d Cir. 1977) (per curiam); *accord Vargas*, 961 F.3d at 584.

## B. Discussion

Because Judge Wood correctly denied Margolies's Section 2255 motion, there is no basis to remand the case. But even if the Court did remand the case, there is no basis to reassign the case to a new judge. Margolies has not identified, and the record does not suggest, any reason to believe that Judge Wood—who sentenced Margolies to the bottom of his Guidelines range—harbors a personal bias against him, or would otherwise be or appear to be incapable of fairly resolving any issues on remand. Margolies' request instead appears to be based solely on disagreement with Judge Wood's rulings, which is not grounds for reassignment. *See Schwartz*, 535 F.2d at 165.

Indeed this Court, in the very case cited by Margolies in favor of reassignment, held that "reassignment to another judge may be advisable" in "the *rare* case where a judge has *repeatedly* adhered to an erroneous view after the error is called to his attention."

44

*United States v. Robin*, 553 F.2d 8, 11 (2d Cir. 1977) (emphases added). That has plainly not occurred here.

The circumstances here bear little resemblance to those in which reassignment has been deemed appropriate. *See, e.g., United States v. Woltmann*, 610 F.3d 37, 41-43 (2d Cir. 2010) (district judge refused to consider Section 5K1.1 motion or the Section 3553(a) factors, claiming that he was bound by plea agreement between the parties that was executed before the defendant's cooperation, and had previously refused to consider a similar letter in a previous case); *United States v. Hernandez*, 604 F.3d 48, 56 (2d Cir. 2010) (reassigned for several reasons, including fact that objective observer might question district court's impartiality); *United States v. Padilla*, 186 F.3d 136, 142-43 (2d Cir. 1999) (district judge stated that defense counsel's notion of justice is "something which baffles me totally and completely" and "changes from day to day," and that "God knows when I've looked to [defense counsel] for justice, I've never seen it"); *United States v. Campo*, 140 F.3d 415, 420 (2d Cir. 1998) (district judge repeatedly expressed displeasure with prosecution for not making a sentencing recommendation and then refused to grant a downward departure unless the prosecutor recommended a specific sentence).

Accordingly, even assuming remand were appropriate, reassignment to a different judge is not warranted here.

45

**CONCLUSION**

**The order of the District Court should be affirmed.**

Dated:    New York, New York
           February 12, 2024

                 Respectfully submitted,

                 DAMIAN WILLIAMS,
                 *United States Attorney for the*
                 *Southern District of New York,*
                 *Attorney for the United States*
                     *of America.*

ADAM SOWLATI,
NATHAN REHN,
    *Assistant United States Attorneys,*
          *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 10,750 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: NATHAN REHN,
*Assistant United States Attorney*