# 23-370

## In the
## United States Court of Appeals
## For the Second Circuit

◆

WOLFE MARGOLIES,

*Petitioner-Appellant,*

v.

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PETITIONER-APPELLANT

BLOCH & WHITE LLP
*Attorneys for Petitioner-Appellant*
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 901-3825

20833

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT ........................................................................................................5

I. The Government's Arguments on the Death Results Issue Are Meritless ........5

    a.    The Government's Defense of Counsel's Performance Fails ..........5

        i.  Margolies Did Not Raise Any "New" Arguments on Appeal ..........5

        ii. Whether Margolies or His Counsel Knew There Is *A* Causation
           Requirement Under 21 U.S.C. § 841(b)(1) is Beside the Point .......6

        iii. The Government's Contention That Counsel's Performance Can
           Be Excused Because There Was "Ample"—or Even
           "Overwhelming"—Causation Evidence at the Time of the Plea Is
           Wrong and Fundamentally Misconstrues the Constitutional Role
           and Duties of Defense Counsel ..........................................9

           1. That Margolies Pled Early *Highlights* Rather Than Excuses
               Counsel's Deficient Performance ........................................10

           2. The Causation Evidence Was Far From "Overwhelming,"
               and the Government Falsely Characterizes the Evidence
               That Is in the Record While Ignoring Many of the "Red
               Flags" Margolies Identified ................................................11

           3. The Government Both Misconstrues and Misunderstands the
               Import of the *Burrage* Case Law That it and Margolies Cited
               ...................................................................................15

    b.    The Government's Prejudice Argument on the Death Results Issue
        Fails ..............................................................................19

II. The Government's Arguments as to the Section 2252A(a)(5)(B) Defense
    Have No Merit ..............................................................................20

    a.    The Government Effectively Concedes the District Court's Bases
        for Rejecting Margolies' Claim Were Wrong and its New
        Arguments Are Baseless ......................................................20

b. The Government's Prejudice Arguments on the § 2252A(a)(5)(B) Defense Fail ........................................................................................24

III. The Government Fails to Defend the District Court's Decision Not to Hold a Hearing..........................................................................................26

IV. The Government's Argument Against Reassignment Is Meritless................27

CONCLUSION ........................................................................................30

# TABLE OF AUTHORITIES

## Cases

*Anderson v. United States*, 2024 WL 768964 (7th Cir. Feb. 26, 2024) ..................17

*Anderson v. United States*, 981 F.3d 569 (7th Cir. 2020) ................................ 16, 17

*Burrage v. United States*, 2013 WL 5461835 (U.S., 2013) .....................................7

*Burrage v. United States,* 571 U.S. 204 (2014*)* ............................................. passim

*Green v. United States*, 260 F.3d 78 (2d Cir. 2001) ....................................................5

*Lee v. United States*, 582 U.S. 357 (2017) ...............................................................19

*Linder v. Lammer*, 2022 WL 19835739 (7th Cir. June 17, 2022)............................7

*Sparman v. Edwards*, 154 F.3d 51 (2d Cir. 1998) ....................................................26

*United States v. Alvarado*, 816 F.3d 242 (4th Cir. 2016))............................. 7, 8, 18

*United States v. Cathey*, 997 F.3d 827 (8th Cir. 2021)...........................................18

*United States v. Davis*, 970 F.3d 650 (6th Cir. 2020)..............................................18

*United States v. Hoey*, 2014 WL 2998523 (S.D.N.Y. July 2, 2014) ........................7

*United States v. Jeffries*, 2023 WL 3035354 (6th Cir. 2023)..................................18

*United States v. Lee*, 653 F.3d 170 (2d Cir. 2011) ..................................................20

*United States v. MacKay*, 610 F. App'x 797 (10th Cir. 2015) .................................7

*United States v. Salmon*, 948 F.2d 776 (D.C. Cir. 1991) ........................................25

*United States v. Seals*, 915 F.3d 1203 (8th Cir. 2019) ............................................18

## Statutes

18 U.S.C. § 2252A ........................................................................ 20, 24, 25, 26

21 U.S.C. § 841(b) ..................................................................................... 6, 16

## Other Authorities

U.S.S.G. § 3E1.1(b) ........................................................................................20

## PRELIMINARY STATEMENT

The Government's brief rests on fundamental misunderstandings of the constitutional role and duties of both defense counsel and the Government—while virtually abandoning the District Court's (erroneous) reasons for dismissing Margolies' habeas petition without holding a hearing.

The Government begins by arguing that Margolies was not misadvised as to the Death Results issue because the record shows he and his counsel knew the Government had *a* causation burden. But the relevant question is whether they knew (and appreciated) how that standard would apply in *this* case (*i.e.*, in light of *Burrage*), a question the Government all but ignores. Rather, the Government says in effect that there simply was no causation issue for defense counsel to explore in this case *at all*. But that's not a serious argument. As made clear by all of the case law cited on this appeal—both by Margolies *and* the Government—the extant record available to defense counsel at the time he pushed Margolies to take a plea was nowhere near sufficient for him to abandon the prospect that the Government could not meet its causation burden, especially without conducting any independent investigation.

Indeed, the Government almost concedes the dearth of causation evidence available to defense counsel at the time of the plea. It argues instead that, for all defense counsel knew, the Government may have found (or revealed) *more*

inculpatory causation evidence if the case proceeded without the Plea Agreement. But no competent defense counsel can so easily capitulate to the Government's unsupported say-so that it *might* have—or *might* acquire—more inculpatory evidence. Further, the Government's suggestion that counsel's lackluster performance can be explained away by the fact that he secured an *early* plea simply ignores that defense counsel have a constitutional obligation to conduct a robust investigation *during the plea-bargaining process*. For example, the Government's suggestion that counsel acted properly because the Government may have conceivably found more inculpatory causation evidence *later* is not just wholly speculative, it ignores the equally likely possibility that a diligent investigation by defense counsel may have found *exculpatory* causation evidence. This is especially significant given the large number of causation "Red Flags" already available to defense counsel at the time of plea, most of which the Government either ignores or misunderstands.

At bottom, the Government suggests this appeal begins and ends with the fact that defense counsel was able to secure an early plea that avoided the theoretical possibility of a 20-year mandatory minimum, an outcome counsel appropriately feared as "horrible." But counsel's fear that an outcome might be "horrible" does not excuse his failure to test whether that outcome was *likely*.

As to the child pornography defense, the Government acknowledges that the District Court's two bases for rejecting Margolies' petition were wrong. That is to say, the Government acknowledges it only ever had evidence that Margolies possessed one item of child pornography and that he deleted it. It now claims for the first time that Margolies' deletion of the video was not "prompt" enough or in "good faith." The Government largely admits that it's making that up. It acknowledges no court has concluded (conclusively, or otherwise) what those terms mean in this context. In any event, even the extant record makes clear that the Government is almost certainly wrong, and it only arrives at its conclusion by mischaracterizing the record. Regardless, even if there are conceivable arguments that Margolies' deletion was not "prompt" or in "good faith," the Government does not address the actual question on appeal: how could defense counsel fail to advise Margolies about the defense *at all* when he qualified for its two key threshold requirements?

The Government then has no real defense for the District Court's failure to hold a hearing other than to depend on its arguments as to why the petition has no merit.

Finally, the Government's arguments against reassignment are way off the mark. The Government acknowledges reassignment is warranted where a District Court "repeatedly adhered to an erroneous view after the error is called to his

attention," which is *precisely* what occurred here. The District Court was told at least *eight* times—by all stakeholders—that Margolies was only ever accused of possessing a single video of child pornography. Yet, at sentencing, the Court wrongly stated that Margolies had a "collection of child pornography," an erroneous fact it almost singularly relied upon to sentence Margolies to *fourteen years* (where his co-defendant, who was *more* culpable in all ways other than a child pornography charge, received probation). Then, the District Court not only repeated that error at *habeas* by *again* relying on the erroneous suggestion that Margoles had more than one video of child pornography, it compounded it by falsely claiming Margolies *admitted* to it. The rare remedy of reassignment is warranted here.

**ARGUMENT**

**I.    The Government's Arguments on the Death Results Issue Are Meritless**

**a.  The Government's Defense of Counsel's Performance Fails**

The Government effectively raises three contentions in urging affirmance of the conclusion that Margolies' counsel was not ineffective as to the Death Results issue:  (i) certain of Margolies's arguments are "new" on appeal, Gov. Br. ("GB") 16; (ii) the extant record suggests Margolies and his counsel knew about the causation standard under *Burrage*, *id.* 17; and (iii) there was "ample," or even "overwhelming," causation evidence, *id.* 22.  None have merit.

**i.  Margolies Did Not Raise Any "New" Arguments on Appeal**

The Government argues that Margolies did not argue below that his attorney "failed to advise him of the but for causation standard set forth [in *Burrage*]" or "may not have been aware of the *Burrage* standard." *Id.* 16.  In its view, Margolies only argued that his attorney failed to inform him the Government would have to prove "his sale of heroin had *directly* resulted in an individual's death." *Id.*  The Government also contends Margolies never "even cited *Burrage* or mentioned the 'but for' causation standard." *Id.*  All of that is wrong.  The Government's hair-splitting between "directly resulted" and "but for" is non-sensical on its face, directly inconsistent with arguments it makes elsewhere, *see infra* at note 1, and, regardless, ignores the solicitude appropriately provided *pro se* litigants, *see Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001).  Regardless, Margolies did raise *Burrage* and

the "but for" issue below.  In supplemental motion papers, Margolies discussed both

in detail, A-126, the District Court invited the Government to respond, A-7, which it

did, arguing at length that its causation evidence was "overwhelming," pointing to

the same evidence it points to on appeal, A-243.  The District Court then addressed

those papers in its ruling.  A-306.  The *Burrage* issue was certainly "passed upon

below."  GB 17.

### ii. Whether Margolies or His Counsel Knew There Is *A* Causation Requirement Under 21 U.S.C. § 841(b)(1) is Beside the Point

To argue Margolies and his counsel knew about the causation standard under

Section 841(b)(1), the Government points to indications they knew the statute

imposed *a* causation requirement, and at times used the statute's "results from"

language.  GB 21.  But it has never been Margolies' contention that he was not

informed that there is *a* causation burden under the statute or that the statute says

"results from."  It is that he was not informed—and his counsel seemingly did not

know about—how that standard would operate *in his case*.

The Government simply never shows Margolies or his counsel knew how the

"results from" standard operates pursuant to *Burrage*.  Because it cannot.  Instead,

it in effect argues that the way *Burrage* interpreted "results from" is so obvious that

this Court should infer defense counsel and Margolies knew what *Burrage* required

simply because they knew the standard was "results from."  That is obviously wrong.

*Burrage*'s interpretation of "results from" was a "dramatic change in the law," *United States v. MacKay*, 610 F. App'x 797, 799 (10th Cir. 2015), that was "non-obvious to the reader from the face of the statute," *United States v. Hoey*, 2014 WL 2998523, at *3 (S.D.N.Y. July 2, 2014). Indeed, the Government's current position that *Burrage* simply announced the obvious reading of "results from" is directly inconsistent with its position in *Burrage*.[1] *See* 571 U.S. at 889-90 ("the Government . . . urge[s] an interpretation of 'results from' under which use of a drug distributed by the defendant need not be a but-for cause of death."). Specifically, there, the Government argued that there were *several* conceivable ways to interpret "results from." *See Burrage*, No. 12-515, Br. for the United States, 2013 WL 5461835, at 17-31.

Unsurprisingly, then, neither of the cases the Government cites for its *Burrage*-is-obvious argument support its position. GB 21 (citing *Linder v. Lammer*, 2022 WL 19835739 (7th Cir. June 17, 2022) (unpublished) and *United States v. Alvarado*, 816 F.3d 242 (4th Cir. 2016)). To be sure, in both, the court found no reversible jury-instruction error in providing a jury with the "results from" language without elaboration. But that's because, in those cases, there was *no* evidence casting any ambiguity over what caused the decedent's death. *See Alvarado*, 816

---

[1] It is also inconsistent with another position the Government takes on *this* appeal: that Margolies' "but for" argument is "new" because he only made arguments about "directly resulted" below. *See supra* at 5.

F.3d at 249 ("The *only* evidence presented was that, but for the heroin, death would not have resulted."). And indeed, the Government's own cases make equally clear that where evidence does not unambiguously establish that a decedent died due to a single drug, the failure to demand an elaboration on "results from" can be reversible error. *See id.* at 249 ("[I]n different circumstances where the record might suggest that the decedent ingested heroin but might have died nonetheless from the effects of other substances, a court's refusal to clarify the phrase 'results from' might become a problem.")

At bottom, then, the crux of the Government's argument seems to be that it was so obvious that only one substance was the "but for" cause of the decedent's death here—in other words, that this was a "single toxicity" rather than a "mixed toxicity" case—that defense counsel did not need to be concerned about, invoke, or even know about *Burrage*. But that is a non-serious argument, especially given the drastic consequences associated with the Death Results issue. As addressed further below, *any* competent counsel should have identified the potential that this was a mixed-toxicity case given the available evidence. This is especially so because it was the *Government* that said so when it represented early on in open court that there was "various heroin" and "fentanyl" in the decedent's system, and that such was

reflected in a toxicology report.[2]  Further, there is an even clearer indicator in the record to reject the Government's suggestion that defense counsel had no reason to believe that this may be a mixed-toxicity case:  defense counsel's own words. Defense counsel *himself* stated this may be a mixed-toxicity case when, at sentencing seeking to mitigate Margolies' responsibility, he asked (rhetorically): "Did the deceased combine the drugs with other controlled substances to create a fatal 'cocktail?'"  SA-20.  That ends the Government's suggestion that defense counsel failed to invoke *Burrage* because he thought this was obviously a single-toxicity case.  Rather, the inference is obvious:  defense counsel failed to invoke *Burrage* because he either did not know about or appreciate it.

### iii. The Government's Contention That Counsel's Performance Can Be Excused Because There Was "Ample"—or Even "Overwhelming"—Causation Evidence at the Time of the Plea Is Wrong and Fundamentally Misconstrues the Constitutional Role and Duties of Defense Counsel

The Government raises several arguments as to the contents of the extant record, and how, in its view, there was "ample"—or even "overwhelming"— causation evidence.  Although the Government does not say so expressly, its

---

[2] The Government boldly suggests in a footnote—for the first time and with no evidentiary support—that the prosecutor must have "misspoke" when she represented that there was "various heroin" and "fentanyl" in the decedent's system and that such was reflected in a toxicology report.  GB 26.  The Government's footnoted statement is deeply concerning.  For one, it is striking how casually the Government dismisses on-the-record remarks from a prosecuting attorney making representations about what would be the key piece of evidence relating to a potential mandatory 20-year sentence.  In any event, the Government cannot cast this off into irrelevancy as a "stray" comment, especially on this appeal.  Whether or not the prosecutor "misspoke," the more fundamental point is that *defense counsel* had no reason to think so.  And the statement should have set off alarm bells about the causation issue.  But it apparently did not.  Indeed, defense counsel seems not to even have asked for the toxicology report following that statement.

argument appears to be that, given that evidence, it was reasonable for defense counsel to assume Margolies' culpability on the causation issue—without independently investigating it—to avoid the Death Results Charge. However formulated, each of the Government's arguments about the state of the record at the time of the plea fails.

### 1. That Margolies Pled Early *Highlights* Rather Than Excuses Counsel's Deficient Performance

Without citing any authority, the Government asserts Margolies' ineffective assistance claim should be rejected because he pled relatively early, *i.e.*, "just three months after indictment." GB 23. In the Government's view, because Margolies pled before receiving full discovery or Jencks Act material, "Margolies did not obtain a full picture of the strength of the Government's case." *Id.* But that is almost exactly the point: Margolies' counsel was ineffective precisely because he pushed Margolies into an early plea subjecting him to devastating consequences without an adequate understanding of the case. The Government makes much of counsel's statement that he viewed trial as a "horrible alternative," GB 34, but counsel only seems to have come to that view by putting full faith in the Government's early representations without conducting any independent investigation. In other words, even if the alternative counsel feared was "horrible," he seems to have done almost nothing to ascertain whether that alternative was *likely* under the facts and the law. That is textbook ineffective assistance. The Government nevertheless suggests this

was run-of-the-mill criminal practice, where defense counsel obtained favorable treatment for his client in exchange for pleading early and avoiding everyone the hassle of continued litigation. This is, in reality, a lawless argument that wishes away a core protection of the Sixth Amendment. In essence, the Government argues defense lawyers can generally be excused from knowing the law or investigating facts during the early plea-bargaining stage because, for all defense counsel knows, the Government might conceivably have indisputable proof of guilt secretly hidden in its then-undisclosed files. But that possibility exists in every criminal case. The Government's *ipse dixit* thus runs headlong into the well-established law—discussed at length in Margolies' opening brief and effectively ignored by the Government— that the Constitution mandates robust representation during the plea-bargaining process. Op. Br. ("OP") 18.

> **2. The Causation Evidence Was Far From "Overwhelming," and the Government Falsely Characterizes the Evidence That Is in the Record While Ignoring Many of the "Red Flags" Margolies Identified**

The Government's argument that there was "ample"—and even "overwhelming"—causation evidence is wrong. As discussed in the next section, an even cursory review of case law would have made it clear to defense counsel that the causation issue required diligent and robust attention. In any event, the Government tellingly either overstates or misstates *each* piece of causation evidence

in the record, while ignoring significant countervailing red flags, which Margolies addresses below.

*Decedent's Text Messages and Cell Phone Usage*.  The Government first suggests, citing PSR ¶ 18, that the decedent, through a text message, "urged Margolies to come as soon as possible and even promised an extra tip if Margolies moved the delivery time up."  GB 25.  But that's false.  Paragraph 18 of the PSR simply stated that the decedent "request[ed] to meet earlier than originally planned."  SA-45.  The Government next contends—this time without any citation—that the decedent "stopped using his cellphone immediately after meeting with Margolies."  GB 25.  Relatedly—again with no citation—the Government suggests the decedent had a "lack of *any* outbound cellular communications after meeting with Margolies."  *Id.*  But there is no evidence at all for either contention.  Rather, the record simply suggests the last outgoing text message on the phone decedent used to communicate with Margolies was sent to Margolies.  The record is silent as to decedent's "cellular communications" other than outgoing text messages on that particular phone (*e.g.*, social media communications) and other communications (*e.g.*, in-person visitors, such as a person in his building).

*Certificate of Death*.  The Government repeatedly mischaracterizes the sparse Certificate of Death completed by the medical examiner's office.  For example, the Government contends the "report concluded that the cause of death was acute heroin

intoxication, *meaning that the Victim died of the very drugs that Margolies provided him with*." GB 25-26 (emphasis added). But that's false. The report says nothing, one way or the other, about the *source* of the heroin it claimed killed the decedent. Specifically, the examiner did nothing to compare the substance Margolies allegedly sold the decedent with the substance that supposedly killed him—the Government's suggestion otherwise is simply false. The Government also claims the "report said the Victim's cause of death was heroin—*precisely the drug that Margolies sold the Victim*." *Id.* 30 (emphasis added). But the record is far from clear that the substance Margolies allegedly sold to the decedent was heroin rather than, for example, fentanyl. *See* A-16 (Government accusing Margolies of selling "heroin *and* fentanyl" three weeks later).

**Margolies' Plea Allocution**. Finally, the Government suggests "[all] of this" foregoing evidence was "buttressed by Margolies' plea allocution." GB 26. The Government points to Margolies' statement that "I delivered a controlled substance containing heroin to an individual identified as [the Victim], and that this individual subsequently died having ingested some of the heroin included in that delivery." *Id*. The Government characterizes that as "Margolies' acknowledgement that the evidence indicated that he caused the Victim's death." *Id.* But of course it does not, especially considering *Burrage*. Agreeing that the decedent died *subsequent to* ingestion of the narcotics Margolies allegedly sold him is far different than agreeing

that those narcotics were a but-for cause of his death. In any event, causation is a legal principle, and the Government simply ignores the fact that a plea to a legal conclusion is not "knowing and voluntary" where the defendant was not made aware of how that standard operates. OB 34.

***The "Red Flags" the Government Ignores***. The Government also ignores a significant number of the Red Flags Margolies identified. OB 29-31. Specifically, the Government offers no response to the following: (i) defense counsel was in court when the Government represented that it had a toxicology report (which defense counsel never asked for) that supposedly identified that the decedent had ingested "various heroin" and "fentanyl"; (ii) there were only 21 glassines found in the decedent's apartment even though Margolies supposedly sold him 30; (iii) the medical examiner did not examine the decedent's body and did not perform a toxicology test (nor did anyone), nor were his sparse conclusions subject to questioning; (iv) defense counsel had no evidence from any scientific witnesses concerning the cause of the decedent's death; and (v) defense counsel had no evidence from any lay witnesses concerning the circumstances of the decedent's death, the finding of his body, or his drug purchasing practices.[3]

---

[3] The Government asserts that the lack of witness evidence is irrelevant because it was not yet required to produce witness statements pursuant to the discovery rules. GB 30. That misses the point. The relevant inquiry is what *defense counsel* knew. That the Government had not produced witness statements, and that defense counsel had done no investigation, demonstrates the relevant point: counsel had *no* witness support for the Government's causation theory.

### 3. The Government Both Misconstrues and Misunderstands the Import of the *Burrage* Case Law That it and Margolies Cited

In his opening brief, Margolies identified a large number of cases demonstrating the significant burden *Burrage* imposes on the Government. OB 23-26. The Government offers two principal responses: (i) many of those are irrelevant "because they were decided in the context of evaluating a trial on the 'death results' [issue] . . . which required proof beyond a reasonable doubt;" GB 27, and (ii) other "courts have routinely affirmed convictions based on evidence that is similar to, or even less powerful than, the evidence here that Margolies' offense caused the Victim's death," *id.* 28. Both arguments miss the mark while obscuring the relevant point: any review of *Burrage* case law—*i.e.*, decisions favoring defendants *and* decisions favoring the Government—would have made it clear to defense counsel that there was a serious causation issue to investigate.

To start, the Government's distinction of Margolies' cases—that many were post-verdict—makes little sense. Here, the question is simply whether there were sufficient indicators available to defense counsel to trigger his obligation to investigate the Death Results issue. And that a number of appellate court decisions have *reversed jury verdicts* on full trial records similar to—or even more robust than—the evidence available to defense counsel (at an early of stage of the case, *i.e.*,

15

even before counsel investigated) is a deeply revealing indication that defense counsel should have vigorously pursued the issue in this case.

What's more, the Government fundamentally misconstrues directly on-point case law addressing the precise issues this Court confronts. Most specifically, the Government seriously misunderstands *Anderson v. United States*, 981 F.3d 569 (7th Cir. 2020). The Government seems to argue *Anderson* is inapposite because the petitioner there pled to the Death Results Charge and its 20-year mandatory minimum, whereas here, Margolies' plea got him out from under the 20-year mandatory minimum. GB 31-32. But that distinction is completely irrelevant.

In *Anderson*, the Government charged the petitioner under § 841(b)(1)(A), the Death Results Charge, which for Anderson (unlike Margolies) would have carried a mandatory life sentence given his criminal history (Margolies had no criminal history). To avoid the life sentence, Anderson's lawyer negotiated a Rule 11(c)(1)(C) plea, allowing Anderson to plead guilty to the Death Results Charge but only receive a 20-year sentence. Given the foregoing, the decisions that Anderson and Margolies faced were precisely analogous (albeit different in scope).

- For Anderson, it was (i) plea to the Death Results issue and get a 20-year sentence or (ii) litigate the Death Results issue and risk a mandatory life sentence.

- For Margolies, it was (i) plea to the Death Results issue and be stuck with a guidelines range of 14-17.5 years; or (ii) litigate the Death Results issue and risk a mandatory 20-

year sentence (only, of course, if the Government superseded the indictment).

Anderson, like Margolies, opted to plea to the Death Results issue to avoid risking the mandatory lengthier sentence. And Anderson, like Margolies, subsequently brought a *habeas* petition asserting that his decision to do so was caused by his lawyer's ineffective assistance in failing to investigate or appreciate the causation issue before advising him to plea. In *Anderson*, as here, the district court denied the petition without a hearing (although it at least ordered defense counsel to submit an affidavit). And, in *Anderson*, the Seventh Circuit vacated that decision, concluding that, despite the risk of a mandatory life sentence, a hearing was required to determine if Anderson was prejudiced by his lawyer's ineffectiveness in advising him to take the 20-year deal without sufficiently investigating the causation issue or advising Anderson as to same.[4] That is precisely what Margolies asks this Court to do here.

As to the few cases the Government cites in which appellate courts upheld Death Results convictions, the Government mischaracterizes even those. To be clear, despite the Government's contention, none involved "evidence that is similar

---

[4] On remand, *Anderson* took an odd turn, but what occurred strongly supports Margolies' appeal. The Government turned to a new ground to reject Anderson's petition: that Anderson could not have been prejudiced by the causation issue because there were other bases besides the Death Results issue that would have subjected Anderson to a life sentence. The district court agreed and the Seventh Circuit affirmed. *Anderson v. United States*, -- F.4th --, 2024 WL 768964 (7th Cir. Feb. 26, 2024). The court nevertheless made clear that—had there been no other bases to subject Anderson to a life sentence—"Anderson would have . . . established that he was prejudiced by his plea counsel's ineffectiveness." *Id.* at *1.

to, or even less powerful than, the evidence" that Margolies' defense counsel had when he decided to forego investigating or advising on the causation issue. GB 28. For example, in *United States v. Seals*, 915 F.3d 1203 (8th Cir. 2019), the victim purchased heroin from the defendant, was captured on surveillance footage *immediately* using that heroin, and then collapsed *seven minutes* later. Similarly, in *United States v. Cathey*, 997 F.3d 827 (8th Cir. 2021), the victim himself testified that he had taken the drugs the defendant sold him and overdosed within "seconds." In *United States v. Alvarado*, 816 F.3d 242 (4th Cir. 2016) and *United States v. Davis*, 970 F.3d 650 (6th Cir. 2020), scientific experts testified without ambiguity that the decedents would not have died had they not ingested the drugs the defendants sold them, and they specifically ruled out other substances as causal factors. And in *United States v. Jeffries*, 2023 WL 3035354 (6th Cir. 2023), shortly after the victim's overdose on fentanyl, the defendant was arrested at the victim's home trying to make another sale of fentanyl, which was the same size, shape, consistency, and color of the fentanyl in the victim's possession. (To be clear, the foregoing only highlights certain of the more damning causation evidence in those cases; there was more in each.)

In any event, any review of any of this case law makes the relevant point clear: this case obviously involved a serious causation issue that any competent counsel should have investigated thoroughly and advised their client about.

### b.  The Government's Prejudice Argument on the Death Results Issue Fails

Effectively the Government's sole argument that Margolies was not prejudiced is to again suggest there was "overwhelming evidence of guilt," meaning Margolies "reaped substantial benefits by pleading guilty pursuant to the Plea Agreement."  GB 34.  But that wishes away Margolies' appellate arguments, which he incorporates here.  Regardless, the Government's contentions about the supposed "substantial benefits" Margolies received pursuant to the Plea Agreement ignore fact, law, and basic criminal procedure.  For one, the Government significantly overstates the value Margolies received.  Through the Plea Agreement, Margolies agreed to a sentencing range of 14-17.5 years, which he did to avoid the potential of a mandatory minimum of 20 years.  The Government notes that the Plea Agreement allowed Margolies' counsel to seek a downward variance, *id.*, but such variances are of course rare, especially where, as here, the Government opposes them.[5]  Margolies was thus highly likely to receive a sentence of between 14-17.5 years pursuant to the Plea Agreement.  And, as the Supreme Court has made clear, a defendant obtaining only a marginal benefit of a few years off of a sentence pursuant to a plea agreement may be more likely to take their chances at trial (even where, much unlike here, they have "no realistic defense").  *Lee v. United States*, 582 U.S. 357, 367 (2017).  Further,

---

[5] In 2019, opposed variances occurred in only 17.8% of cases.  https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2019_Quarterly_Report_Final.pdf

as the Government acknowledges, the Plea Agreement precluded Margolies from pushing for a *Fatico* hearing (or pleading to the indictment), which would have at least allowed Margolies to present a causation defense. The Government notes that its burden would be lower at such a hearing, but it ignores the fact that, if Margolies lost, he would have been in the *exact* position he was with the Plea Agreement.[6]

## II. The Government's Arguments as to the Section 2252A(a)(5)(B) Defense Have No Merit

### a. The Government Effectively Concedes the District Court's Bases for Rejecting Margolies' Claim Were Wrong and its New Arguments Are Baseless

As noted, the District Court relied on two supposed facts to conclude Margolies could not have qualified for the § 2252A(a)(5)(B) defense: (i) Margolies had more than three images of child pornography; and (ii) there was no evidence he deleted anything. Margolies pointed out that both assertions were wrong and, notably, the Government does not defend either on appeal. Nevertheless, despite conceding that Margolies qualified for the two central requirements of the defense, the Government strains to defend counsel's decision to not even inform him of the defense. The effort fails.

Despite acknowledging the "sparse case law" on the statutory defense, GB 35, the Government now surmises that Margolies could not establish that his deletion

---

[6] In this situation, Margolies still would have been entitled to a three-point acceptance of responsibility reduction under U.S.S.G. § 3E1.1(b). *See United States v. Lee*, 653 F.3d 170 (2d Cir. 2011).

was "promptly" or in "good faith," as otherwise required by the statute. These new arguments are both wrong and misdirected.

The Government's "promptly" argument fails at every turn. To start, the Government offers no law as to what "promptly" means in this context. Nevertheless, as the Government concedes, the extant record shows that—*at most*— the span between Margolies' receipt of the video and its deletion was somewhere between *immediate* and a few weeks. The Government acknowledges Margolies was sent a (nondescript) link directing to the video on October 25, 2018, GB 4, and that the contents of Margolies' phone were deleted "prior to . . . October or November 2018," *id.* 35-36. And even that assumes the truth of the Government's unsupported assertion that Margolies only deleted the video in a mass deletion with the other contents of his phone. There is other evidence—ignored by the Government—suggesting Margolies deleted the video almost immediately. Specifically, the Probation Department reported Margolies' statement that he deleted it *before* even responding to the sender. SA-55 ("[Mr. Margolies] reportedly deleted the video, and responded to the girl, "LOL . . . Me."). Clearly, Margolies thought he deleted the video "promptly." Given the foregoing, there was simply no basis for defense counsel not to advise Margolies about the defense on the ground that it would have been impossible to meet the "promptly" requirement.

The Government's "good faith" argument similarly fails. As with the "promptly" requirement, the Government offers no law on what "good faith" means here. Nevertheless, the Government seems to argue Margolies could not have shown he deleted the video in good faith because he had a "deliberate interest" in receiving it. GB 37. Even crediting that theory of what "good faith" means, however, the facts do not support it. The Government bases its "deliberate interest" theory entirely on the facts that (i) certain *other* individuals in a group chat that *someone else* added Margolies to had off-color usernames (none of which, in any event, suggest an interest in child pornography);[7] (ii) Margolies possessed lawful child "erotica" (like cartoons); and (iii) Margolies wrote "controversial" music lyrics. GB 36. It is frankly nonsense to suggest those facts suggest Margolies had a "deliberate interest" in receiving child pornography. Surely, if he did, the Government's investigation— which supposedly found over 35,000 images of child erotica—would have turned up more than a *single* item of child pornography. To be sure, it is the Government's (unsupported) suggestion that Margolies deleted that video in a bad faith blanket deletion of other materials on his phone. *Id.* But even if that were true—*i.e.*, if Margolies had a "deliberate interest" in child pornography yet also deleted the video

---

[7] The Government's suggestion that Margolies "was part of [this] group chat," and "participated in [this] online chat forum" is deeply disingenuous. The evidence shows that, on October 25, 2018, Margolies was sent an unsolicited link as a private message on an internet application. The link in no way revealed that it would direct to a group chat (or to child pornography), but when Margolies clicked it, it took him to the separate group chat forum at issue. Margolies thus took no steps of his own to "participate in" or be "part of" this group chat forum.

to hide his tracks—the Government *surely* would have found other child pornography in the deleted cache on Margolies' phone (or elsewhere). In any event, the Government ignores several other facts in making its "deliberate interest" argument. The Government does not and cannot dispute that the video at issue was sent to Margolies unsolicited on an internet application, and that the video played automatically via an internet link that did not itself preview its contents. In other words, Margolies did not search for it, did not ask for it, and did not know what it was when he accessed it (a single time). The Government also again ignores Margolies' statements, which make clear he did not want the video sent to him. Specifically, Margolies told the Probation Department not only that he "watched the video and was 'surprised' because he was not expecting to see such a video when he clicked on the link," but that he was "kind of annoyed that" it was sent to him. SA-55. The Government takes issue with Margolies' response of "LOL," GB 36, but Margolies explained that too: "he 'didn't want to be an asshole about it so [he] didn't say anything,'" SA-55.

The most reasonable inference is thus both clear and consistent with Margolies' statements: Margolies deleted the video because he did not want child pornography. That is certainly "good faith." At bottom, though, the fundamental point remains: given the foregoing, there was simply no basis for defense counsel

not to advise Margolies about the defense on the ground that it would have been impossible for him to meet the "good faith" requirement.

### b. The Government's Prejudice Arguments on the § 2252A(a)(5)(B) Defense Fail

The Government tellingly fails to address most of the prejudice arguments Margolies presented, including that his plea to the child pornography charge made him generally ineligible for the same youthful offender probationary program his co-defendant entered. OB 16. Rather, the Government raises three prejudice arguments, discussed below. The arguments are not just meritless, they each depend on the same improper assumption: that Margolies would *not* qualify for the § 2252A(a)(5)(B) defense. But by assuming that the defense was *not* viable, the Government gets the prejudice inquiry backwards, as it elsewhere seems to understand. *See* GB 38 ("And even if the defense had been viable, there was no prejudice.").

*First*, the Government argues there was no prejudice because the court could have taken Margolies' possession of child pornography into account as a sentencing factor. *Id*. This argument makes little sense. As previewed above, it simply wishes away the central assumption underlying the prejudice inquiry, *i.e.*, that Margolies' § 2252A(a)(5)(B) defense was viable. Section 2252A(a)(5)(B) is no technical or procedural defense; it goes to the heart of culpability, *i.e.*, Margolies would not be culpable because he promptly and in good faith deleted the single item of child

24

pornography that was sent to him unsolicited. Indeed, had the Court taken Margolies' possession of child pornography into account at sentencing in this context, it almost surely would have been an abuse of discretion. *See United States v. Salmon*, 948 F.2d 776, 779 (D.C. Cir. 1991) ("conduct is only relevant [to sentencing] if the defendant is accountable for it," and "an affirmative defense absolves a defendant of responsibility or accountability for particular conduct").

*Second*, the Government argues Margolies was not prejudiced because, had he not pled, "it was certainly possible—perhaps likely—that the Government would have found additional child pornography." GB 38-39. This is a startling argument for the Government (or any government) to make. No judicial system—or defense counsel—can place reliance upon a government's say-so that it believes other crimes are "certainly possible." In any event, the Government's argument again ignores that the prejudice inquiry here assumes the viability of Margolies' § 2252A(a)(5)(B) defense. The Government cannot explain why it is "perhaps likely" that someone whose conduct fits within the affirmative defense would otherwise possess child pornography.

*Finally*, the Government suggests Margolies was not prejudiced because even if he qualified for the affirmative defense as to a *possession* charge, it could have superseded to bring a *receipt* charge, for which there is no analogous defense. GB 39. This argument is egregiously wrong. As with a possession charge, a receipt

charge carries a *knowing* requirement, *see* 18 U.S.C. § 2252A(a)(2), and there is *zero* evidence—none—that Margolies knew when the video was sent to him that it constituted child pornography.

## III. The Government Fails to Defend the District Court's Decision Not to Hold a Hearing

The Government's sole basis to defend Judge Wood's refusal to hold a hearing is to repeat its argument that Margolies' petition has no merit.  GB 40.  Margolies incorporates his arguments here and simply responds to two other points.  *First*, the Government suggests (as elsewhere) that Margolies' statements in his *habeas* petition were "unsworn."  GB 41.  That is false.  Margolies, even acting *pro se*, executed a verification attached to his petition stating:  "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct," A-144, and incorporated his memorandum of law into that petition, A-135.  *Second*, the Government all but admits that the district court was required to hold some kind of hearing by quoting this Court's admonition in *Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998) that "a district court facing the question of constitutional ineffectiveness of counsel should, *except in highly unusual circumstances*, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs."  GB 41 n.7.

## IV.    The Government's Argument Against Reassignment Is Meritless

The Government fails to address Margolies' arguments for reassignment, including that reassignment is more warranted where, as here, the lower court served as finder-of-fact.  Rather, the Government suggests reassignment is only warranted "where a judge has repeatedly adhered to an erroneous view after the error is called to his attention."  GB 43.  That's not true; there are other bases for reassignment that apply here, *see* OB 56, but, in any event, what the Government describes is *precisely* what occurred here.

As Margolies noted, prior to Margolies' petition, Judge Wood came under the incorrect impression that Margolies was a serial consumer (and possessor) of child pornography.  Indeed, she relied heavily upon that supposed fact to impose a 14-year sentence (even though Margolies' co-defendant—who was more culpable in *all* ways other than a child pornography charge—received *no jail time*).  It is unclear how Judge Wood came to that conclusion.  The undisputed fact that Margolies was only ever accused of possessing *one* item of child pornography was repeatedly brought to the court's attention by all parties and at every stage, including:  (i) the February 13, 2019 criminal complaint, A-20; (ii) the March 13, 2019 indictment, A-23; (iii) Margolies' March 19, 2019 bail hearing, A-35; (iv) Margolies' March 20, 2019 bail appeal, A-262 (v) Margolies' June 24, 2019  plea allocution, A-79; (vi) the October 28, 2019 PSR, SA-46; and (vii) *both* parties' sentencing submissions, filed

27

on November 1, 2019, SA-23, and November 11, 2019, A-88, respectively. Despite all of that, however, in sentencing Margolies on December 2, 2019, Judge Wood focused almost exclusively on the child pornography charge and, in particular, the supposed fact that Margolies had a "collection of child pornography." A-225.

Then, in his *pro se* petition, Margolies *yet again* brought to Judge Wood's attention that he was only ever accused of possessing a single item of child pornography. A-152. The Government did not (and could not) dispute that. A-161. Yet, in denying Margolies' petition, Judge Wood *again* stuck to the position that Margolies had more than one item of child pornography, an erroneous fact she heavily relied upon—again. Indeed, this time, she went even *further* and suggested Margolies *admitted* to having more than one item of child pornography:

> [T]he Presentence Investigation Report shows that Margolies possessed greater than three images of child pornography on his phone. . . .
>
> The parties dispute the exact number of pornographic images that were on Margolies' phone. Law enforcement contends that Margolies' phone contained "approximately 35,000 images constituted child erotica." (PSR ¶ 30). Margolies maintains that only some of those images constituted child pornography.

A-314.

As is clear, Judge Wood got the facts egregiously wrong, yet again and in several respects, and in a way that portrayed Margolies as far more culpable than the facts dictated. As noted, her views appear to stem from a wild misreading of the

PSR, which in no way suggested Margolies possessed any child pornography other than a single video. Although the PSR suggested Margolies' phone contained "approximately 35,000 images constituting child *erotica*," SA-46 (emphasis added), Margolies in no way admitted, as Judge Wood concluded, that "some of those images constituted child *pornography*," A-314 (emphasis added).

In other words, despite being told by everyone at *every* stage that Margolies was only accused of possession of a single video of child pornography—and relying on that erroneous fact to impose a harsh sentence (especially relative to his co-defendant)—Judge Wood maintained the position he had more child pornography than that, and that he *admitted* to it, all the way at the final *habeas* stage.

Although reassignment is (and should be) a rare remedy, it is required where a district court repeatedly adheres to a pernicious view of a defendant that is premised on incorrect facts, especially where the erroneous view is repeatedly brought to the judge's attention. It reflects an impermissible perception of bias and, respectfully, warrants reassignment to a new judge.

## CONCLUSION

The Court should reverse the denial of Margolies' habeas petition and remand

for a hearing. This Court should further reassign this case on remand.


Dated:      March 4, 2024
             New York, New York


Respectfully submitted,

_____

Benjamin D. White
BLOCH & WHITE LLP
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 901-3825
bwhite@blochwhite.com

*Attorney for Petitioner-Appellant*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Local Rule 32.1(a)(4)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 7,000 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Second Circuit Local Rule 32.1 and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared using Microsoft 365 in proportionally spaced typeface of 14 points or more.

Respectfully submitted,

Benjamin D. White